**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
John P. Fiske (SBN 249256)
655 West Broadway, Suite 1700
San Diego, California 92101
Telephone: 619-237-3490

**BARON & BUDD, P.C.**
Scott Summy (pending Pro Hac Vice)
(Texas Bar No. 19507500)
Carla Burke (pending Pro Hac Vice)
(Texas Bar No. 24012490)
Celeste Evangelisti (SBN 225232)
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
Telephone: 214-521-3605

**SAN DIEGO UNIFIED PORT DISTRICT**
**OFFICE OF THE GENERAL COUNSEL**
Thomas A. Russell, SBN 108607, Gen. Counsel
Ellen F. Gross, SBN 149127, Asst. Gen. Counsel
John N. Carter, SBN 246886, Dep. Gen. Counsel
3165 Pacific Highway
P.O. Box 120488
San Diego, CA 92112-0488
Telephone: 619-686-6219

JAN I. GOLDSMITH, City Attorney
California State Bar No. 70988
DANIEL F. BAMBERG, Assistant City Attorney
California State Bar No. 60499
PAUL F. PRATHER, Deputy City Attorney
California State Bar No. 252985
**OFFICE OF THE CITY ATTORNEY**
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
Telephone:  (619) 533-5800

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO UNIFIED PORT DISTRICT, a public corporation; and CITY OF SAN DIEGO, a municipal corporation, <br><br> PLAINTIFFS, <br><br> v. | CASE NO. **'15CV0578 JAH NLS** <br><br> **PLAINTIFFS' ORIGINAL COMPLAINT** |

1

MONSANTO COMPANY,
SOLUTIA INC., and
PHARMACIA CORPORATION,

**DEFENDANTS.**

Plaintiffs SAN DIEGO UNIFIED PORT DISTRICT (the "Port District") and CITY OF SAN DIEGO (the "City") hereby allege, upon information and belief, as follows:

## I.   PARTIES

1.   Plaintiff Port District is a public entity created by the San Diego Unified Port District Act (California Harbors & Navigation Code, Appendix 1, § 1 *et seq.*) enacted by the California Legislature in 1962 (the "Port Act").  The Port District is a Trustee, holding and managing tidelands and submerged lands in and around San Diego Bay "for the development, operation, maintenance, control, regulation, and management of the harbor of San Diego … and for the promotion of commerce, navigation, fisheries, and recreation therein."  (Harb. & Nav. Code App. 1, §§2, 4, 5, 5.5.)  The Port District is specifically authorized to use its "powers and authority … to protect and enhance … physical access to the bay … natural resources of the bay, including plant and animal life … [and] quality of water in the bay." *Id*.

2.   Plaintiff City is a California Charter City and municipal corporation, duly organized and existing by virtue of the laws of the state of California.

3.   The City was the trustee of certain, relevant tidelands and submerged lands in and around San Diego Bay (the "Bay") from the early 1900s through 1963, at which time certain, relevant property was transferred to Plaintiff Port District.

4.   Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri.

5.   Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

///

GOMEZ
TRIAL ATTORNEYS

6.     Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack, New Jersey.   Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

7.     The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business.   Old Monsanto began manufacturing Polychlorinated biphenyls ("PCBs") in the 1930s and continued to manufacture commercial PCBs until the late 1970s.

8.     Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations.   The corporation now known as Monsanto operates Old Monsanto's agricultural products business.  Old Monsanto's chemical products business is now operated by Solutia.  Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

9.     Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business.   Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.[1]

10.     Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.[2]

---

[1]   *See* MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October 8, 2013); *see also* Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx (last accessed February 20, 2014).

[2] *See id*.

GOMEZ
TRIAL ATTORNEYS

11.     In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code.  Solutia's reorganization was completed in 2008.  In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.[3]

12.     Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants."

### III.     JURISDICTION AND VENUE

13.     This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists between Plaintiffs and Defendants.   Each Plaintiff is located in California, but no Defendant is a citizen of California.   Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri.   Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri. Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

14.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. section 1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

### IV.     FACTUAL ALLEGATIONS

15.     Plaintiffs bring this suit against Defendants for monetary damages and abatement of the public nuisance caused by PCBs in Bay tidelands, submerged lands, and water.

///

///

---

[3] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed February 20, 2014).

**A.     Monsanto Created, Manufactured, Promoted, and Sold PCBs with the Knowledge that PCBs would Contaminate the Environment and Endanger Human and Ecological Health**

16.     PCB is a man-made molecule comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring).  A "PCB congener" is any single, unique chemical compound in the PCB category.  Over two hundred congeners have been identified.[4]

17.     PCBs were generally manufactured as mixtures of congeners.  From approximately 1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally produced PCBs for commercial use.[5]   The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

18.     Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States including electrical equipment such as transformers, motor start capacitors, and lighting ballasts.  In addition, PCBs were incorporated into a variety of products such as caulks, paints, and sealants.

19.     As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

---

[4] *See* Table of PCB Congeners, available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/congeners.htm (last accessed February 20, 2014).

[5] *See* 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned . . . ."); 121 Cong. Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co. . . . ."). *See also* MONS 058730-058753 at 058733 (identifying other producers as "all ex-USA."), attached as Exhibit A.

20.     PCBs have been known to migrate out of their original source material or enclosure and contaminate nearby surfaces, air, water, soil, and other materials. For example, PCB compounds volatilize out of building materials (such as caulk) into surrounding materials such as masonry, wood, drywall, and soil, thereby causing damage to those surrounding materials. PCBs can also escape from totally-enclosed materials (such as light ballasts) and similarly contaminate and damage surrounding materials.

21.     Humans may be exposed to PCBs through ingestion, inhalation, and dermal contact. Individuals may inhale PCBs that are emitted into the air. They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks. And they may absorb PCBs from physical contact with PCBs or PCB-containing materials.

22.     EPA has determined that Monsanto's PCBs are probable human carcinogens. In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254, and 1260. [6] EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

23.     In addition, EPA concluded that PCBs are associated with serious non-cancer health effects. From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system, the reproductive system, the nervous system, and the endocrine system.

///

///

///

─────────────────────

[6] *See* EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed May 5, 2014).

GOMEZ
TRIAL ATTORNEYS

24.    PCBs are known to be toxic to a number of aquatic species and wildlife including fish, marine mammals, reptiles, amphibians, and birds.  The presence of PCBs can cause changes in community and ecosystem structure and function.[7]

25.    Monsanto was well aware of scientific literature published and information available as early as the 1930s that established that inhalation in industrial settings resulted in toxic systemic effects. [8]

26.    Through the 1940s, 1950s, and 1960s , Monsanto became aware of further health effects of  PCBs which were also causing widespread contamination of the environment, far beyond the areas of its use.[9]

27.    Despite growing evidence of PCBs' infiltration of every level of the global ecology, Monsanto remained steadfast in its production of Aroclors and other PCBs. [10]

28.    Monsanto formed an "Aroclor Ad Hoc Committee."  The Aroclor Ad Hoc Committee held its first meeting on September 5, 1969.  The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a global contaminant."[11]  The meeting minutes acknowledge that PCB has been found in fish, oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife.   Moreover, the committee implicated the normal use of PCB-containing products as the cause of the problem:  "In one application alone (highway

---

[7] *See* EPA, Understanding PCB Risks, available at http://www.epa.gov/housatonic/understandingpcbrisks.html#WildlifeEcologicalRiskAssessment (last accessed March 5, 2015).

[8] *See* Exhibits B-N

[9] *See* Exhibits B-N

[10] *See* Exhibits B-N

[11] *See* Exhibit L

GOMEZ
TRIAL ATTORNEYS

paints), one million lbs/year are used.  Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."[12]

29.    On October 2, 1969, the Aroclor Ad Hoc Committee, reported extensive environmental contamination.  The Committee advised that Monsanto could not protect the environment from Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors:

> "There is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated – e.g. Aroclors 1254 and 1260) as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds. Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent environmental contamination.  There are, however a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series.[13]"

30.    Monsanto's desire to protect Aroclor sales rather than the environment is reflected in the Committee's stated objectives:

> "1. Protect continues sales and profits of Aroclors;
> 2. Permit continued development of new uses
> and sales, and
> 3. Protect the image of the Organic Division and the Corporation
> as members of the business community recognizing their
> responsibilities to prevent and/or con-trol contamination of the global
> ecosystem.[14]"

31.    At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB compounds.  In a 1960 brochure, Monsanto promotes the use of Aroclors in

---

[12] *Id.*

[13] *See* Exhibit M.

[14] *Id.*

GOMEZ
TRIAL ATTORNEYS

transformers and capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire or cable coatings, impregnants for insulation, dielectric sealants, chemical processing vessels, food cookers, potato chip fryers, drying ovens, thermostats, furnaces, and vacuum diffusion pumps.  Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil; insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks; papers; mastics; sealant;, caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers; masonry coatings for swimming pools, stucco homes, and highway paints;  protective and decorative coatings for steel structures, railway tank and gondola cars; wood and metal maritime equipment;  and coatings for chemical plants, boats, and highway marking. [15]

32.    A 1961 brochure explains that Monsanto's Aroclors are being used in "lacquers for women's shoes,"   as "a wax for the flame proofing of Christmas trees," as "floor wax,"  as an adhesive for bookbinding, leather, and shoes,  and as invisible marking ink used to make chenille rugs and spreads. [16]

33.    Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used in a variety of industrial, commercial, household, and consumer goods. Moreover, Monsanto affirmatively encouraged these uses by encouraging salesmen to market products for these and other applications.

34.    A few years later, in 1970, Monsanto tried to distance itself from the variety of applications of Aroclors that it proudly espoused a few years before.  In a press release, the company claimed:  "What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and

---

[15] *See* The Aroclor Compounds (hand dated May 1960), 0509822- 66, attached as Exhibit S.

[16] *See* Plasticizer Patter (February 1961), 0627503-21, attached as Exhibit T.

GOMEZ
TRIAL ATTORNEYS

capacitors.  It is also used in commercial heating and cooling systems.  It is not a 'household' item."[17]

**B.    Monsanto Concealed the Toxic Impacts of PCBs from Governmental Entities**

35.    While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite — that the compounds were not toxic and that the company would <u>not</u> expect to find PCBs in the environment in a widespread manner.[18]

36.    In a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."[19]  Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry."[20]  A similar letter to the Regional Water Quality Control Board states "we would anticipate no problems associated with the environment from refuse dumps."[21]

37.    In May 1969, Monsanto employee Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to

---

[17] *See* Press release (July 16, 1970), MCL000647-50, attached as Exhibit U, at MCL000648.

[18] *See* Exhibits O-R.

[19] *See* Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969), attached as Exhibit O.

[20] *Id.*

[21] *See* Letter from Monsanto to State of California Resources Agency (March 27, 1969), attached as Exhibit P.

relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."[22]

38.    Monsanto delivered the same message to the New Jersey Department of Conservation in July 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic."[23]   The letter then reiterates Monsanto's position regarding environmental contamination:  "We are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."[24]

**C.    Plaintiffs have been, and continue to be, injured by Monsanto's Misconduct**

39.    The Bay is one of the state's most valuable natural resources.

40.    PCBs manufactured by Monsanto (specifically, Aroclor compounds 1254 and 1260) have been found in Bay sediments and water and have been identified in tissues of fish, lobsters, and other marine life in the Bay. PCB contamination in and around the Bay affects all San Diegans and visitors who enjoy the Bay, who reasonably would be disturbed by the presence of a hazardous, banned substance in the sediment, water, and wildlife.

41.    PCBs are identified as a Primary Chemical of Concern ("COC") in California Regional Water Quality Control Board Cleanup and Abatement Order ("CAO") No. R9-2012-0024, dated March 14, 2012, which directed the City and Port

---

[22] *See* Monsanto Memorandum to W.R. Richard (May 26, 1969), attached as Exhibit Q.

[23] *See* Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969), attached as Exhibit R.

[24] *Id.*

GOMEZ
TRIAL ATTORNEYS

PLAINTIFFS' ORIGINAL COMPLAINT

1   District (and others) to, among other things, remediate PCB contaminated sediments

2   within the Bay.

3       42.    The CAO identified discrete areas of the Bay for removal of PCBs.  PCBs,

4   however, are present in other areas of Bay public trust lands and natural resources.

5       43.    Prior to issuing the CAO, the San Diego Water Board estimated human

6   health risks due to the consumption of PCB contaminated fish tissue found in the Bay

7   and employed human fish consumption rates and bioaccumulation factors in the

8   analysis.

9       44.    The San Diego Water Board concluded that human ingestion of seafood

10  caught within the Bay can significantly increase cancer risk, specifically identifying

11  PCBs as a carcinogenic chemical.

12      45.    The San Diego Water Board identified some of the health and cancer risks

13  posed by PCBs in San Diego's Bay, including the following:

"U.S. EPA (2000b) has classified PCBs as 'probably human carcinogens.'
Studies have suggested that PCBs may play a role in inducing breast cancer.
Studies have also linked PCBs to increased risk for several other cancers
including liver, biliary tract, gall bladder, gastrointestinal tract, pancreas,
melanoma, and non-Hodgkin's lymphoma. PCBs may also cause non-
carcinogenic effects, including reproductive effects and developmental
effects (primarily to the nervous system). PCBs tend to accumulate in the
human body in the liver, adipose tissue (fat), skin, and breast milk. PCBs
have also been found in human plasma, follicular fluid, and sperm fluid.
Fetuses may be exposed to PCBs in utero, and babies may be exposed to
PCBs during breastfeeding.  According to U.S. EPA (2000b), '[s]ome
human studies have also suggested that PCB exposure may cause adverse
effects in children and developing fetuses while other studies have not
shown effects.  Reported effects include lower IQ scores, low birth weight,
and lower behavior assessment scores."

25      46.    PCBs were not only a substantial factor in causing the City and Port

26  District to incur damages, but a primary driving force behind the need to clean up and

27  abate Bay sediments.  In addition, fish consumption warnings are posted at locations in

and around Bay tidelands warning the public that fish within the Bay may contain contaminants and directing consumption limitations.

## FIRST CAUSE OF ACTION

### PUBLIC NUISANCE

47.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

48.    Monsanto manufactured, distributed, marketed, and promoted PCBs in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the free use of the Bay.

49.    The presence of PCBs interferes with the comfortable enjoyment of the Bay for customary uses for fishing, swimming, and other water activities.

50.    The presence of PCBs interferes with the free use of the Bay for the promotion of commerce, navigation, and fisheries.

51.    The presence of PCBs interferes with the free use of the Bay for ecological preservation and habitat restoration.

52.    The State Water Resources Control Board advised that the presence of PCBs presents an increased health risk to humans who consume fish and shellfish from the Bay due to bioaccumulation of pollutants from the Shipyard Sediment Site.  The Board also noted that there is a community of affected persons, including a considerable number of persons from minority populations, who consume fish and shellfish with a greater potential for adverse health effects.  The Board also found that the site poses an increased cancer and non-cancer risk to both recreational and subsistence fishermen and to their family members who may consume fish and shellfish caught in the Bay.

53.    The presence of PCBs causes inconvenience and annoyance to the City and Port District, who are charged with preserving the natural resources of the Bay, including plant and animal life, and the quality of water in the Bay.

///

///

GOMEZ
TRIAL ATTORNEYS

54.     The condition affects a substantial number of people who use the Bay for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe resources and environment.

55.     An ordinary person would be reasonably annoyed or disturbed by the presence of PCBs that endanger the health of fish, animals, and humans and degrade water quality and destroy marine habitats.

56.     The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human health and the environment.

57.     The City and Port District suffered harm that was different from the type of harm suffered by the general public and have incurred substantial costs deriving from the CAO.

58.     Neither the City nor the Port District consented to the conduct that resulted in the contamination of the Bay.

59.     Monsanto's conduct was a substantial factor in causing the harm to the City and Port District.

60.     The State Water Resources Control Board found that the contamination at the Shipyard Sediment Site meets all three criteria for a "nuisance" as defined by California Water Code section 13050 (m) because it:  (1) is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property;  (2) affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal;  and  (3) occurs during, or as a result of, the treatment or disposal of wastes.

61.     Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was cause the type of contamination now found in the Bay.  Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish species, and would endanger birds and animals.

GOMEZ
TRIAL ATTORNEYS

In addition, Monsanto knew that PCBs are associated with serious illnesses and cancers in humans and that humans may be exposed to PCBs through ingestion and dermal contact.  As a result, it was foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters or by eating fish from those waters. Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any coastal marine areas.

62.    As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

## SECOND CAUSE OF ACTION

## EQUITABLE INDEMNITY

63.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

64.    Monsanto is responsible for creating a public nuisance by manufacturing, distributing, and promoting PCBs, resulting in contamination in and around the Bay.

65.    Monsanto's creation of a public nuisance contributed as a substantial factor in causing Plaintiffs' injury.

66.    Monsanto must reimburse the City and Port Districts for their injuries.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1.    Any and all compensatory damages according to proof including, but not limited to, all costs and expenses deriving from the presence of PCBs in and around the Bay;

2.    A judicial determination that each Defendant is liable for any and all future costs related to the investigation, remediation, and removal of PCBs from in and around the Bay;

GOMEZ
TRIAL ATTORNEYS

15

1     3.     Damages sufficient to compensate Plaintiffs for the injury to and

2    loss of use of natural resources deriving from the presence of PCBs in and

3    around the Bay, including the cost of restoring those natural resources;

4     4.     Punitive damages;

5     5.     Litigation costs and attorney's fees as provided by law;

6     6.     Pre-judgment and post-judgment interest;

7     7.     Any other and further relief as the Court deems just, proper, and

8    equitable.

## DEMAND FOR JURY TRIAL

     Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: March 13, 2015         Respectfully submitted,

                 By: s/ John P. Fiske

                 **GOMEZ TRIAL ATTORNEYS**
                 John H. Gomez (SBN 171485)
                 John P. Fiske (SBN 249256)
                 655 West Broadway, Suite 1700
                 San Diego, California 92101

                 **BARON & BUDD, P.C.**
                 Scott Summy (pending Pro Hac Vice)
                 Carla Burke (pending Pro Hac Vice)
                 Celeste Evangelisti (SBN 225232)
                 3102 Oak Lawn Avenue, Suite 1100
                 Dallas, Texas 75219-4281

                 By: s/John N. Carter
                 **SAN DIEGO UNIFIED PORT DISTRICT**
                 **OFFICE OF THE GENERAL COUNSEL**
                 Thomas A. Russell
                 Ellen F. Gross
                 John N. Carter
                 3165 Pacific Highway
                 P.O. Box 120488

San Diego, CA 92112-0488


By: s/ Paul F. Prather

**OFFICE OF THE CITY ATTORNEY**
JAN I. GOLDSMITH, City Attorney
DANIEL F. BAMBERG, Assistant City Attorney
PAUL F. PRATHER, Deputy City Attorney
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
Telephone:  (619) 533-5800
Facsimile:   (619) 533-5856