# EXHIBIT M

# CONFIDENTIAL

Date: October 2, 1969

Subject: <u>REPORT OF AROCLOR "AD HOC" COMMITTEE</u>

To: Howard S. Bergen, Jr.
    James E. Springate

From: M. N. Farrar
      P. B. Hodges, Secretary
      E. V. John
      W. R. Richard
      E. P. Wheeler, Chairman

DSW 014612

# CONTENTS

1. Objectives *Summary of the Problem* — Page 1
2. Probability of Success — Page 2
3. Recommendations — Page 3-4
4. Basis for Recommendations — Page 5-11
5. General Background — Page

OSW 014613

## OBJECTIVES

*on August 25,*

At a meeting of business group directors of Function Fluids and Plasticizers with Organic Division and Corporate Staff members, an "ad hoc" committee was appointed to prepare a resume of the situation concerning the environmental contamination through the manufacture and use of polychlorinated biphenyls (Aroclors).

The objective of the committee was to ~~prepare~~ recommended actions that will:

1. Protect continued sales and profits of Aroclors;

2. Permit continued development of new uses and sales, and

3. Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem.

OSM 014614

## PROBABILITY OF SUCCESS

The committee believes there is little probability ~~(of any)~~ that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated--e.g. Aroclors 1254 and 1260) as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.

Secondly, the committee believes that there is no ~~possi-~~ *practical* ~~ble~~ course of action that can so effectively police the uses of these products as to prevent^(in order) environmental con- tamination. *completely some*

There are, however, a number of ~~possible~~ actions which must be undertaken/to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series. *(Less than 5 chlorines)*

The ultimate that can be expected is the continued use of the lower chlorinated biphenyls and the chlorinated terphenyls in applications amenable to such control that there is practically zero losses to the environment. In the interim we would hope to establish by appropriate research efforts "tolerance" or safe levels for particular Aroclors in the environment.

— The identification is ~~posi~~ positive

- Toxicity towards certain species is high.

— Persistance is high. —

— Likelyhood of natural origin or degradation is remote. —

DSW 014615

-3-

## RECOMMENDATIONS

OK 1. In view of legal and moral considerations, notify all Aroclor 1254 and 1260 customers of environmental contamination problem. + advising customers. —

3. ~~2.~~ Consult with appropriate federal agencies' headquarters in Washington to determine current status of concern and to inform appropriate individuals therein of Monsanto's research and control efforts.

4. ~~3.~~ Personally contact all governmental and university laboratories which have requested Aroclor samples and indicated interest in the environmental contamination problem.

For 1254 & 1260.

2. ~~4.~~ Reduce losses of Aroclors in liquid wastes from Monsanto plants to ~~absolute~~ minimum. Goal—0 to 5 ppb ~~10 parts per million.~~

5. Determine extent of atmospheric losses from Aroclors from Anniston and WGK Plants and develop plans for control.

6. Analyze in Organic Division laboratories (or by contract) selected appropriate samples from:

   a. Environment of Anniston and WGK Plants.

   b. Monsanto products where contamination is possible.

   c. Agencies and/or laboratories attempting to pinpoint specific sources of contamination.

   d. Customer plants' environments.

   e. Research efforts involved in biological studies--i.e. animal, bird and fish toxicity studies and biodegradation studies.

7. Expand analytical capabilities in conjunction with items 5. and 6. above.

OSM 014616

-4-

RECOMMENDATIONS (Continued)

8. Assign one individual from the division full-time for three to six months to coordinate division and Corporate Staff department efforts.

9. Establish special budgetary account to allow implementation of these recommendations and the continuation of the toxicological research effort now underway and continuing until June, 1971.

DSM 014617

## BASIS FOR RECOMMENDATIONS

1. Notification of All Customers

On ~~September~~ 24, 1969 the San Francisco Chronicle published a "scare" story following an interview with Dr. Robert Risebrough of the University of California. The latter had recently published in Nature the finding of polychlorinated biphenyls in fish, birds and eggs in the California coastal areas.

*Feb.*

On March 3, 1969, the Functional Fluids group sent a letter to the 31 major Aroclor customers in the transformer and capacitor applications. The letter included a copy of the Chronicle story and a Monsanto statement concerning the situation. This was intended to announce to these customers that the polychlorinated biphenyls might be in trouble and implied that the customers should make every effort to prevent loss of these materials to the environment. There has been subsequently some follow-up with at least General Electric and Westinghouse.

It has been recognized from the beginning that other functional fluid uses could lead to losses of the Aroclors to liquid waste streams from the customers' plants. Losses could occur from spills, unusual leakage of large volumes and daily losses of smaller volumes.

It has also been recognized that there could be vapor losses but it has been felt that these were perhaps of less significance than the vapor losses in plasticizer applications. The concern for vapor losses rises from the published proposed theory that even minute quantities of vapors are eventually transferred to the water environment and accumulated therein.

Another possible source of air environmental contamination is the eventual destruction of materials which have Aroclors in them. Of particular significance might be the burning or partial incineration of waste or used products containing the Aroclors.

-6-

## BASIS FOR RECOMMENDATIONS (Continued)

As the alarm concerning the contamination of the environment grows it is almost certain that a number of our customers or their products will be incriminated. The company could be considered derelict, morally if not legally, if it fails to notify <u>all</u> customers of the potential implication.

A case in point is the recent determination (mid-~~August~~ Sept.) that milk to be marketed by the Maryland Cooperative Milk Producers, Inc. in Baltimore was contaminated with polychlorinated biphenyls. The source of the PCB's was isolated to six dairy herds in Martinsburg, West Virginia. Investigation by the Producers Association is continuing but to our knowledge the specific source of the PCB has not been pin-pointed.

When the Aroclors were indited as causing poisoning in cattle in the mid-1950's, chlorinated naphthalenes were eventually identified as the causative agent. The naphthalenes were used in greases or lubricants for cattle feed machinery and had contaminated the animal food. (Members of the Medical Department have been told that the Texas company "bought" 6,000 head of cattle around the country as a result of this incident. It is not known whether or not the suppliers of the naphthalenes to Texaco were brought into the settlement.) Are our customers selling grease or lubricants containing Aroclors that are now responsible for the milk contamination?

In the plasticizer use area, the Aroclors may be used in rubber based paints or surface coatings. The uses for these surface coatings include the interior walls of potable water supply storage tanks in some communities. In Europe we have been told that similar paints are widely used for swimming pools. In spite of the low degree of solubility of the PCB's in water, there are sentiments among the European scientists (and our PCB competitive manufacturers) that such uses may be sources of pollution.

Other customer applications or uses which could be suspect include <u>highway marking paints</u>, ~~and~~ any of the oil and/or grease lubricant applications, caulking compounds + sealants,

DSW 014619

## BASIS FOR RECOMMENDATIONS (Continued)

2. ### Consultation with Federal Agencies

In August of 1968 when the current effort related to this problem got underway, the scientists at the U. S. Department of Interior, Fish and Wildlife Laboratories at Paturent, Maryland were visited. In the six to twelve months that the laboratory had been looking for PCB residues, they had identified such compounds in dead eagles as well as marine birds. At that time they did not report positive findings in fish, shell fish or other marine organisms. We know that their efforts have been continuing at an accelerated rate but the laboratory has not been revisited to learn of current developments.

The U. S. Food and Drug Administration in Washington called Dr. Kelly in June to report that the State of Georgia had found PCB's in milk (we had in April supplied samples of our Aroclors to the Georgia State Department of Agriculture Laboratories in Atlanta).

The analyses of milk from the Maryland co-op mentioned in 1. above were performed by an FDA laboratory.

On Friday, September 26, we were asked to send samples to the Atlanta Toxicological Branch of the FDA and to the Residue Chemical Branch Division of Pesticides, FDA in Washington. The stated reason for the request was for these laboratories to determine the "acute toxicity" of Aroclors 1254 and 1260.

In the past year we have had request for samples from five or six of the regional laboratories of the Federal Water Pollution Control Administration-- an agency within the U. S. Department of Interior. We have not had an opportunity to follow-up with these laboratories as to their interest or concern.

In August a laboratory of the Bureau of Commercial Fisheries, Department of Interior, at Pensacola, Florida, reported finding PCB's in the river below our Pensacola Plant. Subsequently, they reported that 5 parts per billion of Aroclor 1254 killed baby shrimp in 18 days. There has been no follow-up by St. Louis based personnel since our Pensacola Plant discontinued the use of Pydraul AC.

DSW 014620

-8-

## BASIS FOR RECOMMENDATIONS (Continued)

Appropriate individuals in the parent federal agencies should be visited to determine their current activities and concern and, secondly to make these agencies aware of Monsanto's interest, research and control efforts.

3. Contact with other Governmental and University Laboratories

    In addition to the above, Monsanto has provided samples of the Aroclors to 30 or 40 other governmental and university laboratories or scientists. It would be prudent and appropriate for someone from Monsanto to personally follow-up the supplying of the samples and determine the status of the efforts of these groups. For example, the State Department of Agriculture Laboratory in Hartford, Connecticut reported in July that they had found PCB in fish off the coast of Connecticut. This led to two articles in the Hartford Times and a five minute radio program through a syndicated outlet of 108 radio stations.

4. Losses from Monsanto Plants

    Efforts to reduce the losses of Aroclors in liquid wastes from the Anniston and WGK Plants are completed or underway. It is impossible to establish a limit as to what can be discharged "safely". Investigation has shown that the waters in receiving streams below the Anniston Plant contain significant (parts per million) concentrations of PCB. More ominous perhaps is the fact that sediment in the bottom of these streams miles below our plants may contain up to 2% Aroclor.

    To prepare for the eventual publication in the press of the discharge of PCB's in Alabama and to the Mississippi River, a significant effort must be made to determine the present levels of contamination and more importantly, determine the levels of contamination as "clean up" procedures begin to show an effect.

    The incident at the Monsanto Plant at Pensacola indicates that all Monsanto Plants using Aroclors should be made aware of the potential problem and efforts made to eliminate any losses. The significance of "any losses" may be related to the one to three gallons per day which was being lost at the Pensacola Plant.

DSW 014621

## BASIS FOR RECOMMENDATIONS (Continued)

Hopefully research efforts will indicate that a "safe level" of losses would be higher in fresh water streams not adjacent to coastal estuaries. At the present time we know of no claims that the PCB's are "destroying" fish.

5. ### Atmospheric Losses at Anniston and WGK

   The determination of atmospheric losses for our Aroclor manufacturing plants will be more tedious and time consuming than in the case of liquid wastes. We will never be prepared to discuss intelligently potential problems of our customers where there may be atmospheric losses until we have some data on our own plants. This is particularly true if we ever expect to recommend to our customers measures for control of atmospheric losses.

6. ### Analytical Capabilities (a. through e. inclusive)

   In each of the recommendations 2. through 5. above, there is the implication that Monsanto's best interest could be served by appropriate sampling and analysis. In connection with any of the governmental and other laboratories, we must accept their reported analytical results or in specific instances offer to run duplicate analyses to confirm for ourselves the validity of the reported results.

   The committee agrees that to perform analyses that would confirm all of the reported findings represents an unreasonable cost in terms of personnel and facilities. At the same time there appears to be no alternative to the acceptance in the last three months that confirmation analysis in selected cases should be done. This has led to an accumulation of a backlog of samples which need attention. Delays in analysis are occurring because of shifting priorities for samples as they are received or as they have been retained.

   A case in point is the delay in analyzing thirteen samples from the Inorganic Division. Samples were submitted following the finding that five of five commercially available electric dishwashing compounds analyzed showed the presence of PCB's. The Inorganic Division can not exonerate the products it sells to the detergent manufacturers until it has some data showing whether or not Monsanto supplied materials are contaminated. In the meantime Inorganic Division Quality Control has

OSW 014622

-10-

## BASIS FOR RECOMMENDATIONS (Continued)

suggested to its Division Engineering that future designs for making detergent components _insure_ that the use of Aroclors will not permit contamination. Secondly, it is obvious that the Division cannot approach its detergent manufacturing customers about their potential problem until the above data indicate that "our own skirts are clean".

This week it was agreed that milk and water samples from the Maryland co-op in Baltimore should take precedence over other samples which had been scheduled.

In summary, the committee believes there will be a growing number of samples from the following:

   a. Environment of Anniston and WGK Plants.
   b. Monsanto products where contamination is possible.
   c. Agencies and/or laboratories attempting to pin-point specific sources of contamination.
   d. Customer plants' environment.
   e. Research efforts involved in biological studies--i.e. animal, bird and fish toxicity studies and biodegradation studies.

7. Expansion of Analytical Capabilities

   The recommendation to expand the analytical capabilities is a necessity in view of the preceding recommendations.

8. Assignment of Full-Time Effort

   Up to this time the coordination of the Division effort has been principally the responsibility of W. R. Richard and E. P. Wheeler with support from R. E. Keller and Cumming Paton. Each of these individuals has other responsibilities to the extent that, although the Aroclor problem may have been a predominant issue, other areas of interest could not be slighted.

   The committee believes that the problem is of sufficient seriousness to warrant the full concentration of at least one individual for the next three to six months. Those who have been involved up to this point would obviously continue in their

DSW 014623

-11-

## BASIS FOR RECOMMENDATION (Continued)

supporting efforts where the individual's background or expertise would make it appropriate. For example in connection with the follow-up with the federal agencies in Washington, Dr. Kelly would expect to be present for any contact with USFDA officials.

Other members of the Medical Department would be made available for contacts with the pollution control agencies or those laboratories or universities where toxicity appears to be of interest or concern.

Certainly Dr. Keller and Scott Tucker should accompany anyone making visits where the specific question of analytical techniques was to be discussed.

This still leaves a number of man months to be devoted to the other laboratories or agencies which have up to this point not made their specific interest known.

Equally if not more important is the effort which must be made relating to the contacts with customers. The committee does not believe that this can be handled by district marketing representatives without supplying such "local" individuals with a complete background of the problem.

9. Budgetary Considerations

The committee recognizes the restrictions placed on those currently involved by mandates to operate within normal or proposed reduced budgets. It should be clear, however, that the product groups, the Division and the Corporation are faced with an extraordinary situation. There can not be too much emphasis given to the threat of curtailment or outright discontinuance of the manufacture and sales of this very profitable series of compounds. If the products, the Division and the Corporation are to be adequately protected, adequate funding is necessary.

OSW 014624