**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
John P. Fiske (SBN 249256)
655 West Broadway, Suite 1700
San Diego, CA  92101
Telephone:  619-237-3490

**BARON & BUDD P.C.**
Scott Summy (admitted Pro Hac Vice)
(Texas Bar No. 19507500)
Carla Burke (admitted Pro Hac Vice)
(Texas Bar NO. 24012490)
Celeste Evangelisti (SBN 225232)
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Telephone:  214-521-3605

JAN 1. GOLDSMITH, City Attorney
California State Bar No. 70988
DANIEL F. BAMBERG, Assistant City Attorney
California State Bar No. 60499
PAUL F. PRATHER, Deputy City Attorney
California State Bar No. 252985
**OFFICE OF THE CITY ATTORNEY**
1200 Third Avenue, Suite 1100
San Diego, CA  92101
Telephone:  619-533-5800

*Attorneys for Plaintiff City of San Diego*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN DIEGO, a municipal corporation;<br><br>        Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION,<br><br>        Defendants. | Case No.  3:15-cv-00578-WQH-JLB<br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>Assigned to Judge William Q. Hayes<br>File Date:  March 13, 2015 |

Plaintiff the CITY OF SAN DIEGO ("the City") hereby alleges, upon information and belief, as follows:

## I.   INTRODUCTION

1.   Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants – found in bays, oceans, rivers, streams, soil, and air.  In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects.  In addition, PCBs can impair and even destroy populations of fish, birds, and other animals.

2.   Monsanto Company was the sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name "Aroclor" for certain PCB compounds.  Although Monsanto knew for decades that PCBs were toxic, knew that they could not be contained and as a result were widely contaminating all natural resources and living organisms, and knew that there was no safe way to dispose of PCBs, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture of and most uses of PCBs.

3.   PCBs have been found in and around San Diego Bay ("the Bay") at levels that require cleanup in certain areas.  At different times and locations, PCBs have been detected in the Bay's water, sediments, fish, and lobsters.  PCBs entered the Bay through a variety of ways.  PCBs regularly leach, leak, off-gas, and escape their intended applications into air, soil, and water.  PCBs also leach from landfills and other disposal locations and enter the Bay with stormwater and other runoff.

4.   As a public property owner and former trustee of the Bay, Plaintiff seeks to abate the contamination, to recover damages for injuries to property, and to

recover all past and future costs associated with investigating and removing PCBs from in and around the Bay and preventing future injuries.

## II.   PARTIES

### A.   Plaintiff

5.   Plaintiff City is a California Charter City and municipal corporation, duly organized and existing by virtue of the laws of the State of California.  The City was the trustee of certain relevant tidelands and submerged lands in and around the Bay from the early 1900s through 1963, when that property was transferred to the Port District.

6.   Plaintiff brings this suit pursuant to California Code of Civil Procedure 731, and California Civil Code sections 3479, 3480, 3491, 3493, and 3494 and any other applicable codes or sources of relief available for monetary damages and abatement of the public nuisance caused by PCBs in the Bay.

### B.   Defendants

7.   Defendant Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri.

8.   Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

9.   Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack, New Jersey.  Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

10.   The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business.  Old Monsanto began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late 1970s.

11.   Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations.

The corporation now known as Monsanto operates Old Monsanto's agricultural products business. Old Monsanto's chemical products business is now operated by Solutia. Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

12. Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.[1]

13. Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business – including the manufacture and sale of PCBs.[2]

14. In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assumed financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.[3]

---

[1] See MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October 8, 2013); *see also* Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx (last accessed February 20, 2014).

[2] *See id*.

[3] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed February 20, 2014).

15.     Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants" or "Monsanto."

## III.    JURISDICTION AND VENUE

16.     This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists between Plaintiff and Defendants.   Plaintiff is located in California, but no Defendant is a citizen of California.  Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri.   Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

17.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## IV.    FACTUAL ALLEGATIONS

### A.    PCBs are Toxic Chemicals that Cannot Be Contained and that Cause Environmental Contamination.

18.     Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring).   A "PCB congener" is any single, unique chemical compound in the PCB category.  Over two hundred congeners have been identified.[4]

19.     PCBs were generally manufactured as mixtures of congeners.   From approximately 1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally produced PCBs for commercial use.[5]

---

[4] Table of PCB Congeners, available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/ pubs/ congeners.htm (last accessed February 20, 2014).

[5] *See* 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned ... ");  121 Cong. Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co. ... ").  *See also* MONS 058730-058752 at 058733 (identifying other producers as "all ex-USA."), attached as Exhibit A.

The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

20. Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States, including electrical equipment such as transformers, motor start capacitors and lighting ballasts. In addition, PCBs were incorporated into a variety of products such as caulks, paints and sealants.

21. As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

22. PCBs easily migrate or leach out of their original source material or enclosure and contaminate nearby surfaces, air, water, soil and other materials. For example, PCB compounds volatilize out of building materials (such as caulk) into surrounding materials such as masonry, wood, drywall and soil, thereby causing damage to those surrounding materials. PCBs can also escape from totally-enclosed materials (such as light ballasts) and similarly contaminate and damage surrounding materials and escape into the environment.

23. PCBs present serious risks to the health of humans, wildlife and the environment.

24. Humans may be exposed to PCBs through ingestion, inhalation and dermal contact. Individuals may inhale PCBs that are emitted into the air. They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks. And humans may absorb PCBs from physical contact with PCBs or PCB-containing materials.

25. EPA has determined that Monsanto's PCBs are probable human

carcinogens.  In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254 and 1260.[6]  EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

26.    The International Agency for Research on Cancer published an assessment in 2015 that asserts an even stronger relationship between PCBs and human cancer.  The report explains:  "There is sufficient evidence in humans for the carcinogenicity of polychlorinated biphenyls (PCBs). PCBs cause malignant melanoma. Positive associations have been observed for non-Hodgkin lymphoma and cancer of the breast. ... PCBs are carcinogenic to humans ... ."[7]

27.    In addition, EPA concluded that PCBs are associated with serious non-cancer health effects.  From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system, the reproductive system, the nervous system and the endocrine system.

28.    PCBs are known to be toxic to a number of aquatic species and wildlife including fish, marine mammals, reptiles, amphibians and birds.  The presence of PCBs can cause changes in community and ecosystem structure

---

[6]   EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed May 5, 2014).

[7] International Agency for Research on Cancer.  IARC monographs on the evaluation of carcinogenic risks to humans, volume 107.  Polychlorinated and Polybrominated Biphenyls (2015), available at http://monographs.iarc.fr/ENG/Monographs/vol107/ (last accessed July 31, 2015).

1  and function.[8]

2  **B.**  **Monsanto Has Long Known of PCBs' Toxicity.**

3  29.  Monsanto was well aware of scientific literature published in the 1930s that
4  established that inhalation in industrial settings resulted in toxic systemic
5  effects.[9]

6  30.  An October 11, 1937, Monsanto memorandum advises that "Experimental
7  work in animals shows that prolonged exposure to Aroclor vapors evolved
8  at high temperatures or by repeated oral ingestion will lead to systemic
9  toxic effects.  Repeated bodily contact with the liquid Aroclors may lead to
10  an acne-form skin eruption."[10]

11  31.  A September 20, 1955, memo from Emmet Kelly set out Monsanto's
12  position with respect to PCB toxicity:  "We know Aroclors are toxic but the
13  actual limit has not been precisely defined.  It does not make too much
14  difference, it seems to me, because our main worry is what will happen if
15  an individual developes [*sic*] any type of liver disease and gives a history of
16  Aroclor exposure.  I am sure the juries would not pay a great deal of
17  attention to [maximum allowable concentrates]."[11]

18  32.  On November 14, 1955, Monsanto's Medical Department provided an
19  opinion that workers should not be allowed to eat lunch in the Aroclor
20  department:

21

22

23  [8] *See* EPA, Understanding PCB Risks, available at http://www.epa.gov/housatonic/
24  understandingpcbrisks.html#WildlifeEcologicalRiskAssessment  (last  accessed
March 5, 2015).

25  [9] *See* Exhibits B, C and F.

26  [10] MONS 061332, attached as Exhibit B.

27  [11] MONS 095196-7, attached as Exhibit C.

28

> It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties.  While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[12]

33. On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors:  "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 [which contained PCBs] is just too toxic for use in a submarine."[13]

34. In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[14]  Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."[15]  Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[16]

35. At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB compounds.  In a 1960 brochure, Monsanto promoted the use of Aroclors in transformers and capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire or cable coatings,

---

[12] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number), attached as Exhibit D.

[13] MONS 095640, attached as Exhibit E.

[14] *See* JDGFOX00000037-63, attached as Exhibit F.

[15] *Id*. at JDGFOX00000039.

[16] *Id*. at JDGFOX00000037.

impregnants for insulation, dielectric sealants, chemical processing vessels, food cookers, potato chip fryers, drying ovens, thermostats, furnaces and vacuum diffusion pumps. Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil; insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks; papers; mastics; sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers; masonry coatings for swimming pools, stucco homes, and highway paints; protective and decorative coatings for steel structures, railway tank and gondola cars; wood and metal maritime equipment; and coatings for chemical plants, boats, and highway marking.[17]

36.   A 1961 brochure explained that Monsanto's Aroclors were being used in "lacquers for women's shoes," as "a wax for the flame proofing of Christmas trees," as "floor wax," as an adhesive for bookbinding, leather, and shoes, and as invisible marking ink used to make chenille rugs and spreads.[18]

37.   Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used in a variety of industrial, commercial, household, and consumer goods. Moreover, Monsanto affirmatively encouraged these uses by encouraging salesmen to market products for these and other applications.

38.   Years later, in 1970, Monsanto tried to distance itself from the variety of applications of Aroclors that it proudly espoused a few years before. In a press release, the company claimed: "What should be emphasized ... is that PCB was developed over 40 years ago primarily for use as a coolant in

[17]  The Aroclor Compounds (hand-dated May 1960), 0509822-66, attached as Exhibit S.

[18]  Plasticizer Patter (February 1961), 0627503-21, attached as Exhibit T.

electrical transformers and capacitors.  It is also used in commercial heating and cooling systems.  It is not a 'household' item."[19]

39.   In 1975, William Papageorge, then Monsanto's manager of product acceptability, admitted that PCBs had been used in all types of products. Papageorge testified at a Public Hearing Before the Department of Natural Resources that "[t]he past uses [of PCBs] . . . were many and varied. . . . They go on and on.  Virtually anything you can imagine, at one time or other, someone tried PCB's in them."[20]

### C.   Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing Harm to Animals and Fish.

40.   Monsanto also knew that PCBs were causing widespread contamination of the environment, far beyond the areas of its use.[21]

41.   Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen, who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[22]  The report noted that PCBs were also detected in the air over London and Hamburg and found in seals caught off the coast of Scotland.  Jensen concluded that PCBs can "be presumed to be widespread throughout the world."[23]

---

[19] *See* Press release (July 16, 1970), MCL000647-50, attached as Exhibit V, at MCL000648.

[20] *See* Declaration of Kathleen L. Roach, Exhibit 43, (Document 681-43), *Appleton Papers, Inc. and NCR Corp. v. George A. Whiting Paper Co.*, Case 2:08-cv-00016-WCG (E.D. Wis.), attached as Exhibit W.

[21] *See* Exhibits G, H and L.

[22] New Scientist (Dec. 15, 1966), MONSFOX00003427, attached as Exhibit G.

[23] *Id.*

42.   A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[24]   The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine falcons and 34 other bird species.   The report linked PCBs to the rapid decline in peregrine falcon populations in the United States.

43.   Despite growing evidence of PCBs' infiltration of every level of the global ecology, Monsanto remained steadfast in its production of Aroclors and other PCBs.

44.   On March 6, 1969, Monsanto Research Center employee W.R. Richard wrote a memorandum discussing Risebrough's article that criticized PCBs as a "toxic substance," "widely spread by air-water; therefore, an uncontrollable pollutant ... causing extinction of peregrine falcon … [and] endangering man himself."[25]   Richard explained that Monsanto could take steps to reduce PCB releases from its own plants but cautioned, "It will be still more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper.   In this applications exposure to consumers is greater and the disposal problem becomes complex."[26]

45.   On September 9, 1969, W.R. Richard, by then a member of the newly-formed Aroclor "Ad Hoc" Committee, wrote an interoffice memo titled "Defense of Aroclor."[27]   He acknowledged the role of Aroclor in water pollution:   "Aroclor product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a long life."   He noted

---

[24] R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968), attached as Exhibit H.

[25] MONS 096509-096511, attached as Exhibit I.

[26] Id.

[27] DSW 014256-014263, attached as Exhibit J.

that Aroclors 1254 and 1260 had been found along the Gulf Coast of Florida causing a problem with shrimp; in San Francisco Bay, where it was reported to thin egg shells in birds; and in the Great Lakes. Richard advised that the company could not defend itself against all criticism: "We can't defend vs. everything. Some animals or fish or insects will be harmed. Aroclor degradation rate will be slow. Tough to defend against. Higher chlorination compounds will be worse [than] lower chlorine compounds. Therefore we will have to restrict uses and clean-up as much as we can, starting immediately."[28]

46.   On January 29, 1970, Elmer Wheeler of Monsanto's Medical Department and Chairman of the Aroclor "Ad Hoc" Committee circulated laboratory reports discussing results of animal studies. He noted: "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated. Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."[29]

47.   In a PCB Presentation to Corporate Development Committee, Monsanto expressed a desire to keep profiting from PCBs despite the environmental havoc. The report suggests possible reactions to the contamination issue. It considered that doing nothing was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint." But the option of going out of the Aroclor business was also considered unacceptable:

---

[28] *Id.*

[29] MONS 098480, attached as Exhibit K.

"there is too much customer/market need and selfishly too much Monsanto profit to go out."[30]

48.   Monsanto formed an "Aroclor 'Ad Hoc' Committee" to investigate the pollution caused by PCBs.  The Aroclor "Ad Hoc" Committee held its first meeting on September 5, 1969.  The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a global contaminant."[31]  The meeting minutes acknowledge that PCB has been found in fish, oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife.  Moreover, the committee implicated the normal use of PCB-containing products as the cause of the problem:  "In one application alone (highway paints), one million lbs/year [of PCBs] are used.  Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."[32]

49.   A month later, on October 2, 1969, the Committee reported extensive environmental contamination.  The Committee advised that Monsanto could not protect the environment from Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors:

The committee believes that there is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated -- e.g. Aroclors 1254 and 1260) as nearly <u>global environmental contaminants</u> leading to <u>contamination of human food</u> (particularly fish), the <u>killing of some marine species</u> (shrimp), and the possible extinction of several species of fish eating birds.

---

[30] Ex. A at 058737.

[31] Ex. K at 030483.

[32] *Id*. at 030485.

Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent completely some environmental contamination.

<u>There are, however, a number of actions</u> which must be undertaken <u>to prolong the manufacture, sale and use of these particular Aroclors</u> as well as to protect the continued use of other members of the Aroclor series.[33]

50.     Monsanto's desire to protect its Aroclor profits rather than the environment is reflected in the Committee's stated objectives:

1.     Protect continued sales and profits of Aroclors;
2.     Permit continued development of new uses and sales, and
3.     Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem.[34]

51.     An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260:  "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment."  Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business."  To that end, it says, "We want to avoid any situation where a customer wants to return fluid. ... We would prefer that the customer use up his current inventory and purchase [new products] when available.  He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system.  <u>We don't want to take fluid back</u>."[35]

---

[33] DSW 014612-014624, at 014615, attached as Exhibit M (emphasis added).

[34] *Id*. at 014614.

[35] MONS 100123-100124, attached as Exhibit N.

52.   Instead of having customers return fluids, Monsanto instructed its customers to dispose of PCB containing material in local landfills, knowing that landfills were not suitable for PCB contaminated waste.  Monsanto had determined that the only effective mothed of disposing of PCBs was incineration, and it constructed an incinerator for disposal of its own PCB contaminants.  Nevertheless, as William Papageorge explained in his 1975 testimony before the Department of Natural Resources,    Monsanto instructed its customers to dispose of PCB contaminated waste in landfills: "lacking that resource [a commercial incinerator], we have to reluctantly suggest, because we don't have a better answer, that they find a well operated, properly operated landfill and dispose of the material in that fashion."[36]

53.   In 1970, the year after Monsanto formed the "ad hoc" committee, and despite Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.

54.   Growing awareness of the ubiquitous nature of PCBs led the United States to conduct an investigation of health and environmental effects and contamination of food and other products.  An interdepartmental task force concluded that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects on human health.[37]

55.   After that report, environmental sampling and studies indicated that PCBs were a "more serious and continuing environmental and health threat than

---

[36] Exhibit W at 29.

[37] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976), available at http://nepis.epa.gov (search "560776001") (last accessed July 31, 2015).

had been originally realized."[38]  To address these concerns, EPA undertook a study to assess PCB levels in the environment on a national basis.  That study revealed widespread occurrence of PCBs in bottom sediments in several states, including California.[39]

56.    EPA's study noted the particular burden on California.   "PCBs have become a significant component of the marine food webs of southern California," were found in sediments in the Santa Barbara Basin, and found in high levels in the San Francisco Bay.[40]

### D.    Monsanto Concealed the Nature of PCBs from Governmental Entities.

57.    While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite – that the compounds were not toxic and that the company would <u>not</u> expect to find PCBs in the environment in a widespread manner.[41]

58.    In a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."[42]  Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in

---

[38] *Id.* at 1.

[39] *Id.*, *passim.*

[40] *Id.* at 78-9.

[41] *See* Exhibits O-R (letters to governmental agencies).

[42] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969), attached as Exhibit O.

the air or in the liquid discharges from a using industry."[43]   A similar letter to the San Francisco Bay Regional Water Quality Control Board explained that PCB plasticizers (found in surface coatings, such as paints, industrial adhesives and window sealants), in normal use, present no special health problems" and that, "[i]n view of PCB's chemical inertness, we would anticipate no problems associated with the environment from refuse dumps."[44]

59.   In May 1969, Monsanto's Manager, Environmental Health, Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."[45]

60.   Monsanto delivered the same message to the New Jersey Department of Conservation in July 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic."[46]   The letter then reiterates Monsanto's position regarding environmental contamination:  "We are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would

---

[43] *Id.*

[44] Letter from Monsanto to State of California Resources Agency (March 27, 1969), attached as Exhibit P.

[45] Monsanto Memorandum to W.R. Richard (May 26, 1969), attached as Exhibit Q.

[46] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969), attached as Exhibit R.

be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."[47]

61.   At the same time that Monsanto was downplaying the toxicity of PCBs and inevitable widespread contamination caused by PCBs, its Aroclor "Ad Hoc" Committee acknowledged that there was nothing that could be done to prevent PCBs from becoming a global contaminant leading to contamination of the food supply, injuring marine life and possibly leading to the extinction of certain bird species.   The committee reported on the probability of success of actions Monsanto might undertake to address the PCB problem and provided:

> The committee believes there is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls … as nearly global environmental contaminants leading to the contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.[48]

62.   Moreover, the committee acknowledged that no course of action could be taken to prevent products containing PCBs from contaminating the environment, particularly waters and the marine environment.   The committee explained "the committee believes that there is no possible course of action that can so effectively police the uses of these PCB containing products as to prevent completely some environmental contamination."[48]   Further, the committee reported concern that vapor losses from PCB containing products likely results in contamination of an

---

[47] *Id.*

[48] DSW 014612-014624, at 014615, attached as Exhibit M.

aquatic environment because based on published reports "even minute quantities of [PCB] vapors are eventually transferred to the water environment and accumulated therein."[49]

63.   Exactly as Monsanto's committee had acknowledged, PCBs have become a global contaminant and have accumulated in the waters of the Bay to the point where they are a public nuisance and require remediation and abatement.

###   F.   The San Diego Bay is a 303(d) Impaired Body of Water for PCBs.

64.   The Bay is one of the region's most widely used natural resources, and the PCB contamination affects all San Diegans, who reasonably would be disturbed by the presence of a hazardous, banned substance in the sediment, water, and wildlife.

65.   PCBs (specifically, Aroclor compounds 1254 and 1260) have been found in samples of sediments and water taken from the Bay at varying times and locations, requiring substantial remediation work and cost.  In addition, PCBs have been identified in tissues of fish and lobster in the Bay.

66.   PCBs are identified as a Primary Chemical of Concern ("COC") in California Regional Water Quality Control Board, San Diego Region ("Regional Water Board") Cleanup and Abatement Order ("CAO") No. R9-2012-0024, dated March 14, 2012, which directed the City to, among other things, remediate PCB contaminated sediments within a discrete area known as the Shipyard Sediment Site.

67.   Other areas of PCB deposition and impacts have been located, and it is probable that the Regional Water Board may  order remediation of PCB contaminated sediments in other areas.

---

[49] *Id*. at DWS 014618.

68.    The Regional Water Board estimated human health risks due to the consumption of PCB contaminated fish tissue found in the Bay and employed human fish consumption rates and bioaccumulation factors in the analysis.

69.    The Regional Water Board also concluded that human ingestion of seafood caught within certain assessment areas can significantly increase cancer risk, specifically identifying PCBs as a carcinogenic chemical.

70.    PCBs have entered the Bay through various sources.  PCBs leach from landfills and are found in commercial and industrial waste water as a result of Monsanto's directions to its customers on proper disposal methods when it knew, in fact, that disposal of PCBs in landfills was not proper.  PCBs also leach out of paints, caulk, sealants and other applications and are transported by air and water to the Bay.  Plaintiff also manages and operate a municipal stormwater system, which collects and transports stormwater to be discharged into the Bay.  In order to discharge stormwater into the Bay, Plaintiff is required to receive a Municipal Regional Stormwater Permit from the Regional Water Board, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act.

71.    As former and current trustees of the Bay, and as stormwater dischargers into the Bay, Plaintiff has spent substantial amounts of money to limit the amount of PCBs in the Bay.  Plaintiff will also likely continue to incur costs to remove PCBs from the Bay and to keep PCBs from entering the Bay for the foreseeable future.

72.    PCBs were not only a substantial factor in causing the City to incur costs and damages, but PCBs were also the primary driving force behind the need to clean up and abate the Shipyard Sediment Site.  Without abatement of the health hazard caused by PCBs in the Bay, Plaintiff will continue to suffer injuries and damages.

73.   Monsanto's conduct, as set forth above, was committed with malice, oppression and/or fraud, as those terms are defined in Civil Code § 3294. Monsanto's conduct was despicable and in conscious disregard to the rights and safety of others, including Plaintiff. Monsanto's despicable conduct has subjected unjust hardship in conscious disregard to Plaintiff, who is the former trustee of waters, sediments, and tideland properties in and surrounding the Bay. Defendants intentionally misrepresented and concealed material facts from governmental entities in the state with the intent of causing injury. In addition to Plaintiff's entitlement to actual damages and request for abatement, Plaintiff is entitled to recover exemplary damages.

## FIRST CAUSE OF ACTION
### CONTINUING PUBLIC NUISANCE

74.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

75.   Monsanto manufactured, distributed, marketed and promoted PCBs in a manner that created or participated in creating a continuing public nuisance that is harmful to health and obstructs the free use of the Bay. Monsanto also directed its customers and the public to dispose of PCB containing materials improperly, resulting in PCBs leaching from landfills and entering the Bay.

76.   The presence of PCBs interferes with the comfortable enjoyment of the Bay for its customary uses for commercial and sport fishing, swimming and other water activities.

77.   The presence of PCBs interferes with the free use of the Bay for the promotion of commerce, navigation and fisheries.

78.   The presence of PCBs interferes with the free use of the Bay for ecological preservation and habitat restoration.

79.   The San Diego Bay is listed as impaired due to PCB, pursuant to the Clean Water Act and the 303(d) list.

80.   The Regional Water Board found that the contamination at the Shipyard Sediment Site meets all three criteria for a "nuisance" as defined by California Water Code section 13050 (m) because it: (1) is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; (2) affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal; and (3) occurs during, or as a result of, the treatment or disposal of wastes.

81.   The presence of PCBs adversely affects the quality of water in the Bay and causes inconvenience and annoyance to Plaintiff, who has been required to incur costs in order to protect plant and animal life, and their presence.

82.   The condition affects a substantial number of people who use the Bay for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe resources and environment.

83.   An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals and humans and degrade water quality and destroy marine habitats.

84.   The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human health and the environment.

85.   Plaintiff has suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, and Plaintiff has incurred substantial costs deriving from state-mandated PCB clean-up.  In addition, the City is obligated to pay for certain remediation of the Shipyard Sediment Site pursuant to the March 14, 2012 CAO.

86.   Plaintiff did not consent to the conduct that resulted in the contamination of the Bay.

87.   Monsanto's conduct was a substantial factor in causing the harm to the City and Port District.   Without an abatement of the nuisance created by Monsanto, Plaintiff will continue to suffer injuries, and the hazards caused by PCBs will continue.

88.   Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was causing the type of contamination now found in the Bay.   Monsanto knew that PCBs would leach out of products and escape into the environment, that there was no way to contain PCBs and prevent such escape, and that PCBs would accumulate in an aquatic environment like the Bay.   Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish species, and would endanger birds and animals.   In addition, Monsanto knew that PCBs are associated with serious illnesses and cancers in humans and knew that humans may be exposed to PCBs through ingestion and dermal contact.   As a result, it was foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters or by eating fish from those waters.   Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any coastal marine areas.

89.   As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiff has suffered and continues to suffer actual damages and injuries to property requiring abatement and other costs to be determined at trial.

## SECOND CAUSE OF ACTION

## EQUITABLE INDEMNITY

90.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

91.    Monsanto is responsible for creating a continuing public nuisance by manufacturing, distributing, and promoting PCBs, resulting in contamination of water, soil, and sediment in and around the Bay.

92.    Monsanto's creation of the public nuisance is a substantial factor in causing Plaintiff's injury.

93.    The conduct of the City did not contribute in any way to the creation of the public nuisance.

94.    The Regional Water Board has required the City, however, to remediate PCB-contaminated sediments from the Shipyard Sediment Site and may require further remediation of other areas.  The City has incurred and will incur costs to remove PCBs from the Bay pursuant to the Board's order.

95.    Monsanto must reimburse the City for its costs of complying with the Board's remediation order.

## PRAYER FOR RELIEF

Plaintiff prays for judgment that Defendants are liable to the City, jointly and severally, for creation of the public nuisance and must pay as follows:

1) Any and all compensatory damages according to proof including, but not limited to, all past and future costs and expenses related to the investigation, remediation, and removal of PCBs from in and around the Bay;

2) An order that Defendants pay for establishment of a fund used by the City to abate the public nuisance created by the presence of PCBs in and around the Bay, including remediating all PCB contamination in the Shipyard Sediment Site and other areas;

3)  Punitive damages;

4)  Litigation costs and attorney's fees as provided by law;

5)  Pre-judgment and post-judgment interest;

6)  Any other and further relief as the Court deems just, proper, and equitable.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated:  August 3, 2015                           Respectfully submitted,

By: <u>s/  Carla Burke</u>
**BARON & BUDD, P.C.**
Scott Summy (admitted Pro Hac Vice)
Carla Burke (admitted Pro Hac Vice)
Celeste Evangelisti (SBN 225232)

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
John P. Fiske (SBN 249256)

**OFFICE OF THE CITY ATTORNEY**
JAN I. GOLDSMITH, City Attorney
California State Bar No. 70988
DANIEL F. BAMBERG,
Assistant City Attorney
California State Bar No. 60499
PAUL F. PRATHER, Deputy City Attorney
California State Bar No. 252985

***Attorneys for the City of San Diego***