**JACKSON GILMOUR & DOBBS, PC**
William J. Jackson (admitted Pro Hac Vice)
Texas Bar No. 00784325
Micheal W. Dobbs (admitted Pro Hac Vice)
Texas Bar No. 24012533
Ann L. Al-Bahish (admitted  Pro Hac Vice)
Texas Bar No. 00787006
3900 Essex Lane, Suite 700
Houston, Texas 77027
Telephone: 713-355-5000

**SAN DIEGO UNIFIED PORT DISTRICT**
**OFFICE OF THE GENERAL COUNSEL**
Thomas A. Russell, SBN 108607, Gen. Counsel
Ellen F. Gross, SBN 149127, Asst. Gen. Counsel
John N. Carter, SBN 246886, Dep. Gen. Counsel
3165 Pacific Highway
P.O. Box 120488
San Diego, CA 92112-0488
Telephone: 619-686-6219

*Attorneys for Plaintiff San Diego Unified Port District*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

SAN DIEGO UNIFIED PORT DISTRICT, a public corporation; and CITY OF SAN DIEGO, a municipal corporation,

PLAINTIFFS,

v.

MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION,

DEFENDANTS.

CASE NO. 3:15-CV-0578-WQH-JLB

**PLAINTIFF SAN DIEGO UNIFIED PORT DISTRICT'S FIRST AMENDED COMPLAINT**

Judge: Hon. William Q. Hayes
Filed Date:  March 13, 2015

Plaintiff, SAN DIEGO UNIFIED PORT DISTRICT ("the Port District"), hereby alleges, upon information and belief, as follows:

## I.    INTRODUCTION

1.    Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants –

found in bays, oceans, rivers, streams, soil, and air.  In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system and endocrine system, among others.  In the environment, PCBs have widespread deleterious effects and can impair and even destroy populations of fish, birds, and other animals.

2.     Monsanto Company was the sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name "Aroclor" for certain PCB compounds.  For decades, Monsanto knew that PCBs were toxic, that they could not be contained and were widely contaminating all natural resources and living organisms, and that there was no safe way to dispose of PCBs.  Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture of and most uses of PCBs.

3.     PCBs have been found in and around San Diego Bay ("the Bay") at levels that require cleanup in certain areas.  At different times and locations, PCBs have been detected in the Bay's water, sediments, fish and lobsters.  PCBs entered the Bay through a variety of ways.  PCBs regularly leach, leak, off-gas and escape their intended applications into air, soil and water.  PCBs also leach from landfills and other disposal locations and enter the Bay with stormwater and other runoff.

4.     As a public property owner and trustee of natural resources in and surrounding the Bay, Plaintiff Port District seeks all past and future costs associated with investigating and removing PCBs from in and around the Bay and preventing future injuries.  In its own right and in its capacity as trustee for the public, the Port District also seek damages for injuries to property and the natural resources of the Bay and seeks abatement of the public nuisance caused by PCBs in and around the Bay.

FIRST AMENDED COMPLAINT OF PLAINTIFF SAN DIEGO UNIFIED PORT DISTRICT

## II.    PARTIES

### A.    Plaintiffs

5.    Plaintiff Port District is a public entity created by the San Diego Unified Port District Act (California Harbors & Navigation Code, Appendix 1, § 1 *et seq.*) enacted by the California Legislature in 1962 (the "Port Act").  The Port District is a trustee for the people of the State of California, which holds and manages the tidelands and submerged lands in and around San Diego Bay "for the development, operation, maintenance, control, regulation, and management of the harbor of San Diego … and for the promotion of commerce, navigation, fisheries, and recreation therein."  Harb. & Nav. Code App. 1, §§2, 4, 5, 5.5.  The Port District is specifically authorized to use its "powers and authority … to protect and enhance … physical access to the bay … natural resources of the bay, including plant and animal life … [and] quality of water in the bay."  *Id.*  The Port District holds and exercises land management authority over the tidelands and submerged lands in and around San Diego Bay.  The Port District is the successor to the powers vested in the cities that make up the Unified Port District, and the powers of those cities related to these properties are vested in the Port District.  *Id.* at § 70.

6.    Plaintiff Port District brings this suit pursuant to California Code of Civil Procedure 731, and California Civil Code sections 3479, 3480, 3491, 3493, and 3494 and any other applicable codes or sources of relief available for monetary damages and abatement of the public nuisance caused by PCBs in the Bay.

7.    Plaintiff City is a California Charter City and municipal corporation, duly organized and existing by virtue of the laws of the State of California.  The City was the trustee of certain relevant tidelands and submerged lands in and around the Bay from the early 1900s through 1963, when that property was transferred to the Port District.  Plaintiff City is filing, or has filed, a separate First Amended Complaint.

1

## B.   Defendants

2

3
8.     Defendant Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri.

4

5
9.     Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

6

7
10.    Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to the original Monsanto Company) is a Delaware

8
limited liability company with its principal place of business in Peapack, New

9
Jersey.  Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

10
11.    The original Monsanto Company ("Old Monsanto") operated an

11
agricultural products business, a pharmaceutical and nutrition business, and a

12
chemical products business.  Old Monsanto began manufacturing PCBs in the 1930s

13
and continued to manufacture commercial PCBs until the late 1970s.

14
12.    Through a series of transactions beginning in approximately 1997, Old

15
Monsanto's businesses were spun off to form three separate corporations.  The

16
corporation now known as Monsanto operates Old Monsanto's agricultural products

17
business.  Old Monsanto's chemical products business is now operated by Solutia.

18
Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

19
13.    Solutia was organized by Old Monsanto to own and operate its

20
chemical manufacturing business.  Solutia assumed the operations, assets, and

21
liabilities of Old Monsanto's chemicals business.[1]

22
14.    Although Solutia assumed and agreed to indemnify Pharmacia (then

23

24
[1] See MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND,

25
*Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October 8, 2013); see also Relationships Among

26
Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.

27
aspx (last accessed July 29, 2015).

28

known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business – including the manufacture and sale of PCBs.[2]

15.     In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto Company continues to manage and assumed financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.[3]

16.     Monsanto Company, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants" or "Monsanto."

## III.    JURISDICTION AND VENUE

17.     This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists between Plaintiffs and Defendants. Each Plaintiff is located in California, but no Defendant is a citizen of California. Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri. Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri. Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

18.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

---

[2] *See id.*
[3] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed July 29, 2015).

## IV.   FACTUAL ALLEGATIONS

### A.   PCBs are Toxic Chemicals that Cannot Be Contained and that Cause Environmental Contamination.

19.     Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring).  A "PCB congener" is any single, unique chemical compound in the PCB category.  Over two hundred congeners have been identified.[4]

20.     PCBs were generally manufactured as mixtures of congeners.  From approximately 1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally produced PCBs for commercial use.[5]  The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

21.     Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States, including electrical equipment such as transformers, motor start capacitors and lighting ballasts.  In addition, PCBs were incorporated into a variety of products such as caulks, paints and sealants.

22.     As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of, or that is subsequently incorporated into, another product.

23.     PCBs easily migrate or leach out of their original source material or

---

[4] Table of PCB Congeners, available at http://www.epa.gov/epawaste/hazard/tsd/ pcbs/pubs/congeners.htm (last accessed July 29, 2015).
[5] *See* 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned ... ."); 121 Cong. Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co. ... ."). *See also* MONS 058730-058753 at 058733 (identifying other producers as "all ex-USA."), attached as Exhibit A.

enclosure and contaminate nearby surfaces, air, water, soil and other materials. For example, PCB compounds volatilize out of building materials (such as caulk) into surrounding materials such as masonry, wood, drywall and soil, thereby causing damage to those surrounding materials. PCBs can also escape from totally-enclosed materials (such as light ballasts) and similarly contaminate and damage surrounding materials and escape into the environment.

24. PCBs present serious risks to the health of humans, wildlife and the environment.

25. Humans may be exposed to PCBs through ingestion, inhalation and dermal contact. Individuals may inhale PCBs that are emitted into the air. They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks. And humans may absorb PCBs from physical contact with PCBs or PCB-containing materials.

26. EPA has determined that Monsanto's PCBs are probable human carcinogens. In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254 and 1260.[6] EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

27. In addition, EPA concluded that PCBs are associated with serious non-cancer health effects. From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system, the reproductive system, the nervous system and the endocrine system.

---

[6] EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed July 29, 2015).

28.    PCBs are known to be toxic to a number of aquatic species and wildlife including fish, marine mammals, reptiles, amphibians and birds.  The presence of PCBs can cause changes in community and ecosystem structure and function.[7]

**B.    Monsanto Has Long Known of PCBs' Toxicity.**

29.    Monsanto was well aware of scientific literature published in the 1930s that established that inhalation in industrial settings resulted in toxic systemic effects.[8]

30.    An October 11, 1937, Monsanto memorandum advised that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects.  Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[9]

31.    A September 20, 1955, memo from Emmet Kelly set out Monsanto's position with respect to PCB toxicity:  "We know Aroclors are toxic but the actual limit has not been precisely defined.  It does not make too much difference, it seems to me, because our main worry is what will happen if an individual developes [*sic*] any type of liver disease and gives a history of Aroclor exposure.  I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[10]

32.    On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department:

> It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties.  While the Aroclors are not particularly

---

[7] *See* EPA, Understanding PCB Risks, available at http://www.epa.gov/housatonic/understandingpcbrisks.html#WildlifeEcologicalRiskAssessment (last accessed July 29, 2015).
[8] *See* Exhibits B, C and F.
[9] MONS 061332, attached as Exhibit B.
[10] MONS 095196-7, attached as Exhibit C.

hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[11]

33.   On January 21, 1957, Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors:  "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 [which contained PCBs] is just too toxic for use in a submarine."[12]

34.   In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[13]  Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."[14]  Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[15]

35.   At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB compounds.  In a 1960 brochure, Monsanto promoted the use of Aroclors in transformers and capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire or cable coatings, impregnants for insulation, dielectric sealants, chemical processing vessels, food cookers, potato chip fryers, drying ovens, thermostats, furnaces and vacuum diffusion pumps. Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil; insecticides; natural waxes used in dental casting, aircraft parts,

---

[11] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number), attached as Exhibit D.
[12] MONS 095640, attached as Exhibit E.
[13] *See* JDGFOX00000037-63, attached as Exhibit F.
[14] *Id*. at JDGFOX00000039.
[15] *Id*. at JDGFOX00000037.

and jewelry; abrasives; specialized lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks; papers; mastics; sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers; masonry coatings for swimming pools, stucco homes, and highway paints; protective and decorative coatings for steel structures, railway tank and gondola cars; wood and metal maritime equipment; and coatings for chemical plants, boats, and highway marking.[16]

36.     A 1961 brochure explained that Monsanto's Aroclors were being used in "lacquers for women's shoes," as "a wax for the flame proofing of Christmas trees," as "floor wax," as an adhesive for bookbinding, leather, and shoes, and as invisible marking ink used to make chenille rugs and spreads.[17]

37.     Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used in a variety of industrial, commercial, household and consumer goods.  Moreover, Monsanto affirmatively encouraged these uses by encouraging salesmen to market products for these and other applications.

38.     Years later, in 1970, Monsanto tried to distance itself from the variety of applications of Aroclors that it proudly espoused a few years before.  In a press release, the company claimed:  "What should be emphasized ... is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors.  It is also used in commercial heating and cooling systems.  It is not a 'household' item."[18]

---

[16] The Aroclor Compounds (hand-dated May 1960), 0509822-66, attached as Exhibit S.
[17] Plasticizer Patter (February 1961), 0627503-21, attached as Exhibit T.
[18] *See* Press release (July 16, 1970), MCL000647-50, attached as Exhibit V, at MCL000648.

39.    In 1975, William Papageorge, then Monsanto's manager of product acceptability, admitted that PCBs had been used in all types of products. Papageorge testified at a public hearing before the Wisconsin Department of Natural Resources that "[t]he past uses [of PCB's] … were many and varied. … They go on and on.  Virtually anything you can imagine, at one time or another, someone tried PCB's in them."[19]

## C.    Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing Harm to Animals and Fish.

40.    Monsanto also knew that PCBs were causing widespread contamination of the environment, far beyond the areas of its use.[20]

41.    Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen, who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[21]  The report noted that PCBs were also detected in the air over London and Hamburg and found in seals caught off the coast of Scotland. Jensen concluded that PCBs can "be presumed to be widespread throughout the world."[22]

42.    A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[23]  The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine falcons and 34 other bird

---

[19] *See* Declaration of Kathleen L. Roach, Exhibit 43 (Document 681-43) at p. 27, *Appleton Papers, Inc. and NCR Corp. v. George A. Whiting Paper Co.*, Case 2:08-cv-00016- WCG (E.D.Wis.), attached as Exhibit W.
[20] *See* Exhibits G, H and L.
[21] New Scientist (Dec. 15, 1966), MONSFOX00003427, attached as Exhibit G.
[22] *Id.*
[23] R.W. Risebrough, Polychlorinated Biphenyls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968), attached as Exhibit H.

species.  The report linked PCBs to the rapid decline in peregrine falcon populations in the United States.

43.     Despite growing evidence of PCBs' infiltration of every level of the global ecology, Monsanto remained steadfast in its production of Aroclors and other PCBs.

44.     On March 6, 1969, Monsanto Research Center employee W.R. Richard wrote a memorandum discussing Risebrough's article that criticized PCBs as a "toxic substance," "widely spread by air-water; therefore, an uncontrollable pollutant ... causing extinction of peregrine falcon … [and] endangering man himself."[24]   Richard explained that Monsanto could take steps to reduce PCB releases from its own plants but cautioned, "It will be still more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper.  In these applications exposure to consumers is greater and the disposal problem becomes complex."[25]

45.     On September 9, 1969, W.R. Richard, by then a member of the newly-formed Aroclor "Ad Hoc" Committee, wrote an interoffice memo titled "Defense of Aroclor."[26]  He acknowledged the role of Aroclor in water pollution: "Aroclor product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a long life."  He noted that Aroclors 1254 and 1260 had been found along the Gulf Coast of Florida causing a problem with shrimp; in San Francisco Bay, where it was reported to thin egg shells in birds; and in the Great Lakes.  Richard advised that the company could not defend itself against all criticism:  "We can't defend vs. everything.  Some animals or fish or insects will be

---

[24] MONS 096509-096511, attached as Exhibit I.
[25] *Id.*
[26] DSW 014256-014263, attached as Exhibit J.

harmed.  Aroclor degradation rate will be slow.  Tough to defend against.  Higher chlorination compounds will be worse [than] lower chlorine compounds.  Therefore we will have to restrict uses and clean-up as much as we can, starting immediately."[27]

46.     On January 29, 1970, Elmer Wheeler of Monsanto's Medical Department and Chairman of the Aroclor "Ad Hoc" Committee circulated laboratory reports discussing results of animal studies.  He noted:  "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated.  Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."[28]

47.     In a PCB Presentation to Corporate Development Committee, Monsanto expressed a desire to keep profiting from PCBs despite the environmental havoc.  The report suggests possible reactions to the contamination issue.  It considered that doing nothing was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint."  But the option of going out of the Aroclor business was also considered unacceptable:  "there is too much customer/market need and selfishly too much Monsanto profit to go out."[29]

48.     Monsanto formed an "Aroclor 'Ad Hoc' Committee" to investigate the pollution caused by PCBs.  The Aroclor "Ad Hoc" Committee held its first meeting on September 5, 1969.  The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a global contaminant."[30] The meeting minutes acknowledge that PCB has been found in fish, oysters, shrimp,

---

[27] *Id*. at 014256.
[28] MONS 098480, attached as Exhibit K.
[29] Ex. A at MONS 058737.
[30] Ex. L at MONS 030483.

FIRST AMENDED COMPLAINT OF PLAINTIFF SAN DIEGO UNIFIED PORT DISTRICT

birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife. Moreover, the committee implicated the normal use of PCB-containing products as the cause of the problem: "In one application alone (highway paints), one million lbs/year [of PCBs] are used. Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."[31]

49.     A month later, on October 2, 1969, the Committee reported extensive environmental contamination. The Committee advised that Monsanto could not protect the environment from Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors:

> The committee believes that there is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated -- e.g. Aroclors 1254 and 1260) as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.
>
> Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent completely some environmental contamination.
>
> There are, however, a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series.[32]

50.     Monsanto's desire to protect its profits from Aroclor sales rather than the environment is reflected in the Committee's stated objectives:

1.     Protect continued sales and profits of Aroclors;
2.     Permit continued development of new uses and sales, and

---

[31] *Id*.at 030485.
[32] DSW 014612-014624, at 014615, attached as Exhibit M (emphasis added).

3.    Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem.[33]

51.    An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260: "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment." Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business." To that end, it says, "We want to avoid any situation where a customer wants to return fluid. ... We would prefer that the customer use up his current inventory and purchase [new products] when available. He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system. We don't want to take fluid back."[34]  Instead of having customers return the old formula fluids, Monsanto instructed its customers to dispose of PCB containing wastes in local landfills, knowing that landfills were not suitable for PCB contaminated waste.  Monsanto had determined that the only effective mothed of disposing of PCBs was high temperature incineration, which was not commercially available to it or its customers, and it had constructed an incinerator for the disposal of its own *liquid* PCB contaminants.  Monsanto made its incinerator available to its customers, for a fee, for the disposal of their *liquid* PCB wastes.  However, as William Papageorge explained in his 1975 testimony before the Wisconsin Department of Natural Resources, Monsanto instructed its customers to dispose of *solid* PCB contaminated wastes in landfills:  "lacking that resource [a commercial incinerator], we have to reluctantly suggest, because we don't have a better answer,

_____

[33] *Id*. at 014614.
[34] MONS 100123-100124, attached as Exhibit N.

that they find a well operated, properly operated landfill and dispose of the material in that fashion."[35]

52.     In 1970, the year after Monsanto formed the "ad hoc" committee, and despite Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.[36]

53.     Growing awareness of the ubiquitous nature of PCBs led the United States to conduct an investigation of health and environmental effects and contamination of food and other products.   An interdepartmental task force concluded that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects on human health.[37]

54.     After that report, environmental sampling and studies indicated that PCBs were a "more serious and continuing environmental and health threat than had been originally realized."[38]  To address these concerns, EPA undertook a study to assess PCB levels in the environment on a national basis.   That study revealed widespread occurrence of PCBs in bottom sediments in several states, including California.[39]

55.     EPA's study noted the particular burden on California.  "PCBs have become a significant component of the marine food webs of southern California," were found in sediments in the Santa Barbara Basin, and found in high levels in the San Francisco Bay.[40]

---

[35] *See* Exhibit W at 29.
[36] *Id.* at 27.
[37] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976), available at http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2000I3HT.txt (last accessed July 29, 2015).
[38] *Id.* at 1.
[39] *Id., passim.*
[40] *Id.* at 78-9.

1

### D.  Monsanto Concealed the Nature of PCBs from Governmental Entities.

2

3    56.     While the scientific community and Monsanto knew that PCBs were

4    toxic and becoming a global contaminant, Monsanto repeatedly misrepresented

5    these facts, telling governmental entities the exact opposite – that the compounds

6    were not toxic and that the company would <u>not</u> expect to find PCBs in the

     environment in a widespread manner.[41]

7    57.     In a March 24, 1969 letter to Los Angeles County Air Pollution Control

8    District, Monsanto advised that the Aroclor compounds "are not particularly toxic

9    by oral ingestion or skin absorption."[42]  Addressing reports of PCBs found along the

10   West Coast, Monsanto claimed ignorance as to their origin, explaining that "very

11   little [Aroclor] would normally be expected either in the air or in the liquid

12   discharges from a using industry."[43]  A similar letter to the San Francisco Bay

13   Regional Water Quality Control Board explained that PCB plasticizers (found in

14   surface coatings, such as paints, industrial adhesives and window sealants), in

15   normal use, present no special health problems" and that, "[i]n view of PCB's

16   chemical inertness, we would anticipate no problems associated with the

17   environment from refuse dumps."[44]

18   58.     In May 1969, Monsanto's Manager, Environmental Health, Elmer

19   Wheeler spoke with a representative of the National Air Pollution Control

20   Administration, who promised to relay to Congress the message that Monsanto

21

22

23

24   [41] *See* Exhibits O-R (letters to governmental agencies).
25   [42] Letter from Monsanto to Los Angeles County Air Pollution Control District
     (March 24, 1969), attached as Exhibit O
26   [43] *Id.*
     [44] Letter from Monsanto to State of California Resources Agency (March 27, 1969),
27   attached as Exhibit P.

28

FIRST AMENDED COMPLAINT OF PLAINTIFF SAN DIEGO UNIFIED PORT DISTRICT

"cannot conceive how the PCBs can be getting into the environment in a widespread fashion."[45]

59.     Monsanto delivered the same message to the New Jersey Department of Conservation in July 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic."[46]  The letter then reiterates Monsanto's position regarding environmental contamination:  "We are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."[47]

60.     At the same time that Monsanto was downplaying the toxicity of PCBs and inevitable widespread contamination caused by PCBs, its Aroclor "Ad Hoc" Committee acknowledged that there was nothing that could be done to prevent PCBs from becoming a global contaminant leading to contamination of the food supply, injuring marine life and possibly leading to the extinction of certain bird species. The committee reported on the probability of success of actions Monsanto might undertake to address the PCB problem and provided:

> The committee believes there is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls … as nearly global environmental contaminants leading to the contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.[48]

61.     Moreover, the committee acknowledged that no course of action could be taken to prevent products containing PCBs from contaminating the environment,

---

[45] Monsanto Memorandum to W.R. Richard (May 26, 1969), attached as Exhibit Q.
[46] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969), attached as Exhibit R.
[47] Id.
[48] DSW 014612-014624, at 014615, attached as Exhibit M.

particularly waters and the marine environment.  The committee explained "the committee believes that there is no practical course of action that can so effectively police the uses of these PCB containing products as to prevent completely some environmental contamination."[49]  Further, the committee reported concern that vapor losses from PCB containing products likely results in contamination of an aquatic environment because based on published reports "even minute quantities of [PCB] vapors are eventually transferred to the water environment and accumulated therein."[50]

62.    Exactly as Monsanto's committee had acknowledged, PCBs have become a global contaminant and have accumulated in the waters of the Bay to the point where they are a public nuisance and require remediation and abatement.

**E.    The San Diego Bay is a 303(d) Impaired Body of Water for PCBs.**

63.    The Bay is one of the region's most widely used natural resources, and the PCB contamination affects all San Diegans, who reasonably would be disturbed by the presence of a hazardous, banned substance in the sediment, water, and wildlife.

64.    PCBs (specifically, Aroclor compounds 1254 and 1260) have been found in samples of sediments and water taken from the Bay at varying times and locations, some requiring substantial remediation work and cost.  In addition, PCBs have been identified in tissues of fish and lobster in the Bay.

65.    PCBs are identified as a Primary Chemical of Concern ("COC") in California Regional Water Quality Control Board, San Diego Region ("Regional Water Board") Cleanup and Abatement Order ("CAO") No. R9-2012-0024, dated March 14, 2012, which directed the City and the Port District to, among other things,

---

[49] *Id.*
[50] *Id.* at DWS 014618.

remediate PCB contaminated sediments within a discrete area known as the Shipyard Sediment Site.

66.     There are other sites and public properties within and around the Bay that are currently under investigation for PCB contamination and that will be investigated for PCB contamination in the future.  The site and location of future PCB contamination investigation areas are currently unknown; the Regional Water Board, however, has indicated that it may require the investigation of dozens of sites in and around the Bay and the subsequent remediation of any areas containing PCB contamination that it deems appropriate.

67.     The Regional Water Board estimated human health risks due to the consumption of PCB contaminated fish tissue found in the Bay and employed human fish consumption rates and bioaccumulation factors in the analysis.

68.     The Regional Water Board also concluded that human ingestion of seafood caught within certain assessment areas can significantly increase cancer risk, specifically identifying PCBs as a carcinogenic chemical.

69.     PCBs have entered the Bay through various sources.  As Monsanto knew they would, PCBs sluff from myriad products and uses promoted by Monsanto and enter the environment in the absence of any discharge.  PCBs are also found in commercial and industrial waste water as a result of Monsanto's directions to its customers to dispose of their PCB contaminated wastes in landfills when Monsanto knew, in fact, that disposal of PCBs in landfills was not proper.  PCBs also leach out of paints, caulk, sealants and other applications and are transported by air and water to the Bay.

70.     As trustees of the Bay, Plaintiff Port District has spent substantial amounts of money to limit the amount of PCBs in the Bay.  The Port District will also likely continue to incur costs to remove PCBs from the Bay and to keep PCBs from entering the Bay for the foreseeable future.

71.     PCBs were not only a substantial factor in causing the Port District to incur costs and damages, but PCBs were also the primary driving force behind the need to clean up and abate the Shipyard Sediment Site.  Without abatement of the health hazard caused by PCBs in the Bay, Plaintiff Port District will continue to suffer injuries and damages.  In addition, PCB contamination has resulted in the impairment of navigational capabilities within the Bay.  For example, previous PCB driven remedial actions have resulted in the creation of permanent engineered caps isolating PCB-contaminated sediments at the Campbell Shipyard and Convair Lagoon sediment sites, at significant cost and interference to the Port District. Navigation is prohibited above and around these caps to ensure their stability and continued effectiveness.  PCBs have similarly impaired and interfered with the use of other properties and functions of the Port District.

72.     Remedial proposals for contaminated sediments at other sites within the Bay currently under review by the Regional Water Board include the addition of sand and other material to the Bay, which has the potential to impair navigational capabilities.  Further, navigational maintenance costs may increase as a result of PCB contamination within Bay sediments through additional environmental review and disposal requirements.

73.     Monsanto's conduct, as set forth above, was committed with malice, oppression and/or fraud, as those terms are defined in Civil Code § 3294. Monsanto's conduct was despicable and in conscious disregard to the rights and safety of others, including Plaintiff Port District.  Monsanto's despicable conduct has subjected unjust hardship in conscious disregard to the public and to Plaintiff Port District, who is trustee of properties in and surrounding the Bay.  Defendants intentionally misrepresented and concealed material facts from governmental entities in the state with the intent of causing injury.  In addition to Plaintiff Port

District's entitlement to actual damages and request for abatement, Plaintiff is entitled to recover exemplary damages.

## FIRST CAUSE OF ACTION

### PUBLIC NUISANCE

74.     Plaintiff Port District realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

75.     Monsanto manufactured, distributed, marketed and promoted PCBs in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the free use of the Bay.  Monsanto also directed its customers and the public to dispose of PCB containing materials improperly, resulting in PCBs leaching from landfills and entering the Bay.

76.     The presence of PCBs interferes with the comfortable enjoyment of the Bay for its customary uses for commercial and sport fishing, swimming and other water activities.

77.     The presence of PCBs interferes with the free use of the Bay for the promotion of commerce, navigation and fisheries.

78.     The presence of PCBs interferes with the free use of the Bay for ecological preservation and habitat restoration.

79.     The San Diego Bay is listed as impaired due to PCBs, pursuant to the Clean Water Act and the 303(d) list.

80.     The Regional Water Board found that the contamination at the Shipyard Sediment Site has caused a nuisance.  Indeed, the contamination meets all three criteria for a "nuisance" as defined by California Water Code section 13050 (m) because it: (1) is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; (2) affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the

annoyance or damage inflicted upon individuals may be unequal; and (3) occurs during, or as a result of, the treatment or disposal of wastes.  The Regional Water Board found that "[t]he "contaminated marine sediment has caused conditions of pollution, contamination or nuisance in San Diego Bay that adversely affect aquatic life, aquatic dependent wildlife, and human health San Diego Bay beneficial uses."

81.    The presence of PCBs causes inconvenience and annoyance to the people of the State of California and to Plaintiff Port District, who has been required to incur costs in order to protect plant and animal life, and their presence adversely affects the quality of water in the Bay.

82.    The condition affects a substantial number of people who use the Bay for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe resources and environment.

83.    An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals and humans and degrade water quality and destroy marine habitats.

84.    The seriousness of the environmental and human health risks created by Monsanto's PCBs and Monsanto's concealment of the dangers posed to human health and the environment far outweigh any social utility of Monsanto's conduct in manufacturing PCBs.

85.    Plaintiff Port District has suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, and Plaintiff Port District has incurred substantial costs deriving from state-mandated PCB clean-up. Further, the Port District holds and manages the tidelands and submerged lands of the Bay for the benefit of the public.  In addition, the Port District is obligated to pay for certain remediation of the Shipyard Sediment Site pursuant to the March 14, 2012 CAO.

86.     Plaintiff Port District did not consent to the conduct that resulted in the contamination of the Bay.

87.     Monsanto's conduct was a substantial factor in causing the harm to Plaintiff Port District.  Without an abatement of the nuisance created by Monsanto, the Port District and the people of the State of California will continue to suffer injuries, and the hazards caused by PCBs will continue.

88.     Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was causing the type of contamination now found in the Bay.  Monsanto knew that PCBs would leach out of products to become waste in the environment and that there was no effective way to prevent PCBs from becoming waste and accumulating in an aquatic environment like the Bay.  Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish species, and would endanger birds and animals.  In addition, Monsanto knew that PCBs are associated with serious illnesses and cancers in humans and knew that humans may be exposed to PCBs through ingestion and dermal contact.  As a result, it was foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters or by eating fish from those waters.  Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any coastal marine area.

89.     As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiff Port District and the public have suffered, and continue to suffer, actual damages and injuries to property requiring abatement and other costs to be determined at trial.

## SECOND CAUSE OF ACTION

## EQUITABLE INDEMNITY

90.     Plaintiff Port District realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

91.     Monsanto is responsible for creating a public nuisance by manufacturing, distributing, and promoting PCBs, resulting in contamination of water, soil and sediments in and around the Bay, and for directing its customers to improperly dispose of PCBs.  Monsanto is also responsible for creating a purpresture as a result of PCBs at certain sites in and around the Bay.  Monsanto is also liable to the Port District for the costs to remediate PCB contamination at discrete sites around the Bay.

92.     Monsanto's creation of the public nuisance is a substantial factor in causing Plaintiff Port District's injury.

93.     Monsanto must reimburse the Port District for its injuries.

## THIRD CAUSE OF ACTION

## PURPRESTURE

94.     Plaintiff Port District realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

95.     The Bay is navigable in law and in fact and is continuously used by the public for commercial and recreational purposes.

96.     The presence of PCBs in the waters and sediments of the Bay constitutes an unauthorized invasion of the rights of the public to navigate the waters of the Bay and constitutes a purpresture.

97.     The presence of PCBs in the waters and sediments of the Bay impairs the navigation of the Bay, related commercial uses of the Bay, and the rights of the entire community to free use and enjoyment of the Bay.

98.     As a direct and proximate result of Monsanto's creation of an unauthorized invasion and obstruction of the rights of the public to navigational uses of the waters of the Bay, the Port District and the people of the State of California have suffered, and continue to suffer, interference with public and navigational uses of the Bay and related property damage that requires investigation, remediation, and monitoring costs to be determined at trial.

99.     The Port District as trustee also has the authority to institute a proceeding in equity and hereby seeks to compel an abatement of the purpresture created by PCBs in the waters and sediments of the Bay.

## PRAYER FOR RELIEF

In addition to the relief requested in each individual cause of action above, Plaintiff Port District prays for judgment against Defendants, jointly and severally, as follows:

1) Any and all compensatory damages according to proof including, but not limited to, all past and future costs and expenses related to the investigation, remediation, and removal of PCBs from in and around the Bay, loss of use of portions of the Bay, and diminution in value of real property in and around the Bay;

2) A judicial determination that each Defendant is liable for any and all future costs related to the investigation, remediation, and removal of PCBs from in and around the Bay;

3) An order that Defendants pay for establishment of a fund used by Plaintiff Port District to abate the public nuisance created by the presence of PCBs in and around the Bay, including investigating and remediating all PCB contamination in the Shipyard Sediment Site and PCB contamination at other sites in and around the Bay, discovered now or in the future, where necessary.

FIRST AMENDED COMPLAINT OF PLAINTIFF SAN DIEGO UNIFIED PORT DISTRICT

4) An order that Defendants abate the purpresture created by the presence of PCBs in the Bay.

5) Compensatory damages to Plaintiff Port District for the injury to and loss of use of natural resources deriving from the presence of PCBs in and around the Bay, including the cost of restoring those natural resources.

6) Punitive/Exemplary damages;

7) Litigation costs and attorney's fees as provided by law;

8) Pre-judgment and post-judgment interest;

9) Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff Port District hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Respectfully submitted,

Dated:  August 3, 2015                    By:*/s/ William J. Jackson*

**JACKSON GILMOUR & DOBBS, PC**
William J. Jackson (admitted Pro Hac Vice)
Texas Bar No. 00784325
Micheal W. Dobbs (admitted Pro Hac Vice)
Texas Bar No. 24012533
Ann L. Al-Bahish (admitted Pro Hac Vice)
Texas Bar No. 00787006

3900 Essex Lane, Suite 700
Houston, Texas 77027
Telephone: 713-355-5000

1

By:/s/ John N. Carter

2

**SAN DIEGO UNIFIED PORT DISTRICT**

3

**OFFICE OF THE GENERAL COUNSEL**

Thomas A. Russell, SBN 108607, Gen.

4

Counsel

Ellen F. Gross, SBN 149127, Asst. Gen.

5

Counsel

6

John N. Carter, SBN 246886, Dep. Gen.

7

Counsel

3165 Pacific Highway

8

P.O. Box 120488

9

San Diego, CA 92112-0488

10

11

ATTORNEYS FOR THE SAN DIEGO

UNIFIED PORT DISTRICT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28