1
2
3
4
5
6
7

8            **UNITED STATES DISTRICT COURT**

9            **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 10  SAN DIEGO UNIFIED PORT | CASE NO. 15-cv-578-WQH-JLB |
| DISTRICT, a public corporation; and | |
| 11  CITY OF SAN DIEGO, a municipal | ORDER |
| corporation, | |
| 12 | |
| Plaintiffs, | |
| 13 | |
| vs. | |
| 14  MONSANTO COMPANY; SOLUTIA | |
| INC.; and PHARMACIA LLC, | |
| 15 | |
| Defendants. | |

16  HAYES, Judge:

17        The matters before the Court are the Motion to Dismiss the City of San Diego's

18  Amended Complaint (ECF No. 31) and the Motion to Dismiss the San Diego Unified

19  Port District's Amended Complaint (ECF No. 32) filed by Defendants.

20  **I. Background**

21        On March 13, 2015, Plaintiffs San Diego Unified Port District (the "Port

22  District") and City of San Diego (the "City") commenced this action by filing the

23  Complaint.  (ECF No. 1).  On August 3, 2015, the City and the Port District filed

24  separate First Amended Complaints ("FACs") against Defendants Monsanto, Solutia,

25  and Pharmacia ("Monsanto"), which are the operative pleadings in this case. (ECF Nos.

26  24, 25).

27        On August 31, 2015, Monsanto filed a Motion to Dismiss the City's FAC.  (ECF

28  No. 31) and a Motion to Dismiss the Port District's FAC.  (ECF No. 32).   On

1  September 21, 2015, the Port District and the City filed responses.  (ECF Nos. 33, 34).
2  On October 10, 2015, Monsanto filed replies.  (ECF Nos. 37, 38).

3  On May 25, 2016, the Court held oral argument on the Motions to Dismiss.
4  (ECF No. 61).   On June 3, 2016, the Port District filed a sur-reply in opposition to
5  Monsanto's Motion to Dismiss addressing the issue of standing.  (ECF No. 65).  On
6  June 10, 2016, Monsanto filed a response to the sur-reply.  (ECF No. 67).  On June 14,
7  2016, the Port District filed a reply to the sur-reply.  (ECF No. 68).  On August 23,
8  2016, Monsanto filed a Notice of Supplemental Authority in Support of Motion to its
9  Motion to Dismiss.  (ECF No. 69).  On August 31, 2016, the Port District and the City
10 filed responses to Monsanto's Notice of Supplemental Authority.  (ECF Nos. 73, 74).
11 On September 7, 2016, Monsanto filed a reply to the Port District's response to
12 Monsanto's  Notice of Supplemental Authority.  (ECF No. 78).  On September 19,
13 2016, Monsanto filed a reply to the City's Notice of Supplemental Authority.  (ECF No.
14 79).

15 **II. Allegations of the FAC**[1]

16 Plaintiff City is a "California Charter City and municipal corporation." (ECF No.
17 25 ¶ 7).  The City was "the trustee of certain relevant tidelands and submerged lands in
18 and around the [San Diego] Bay from the early 1900s through 1963, when that property
19 was transferred to the Port District."  *Id*.

20 "Plaintiff Port District is a public entity created by the San Diego Unified Port
21 District Act."  *Id*. ¶ 5.  "The Port District is a trustee for the people of the State of
22 California, which holds and manages the tidelands and submerged lands in and around
23 San Diego Bay 'for the development, operation, maintenance, control, regulation, and
24 management of the harbor of San Diego . . . and for the promotion of commerce,
25 navigation, fisheries, and recreation therein.'"  *Id*.  "The Port District is specifically
26 authorized to use its 'powers and authority . . . to protect and enhance . . .  physical

27

28    [1]    The factual allegations in the FACs (ECF Nos. 24 and 25) are identical in aspects relevant to these motions.

access to the bay . . . natural resources of the bay, including plant and animal life . . . [and] quality of water in the bay.'" *Id*.

Defendant companies, Monsanto, Pharmacia, and Solutia, are corporate spin-offs of the original Monsanto Company. *Id*. ¶ 12. "Monsanto Company was the sole manufacturer of [polychlorinated biphenyls ("PCBs")] in the United States from 1935 to 1979, and trademarked the name 'Aroclor' for certain PCB compounds." *Id*. ¶ 2. PCBs "are man-made chemical compounds that have become notorious as global environmental contaminants found in bays, oceans, rivers, streams, soil, and air." *Id*. ¶ 1. "In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system and endocrine system, among others." *Id*. ¶ 1. "In the environment, PCBs have widespread deleterious effects and can impair and even destroy populations of fish, birds, and other animals." *Id*.

"While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite – that the compounds were not toxic and that the company would <u>not</u> expect to find PCBs in the environment in a widespread manner." *Id*. ¶ 56.

Although Monsanto knew "that landfills were not suitable for PCB contaminated waste," Monsanto "instructed its customers to dispose of PCB containing wastes in local landfills" instead of "having customers return the old formula fluids." *Id*. ¶ 51. Having "determined that the only effective method of disposing of PCBs was high temperature incineration, which was not commercially available to it or its customers," Monsanto "constructed an incinerator for the disposal of its own *liquid* PCB contaminants." *Id*. "Monsanto made its incinerator available to its customers, for a fee, for the disposal of their liquid PCB wastes." *Id*.

Monsanto "continued producing PCBs until Congress enacted the Toxic Substances Control Act ('TSCA'), which banned the manufacture of and most uses of

PCBs." *Id*. ¶ 2.

"PCBs are identified as a Primary Chemical of Concern ('COC') in California Regional Water Quality Control Board, San Diego Region ('Regional Water Board') Cleanup and Abatement Order ('CAO') No. R9-2012-0024, dated March 14, 2012, which directed the City and the Port District to, among other things, remediate PCB contaminated sediments within a discrete area known as the Shipyard Sediment Site." *Id*. ¶ 65. "There are other sites and public properties within and around the Bay that are currently under investigation for PCB contamination and that will be investigated for PCB contamination in the future." *Id*. ¶ 66.

"The Regional Water Board estimated human health risks due to the consumption of PCB contaminated fish tissue found in the Bay and employed human fish consumption rates and bioaccumulation factors in the analysis." *Id*. ¶ 67. "The Regional Water Board . . . concluded that human ingestion of seafood caught within certain assessment areas can significantly increase cancer risk, specifically identifying PCBs as a carcinogenic chemical." *Id*. ¶ 68.

"PCBs have entered the Bay through various sources." *Id*. ¶ 69. "PCBs sluff from myriad products and uses promoted by Monsanto and enter the environment . . . ." *Id*. "PCBs are also found in commercial and industrial waste water as a result of Monsanto's directions to its customers to dispose of their PCB contaminated wastes in landfills when Monsanto knew, in fact, that disposal of PCBs in landfills was not proper." *Id*. "PCBs also leach out of paints, caulk, sealants and other applications and are transported by air and water to the Bay." *Id*.

The City "manages and operate a municipal stormwater system, which collects and transports stormwater to be discharged into the Bay." (ECF No. 24 ¶ 70). "In order to discharge stormwater into the Bay, Plaintiff is required to receive a Municipal Regional Stormwater Permit from the Regional Water Board, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act." *Id*. "As former and current trustees of the Bay, and as stormwater dischargers into the Bay, [the City]

has spent substantial amounts of money to limit the amount of PCBs in the Bay." *Id*. ¶ 71. "[The City] will also likely continue to incur costs to remove PCBs from the Bay and to keep PCBs from entering the Bay for the foreseeable future." *Id*. "PCBs were not only a substantial factor in causing the City to incur costs and damages, but PCBs were also the primary driving force behind the need to clean up and abate the Shipyard Sediment Site." *Id*. ¶ 72.

"As trustees of the Bay, Plaintiff Port District has spent substantial amounts of money to limit the amount of PCBs in the Bay." (ECF No. 25 ¶ 70). "The Port District will also likely continue to incur costs to remove PCBs from the Bay and to keep PCBs from entering the Bay for the foreseeable future." *Id*. "PCBs were not only a substantial factor in causing the Port District to incur costs and damages, but PCBs were also the primary driving force behind the need to clean up and abate the Shipyard Sediment Site." *Id*. ¶ 71. "Without abatement of the health hazard caused by PCBs in the Bay, Plaintiff Port District will continue to suffer injuries and damages." *Id*. "In addition, PCB contamination has resulted in the impairment of navigational capabilities within the Bay." *Id*. "For example, previous PCB driven remedial actions have resulted in the creation of permanent engineered caps isolating PCB-contaminated sediments at the Campbell Shipyard and Convair Lagoon sediment sites, at significant cost and interference to the Port District." *Id*. "Navigation is prohibited above and around these caps to ensure their stability and continued effectiveness." *Id*. " PCBs have similarly impaired and interfered with the use of other properties and functions of the Port District."

The FAC filed by the City asserts claims for public nuisance and for equitable indemnity. The FAC filed by the Port District asserts claims for public nuisance, equitable indemnity, and purpresture.

## III. Judicial Notice

"As a general rule, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d

668, 688 (9th Cir. 2001) (internal quotation marks omitted).  Under the doctrine of incorporation by reference, "[a] district court ruling on a motion to dismiss may consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleadings." *Parrino v. FHP, Inc*., 146 F.3d 699, 705 (9th Cir. 1998) (internal quotation marks omitted).  The "incorporation by reference" doctrine has been extended "to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

The Court takes judicial notice of the CAO, issued by the California Regional Water Quality Control Board, No. R9-2012-0024, dated March 14, 2012, in both motions to dismiss because the document is referenced in both FACs.  The Court denies the request for judicial notice of the remaining documents because the documents are unnecessary for the resolution of the motions to dismiss.  *See, e.g.*, *Asvesta v. Petroutsas*, 580 F.3d 1000, 1010 n. 12 (9th Cir. 2009)  (denying request for judicial notice where judicial notice would be "unnecessary").

**IV. Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Federal Rule of Civil Procedure 8(a) provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'"  *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citation omitted). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotations and citation omitted).

## V. Motion to Dismiss the Port District's First Amended Complaint (ECF No. 32)

### A. Public Nuisance

Under California law, a nuisance is defined as "[a]nything that is injurious to health," "interfere[s] with the comfortable enjoyment of life or property," or "unlawfully obstructs the free passage or use of any navigable lake, or river, bay." Cal. Civ. Code § 3479. A public nuisance is one which "affects at the same time an entire community or neighborhood, or any considerable number of persons." Cal. Civ. Code § 3480.

In California, a nuisance action can be brought in two ways. First, California Civil Code section 731 states

> A civil action may be brought in the name of the people of the State of California to abate a public nuisance, as defined in Section 3480 of the Civil Code, by the district attorney or county counsel of any county in which the nuisance exists, or by the city attorney of any town or city in which the nuisance.

Cal. Civ. Proc. Code § 731.  Second, an action can be "brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by a nuisance, as defined in Section 3479 of the Civil Code, and by the judgment in that action the nuisance may be enjoined or abated as well as damages recovered therefor."  Cal. Civ. Proc. Code § 731.  "Where a public entity can show it has a property interest injuriously affected by the nuisance, then, like any other such property holder, it should be able to pursue the full panoply of tort remedies available to private persons."  *Selma Pressure Treating Co. v. Osmose Wood Preserving Co.,* 271 Cal. Rptr. 596, 604 (Ct. App. 1990) (interpreting the term "person" in section 731 to include governmental units).

### i. Standing

Monsanto contends that the Port District lacks the standing to bring a representative public nuisance claim under California Code of Procedure section 731 because the Port District is not a district attorney, county counsel, or city attorney. (ECF No. 38 at 6-7).  Monsanto contends that even though the San Diego Unified Port District Act (the "Port Act") gives the Port District the right to sue and be sued, "the Port is simply not authorized to bring a representative public nuisance claim and cannot seek abatement."  *Id.* at 7.  Monsanto contends that the Port District "is not on equal legal footing with the State, San Diego County or the five perimeter cities that surrendered tideland property five decades ago," because it is a public corporation under the Port Act.  (ECF No. 67 at 6).  Monsanto contends that "[n]o statutory or case law authority exists supporting the proposition that a California 'public corporation' can bring a public nuisance claim on behalf of the State."  *Id.*

The Port District contends that it "brings this action as trustee for the people of the State of California, an inherently representative capacity, to hold Monsanto

responsible for the PCB contamination in the Bay."[2]  (ECF No. 33 at 9).  The Port District contends that the State of California delegated the public trust responsibilities to the Port District as the trustee for the people of the State of California through the Port Act in 1963.  (ECF No. 65).  The Port District contends that

> [w]hen the State of California transferred "all right, title and interest" in the tidelands and submerged lands ringing the Bay from the State and the local governments to the newly created Port District in 1963, the State also gave the Port District broad powers to "protect, preserve, and enhance" those properties it holds in trust. Harb. & Nav. Code App. 1 at §§ 4, 5.5, 14. Not only did the State of California delegate to the Port District the State's authority to manage the Bay and the submerged lands now contaminated with PCBs, the State also expressly transferred the cities' and county's proprietary rights in those submerged lands _and_ the concomitant powers to protect those properties, including the power to bring a public nuisance action. _See_ Harb. & Nav. Code App. 1 at § 70.

_Id_. at 6.

California Code of Civil Procedure section 731 provides,

> A civil action may be brought in the name of the people of the State of California to abate a public nuisance . . . by the district attorney or county counsel of any county in which the nuisance exists, or by the city attorney of any town or city in which the nuisance exists.

Cal. Civ. Proc. Code § 731.  Section 731 gives the "district attorney or county counsel of any county" and "the city attorney of any town or city" in which the nuisance exists the authority to bring a civil action to abate a public nuisance.  In _Lamont Storm Water District v. Pavich_, 93 Cal. Rptr. 2d 288 (Ct. App. 2000), the California Court of Appeal held that only public bodies explicitly authorized to abate a public nuisance may bring an action.  Relying on a general empowerment section of the Stormwater District Act of 1909, the plaintiff, a storm water district, brought an action to abate a public nuisance.  The court held that the plaintiff had not been granted authority to maintain an action to abate a nuisance.  The court determined that the "enabling legislation grants

---

[2] At oral argument, counsel confirmed that the Port District is only bringing its public nuisance claim in a representative capacity. (ECF No. 66 at 64:21-24, 53:13-14).

the general power to sue and be sued, and the specific power to acquire property through eminent domain," but the legislation "does not enumerate the power to file actions to abate nuisance as among a storm water district's powers." *Id.* at 291. The court held that "when the Legislature has intended to grant the power to abate a nuisance, it has done so specifically and in clear terms." *Id.*

In this case, the FAC alleges that the Port District "is a public entity created by the San Diego Unified Port District Act (California Harbors & Navigation Code, Appendix 1, § 1 *et seq.*) enacted by the California Legislature in 1962 (the 'Port Act')." (ECF No. 25 ¶ 5). The FAC alleges that the Port District "is a trustee for the people of the State of California, which holds and manages the tidelands and submerged lands in and around San Diego Bay." *Id.* The FAC alleges that the "Port District is specifically authorized to use its 'power and authority . . . to protect and enhance . . . physical access to the bay . . . natural resources of the bay, including plant and animal life . . . [and] quality of water in the bay.'" *Id.* (quoting Harb. & Nav. Code App. 1, §§ 2, 4, 5, 5.5). The FAC alleges that the "Port District holds and exercises land management authority over the tidelands and submerged lands in and around San Diego Bay." *Id.* The FAC alleges that the "Port District is the successor to the powers vested in the cities that make up the Unified Port District, and the powers of those cities related to these properties are vested in the Port District." *Id.*

In 1963, through the Port Act, the State of California and the cities of San Diego, Chula Vista, Coronado, National City, and Imperial Beach granted and conveyed "all right, title and interest" in the tidelands and submerged lands around San Diego Bay to the Port District. *See* Harb. & Nav. Code App. 1 §§ 4, 5, 5.5. The Port District was granted the authority over "control, regulation, and management of the harbor of San Diego upon the tidelands and lands lying under the inland navigable waters of San Diego Bay." *Id.* § 4. The Port Act provides the authority to "sue and be sued in all actions and proceedings in all courts and tribunals of competent jurisdiction." *Id.* § 23. The Port District was given the power to "protect, preserve, and enhance,"

(1) The physical access to the bay.
(2) The natural resources of the bay, including plant and animal life.
(3) The quality of water in the bay.

*Id.* § 4.  The Port Act states that the Port District is

> the successor of the county and each of the cities included therein as to all powers theretofore vested in the county or each such city or exercisable by its officers, which are by the provisions of this act granted to the district or are exercisable by its officers.  Such powers are relinquished by the county and the cities and surrendered to the [Port] district.

*Id.* § 70.  The Port Act gives the Port District the power to pass and enforce "all necessary ordinances and resolutions for the regulation of the district."  *Id.* § 21.  San Diego Unified Port District Code, Published Pursuant to San Diego Unified Port District Ordinance 19, authorizes the Port District to abate public nuisances by bringing a civil action.  *See* SDUPD Code § 0.11(f) ("[A]ny violation of the provisions of the District Code is deemed to be a public nuisance.  Such violations may be abated by civil action or pursuant to applicable administrative abatement procedures.").

The Legislature granted the Port District "all powers theretofore vested in the county or each such city or exercisable by its officers, which are by the provisions of this act granted to the district or are exercisable by its officers."  Harb. & Nav. Code App. 1 § 70.  This includes, the power to "protect, preserve, and enhance" the Bay.  *Id.* § 4.  Before the conveyance of the Bay to the Port District, the State of California and the cities of San Diego, Chula Vista, Coronado, National City, and Imperial Beach had the authority to bring a public nuisance claim to protect the Bay.  Because the authority of the State and cities to bring a public nuisance claim was specifically transferred to the Port District, the Court concludes that the Legislature expressed its intention in specific and clear terms to grant the Port District the power to abate a nuisance.[3]  *See Lamont*, 93 Cal. Rptr. 2d at 291 ("[W]hen the Legislature has intended to grant the

---

[3] Monsanto contends that the Port District can only seek abatement and cannot seek to "recover the costs to investigate and remediate" contamination.  *See* ECF No. 25 at 26.  The Court does not address the issue of damages the Port District may recover in a representative capacity at this stage of the proceedings.

power to abate a nuisance, it has done so specifically and in clear terms."). The Court concludes that the Port District has standing to bring a representative cause of action under section 731.

### ii. Causation

Monsanto contends that the Port District's public nuisance claim should be dismissed because the Port District has not set forth facts demonstrating a connection between Monsanto's alleged acts and the disposal of the products that ultimately led to the alleged nuisance. (ECF No. 32-1 at 16). Monsanto contends that the "mere placement of a product (even an allegedly dangerous product) into the stream of commerce is insufficient for liability to attach under California law." *Id.* at 17.

The Port District contends that Monsanto is liable for the creation of a public nuisance due to Monsanto's conduct beyond that of merely supplying a product. (ECF No. 33 at 14-15). The Port District contends that despite knowing that PCBs were dangerous to human health and the environment, Monsanto concealed the dangers of PCBs, promoted the use of PCBs, and improperly instructed customers how to dispose of PCBs. *Id.*

"[C]ausation [is] a necessary element of a public nuisance claim." *In re Firearm Cases*, 24 Cal. Rptr. 3d 659, 678 (Ct. App. 2005). "[L]iability for nuisance does not hinge on whether the defendant owns, possesses or controls the [nuisance-creating] property, nor on whether [the defendant] is in a position to abate the nuisance; the critical question is whether the defendant created or assisted in the creation of the nuisance." *City of Modesto Redev, Agency v. Superior Court*, 13 Cal. Rptr. 3d 865, 872 (Ct. App. 2004). A defendant may be liable for assisting in the creation of a nuisance if he either "(1) affirmatively instructs the polluting entity to dispose of hazardous substances in an improper or unlawful manner or (2) manufactures or installs the disposal system." *Team Enterprises, LLC v. W. Inv. Real Estate Trust,* 647 F.3d 901, 912 (9th Cir. 2011) (internal citations omitted). "Mere but-for causation, on the other hand, does not give rise to nuisance liability." *Id.*

In *City of San Diego v. U.S. Gypsum Co.*, the City of San Diego brought a nuisance action against manufacturers of asbestos-containing building materials, seeking to recover damages for money the City had spent and would spend to identify and abate asbestos. 35 Cal. Rptr. 2d 876, 877 (Ct. App. 1994). On appeal, the court affirmed the order granting summary judgment in favor of the defendants, holding that the City could not maintain an action based on nuisance. The court concluded that the case was a "products liability action in the guise of a nuisance action." *Id*. at 884. The court noted that the "City cites no California decision . . . that allows recovery for a defective product under a nuisance cause of action. Indeed, under [the] City's theory, nuisance 'would become a monster that would devour in one gulp the entire law of tort.'" *Id*. at 883.

In *City of Modesto*, the City of Modesto brought claims under the Polanco Act against dry cleaning solvent and equipment manufacturers and distributors. 13 Cal. Rptr. 3d at 865. The court analyzed the claim in light of common law nuisance principles due to the statutory language of the Polanco Act. *Id*. at 868-72. The superior court granted summary judgment to the defendants. On appeal, the court affirmed the order granting the defendants' summary judgment. The court concluded that the defendants, whose conduct "was limited to manufacturing or selling solvents to dry cleaners, with knowledge of the hazards of those substances, without alerting the dry cleaners to proper methods of disposal," were not responsible parties because they "merely placed solvents in the stream of commerce without warning adequately of the dangers of improper disposal." *Id*. at 875-76. The court stated that "any failure to warn was not an activity directly connected with the disposal of solvents" and that "such behavior . . . does not fall within the context of nuisance, but is better analyzed through the law of negligence or products liability . . . ." *Id*. at 875. However, the court also stated that "those who create or assist in creating a system that causes hazardous wastes to be disposed of improperly, or who instruct users to dispose of wastes improperly, can be liable under the law of nuisance." *Id*. at 874; *see also Team Enterprise*, 647 F.3d at

912 ("A defendant may be liable for assisting in the creation of a nuisance if he either (1) affirmatively instructs the polluting entity to dispose of hazardous substances in an improper or unlawful manner or (2) manufactures or installs the disposal system." (internal citations omitted)).

In *County of Santa Clara v. Atlantic Richfield Co.*, the court held that the defendants, who manufactured lead paint, could be liable for public nuisance because "the alleged basis for defendants' liability for the public nuisance created by lead paint [was] their affirmative promotion of lead paint for interior use, not their mere manufacture and distribution of lead paint or their failure to warn of its hazards." 40 Cal. Rptr. 3d 313, 328 (Ct. App. 2006). The court noted that the "defendants' *promotion of lead paint for interior use* with knowledge of the hazard that such use would create" is conduct "distinct from and far more egregious than simply producing a defective product or failing to warn of a defective product; indeed, it is quite similar to instructing the purchaser to use the product in a hazardous manner, which *Modesto* found *could* create nuisance liability." *Id.*

In this case, the Port District alleges that PCBs "are man-made chemical compounds that have become notorious as global environmental contaminants found in bays, oceans, rivers, streams, soil, and air." (ECF No. 25 ¶ 1). The Port District alleges that Monsanto was the "sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name 'Aroclor' for certain PCB Compounds." *Id.* ¶ 2. The Port District alleges that Monsanto knew that PCBs presented a health risk and "were causing widespread contamination of the environment, far beyond the areas of its use." *Id.* ¶ 40. The Port District alleges that despite knowing of the health and environmental risks associated with PCBs, Monsanto "promot[ed] the use and sale of Aroclor and other PCB compounds." *Id.* ¶ 35. The Port District alleges that "Monsanto instructed its customers to dispose of PCB containing material in local landfills, knowing that landfills were not suitable for PCB contaminated waste." *Id.* ¶ 51. The Port District alleges that Monsanto "had determined that the only effective method of

disposing of PCBs was high temperature incineration, which was not commercially available to it or its customers, and it had constructed an incinerator for the disposal of its own *liquid* PCB contaminants." *Id.* The Port District alleges that Monsanto "made its incinerator available to its customers, for a fee, for the disposal of their liquid PCB wastes," but "instructed its customers to dispose of *solid* PCB contaminated wastes in landfills. *Id.* Based on these allegations, Plaintiffs have alleged sufficient facts to support a claim for public nuisance. *See Modesto*, 13 Cal. Rptr. 3d at 864 ("[T]hose who create or assist in creating a system that causes hazardous wastes to be disposed of improperly, or who instruct users to dispose of wastes improperly, can be liable under the law of nuisance."); *Team Enterprise*, 647 F.3d at 912 ("A defendant may be liable for assisting in the creation of a nuisance if he . . . affirmatively instructs the polluting entity to dispose of hazardous substances in an improper or unlawful manner . . . ."); *County of Santa Clara*, 40 Cal. Rptr. 3d at 328 ("[L]iability is premised on defendants' promotion of lead paint for interior use with knowledge of the hazard that such use would create."); *but see City of Bloomington, Ind. v. Westinghouse Elec. Corp.*, 891 F.2d 611, 614 (7th Cir.1989) ("Since the pleadings do not set forth facts from which it could be concluded that Monsanto retained the right to control the PCBs beyond the point of sale . . . Monsanto cannot be held liable on a nuisance theory."); *Town of Westport v. Monsanto Co.*, No. CIV. A. 14-12041-DJC, 2015 WL 1321466, *4 (D. Mass. Mar. 24, 2015) (granting the motion to dismiss a public nuisance claim because, after the point of sale, Monsanto "did not have the power or authority to maintain or abate these PCB-containing building materials").

### B. Equitable Indemnity

Monsanto contends that the Port District "fails to state a cognizable claim for equitable indemnity because its FAC is devoid of any facts showing Monsanto is jointly and severally liable with the Port District to an injured third party for alleged harm to the Bay." (ECF No. 32-1 at 23). Monsanto contends that it "has not been investigated by the State or named as a discharger in the 2012 CAO, nor does the FAC include any

allegations that would support Monsanto being named as a discharger . . . . " *Id*. Monsanto also contends that the Port District's claim is barred by the statute of limitations.

The Port District alleges that the Port District has been named in a CAO issued by the Regional Water Board for the Shipyard Sediment Site. (ECF No. 25 at 19). The Port District contends that the "PCB contamination was a driving force behind the Cleanup and Abatement Order and that the Water Board found that the contamination was a nuisance." (ECF No. 33 at 25). The Port District contends that "[t]he allegations in the FAC . . . clearly establish Monsanto's liability under public nuisance and purpresture for the PCB contamination addressed by the Water Board's [CAO]." (ECF No. 33 at 24). The Port District contends that its claim is not time barred because the CAO was issued on March 14, 2012, and the Port District's Complaint was filed March 13, 2015. *Id.* at 24.

Equitable indemnity "allows one tortfeasor to seek either full or partial indemnity from a joint tortfeasor on a comparative fault basis." *Selma,* 271 Cal. Rptr. at 601. For the purpose of indemnity, joint tortfeasors are "two or more persons who are liable to the same person for the same harm." *Id*. at 602 (citing Restatement Second of Torts § 886A, com. b). "It is not necessary that [the tortfeasors] act in concert or in pursuance of a common design, nor is it necessary that they be joined as defendants." *Id*. "It can apply to acts that are concurrent or successive, joint or several, as long as they create a detriment caused by several actors." *Greystone Homes, Inc. V. Midtec, Inc.*, 86 Cal. Rptr. 3d 196, 205 (Cal. App. 2008). However, equitable indemnity is not available "in the absence of a joint legal obligation to the injured party." *Prince*, 202 P.3d at 1122. The California Supreme Court "has consistently ruled that a cause of action for indemnity does not accrue until the indemnitee suffers loss through payment of an adverse judgment or settlement." *City of San Diego*, 35 Cal. Rptr. 2d at 884; *see also Valley Circle*, 659 P.2d at 1165 (holding that an action for equitable indemnity accrues for limitation purposes at "the time the tort defendant pays a judgment or settlement as

to which he is entitled to indemnity.").  California courts apply a three-year statute of limitation on equitable indemnity claims.  *See* Cal. Civ. Proc. Code § 338; *City of San Diego*, 35 Cal. Rptr. 2d at 881 (applying a three-year statute of limitations in a public nuisance claims for injury to buildings).

In *Selma*, the State of California and the Regional Water Quality Control Board (the "State") brought a nuisance cause of action against the defendants, owners of a wood treatment facility, arising from the discharge of hazardous waste at defendant's facility.  271 Cal. Rptr. at 599.  The State brought the nuisance claim, among others, following defendants' "alleged failure to comply with [a] cleanup and abatement order." *Id.* at 601.  The defendants filed cross-complaints and sought equitable indemnity from several cross-defendants, including Osmose and a group of chemical suppliers.  *Id.* at 598-99.  The chemical suppliers allegedly provided "assistance and advice" about the chemicals used by the defendants at the facility and failed to warn of the risks associated with improper use or disposal of the chemicals.  Osmose was a company involved in the design and installation of the wood treatment system and facilities.  *Id.* at 600.  The defendants alleged that "Osmose misrepresented the injurious nature of the wood treating chemicals on the environment," recommended harmful disposal methods, and "did not inform" defendants of the environmental harm caused by the waste.  *Id.*

The state court concluded that the defendants stated facts sufficient for an equitable indemnity claim against both Osmose and the chemical suppliers.  *Id.* at 610.  The court stated that in "deciding the propriety of allowing an indemnification claim . . . we look for joint liability to the plaintiff or injured party by both the would-be indemnitee and indemnitor."  *Id.* at 602.  The court concluded that because "the State could plead a cause of action for damages flowing from nuisance against [Osmose and the chemical companies], " the defendants could state a claim for equitable indemnity allege that Osmose and the chemical companies contributed to the public nuisance.  *Id.* at 606-07.  The court concluded that the defendants "could state a claim for equitable

indemnity against Osmose for Osmose's contribution or assistance in the creation of a nuisance insofar as Osmose helped design the system of chemical waste disposal used." *Id.* Osmose recommended disposal of the product into an "unlined dirt pond" and "knew, or should have known, such disposal practices might threaten the safety of the underlying water supply." *Id.* at 607. The court concluded that the pleadings demonstrated that Osmose "knew of the dangerous propensities of the chemicals if improperly disposed of and failed to warn appellants of these dangerous propensities." *Id.* Similarly, the court concluded that the defendants stated a claim for equitable indemnity against the chemical companies. *Id.* at 610. The court concluded that "in failing to warn an unknowledgeable [defendant] of the hazards to the environment of which [the chemical companies] knew could flow from the improper handling and disposal of the wood-treating chemicals, [the chemical companies] failure could be found to be a substantial factor in the creation of the nuisance." *Id.* The court concluded that "[u]nder the principles of equitable indemnity, [Osmose and the chemical companies] should be liable for their share of the harm" caused by the public nuisance which formed the basis of the action brought by the State against the defendants. *Id.* at 610.

In this case, the Port District alleges that it has been named in a CAO issued by the California Regional Water Board.[4] (ECF No. 25 ¶ 65). The Port District alleges that "PCBs are identified as a Primary Chemical of Concern" in the CAO. *Id.* The Port District alleges that the California Regional Water Board "directed . . . the Port District to . . . remediate PCB contaminated sediments within [the Bay]." *Id.* ¶ 70. The Port District alleges that it "has incurred substantial costs deriving from state-mandated PCB clean-up." *Id.* ¶ 85. The Port District alleges that "Monsanto's creation of the public nuisance is a substantial factor in causing Plaintiff Port District's injury." *Id.* ¶ 92. The

---

[4] The CAO states, "The San Diego Water Board finds that the Port District caused or permitted wastes to be discharged or to be deposited . . . into San Diego Bay and created, or threatened to create a condition of pollution or nuisance." (ECF No. 31-6 at 8).

Court concludes that these allegations are not sufficient to support an inference that Monsanto could be jointly liable to the California Regional Water Board for the alleged injury.  In addition, the Port District does not allege that there has been a judgment or settlement rendered as a result of this joint liability.  *See City of San Diego*, 35 Cal. Rptr. 2d at 884 (stating that the California Supreme Court "has consistently ruled that a cause of action for indemnity does not accrue until the indemnitee suffers loss through payment of an adverse judgment or settlement."); *Sullins v. Exxon/Mobile Corp.*, 729 F. Supp. 2d 1129, 1140 (N.D. Cal. 2010) (granting summary judgment for the defendant against a claim of equitable indemnity because a final cleanup order from a regulatory agency was not a money judgment or settlement).  Monsanto's motion to dismiss the Port District's equitable indemnity claim is granted.

### C. Purpresture

Monsanto contends that the Port District fails to state a claim for purpresture because the Port District cannot show that Monsanto physically encroached upon the Bay and that the "mere presence of contamination" does not limit navigation.  (ECF No. 32-1 at 25).  Monsanto contends that the Port District's purpresture claim is time barred under the four-year "catch all" statute.  *Id*. at 28.

The Port District contends that "the PCB contamination constitutes an unlawful purpresture of the tidelands and submerged lands of the Bay . . . ."  (ECF No. 33 at 21). The Port District contends that the "accumulation of PCBs in the sediments of the Bay interferes with navigation and the unobstructed use and enjoyment of the Bay by the people of California . . . ."  *Id*. at 22.  The Port District contends that purpresture, like public nuisance, is not subject to any statute of limitations.

A purpresture is an unlawful encroachment, intrusion, or obstruction of a public highway or navigable waterway.  *People v. Gold Run Ditch & Mining Co.*, 4 P. 1152, 1155 (Cal. 1884).  "An unauthorized invasion of the rights of the public to navigate the water flowing over the soil is a public nuisance; and an unauthorized encroachment upon the soil itself is known in law as a purpresture."  *Id*.  In California, a purpresture

1    is a kind of public nuisance. *People v. Gold Run Ditch & Mining Co.*, 4 P. 1152 (1884);

2    Cal. Civ. Code § 3479 ("Anything which . . . unlawfully obstructs the free passage or

3    use, in the customary manner, of any navigable . . . bay . . . is a nuisance."). There is

4    no statute of limitations for a public nuisance action. Cal. Civ. Code § 3490.

5         The FAC alleges that "[t]he presence of PCBs in the waters and sediments of the

6    Bay constitutes an unauthorized invasion of the rights of the public to navigate the

7    waters of the Bay and constitutes a purpresture." (ECF No. 25 ¶ 96). The FAC alleges

8    that the "presence of PCBs in the waters and sediments of the Bay impairs the

9    navigation of the Bay, related commercial uses of the Bay, and the rights of the entire

10   community to free use and enjoyment of the Bay." *Id.* ¶ 97. The FAC alleges that

11   "[a]s a direct and proximate result of Monsanto's creation of an unauthorized invasion

12   and obstruction of the rights of the public to navigational uses of the waters of the Bay,

13   the Port District and the people of the State of California have suffered, and continue

14   to suffer, interference with public and navigational uses of the Bay." *Id.* ¶ 98. The

15   FAC alleges that "previous PCB driven remedial actions have resulted in the creation

16   of permanent engineered caps isolating PCB-contaminated sediments at the Campbell

17   Shipyard and Convair Lagoon sediment sites, at significant cost and interference to the

18   Port District." *Id.* ¶ 71. "The FAC alleges that Navigation is prohibited above and

19   around these caps to ensure their stability and continued effectiveness." *Id.*

20        The Court concludes that the Port District has alleged facts sufficient to plausibly

21   support a cause of action for purpresture. Defendant's motion to dismiss is denied.

22        **D. Prayer of Relief for Natural Resource Damages**

23        Monsanto contends that the Port District cannot recover damages for injury to

24   and loss of us of natural resources because there is no "federal or state law" that

25   designates the Port District as "a lawfully designated natural resource trustee" that can

26   sue for natural resource damages. (ECF No. 32-1 at 28). Monsanto contends that the

27   Port Act does not designate the Port District "as a natural resource trustee" or give the

28   Port District "statutory authorization to recover natural resources damages." *Id.* at 29.

1    The Port District contends that it can recover for natural resource damages
2    because the tidelands and submerged lands of the Bay are public trust lands that the Port
3    District holds in trust. (ECF No. 33 at 27). The Port District contends that "[p]rotection
4    and preservation of the natural resources . . . are an integral part of the Port District's
5    'uses' of its trust duties." *Id*.

6    "It has long been established that the sovereign's interest in the preservation of
7    public resources and the environment enables it to maintain an action to prevent injury
8    thereto." *Selma*, 271 Cal. Rptr. at 606. "The State has not only the right but also the
9    affirmative fiduciary obligation to ensure that the rights of the public to a viable marine
10   environment are protected, and to seek compensation for any diminution in that trust
11   corpus." *Id*. Section 25352 of the California Health and Safety Code provides that "the
12   Governor, or the authorized representative of the state, shall act on behalf of the public
13   as trustee of the natural resources to recover costs." Cal. H & S Code § 25352(c).

14   The tidelands and submerged lands of the Bay are public trust lands. Cal. Harb.
15   & Nav. Code App 1 at §§ 5.5., 14 (The title to the tidelands and submerged lands of the
16   Bay "reside in the district, and the district shall hold such lands in trust . . ."). The Port
17   District was granted the authority over "control, regulation, and management of the
18   harbor of San Diego upon the tidelands and lands lying under the inland navigable
19   waters of San Diego Bay." *Id*. § 4. The Port District was given the power to "protect,
20   preserve, and enhance" the Bay. *Id*. One of the purposes for which the Port District
21   holds the lands is "for the establishment and maintenance of those lands for open space,
22   ecological preservation, and habitat restoration." *Id*. § 87. Through the Port Act, the
23   State of California delegated the public trust rights and authority to the Port District.
24   The Court finds that the Port District has alleged sufficient facts to seek damages for
25   "the injury to and loss of use of natural resources deriving from the presence of PCBs
26   in and around the Bay, including the cost of restoring those natural resources." *See*
27   ECF No. 25 at 27; *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 944 (9th Cir.
28   2002) ("[T]o the extent that natural resources owned or held in trust by Lodi are

1  damaged by environmental contamination, we find that nothing in CERCLA or HSAA

2  prevents the City from suing under MERLO to recover for damage to such resources.").

3      **E. Prayer of Relief for Attorney's Fees and Punitive Damages**

4      Monsanto contends that the Port District's "prayer for punitive damages must be

5  dismissed because the Port District has not alleged sufficient facts showing that

6  Monsanto's lawful, historical manufacture of PCBs involved any 'oppression, fraud,

7  or malice.'" (ECF No. 32-1 at 31). Monsanto contends that the Port District "has not

8  identified any statute or agreement entitling it to attorney's fees" in this case and that

9  "a public entity, such as the Port District, is specifically precluded from recovering

10  attorney's fees from a private defendant." *Id*. at 32.

11      The Court declines to strike the Port District's request for attorney's fees and

12  punitive damages at this stage in the proceedings.

13  **VI.  Motion to Dismiss the City's First Amended Complaint (ECF No. 31)**

14      **A. Public Nuisance Claim**

15      Monsanto contends that the City lacks standing to bring this action for public

16  nuisance. (ECF No. 31-1 at 25). Monsanto contends that the City has failed to properly

17  state a representative public nuisance claim under California Civil Code section 731

18  because the City "failed to mention the People of California anywhere in its FAC." *Id*.

19  Monsanto contends that the City does not have standing to assert a non-representative

20  public nuisance claim under section 731, because the City does not have a property

21  interest in the Bay. *Id*. Monsanto contends that, to the extent that the City alleges a

22  property interest in the rainwater transported through the stormwater conveyance

23  system, that property interest does not provide the "requisite *property* interest to assert

24  a public nuisance *in the Bay*, which is the property that the FAC alleges is injured."

25  (ECF No. 37 at 6-7).

26      The City contends that it has standing to bring a non-representative claim because

27  it has alleged both a special injury and a property interest. (ECF No. 34 at 8). The City

28  contends that the presence of PCBs in the Bay is "specially injurious" to the City

1   because "the Board has directed the City to, among other things, incur significant costs
2   to remediate PCB contamination in a discrete area of the Bay known as the Shipyard
3   Sediment Site." *Id.* at 11.

4   In this case, the City brings the public nuisance claim in its individual capacity.[5]
5   (ECF No. 24).  The City alleges that it is "a public property owner and former trustee
6   of the Bay . . . ."  (ECF No. 24 ¶ 4).  The City alleges that it was "the trustee of certain
7   relevant tidelands and submerged lands in and around the Bay from the early 1900s
8   through 1963, when that property was transferred to the Port District."  *Id.* ¶ 5.  The
9   City alleges that it "manages and operate[s] a municipal stormwater system, which
10  collects and transports stormwater to be discharged into the Bay."  *Id.*  The City alleges
11  that "PCBs . . . leach out of paints, caulk, sealants and other applications and are
12  transported by air and water to the Bay.  *Id.* ¶ 70.  The City alleges that "[t]he presence
13  of PCBs adversely affects the quality of water in the Bay and causes inconvenience and
14  annoyance to Plaintiff, who has been required to incur costs in order to protect plant and
15  animal life, and their presence."  *Id.* ¶ 81.  The City alleges that the presence of PCBs
16  "affects a substantial number of people who use the Bay for commercial and
17  recreational purposes and interferes with the rights of the public at large to clean and
18  safe resources and environment."  *Id.* ¶ 82.  The City alleges that it "has suffered and
19  will continue to suffer harm that is different from the type of harm suffered by the
20  general public . . . ."  *Id.* ¶ 85.  The City seeks "[a]ny and all compensatory damages
21  . . . including . . . all past and future costs and expenses related to the investigation,
22  remediation, and removal of PCBs from in and around the Bay."  *Id.* at 25.  The City
23  seeks "[a]n order that Defendants pay for establishment of a fund used by the City to
24  abate the public nuisance created by the presence of PCBs in and around the Bay,
25  including remediating all PCB contamination in the Shipyard Sediment Site and other

26
27  [5] At oral argument, Counsel for the City stated that the City "never alleged a representative claim" and that it was "alleging a claim in [its] individual capacity." (ECF No. 66 at 27:8-10).  The FAC does not state that the City is bringing its public
28  nuisance claim as a representative claim "in the name of the people of the State of California."  *See* Cal. Civ. Proc. Code § 731.

1    areas . . ." *Id*.

2         ### i. Special Injury

3         The City asserts that section 731 provides a public nuisance action "for

4    abatement and monetary damages by any plaintiff who has special injury." (ECF No.

5    34 at 9). The City asserts that "[t]o be consistent with the substantive right guaranteed

6    by Civil Code section 3493, the action for damages must extend to a municipality that

7    alleges special injury caused by the nuisance." *Id*.

8         Section 731 provides that "any person whose property is injuriously affected" can

9    bring a public nuisance claim. Cal. Civ. Proc. Code § 731. Under section 731,

10   "[w]here a public entity can show it has a property interest injuriously affected by the

11   nuisance, then, like any other such property holder, it should be able to pursue the full

12   panoply of tort remedies available to private persons." *Selma*, 271 Cal. Rptr. 596, 603

13   (Ct. App. 1990) (interpreting the term "person" in section 731 to include governmental

14   units).

15        Under section 3493, "A private person may maintain an action for a public

16   nuisance, if it is specially injurious to himself, but not otherwise." Cal. Civ. Code §

17   3493. In *City of Los Angeles v. Shpegel-Dimsey, Inc.*, the court concluded that "Civil

18   Code section 3493 provides no authority for . . . a public entity rather than a private

19   party, to recover damages for a 'specially injurious' public nuisance . . ." 244 Cal. Rptr.

20   507, 512 (Ct. App. 1988); *see also Torrance Redevelopment Agency v. Solvent Coating*

21   *Co.*, 763 F. Supp. 1060, 1065 (C.D. Cal. 1991).

22        The City, as a public entity rather than a private party, cannot establish standing

23   for a public nuisance claim under section 731 by alleging a "special injury" under

24   section 3493. The City can only establish standing for a public nuisance claim by

25   alleging that its "property is injuriously affected." *See* Cal. Civ. Proc. Code § 731.

26        ### ii. Property Damage

27        The City asserts that it has "property" which "is injuriously affected" by PCBs

28   and seeks "removal of PCBs from in and around the Bay." (ECF Nos. 34 at 10; 24 at

25).  In the FAC, the City alleges that it was divested of its property interest in the Bay in 1963.  The City does not allege a property interest in the Bay.  Although the City alleges a property interest in the municipal stormwater system, the City does not allege facts sufficient to infer that the municipal stormwater system is "injuriously affected by the nuisance" nor does the City seek damages based on the presence of PCBs in the sewer system.[6]  *See Selma*, 271 Cal. Rptr. at 603 ("Where the State has a property interest which has been injuriously affected by a nuisance, the State can, like any property owner, seek damages.").  The FAC does not allege sufficient facts to infer that the City has standing to bring a public nuisance claim as a "person whose property is injuriously affected" under California Code of Civil Procedure section 731.[7]  The Court grants Defendant's motion to dismiss the City's public nuisance claim.

## B. Equitable Indemnity

Monsanto contends that the City "fails to state a cognizable claim for equitable indemnity because its FAC is devoid of any facts showing Monsanto is jointly and severally liable with the City to an injured third party for alleged harm to the Bay." (ECF No. 31-1 at 28).  Monsanto contends that it "has not been investigated by the State or named as a discharger in the 2012 CAO . . . nor does the FAC include any allegations that would support Monsanto being named as a discharger or liable jointly with the

_____

[6] In its opposition papers, the City asserts that it has a property interest in the water that runs through the stormwater system, derived under the doctrine of "Pueblo Rights," and that PCBs interfere with the City's property interests to that water.  (ECF No. 34 at 10).  The City contends that "it seeks to recover the costs of removing the PCBs from the stormwater system."  *Id.* at 11.  Those allegations are not in the FAC, therefore, the Court does not consider whether those allegations would give the City the requisite standing to state a claim for public nuisance.

[7] On August 23, 2016, Monsanto filed a Notice of Supplemental Authority in support of their Motion to Dismiss.  (ECF No. 69).  Monsanto's submission included notice of an order in a case currently in the Northern District of California. (ECF No. 69-1).  On August 22, 2016, the court dismissed three cases involving public nuisance and equitable indemnity causes of action brought by three Northern California cities against Monsanto.  The court granted Monsanto's motion to dismiss for failure to state a claim in regards to the non-representative public nuisance cause of action.  *Id.* at 6-9.  The cities argued that they had a property interest in the stormwater that had been polluted by Monsanto's PCB; however, the court concluded that the cities failed to establish a property interest that was injuriously affected in the stormwater.  *Id.* at 7-9.

City. . . ." *Id*. at 29.  Monsanto contends that the "CAO is not a 'payment to any third party in settlement of a claim or in satisfaction of a judgment' necessary to sustain an equitable indemnity claim."  (ECF No. 37 at 12).  Monsanto contends that the City's claim is also barred by the statute of limitations because the alleged contamination of the Bay was first addressed as early as "the 2006 Campbell Shipyard Settlement under which the City paid $3.45 million to remediate PCBs." *Id*. at 14.

The City contends that "the key to joint and several liability in the equitable indemnity context is that both the indemnitee and indemnitor carry a responsibility for the same underlying harm."  (ECF No. 34 at 25).  The City contends that it has "alleged facts showing that the [California Regional Water Quality Control Board] may consider both the City and Monsanto to be responsible for the contamination of the Shipyard Sediment Site." *Id*.  The City contends that it filed its FAC within the applicable three-year statute of limitations period.  *Id*.

Equitable indemnity "allows one tortfeasor to seek either full or partial indemnity from a joint tortfeasor on a comparative fault basis." *Selma,* 271 Cal. Rptr. at 601.  For the purpose of indemnity, joint tortfeasors are "two or more persons who are liable to the same person for the same harm." *Id*. at 602 (citing Restatement Second of Torts § 886A, com. b).  Equitable indemnity is not available "in the absence of a joint legal obligation to the injured party." *Prince v. Pac. Gas & Elec. Co.*, 202 P.3d 1115, 1122 (Cal. 2009).  However,  "[i]t is not necessary that [the tortfeasors] act in concert or in pursuance of a common design, nor is it necessary that they be joined as defendants." *Id*.  "It can apply to acts that are concurrent or successive, joint or several, as long as they create a detriment cause by several actors." *Greystone Homes*, 86 Cal. Rptr. 3d at 205.

The California Supreme Court "has consistently ruled that a cause of action for indemnity does not accrue until the indemnitee suffers loss through payment of an adverse judgment or settlement." *City of San Diego*, 35 Cal. Rptr. 2d at 884; *see also Valley Circle Estates v. VTN Consolidated, Inc.*, 659 P.2d 1160, 1165 (Cal. 1983)

(holding that an action for equitable indemnity accrues for limitation purposes at "the time the tort defendant pays a judgment or settlement as to which he is entitled to indemnity."). California courts apply a three-year statute of limitation on equitable indemnity claims. *See* Cal. Civ. Proc. Code § 338; *City of San Diego*, 35 Cal. Rptr. 2d at 884 (applying a three-year statute of limitations in an equitable indemnity claim).

In this case, the City alleges that it has been named in a CAO issued by the California Regional Water Board.[8] (ECF No. 24 ¶ 66). The City alleges that "PCBs are identified as a Primary Chemical of Concern" in the CAO. (ECF No. 24 ¶ 66). The City alleges that it "has incurred substantial costs deriving from state-mandated PCB clean-up." *Id.* ¶ 85. The City alleges that it "is obligated to pay for certain remediation of the Shipyard Sediment Site pursuant to the March 14, 2012 CAO." *Id.* The City alleges that "Monsanto's creation of the public nuisance is a substantial factor in causing Plaintiff's injury." *Id.* ¶ 92. The Court concludes that the City does not allege facts sufficient to support an inference that Monsanto could be jointly liable to the California Regional Water Board for the alleged injury. In addition, the FAC does not allege that there has been a judgment or settlement rendered as a result of this joint liability. *See id.* ¶ 85; *City of San Diego*, 35 Cal. Rptr. 2d at 884 (stating that the California Supreme Court " has consistently ruled that a cause of action for indemnity does not accrue until the indemnities suffers loss through payment of an adverse judgment or settlement."); *Sullins*, 729 F. Supp. 2d at 1140 (granting summary judgment for the defendant against a claim of equitable indemnity because a final cleanup order from a regulatory agency was not a money judgment or settlement). Accordingly, the City fails to state a claim for equitable indemnity. Monsanto's motion to dismiss the City's equitable indemnity claim is granted.

**VII. Conclusion**

---

[8] The CAO states, "The San Diego Water Board finds that the City of San Diego has caused or permitted wastes to be discharged or to be deposited . . . into San Diego Bay and created, or threatened to create, a condition of pollution or nuisance." (ECF No. 31-6 at 4).

1   IT IS HEREBY ORDERED that Monsanto's Motion to Dismiss the Port
2  District's Amended Complaint (ECF No. 32) is granted as to the Port District's
3  equitable indemnity cause of action and denied in all other respects.
4   IT IS FURTHER ORDERED that Monsanto's Motion to Dismiss the City's
5  Amended Complaint (ECF No. 31) is granted.
6   Plaintiffs shall file any motions for leave to amend complying with Local Rule
7  15.1 within sixty (60) days of this Order.
8  DATED:  September 28, 2016
9
10  **WILLIAM Q. HAYES**
United States District Judge
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28