**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
John P. Fiske (SBN 249256)
655 West Broadway, Suite 1700
San Diego, CA  92101
Telephone:  619-237-3490

**BARON & BUDD P.C.**
Scott Summy (admitted Pro Hac Vice)
(Texas Bar No. 19507500)
Carla Burke (admitted Pro Hac Vice)
(Texas Bar NO. 24012490)
Celeste Evangelisti (SBN 225232)
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Telephone:  214-521-3605

JAN I. GOLDSMITH, City Attorney
California State Bar No. 70988
DAVID J. KARLIN, Assistant City Attorney - Interim
California State Bar No. 156178
PAUL F. PRATHER, Deputy City Attorney
California State Bar No. 252985
**OFFICE OF THE CITY ATTORNEY**
1200 Third Avenue, Suite 1100
San Diego, CA  92101
Telephone:  619-533-5800

*Attorneys for Plaintiff City of San Diego*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN DIEGO, a municipal corporation; | Case No.  3:15-cv-00578-WQH-AGS |
| Plaintiff, | **PLAINTIFF'S SECOND AMENDED COMPLAINT** |
| v. | |
| MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION, | Assigned to Judge William Q. Hayes<br>File Date:  March 13, 2015 |
| Defendants. | |

Plaintiff the CITY OF SAN DIEGO ("the City") hereby alleges, upon information and belief, as follows:

## I.   INTRODUCTION

1.   Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants – found in bays, oceans, rivers, streams, soil, and air. PCBs are persistent in the environment, easily transfer up the food chain, or bioaccumulate, and concentrations in tissues biomagnify as this process occurs.  As a result, PCBs have been detected in the tissues of all living beings on earth including all forms of marine life, various animals and birds, plants and trees, and humans. The extent of PCB contamination is troubling because PCBs cause a variety of adverse human health effects. In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects. In addition, PCBs can impair and even destroy populations of fish, birds, and other animals.

2.   Monsanto Company has repeatedly held itself out as the sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name "Aroclor" for certain PCB compounds.  Although Monsanto knew for decades that PCBs were toxic, knew that they could not be contained and as a result were widely contaminating all natural resources and living organisms, and knew that there was no safe way to dispose of PCBs, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture of and most uses of PCBs as of January 1, 1979.

3.   U.S. EPA (2000b) has classified PCBs as 'probable human carcinogens.' Studies have suggested that PCBs may play a role in inducing breast cancer. Studies have also linked PCBs to increased risk for several other cancers

including liver, biliary tract, gall bladder, gastrointestinal tract, pancreas, melanoma, and non-Hodgkin's lymphoma. PCBs may also cause non-carcinogenic effects, including reproductive effects and developmental effects (primarily to the nervous system). PCBs tend to accumulate in the human body in the liver, adipose tissue (fat), skin, and breast milk. PCBs have also been found in human plasma, follicular fluid, and sperm fluid. Fetuses may be exposed to PCBs in utero, and babies may be exposed to PCBs during breastfeeding. According to U.S. EPA (2000b), '[s]ome human studies have also suggested that PCB exposure may cause adverse effects in children and developing fetuses while other studies have not shown effects. Reported effects include lower IQ scores, low birth weight, and lower behavior assessment scores.

4.      PCBs have traveled into San Diego Bay and the City of San Diego's stormwater system by a variety of ways. PCBs were used in many industrial and commercial applications such as paint, caulking, transformers, capacitors, coolants, hydraulic fluids, plasticizers, sealants, inks, lubricants, and other uses. PCBs regularly leach, leak, off-gas, and escape their intended applications, causing runoff during naturally occurring storm and rain events, after being released into the environment. The runoff originates from multiple sources and industries and enters the City of San Diego's stormwater system and San Diego Bay through stormwater and dry weather runoff.

5.      The natural fate and transport of PCBs result in the gathering and collection in stormwater through no fault of the City of San Diego, which lawfully discharges water into San Diego Bay through its Municipal Separate Storm Sewer System (MS4) NPDES permit.

6.      Monsanto's PCBs have been found in and around San Diego Bay ("the Bay") at levels that require cleanup in certain areas. At different times and locations, PCBs have been detected in the Bay's water, sediments, fish, and lobsters. PCBs entered the Bay through a variety of ways. PCBs regularly leach,

leak, off-gas, and escape their intended applications into air, soil, and water. PCBs also leach from landfills and other disposal locations and can enter the Bay with stormwater and dry weather runoff.

7.   U.S. EPA classifies San Diego Bay as "Impaired" due to the presence of PCBs.

8.   As a public property owner and former trustee of the Bay, Plaintiff seeks to recover damages for retrofit injuries to stormwater system property and/or other public property including trust lands to the extent the City is trustee of such public lands.

9.   The City of San Diego was named in a California Regional Water Quality Control Board Clean Up and Abatement Order for PCBs in the San Diego Bay due in part to the City's ownership of its MS4 stormwater system and due in part to its status as a former trustee of the San Diego Bay.

10.   Currently, third parties are trying to include the City of San Diego into another California Regional Water Quality Control Board Cleanup and Abatement Order at the Laurel Hawthorne Embayment and Former Campbell Shipyard Sediment Cap due to the public nuisance caused by the presence and contamination of Monsanto's PCBs.

## II.   PARTIES

### A. Plaintiff

11.   Plaintiff City of San Diego ("Plaintiff" or "City") is a California Charter City and municipal corporation, duly organized and existing by virtue of the laws of the State of California. The City was the trustee of certain relevant tidelands and submerged lands in and around the Bay from the early 1900s through 1963, when that property was transferred to the Port District.

12.   Plaintiff brings this suit pursuant to California Code of Civil Procedure 731, and California Civil Code sections 3479, 3480, 3491, 3493, and 3494 and any other applicable codes or sources of relief available for monetary

damages caused by Monsanto's PCBs.

**B. Defendants**

13.    Defendant Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri.

14.    Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

15.    Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack, New Jersey.  Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

16.    The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business.  Old Monsanto began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late 1970s.

17.    Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations.  The corporation now known as Monsanto operates Old Monsanto's agricultural products business.  Old Monsanto's chemical products business is now operated by Solutia.  Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

18.    Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business.  Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.[1]

19.    Although Solutia assumed and agreed to indemnify Pharmacia (then

---

[1] *See* Monsanto Company's Answer to the Complaint and Jury Demand, *Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October 8, 2013); *see also* Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx (last accessed February 20, 2014).

known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business – including the manufacture and sale of PCBs.[2]

20.   In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code.  Solutia's reorganization was completed in 2008.  In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assumed financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.[3]

21.   Monsanto represented in its most recent Form 10-K (for the fiscal year ending August 31, 2016):   "Monsanto is involved in environmental remediation and legal proceedings to which Monsanto is party in its own name and proceedings to which its former parent, Pharmacia LLC ("Pharmacia") or its former subsidiary, Solutia, Inc. ("Solutia") is a party but that Monsanto manages and for which Monsanto is responsible pursuant to certain indemnification agreements. In addition, Monsanto has liabilities established for various product claims. With respect to certain of these proceedings, Monsanto has established a reserve for the estimated liabilities."   The document specifies that the company holds $545 million in that reserve.[4]

22.   Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants" or "Monsanto."

---

[2] *See id.*
[3] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed February 20, 2014).
[4] See Monsanto Company, Form 10-K (for the fiscal year ended Aug. 31, 2016), available at http://www.monsanto.com/investors/pages/sec-filings.aspx?page=0&group=1&limit=1 (last accessed November 16, 2016).

## III.   JURISDICTION AND VENUE

23.    This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists between Plaintiff and Defendants.  Plaintiff is located in California, but no Defendant is a citizen of California.  Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri. Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

24.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## IV.   PLAINTIFF'S STANDING

### I.   STORMWATER SYSTEM DAMAGE AND RETROFIT

25.    The City has property rights in its stormwater system, captured stormwater, and tidelands or submerged lands, and other public trust lands that are contaminated with Monsanto's PCBs, to the extent the City of San Diego owns or holds lands in public trust.

26.    The City owns, manages, and operates a municipal stormwater and dry weather runoff system, which captures, collects, reuses for beneficial purposes, and/or transports stormwater and dry weather runoff.

27.    Monsanto's PCBs have contaminated and damaged multiple facilities within the City's stormwater and dry weather runoff systems.

28.    As a result of Monsanto's PCB's presence, the City cannot operate many of its stormwater and dry weather runoff systems as designed because the system now requires upgrades and retrofits to accommodate Monsanto's PCBs.

29.    The City has incurred and will continue to incur costs to reduce PCBs from stormwater and dry weather runoff, which includes efforts to capture and beneficially use stormwater and dry weather runoff to augment existing water

supplies.

30.     The City's stormwater and dry weather runoff management system is damaged such that multiple facilities within the City's system has been and must be further retrofitted and improved in order to reduce and remove PCBs from stormwater and dry weather runoff.  The retrofits and improvements required to reduce PCBs from stormwater and dry weather runoff have cost and will continue to cost the City money.

31.     The City's stormwater system includes and will include into the future inlets, outfalls, pipes, drains, catch basins, bioswales, gutters, city streets, and other infrastructure and systems.  The City owns and operates the entire system, significant parts of which have been damaged and must be retrofitted to accommodate for the presence of Monsanto's PCBs.

32.     The retrofits include but are not limited to new infrastructure build, infrastructure renovation, additional street sweeping, system cleaning additional filtering, new engineering and design, new source control program development and management, and other additional retrofits to the current system.

33.     Retrofits to impacted facilities within the City's stormwater system are required to reduce and remove Monsanto's PCBs to prevent further contamination of the San Diego Bay.

34.     Retrofits to the City stormwater system are in compliance with the City's Watershed Management Plans, discussed further in the following sections.

35.     The City's retrofits also include new development designed to remove or reduce Monsanto's PCBs from City stormwater and dry weather runoff while capturing stormwater and dry weather runoff for beneficial uses to augment existing water supplies.

**II. AB 2594 STORMWATER RESOURCES: USE OF CAPTURED WATER.**

36.     The Legislature codified the City's property interest in stormwater as a usufructuary right.  On August 25, 2016, the California State Legislature

unanimously passed legislation confirming and codifying the Cities' use rights in stormwater.  Assembly Bill 2594 passed in the Senate on August 22, 2016 by a vote of 38-0.[5]  AB 2594 passed in the Assembly on August 25, 2016 by a vote of 78-0.[6]  Not one California Senator or Assemblymember voted against AB 2594.

37.    The unanimously passed bill was signed into law by Governor Brown on September 23, 2016.[7]  The Bill adds a new section 10561.7 to the Water Code to provide that:

> (a) A public entity that captures stormwater from urban areas, in accordance with a stormwater resource plan, before the water reaches a natural channel shall be entitled to use the captured water to the extent that the water augments existing water supplies.

38.    The Bill's legislative history explains, "This bill will make clear that public entities can capture urban stormwater… and use it.  This will encourage more stormwater capture and will provide additional options to finance stormwater systems."[8]  This right to use has long been recognized as a property right under California law.  *See, e.g.*, *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 457 F.Supp.2d 455, 460 (2006), and discussion, *infra*.

/ / /

/ / /

/ / /

---

[5] August 22, 2016 was the same day this court issued the subject order in the Northern District of California cases.
https://leginfo.legislature.ca.gov/faces/billVotesClient.xhtml?bill_id=201520160AB2594
[6] *Id.*
[7] https://www.gov.ca.gov/news.php?id=19559.
[8] 08/23/16- Assembly Floor Analysis, CONCURRENCE IN SENATE AMENDMENTS, Analysis Prepared by: Ryan Ojakian, Dated 08/23/16;
https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201520160AB2594

### III.   WATER CODE SECTION 10560, ET SEQ. "THE STORMWATER RESOURCE PLANNING ACT"

39.   The Water Code confers on cities a right to use stormwater.  Due to ever-increasing population demands, historically significant drought conditions,[9] climate change,[10] and the scarcity of water as a resource in California, stormwater has been recognized as an important resource for California cities.

> In the last decade, as prolonged periods of drought restricted water supplies, California's attention to stormwater has shifted to how stormwater could become a water resource *opportunity*.  Cities faced substantial costs for stormwater treatment plants.  They started developing plans for 'stormwater capture' projects to take advantage of the potential for water supply....[11]

40.   Prior to AB 2594, the California State Legislature developed, passed, and amended The Stormwater Resource Planning Act, addressing stormwater as a resource and conferring use or usufructuary rights on the City.[12]  The Act

---

[9] Stormwater and Green Infrastructure:  The Next Generation of Los Angeles Stormwater Infrastructure, Alf W. Brandt, Office of State Assemblymember Anthony Rendon, Sacramento, California, American Bar Association, Section of Environment, Energy, and Resources, 23rd Section Fall Meeting, Chicago, Illinois, October 28-31, 2015.

[10] California Water Code section 10560, et seq., "The Stormwater Resource Planning Act,"  "(d) Historical patterns of precipitation are predicted to change and an increasing amount of California's water is predicted to fall not as snow in the mountains, but as rain in other areas of the state.  This will likely have a profound and transforming effect on California's hydrologic cycle and much of that water will no longer by captured by California's reservoirs, many of which are located to capture snow melt."

[11] Stormwater and Green Infrastructure:  The Next Generation of Los Angeles Stormwater Infrastructure, Alf W. Brandt, Office of State Assemblymember Anthony Rendon, Sacramento, California, American Bar Association, Section of Environment, Energy, and Resources, 23rd Section Fall Meeting, Chicago, Illinois, October 28-31, 2015.

[12] California Water Code section 10560, et seq., "The Stormwater Resource Planning Act"

authorizes the City to develop a stormwater resource plan, including compliance with stormwater regulations and beneficial capture of stormwater.[13]  The Legislature's findings include the following:[14]

(b) Improved management of stormwater and dry weather runoff, including capture, treatment, and reuse by using the natural function of soils and plants, can improve water quality, reduce localized flooding, and increase water supplies for beneficial uses and the environment.

(e) When properly designed and managed, the capture and use of stormwater and dry weather runoff can contribute significantly to local water supplies through onsite storage and use, or letting it infiltrate into the ground to recharge groundwater, either onsite or at regional facilities, thereby increasing supplies of drinking water.

(g) Stormwater and dry weather runoff can be managed to achieve environmental and societal benefits such as wetland creation and restoration, riverside habitats, instream flows, and an increase in park and recreation lands, and urban green space.

(h) Stormwater and dry weather runoff management through multiobjective projects can achieve additional benefits, including augmenting recreation opportunities for communities, increased tree canopy, reduced urban heat island effect, and improved air quality.

(j) The capture and use of stormwater and dry weather runoff is not only one of the most cost-effective sources of new water supplies, it is a supply that can often be provided using significantly less energy than other sources of new water supplies. *Id.*

41.    Section 10562 confers usufructuary rights upon the City regarding two sources of water—dry weather runoff and stormwater, defined as follows:[15]

---

[13] California Senate Bill (Pavley), Chap. 620 of 2009 Statutes.
[14] Water Code section 10561.
[15] CA Water Code section 10561.5.

(a) 'Dry weather runoff' means surface waterflow and waterflow in storm drains, flood control channels, or other means of runoff conveyance produced by nonstormwater resulting from irrigation, residential, commercial, and industrial activities.

(b) 'Stormwater' means temporary surface water runoff and drainage generated by immediately preceding storms.

42.     The City's plans for beneficial uses of stormwater and dry weather runoff meet the requirements of Water Code section 10562(b), including the following:

(1) Be developed on a watershed basis.

(2) Identify and prioritize stormwater and dry weather runoff capture projects for implementation in a quantitative manner, using a metrics-based and integrated evaluation and analysis of multiple benefits to maximize water supply, water quality, flood management, environmental, and other community benefits within the watershed.

(3) Provide for multiple benefit project design to maximize water supply, water quality, and environmental and other community benefits.

(4) Provide for community participation in plan development and implementation.

(5) Be consistent with, and assist in, compliance with total maximum daily load (TMDL) implementation plans and applicable national pollutant discharge elimination system (NPDES) permits.

(6) Be consistent with all applicable waste discharge permits.

(7) Upon development, be submitted to any applicable integrated regional water management group. Upon receipt, the integrated regional water management group shall incorporate the stormwater resource plan into its integrated regional water management plan.

(8) Prioritize the use of lands or easements in public ownership for stormwater and dry weather runoff projects.

43.     The California Legislature does not require that cities specifically call the plan, the development of the plan, or the component parts of the plan a "Stormwater Resource Plan," recognizing that cities engage in stormwater resource management in a multitude of ways.[16]  Moreover, the Legislature does not require that the plan be constituted in any one singular plan at any one time, but rather the Legislature acknowledges that cities will be *developing* and constantly improving their plans, which components parts may be found in multiple other plans.[17]  The plan may be a proposed plan.[18]

44.     Water Code section 10562(c) states,

> The proposed or adopted plan shall meet the standards outlined in this section.  The plan need not be referred to as a "stormwater resource plan."  Existing planning documents may be utilized as a functionally equivalent plan, including but not limited to, watershed managements plans, integrated resource plans, urban water management plans, or similar plans.  If a planning document does not meet the standards of this section, a collection of local and regional plans may constitute a functional equivalent, if the plans collectively meet all of the requirements of this part.

45.     The City's plans for beneficial uses of stormwater meet the requirements of Water Code section 10562(d), which states, "An entity developing a stormwater resource plan shall identify in the plan all of the following:

> (1) Opportunities to augment local water supply through groundwater recharge or storage for beneficial use of stormwater and dry weather runoff.

> (2) Opportunities for source control for both pollution and stormwater and dry weather runoff volume, onsite and local infiltration, and use of stormwater and dry weather runoff.

---

[16] Water Code section 10562(c).
[17] Water Code section 10562(c).
[18] *Id.*

(3) Projects to reestablish natural water drainage treatment and infiltration systems, or mimic natural system functions to the maximum extent feasible.

(4) Opportunities to develop, restore, or enhance habitat and open space through stormwater and dry weather runoff management, including wetlands, riverside habitats, parkways, and parks.

(5) Opportunities to use existing publicly owned lands and easements, including, but not limited to, parks, public open space, community gardens, farm and agricultural preserves, schoolsites, and government office buildings and complexes, to capture, clean, store, and use stormwater and dry weather runoff rather onsite or offsite.

(6) Design criteria and best management practices to prevent stormwater and dry weather runoff pollution and increase effective stormwater and dry weather runoff management for new and upgraded infrastructure and residential, commercial, industrial, and public development.  These design criteria and best management practices shall accomplish all of the following:

(A) Reduce effective impermeability within a watershed by creating permeable surfaces and directing stormwater and dry weather runoff to permeable surfaces, retention basins, cisterns, and other storage for beneficial use.

(B) Increase water storage for beneficial use through a variety of onsite storage techniques.

(C) Increase groundwater supplies through infiltration, where appropriate and feasible.

(D) Support low-impact development for new and upgraded infrastructure and development using low-impact techniques.

(7) Activities that generate or contribute to the pollution of stormwater or dry weather runoff, or that impair the effective beneficial use of stormwater or dry weather runoff.

(8) Projects and programs to ensure the effective implementation of the stormwater resource plan pursuant to this part and achieve

multiple benefits.  These projects and programs shall include the development of appropriate decision support tools and the data necessary to use the decision support tools.

(9) Ordinances or other mechanisms necessary to ensure the effective implementation of the stormwater resource plan pursuant to this part.

### IV.   CALIFORNIA WATER RIGHTS LAW

### A. The State Does Not "Own" the Water in the Traditional Meaning

46.   The State of California does not "own" water in the traditional meaning of the word.  *State of California v. Superior Court* (2000) 78 Cal.App.4th 1019, 1030. "In California, the groundwater is not owned by any individual or governmental entity but rather by 'the people of the State' for which the 'State as an entity is the holder of the legal title as trustee for the benefit of the people of the state.'" *In re Methy Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,* 457 F.Supp.2d 455, 460 (2006) (footnote omitted).[19]

### B. Beneficial Use Rights v. "Ownership"

47.   The City has *relative beneficial use rights* rather than outright "ownership" in the traditional sense of the word. *State of California v. Superior Court* (2000) 78 Cal.App.4th 1019, 1024. ("[M]odern water law focuses on the

---

[19] The *People* of the State make water policy and control water usage. *State of California v. Superior Court* (2000) 78 Cal.App.4th 1019, 1030. "But the State's power under the Water Code is the power to control and regulate use; such a power is distinct from the concept of 'ownership' as used in the Civil Code and in common usage." *Id.* "'Ownership of California's water is vested generally in the state's residents, but individuals and entities can acquire 'water rights,' the right to divert water from its natural course for public or private use.'" *Siskiyou County Farm Bureau v. Department of Fish and Wildlife*, 237 Cal.App.4th 411, 423 (2015).  Thus it is not true that "the State has an ownership interest in the 'corpus' of State waters even though individual users have usufructuary rights." One user that has such a right is the City of Oakland.  Its interest is correctly viewed as a relative use right fulfilling State Constitutional policy, Water Code section 10560, et seq., and AB 2594 regarding beneficial uses of water.

concept of water *rights* rather than water *ownership*. (quoting 1 Waters and Water Rights (1991 ed.) § 4.01, p. 65.)).

48.     When the City captures stormwater and dry weather runoff, it "salvages" or "rescues" the water, and as a rescuer has a prior right to it. *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 304.  The City's rescued or developed waters "are essentially new waters," and the right to use and distribute them belongs to the rescuers. *Pomona Land & Water Co. v. San Antonio Water Co.* (1908) 152 Cal. 618, 623.

### V. USUFRUCTUARY RIGHTS/INTERESTS CREATE A PROPERTY INTEREST

49.     The City has a usufructuary right and property interest in stormwater and dry weather runoff by its beneficial capture and use of stormwater.  *Fullerton v. State Water Resources Control Board*, 90 Cal.App.3d 590, 597 (1979).

50.     The City built, and owns, and manages an entire stormwater system, including plans and programs designed and intended to capture stormwater for beneficial uses outlined in The Stormwater Resources Planning Act, discussed further below.

51.     The City's beneficial capture and use is in line with *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 457 F.Supp.2d 455, 460 (2006), wherein the court explains that usufructuary interests are property interests in California. "[A] usufructuary interest may be acquired and this interest will be deemed to be a 'possessory property right.' [footnote omitted]."

/ / /

/ / /

/ / /

## VI.   PROPERTY INTERESTS ESTABLISH LEGAL STANDING

52.     The City has a usufructuary right and need not "own" the stormwater and dry weather runoff in order to have standing to bring this suit. The City's usufructuary interest established legal standing.[20]

## VII.   THE CITY'S CAPTURE AND BENEFICIAL USE OF STORMWATER

53.     The City's beneficial uses align with The Stormwater Resources Planning Act.  As explained in Water Code section 10562(c), the components part of the beneficial uses in accordance with The Stormwater Resources Planning Act are found in multiple stormwater and integrated water management plans. The City Manages Storm Water as a Resource,[21] identified as one of the City's five major stormwater goals, "Goal C: Manage Stormwater as a Resource:"

/ / /

/ / /

---

[20] *Orange County Water Dist. v. Arnold Engineering Co.*, 196 Cal.App.4th 1110, 1125-1126, footnote 5 of *Orange County Water Dist.* reads, "'[T]he right of property in water is usufructuary, and consists not so much of the fluid itself as the advantage of its use.' [Citation.]  Hence, the cases do not speak of the ownership of water, but only of the right to its use. (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 441, 189 Cal.Rptr. 346, 658 P.2d 709.)" *Id.* at 1127; in *Selma Pressure Treating Company, Inc. v. Osmose Wood Preserving Company of American, Inc., et al.*, 221 Cal.App.3d 1601 (1990), the court explains a usufructuary interest establishes a property interest, and thus legal standing, for public entities in public nuisance cases; in *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 676 F.Supp.2d 139, 146, fn. 40 (S.D.N.Y. 2009), the court explains "[b]ecause OCWD has a 'possessory property right, that it alleges has been damaged by defendants' conduct, neither its negligence nor products liability claims are barred for lack of a cognizable interest." *Id.* at 461. "OCWD has established a valid usufructuary interest which is independent of the State or the People's general interest in groundwater. [footnote omitted] Accordingly, OCWD may seek damages on its public nuisance claim to the extent that the alleged nuisance has interfered with that right." *Id.* at 466.
[21] Watershed Asset Management Plan, Storm Water Division, Transportation and Storm Water Department, Final Report, July 19, 2013, Figure 1.1.

1

2

3

4

5

6

7

8

9

10

11

12

13

14



Figure 1-1. San Diego Storm Water Division Mission and Goals

54.     The City's Watershed Asset Management Plan states, "The [Storm Water] Division saw the storm water that flowed through its drains as a resource that provides value to the citizens of San Diego and offered opportunities for capture for beneficial purposes."[22]

55.     First, the City is developing its beneficial uses on a watershed basis.[23] The City designs Urban Runoff Management Programs on a watershed basis.  The City is a member of six watershed management groups,[24] including San Dieguito, Los Penasquitos, Mission Bay, San Diego River, San Diego Bay, and Tijuana

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[22] Watershed Asset Management Plan, Storm Water Division, Transportation and Storm Water Department, Final Report, July 19, 2013, 1.1.
[23] Water Code section 10562(b)(1).
[24] While the City of San Diego participates and/or leads six watershed management groups, this SAC will focus on just the San Dieguito WMG by way of example for brevity purposes.

River WMGs. For example, the San Dieguito Watershed Urban Runoff Management Program states,

> Because the water moves **downstream in a watershed**, any activity that affects the water quality, quantity, or rate of movement at one location can **affect the watershed** and receiving waters at downstream locations. Before reaching a stream, surface runoff accumulates from the highest points in a watershed and flows downhill across lawns, rooftops, parking lots, and roads, picking up many pollutants along the way that have the potential to reach our rivers and beaches. For this reason, everyone living or working **within a watershed** needs to contribute to ensure the health of the watershed.[25] (emphasis added)

56.     As the California Legislature recognizes in Water Code section 10562(c), the plan may draw upon local or regional plans due to the complex nature of water flow and watersheds, which may not conform with municipal corporate boundaries.

> The San Dieguito River Watershed Management Area (WMA) is within the boundaries of the Cities of San Diego, Del Mar, Escondido, Poway, Solana Beach and the County of San Diego. These local jurisdictions are committed to finding creative and effective ways to improve the water quality of the receiving waters of the San Dieguito River WMA, such as the San Dieguito Lagoon and Pacific Ocean, while also complying with the National Pollutant Discharge Elimination System Municipal Stormwater Permit (Order No. 2007-0001), hereafter referred to as the Municipal Permit.[26]

57.     Second, the City is also identifying and prioritizing stormwater and dry weather runoff capture projects for implementation in a quantitative manner.[27]

---

[25] City of San Diego Transitional Receiving Water Monitoring Work Plan, October 15, 2014, Tables 2-1, 2-2.
[26] *Id.*
[27] Water Code section 10562(b)(2).

For example, the City uses numeric and metrics-based evaluations to identify and prioritize capture projects:

"The recommended **strategies will be scored on the basis of the number of other benefits they provide**, and may guide future updates to the Water Quality Improvement Plan (Appendix M)."[28] (emphasis added)

58.     Third, the City provides for multiple-benefit project design to maximize water supply, water quality, and environmental and other community benefits.[29]  For example, the San Dieguito River Watershed Management Area (WMA) Water Quality Improvement Plan 4- Water Quality Goals, Strategies, and Schedules states,

> The City of San Diego (City) has identified administrative policies, urban development management programs, and innovative pilot projects, and is investing in research for site locations for green infrastructure and other treatment BMPs throughout its jurisdiction in multiple WMAs. Furthermore, the City is currently developing a framework to evaluate other potential benefits that the recommended strategies may provide **beyond those associated with water quality**. These other benefits may be **financial, environmental, or societal**. Other benefits refer to additional outcomes of a strategy beyond water quality improvements, and can include reduced air pollution, **<u>increased water conservation</u>**, aesthetics-induced property value increases, and increased business investments. The recommended strategies will be scored on the basis of the number of other benefits they provide, and may guide future updates to the Water Quality Improvement Plan (Appendix M).[30] (emphasis added)

"Increased water conservation" is one of the City's strategies to "maximize" and "augment existing water supplies."[31]

---

[28] San Dieguito River Watershed Management Area Water Quality Improvement Plan 4- Water Quality Goals, Strategies, and Schedules, September 2015, 4-82.
[29] Water Code section 10562(b)(3).
[30] San Dieguito River Watershed Management Area Water Quality Improvement Plan 4- Water Quality Goals, Strategies, and Schedules, September 2015, 4-82.
[31] AB 2594.

59.     Fourth, the City also provides for community participation in plan development and implementation.[32]  For example, the San Dieguito River WMA Water Quality Improvement Plan 4- Water Quality Goals, Strategies, and Schedules states,

> Implement a **public education and participation program** to promote and encourage development of programs, management practices, and behaviors that reduce the discharge of pollutants in storm water prioritized by high-risk behaviors, pollutants of concern, and **target audiences**.[33] (emphasis added)

> In addition, once the Water Quality Improvement Plan is submitted to the Regional Water Quality Control Board (Regional Board), **comments will be formally collected** by Regional Board staff during the **30-day comment period**.[34] (emphasis added)

60.     Fifth, the City's plan and beneficial uses are consistent with, and assist in, compliance with total maximum daily load (TMDL) implementation plans and applicable national pollutant discharge elimination system (NPDES) permits,[35] and the City's plan and beneficial uses are consistent with all applicable waste discharge permits.[36]

61.     The San Dieguito River WMA Receiving Water Monitoring Plan states,

> The purpose of this Monitoring Plan is to describe the long-term receiving water monitoring for the San Dieguito River Watershed Management Area (WMA), as required by the **San Diego Regional Water Quality Control Board (Regional Board) Order No. R9-2013-0001, National Pollutant Discharge Elimination System (NPDES) Permit** and Waste Discharge Requirements for Discharges

---

[32] Water Code section 10562(b)(4).
[33] San Dieguito River Watershed Management Area Water Quality Improvement Plan 4- Water Quality Goals, Strategies, and Schedules, September 2015, I-104.
[34] *Id.* at Executive Summary, viii.
[35] Water Code section 10562(b)(5).
[36] Water Code section 10562(b)(6).

from the Municipal Separate Storm Sewer Systems (MS4s) Draining the Watersheds Within the San Diego Region (Regional Board, 2013), hereafter referred to as the **MS4 Permit**. The goal of the San Dieguito River WMA Receiving Water Monitoring Program is to characterize current conditions and assess progress in the receiving waters, and effectiveness of water quality improvement strategies implemented as part of the San Dieguito River WMA Water Quality Improvement Plan.[37] (emphasis added)

62.     And, the San Dieguito Watershed Urban Runoff Management Program states, "The Plan meets the requirements of the **National Pollutant Discharge Elimination System (NPDES) Municipal Stormwater Permit for San Diego Copermittees (Order No. R9-2007-0001, NPDES No. CAS0108758**."[38] (emphasis added)

63.     Sixth, the City prioritizes the use of lands and easements in public ownership for stormwater and dry weather runoff projects.[39] The Storm Water Division of the Transportation and Storm Water Department has a Watershed Asset Management Plan, which states the City's asset management plan has seven elements.

64.     The asset management plan uses a process and criteria to prioritize lands and easements,

1.     What do we own/manage?
2.     What is its required level of service?
3.     Which assets are critical?
4.     What are my optimized management strategies?
5.     What do I need to do to fund it?[40]

65.     The City also employs certain prioritizing activities,

---

[37] San Dieguito River WMA Receiving Water Monitoring Plan, June 2015, 1-1.
[38] San Dieguito Watershed Urban Runoff Management Program, March 2008, at 1.
[39] Water Code section 10562(b)(8).
[40] Watershed Asset Management Plan, Storm Water Division, Transportation and Storm Water Department, Final Report, July 19, 2013, 1.6.2.

1.      Identify assets where rehabilitation or replacement will be cost effective,

2.      Understand and manage critical assets,

3.      Focus maintenance efforts using risk,

4.      Optimize maintenance and capital needs to reduce the life-cycle cost of ownership,

5.      Understand the long-term future renewal, rehabilitation and replacement expenditure requirements of the Division and assist in the development of plans to mitigate the various peak expenditures identified.[41]

66.     Water Code Section 10562(d) guides cities' to identify opportunities to use stormwater as a beneficial resource.

67.     First, the City has identified opportunities to augment local water supply through groundwater recharge and storage for beneficial use of stormwater and dry weather runoff.[42]  The City is developing beneficial uses for local stormwater runoff as part of the drinking water supply.[43]

68.     Second, the City has identified opportunities for source control for both pollution and stormwater and dry weather runoff volume, onsite and local infiltration, and use of stormwater and dry weather runoff.[44]  Source control includes activites such as "street sweeping,"[45] and infiltration includes a multitude of green infrastructure such as "infiltration trenches" and

---

[41] *Id.* at 1.6.3.

[42] Water Code section 10562(d)(1).

[43] Water Reuse Study Final Draft Report, March 2006, Section 6.0, Indirect Potable Reuse Opportunities, 6.1. "Any wetlands development upstream of a surface water reservoir would eventually result in advanced treated water entering into the City's raw water system and provide new source of water beyond stormwater runoff and imported water."

[44] Water Code section 10562(d)(2).

[45] Watershed Asset Management Plan, Storm Water Division, Transportation and Storm Water Department, Final Report, July 19, 2013, 1.1 City of San Diego Storm Water Division Responsibilities.

"infiltration and detention basins."[46] The City identifies green infrastructure best management practices (BMPs), multiuse treatment areas, and water quality improvement BMPs for the purposes of "manag[ing] water and creat[ing] healthier urban environments," "habitat, flood protection, and cleaner water," "providing water quality treatment and runoff volume reduction," and "control and treatment of storm water runoff."[47]

69.    Third, the City identifies projects to reestablish natural water drainage treatment and infiltration systems, or mimic natural system functions to the maximum extent feasible.[48]  The City identifies strategies and best practices for natural water drainage treatment and infiltration systems,[49]



**Figure 4-4**
**Comparison of Various Structural Strategy Categories**

---

[46] San Dieguito River WMA Water Quality Improvement Plan 4 – Water Quality Goals, Strategies, and Schedules, September 2015, 4-65, Figure 4-4.
[47] *Id.*
[48] Water Code section 10562(d)(3).
[49] San Dieguito River WMA Water Quality Improvement Plan 4 – Water Quality Goals, Strategies, and Schedules, September 2015, 4-65, Figure 4-4.

70.     The City employs "natural water drainage treatment and infiltration systems" and "natural system functions" through "green infrastructure," outlined above in Figure 4-4.  The City's green infrastructure uses water as a beneficial resource to recharge natural systems like "planter boxes," "constructed wetlands," and "vegetated" areas.  These important functions help serve the purposes outlined in section 10561, including but not limited to the following: using the natural function of soils and plants to improve water quality, reduce localized flooding, and increase water supplies for beneficial uses and the environment;[50] contributing to local water supplies through onsite use and infiltration;[51] achieving environmental and societal benefits such as wetland creation and restoration, riverside habitats, instream flows, and an increase in park and recreation lands, and urban green space;[52] increasing tree canopy, reducing urban heat island effect, and improving air quality;[53] creating new water supplies using significantly less energy than other sources of new water supplies.[54]

71.     Fourth, the City has identified opportunities to develop, restore, or enhance habitat and open space through stormwater and dry weather runoff management, including wetlands, riverside habitats, parkways, and parks.[55]  The City has identified construction of new or additional wetlands as a way to capture stormwater and runoff for beneficial uses, "[a]ny wetlands development upstream of a surface water reservoir would eventually result in advanced treated water entering into the City's raw water system and provide new source of water beyond

---

[50] Water Code section 10561(b).
[51] Water Code section 10561(e).
[52] Water Code section 10561(g).
[53] Water Code section 10561(h).
[54] Water Code section 10561(j).
[55] Water Code section 10562(d)(4).

stormwater runoff and imported water."[56] "Constructed wetlands" are identified in the green infrastructure BMPs, outlined above in Figure 4-4.

72.   Fifth, the City has identified opportunities to use existing publicly owned lands and easements, including, but not limited to, parks, public open space, community gardens, farm and agricultural preserves, schoolsites, and government office buildings and complexes, to capture, clean, store, and use stormwater and dry weather runoff either onsite or offsite.[57]   For example, "[t]hese BMPs are well suited for public spaces such as active (soccer fields) and passive (parks) recreation areas and raise public awareness of storm water management."[58]

73.   Water Code section 10562(d)(6) promotes the design criteria and BMPs for the opportunities described above, and these design criteria and BMPs are also covered throughout the City's watershed and stormwater plans. The City's Development Services Department devotes a webpage to design creiteria for stormwater practices, including a Storm Water Standards Manual, a Storm Water Applicability Checklist, New Storm Water Permit Requirements, a Storm Water Pollution Prevention Guide for the Constuction Industry, and many other BMP resources.[59]   The City even published a San Diego Low Impact Development Design Manual, discussing "bioswale[s] along parking lots," "permeable pavers," "infiltration trench[es]," "planter boxes," "biorentention," "vegetated filter strips [and] swales," "BMP Design Guidance," "BMP Design Templates," and even "rain barrels."[60]

---

[56] Water Reuse Study Final Draft Report, March 2006, Section 6.0, Indirect Potable Reuse Opportunities, 6.1.
[57] Water Code section 10562(d)(5).
[58] San Dieguito River WMA Water Quality Improvement Plan 4 – Water Quality Goals, Strategies, and Schedules, September 2015, 4-67.
[59] https://www.sandiego.gov/development-services/industry/information/stormwater.
[60] San Diego Low Impact Development Design Manual; *See* Water Code section 10562(d)(6)(D).

74.     Finally, the City's many plans and activities, exemplified above, satisfy Water Code sections 10562(7) –(9), including the entire Storm Water Division of the Transportation and Storm Water Department, which spends millions of dollars and employs many professionals, all under the guidance and direction of the local City Ordinances.  If necessary, further information is available from the City regarding any of the items covered in The Stormwater Resources Planning Act, as space is limited in this Response.

**C. San Diego's Pueblo Rights**

75.     The City of San Diego has specific water rights and property interests in the San Diego River, and other rivers and streams in San Diego, through Pueblo Rights.  The California Supreme Court disposed of the issue in *City of San Diego v. Cuyamaca Water Co.*, 209 Cal. 105 (1930).  This doctrine provides that the City of San Diego succeeded to the rights and privileges of the Mexican Pueblo of San Diego, which included "**a right of priority in and to the use of all the waters of said San Diego River necessary or convenient for the use of said The City of San Diego and the inhabitants thereof.**'" *Id.* at 115-116. (emphasis added).

76.     The court foreclosed further discussion of the issue:

> We are of the opinion that by virtue of the foregoing long line of cases, … the subject is no longer an open one for further consideration and review before this court, and that by said decisions, so long and uniformly followed and adhered to, **the proposition that the prior and paramount right of such pueblos and their successors to the use of the waters of such rivers and streams necessary for their inhabitants and for ordinary municipal purposes, has long since become a rule of property in this state, which at this late date in the history and development of those municipalities which became the successors of such pueblos we are not permitted, under the rule of stare decisis, to disturb**.

*Id*. at 122. (emphasis added).  Thus, the City has settled rights to the River that may not be disturbed by any later judicial finding or review.

77.     San Diego River, like other rivers and streams, transports stormwater and dry weather runoff.  The River is part of the stormwater management system and plan for the City of San Diego, operating as the main stormwater thoroughfare for all flows from the San Diego River Watershed to drain to the ocean.  The City's Pueblo Rights establish express property rights and usufructuary rights in those waters.

## V.       FACTUAL ALLEGATIONS

### A. PCBs are Toxic Chemicals that Cannot Be Contained and that Cause Environmental Contamination.

78.     Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring).  A "PCB congener" is any single, unique chemical compound in the PCB category.  Over two hundred congeners have been identified.[61]

79.     PCBs were generally manufactured as mixtures of congeners.  From approximately 1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally produced PCBs for commercial use.[62]  The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

80.     Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States, including electrical equipment such as transformers, motor start capacitors and lighting ballasts.  In addition, PCBs were incorporated into a variety of products such as caulks, paints and sealants.

---

[61] Table of PCB Congeners, available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/ pubs/ congeners.htm (last accessed February 20, 2014).

[62] *See* 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned ... ."); 121 Cong. Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co. ... ."). *See also* MONS 058730-058752 at 058733 (identifying other producers as "all ex-USA."), attached as Exhibit A.

81.   As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

82.   PCBs easily migrate or leach out of their original source material or enclosure and contaminate nearby surfaces, air, water, soil and other materials. For example, PCB compounds volatilize out of building materials (such as caulk) into surrounding materials such as masonry, wood, drywall and soil, thereby causing damage to those surrounding materials.  PCBs can also escape from totally-enclosed materials (such as light ballasts) and similarly contaminate and damage surrounding materials and escape into the environment.

83.   PCBs present serious risks to the health of humans, wildlife and the environment.

84.   Humans may be exposed to PCBs through ingestion, inhalation and dermal contact.  Individuals may inhale PCBs that are emitted into the air.  They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks.  And humans may absorb PCBs from physical contact with PCBs or PCB-containing materials.

85.   EPA has determined that Monsanto's PCBs are probable human carcinogens.  In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254 and 1260.[63]  EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

---

[63]   EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed May 5, 2014).

86.   The International Agency for Research on Cancer published an assessment in 2015 that asserts an even stronger relationship between PCBs and human cancer.  The report explains:  "There is sufficient evidence in humans for the carcinogenicity of polychlorinated biphenyls (PCBs). PCBs cause malignant melanoma. Positive associations have been observed for non-Hodgkin lymphoma and cancer of the breast. ... PCBs are carcinogenic to humans ... ."[64]

87.   In addition, EPA concluded that PCBs are associated with serious non-cancer health effects.  From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system, the reproductive system, the nervous system and the endocrine system.

88.   PCBs are known to be toxic to a number of aquatic species and wildlife including fish, marine mammals, reptiles, amphibians and birds.  The presence of PCBs can cause changes in community and ecosystem structure and function.[65]

**B. Monsanto Has Long Known of PCBs' Toxicity.**

89.   Monsanto was well aware of scientific literature published in the 1930s that established that inhalation in industrial settings resulted in toxic systemic effects.[66]

90.   An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors

---

[64] International Agency for Research on Cancer.  IARC monographs on the evaluation of carcinogenic risks to humans, volume 107.  Polychlorinated and Polybrominated Biphenyls (2015), available at http://monographs.iarc.fr/ENG/Monographs/vol107/ (last accessed July 31, 2015).

[65] *See* EPA, Understanding PCB Risks, available at http://www.epa.gov/housatonic/ understandingpcbrisks.html#WildlifeEcologicalRiskAssessment (last accessed March 5, 2015).

[66] *See* Exhibits B, C and F.

evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects.  Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[67]

91.   A September 20, 1955, memo from Emmet Kelly set out Monsanto's position with respect to PCB toxicity:  "We know Aroclors are toxic but the actual limit has not been precisely defined.  It does not make too much difference, it seems to me, because our main worry is what will happen if an individual developes [*sic*] any type of liver disease and gives a history of Aroclor exposure.  I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[68]

92.   On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department:

> It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties.  While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[69]

93.   On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors:  "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 [which contained PCBs] is just too toxic for use in a submarine."[70]

94.   In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated

---

[67] MONS 061332, attached as Exhibit B.
[68] MONS 095196-7, attached as Exhibit C
[69] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number), attached as Exhibit D.
[70] MONS 095640, attached as Exhibit E.

compounds of all tested."[71]   Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."[72] Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[73]

95.    At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB compounds.  In a 1960 brochure, Monsanto promoted the use of Aroclors in transformers and capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire or cable coatings, impregnants for insulation, dielectric sealants, chemical processing vessels, food cookers, potato chip fryers, drying ovens, thermostats, furnaces and vacuum diffusion pumps.  Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil; insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks; papers; mastics; sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers; masonry coatings for swimming pools, stucco homes, and highway paints;  protective and decorative coatings for steel structures, railway tank and gondola cars; wood and metal maritime equipment; and coatings for chemical plants, boats, and highway marking.[74]

96.    A 1961 brochure explained that Monsanto's Aroclors were being used in "lacquers for women's shoes," as "a wax for the flame proofing of Christmas

---

[71] *See* JDGFOX00000037-63, attached as Exhibit F.
[72] *Id*. at JDGFOX00000039.
[73] *Id*. at JDGFOX00000037.
[74] The Aroclor Compounds (hand-dated May 1960), 0509822-66, attached as Exhibit S.

trees," as "floor wax," as an adhesive for bookbinding, leather, and shoes, and as invisible marking ink used to make chenille rugs and spreads.[75]

97.    Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used in a variety of industrial, commercial, household, and consumer goods.  Moreover, Monsanto affirmatively encouraged these uses by encouraging salesmen to market products for these and other applications.

98.    Years later, in 1970, Monsanto tried to distance itself from the variety of applications of Aroclors that it proudly espoused a few years before.  In a press release, the company claimed:  "What should be emphasized ... is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors.  It is also used in commercial heating and cooling systems.  It is not a 'household' item."[76]

99.    In 1975, William Papageorge, then Monsanto's manager of product acceptability, admitted that PCBs had been used in all types of products. Papageorge testified at a Public Hearing Before the Department of Natural Resources that "[t]he past uses [of PCBs] . . . were many and varied. . . . They go on and on.  Virtually anything you can imagine, at one time or other, someone tried PCB's in them."[77]

/ / /

/ / /

/ / /

---

[75] Plasticizer Patter (February 1961), 0627503-21, attached as Exhibit T.

[76] *See* Press release (July 16, 1970), MCL000647-50, attached as Exhibit V, at MCL000648.

[77] *See* Declaration of Kathleen L. Roach, Exhibit 43, (Document 681-43), *Appleton Papers, Inc. and NCR Corp. v. George A. Whiting Paper Co.*, Case 2:08-cv-00016-WCG (E.D. Wis.), attached as Exhibit W.

## C. Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing Harm to Animals and Fish.

100. Monsanto also knew that PCBs were causing widespread contamination of the environment, far beyond the areas of its use.[78]

101. Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen, who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[79]  The report noted that PCBs were also detected in the air over London and Hamburg and found in seals caught off the coast of Scotland. Jensen concluded that PCBs can "be presumed to be widespread throughout the world."[80]

102. A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[81]  The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine falcons and 34 other bird species.  The report linked PCBs to the rapid decline in peregrine falcon populations in the United States.

103. Despite growing evidence of PCBs' infiltration of every level of the global ecology, Monsanto remained steadfast in its production of Aroclors and other PCBs.

104. On March 6, 1969, Monsanto Research Center employee W.R. Richard wrote a memorandum discussing Risebrough's article that criticized PCBs as a "toxic substance," "widely spread by air-water; therefore, an uncontrollable pollutant ... causing extinction of peregrine falcon … [and] endangering man

---

[78] *See* Exhibits G, H and L.
[79] New Scientist (Dec. 15, 1966), MONSFOX00003427, attached as Exhibit G.
[80] *Id.*
[81] R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968), attached as Exhibit H.

himself."[82]   Richard explained that Monsanto could take steps to reduce PCB releases from its own plants but cautioned, "It will be still more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper.  In this applications exposure to consumers is greater and the disposal problem becomes complex."[83]

105.  On September 9, 1969, W.R. Richard, by then a member of the newly-formed Aroclor "Ad Hoc" Committee, wrote an interoffice memo titled "Defense of Aroclor."[84]  He acknowledged the role of Aroclor in water pollution: "Aroclor product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a long life."  He noted that Aroclors 1254 and 1260 had been found along the Gulf Coast of Florida causing a problem with shrimp; in San Francisco Bay, where it was reported to thin egg shells in birds; and in the Great Lakes.  Richard advised that the company could not defend itself against all criticism:  "We can't defend vs. everything.  Some animals or fish or insects will be harmed.  Aroclor degradation rate will be slow.  Tough to defend against.  Higher chlorination compounds will be worse [than] lower chlorine compounds.  Therefore we will have to restrict uses and clean-up as much as we can, starting immediately."[85]

106.  On January 29, 1970, Elmer Wheeler of Monsanto's Medical Department and Chairman of the Aroclor "Ad Hoc" Committee circulated laboratory reports discussing results of animal studies.  He noted:   "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated.  Secondly, although there are variations

---

[82] MONS 096509-096511, attached as Exhibit I.
[83] *Id.*
[84] DSW 014256-014263, attached as Exhibit J.
[85] *Id.*

depending on species of animals, the PCB's are about the same as DDT in mammals."[86]

107. In a PCB Presentation to Corporate Development Committee, Monsanto expressed a desire to keep profiting from PCBs despite the environmental havoc. The report suggests possible reactions to the contamination issue. It considered that doing nothing was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint." But the option of going out of the Aroclor business was also considered unacceptable: "there is too much customer/market need and selfishly too much Monsanto profit to go out."[87]

108. Monsanto formed an "Aroclor 'Ad Hoc' Committee" to investigate the pollution caused by PCBs. The Aroclor "Ad Hoc" Committee held its first meeting on September 5, 1969. The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a global contaminant."[88] The meeting minutes acknowledge that PCB has been found in fish, oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife. Moreover, the committee implicated the normal use of PCB-containing products as the cause of the problem: "In one application alone (highway paints), one million lbs/year [of PCBs] are used. Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."[89]

109. A month later, on October 2, 1969, the Committee reported extensive environmental contamination. The Committee advised that Monsanto could not

---

[86] MONS 098480, attached as Exhibit K.
[87] Ex. A at 058737.
[88] Ex. K at 030483.
[89] *Id.* at 030485.

protect the environment from Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors:

> The committee believes that there is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated -- e.g. Aroclors 1254 and 1260) as nearly <u>global environmental contaminants</u> leading to <u>contamination of human food</u> (particularly fish), the <u>killing of some marine species</u> (shrimp), and the possible extinction of several species of fish eating birds.

> Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent completely some environmental contamination.

> <u>There are, however, a number of actions</u> which must be undertaken <u>to prolong the manufacture, sale and use of these particular Aroclors</u> as well as to protect the continued use of other members of the Aroclor series.[90]

110. Monsanto's desire to protect its Aroclor profits rather than the environment is reflected in the Committee's stated objectives:

> 1. Protect continued sales and profits of Aroclors;
> 2. Permit continued development of new uses and sales, and
> 3. Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem.[91]

111. An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260: "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment." Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business." To that end, it says, "We want to avoid any situation where a customer wants to return fluid. ... We would prefer that the

---

[90] DSW 014612-014624, at 014615, attached as Exhibit M (emphasis added).
[91] *Id.* at 014614.

customer use up his current inventory and purchase [new products] when available. He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system. <u>We don't want to take fluid back</u>."[92]

112.   Instead of having customers return fluids, Monsanto instructed its customers to dispose of PCB containing material in local landfills, knowing that landfills were not suitable for PCB contaminated waste.  Monsanto had determined that the only effective mothed of disposing of PCBs was incineration, and it constructed an incinerator for disposal of its own PCB contaminants. Nevertheless, as William Papageorge explained in his 1975 testimony before the Department of Natural Resources,   Monsanto instructed its customers to dispose of PCB contaminated waste in landfills: "lacking that resource [a commercial incinerator], we have to reluctantly suggest, because we don't have a better answer, that they find a well operated, properly operated landfill and dispose of the material in that fashion."[93]

113.   In 1970, the year after Monsanto formed the "ad hoc" committee, and despite Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.

114.   Growing awareness of the ubiquitous nature of PCBs led the United States to conduct an investigation of health and environmental effects and contamination of food and other products.   An interdepartmental task force concluded that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects on human health.[94]

---

[92] MONS 100123-100124, attached as Exhibit N.
[93] Exhibit W at 29.
[94] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976), available at http://nepis.epa.gov (search "560776001") (last accessed July 31, 2015).

115.   After that report, environmental sampling and studies indicated that PCBs were a "more serious and continuing environmental and health threat than had been originally realized."[95]   To address these concerns, EPA undertook a study to assess PCB levels in the environment on a national basis.  That study revealed widespread occurrence of PCBs in bottom sediments in several states, including California.[96]

116.   EPA's study noted the particular burden on California.  "PCBs have become a significant component of the marine food webs of southern California," were found in sediments in the Santa Barbara Basin, and found in high levels in the San Francisco Bay.[97]

## D. Monsanto Concealed the Nature of PCBs from Governmental Entities.

117.   While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite – that the compounds were not toxic and that the company would <u>not</u> expect to find PCBs in the environment in a widespread manner.[98]

118.   In a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."[99]   Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air

---

[95] *Id.* at 1.
[96] *Id.*, *passim.*
[97] *Id.* at 78-9.
[98] *See* Exhibits O-R (letters to governmental agencies).
[99] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969), attached as Exhibit O.

or in the liquid discharges from a using industry."[100]   A similar letter to the San Francisco Bay Regional Water Quality Control Board explained that PCB plasticizers (found in surface coatings, such as paints, industrial adhesives and window sealants), in normal use, present no special health problems" and that, "[i]n view of PCB's chemical inertness, we would anticipate no problems associated with the environment from refuse dumps."[101]

119.   In May 1969, Monsanto's Manager, Environmental Health, Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."[102]

120.   Monsanto delivered the same message to the New Jersey Department of Conservation in July 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic."[103]   The letter then reiterates Monsanto's position regarding environmental contamination:   "We are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."[104]

121.   At the same time that Monsanto was downplaying the toxicity of PCBs and inevitable widespread contamination caused by PCBs, its Aroclor "Ad

---

[100] *Id.*

[101] Letter from Monsanto to State of California Resources Agency (March 27, 1969), attached as Exhibit P.

[102] Monsanto Memorandum to W.R. Richard (May 26, 1969), attached as Exhibit Q.

[103] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969), attached as Exhibit R.

[104] *Id.*

Hoc" Committee acknowledged that there was nothing that could be done to prevent PCBs from becoming a global contaminant leading to contamination of the food supply, injuring marine life and possibly leading to the extinction of certain bird species.   The committee reported on the probability of success of actions Monsanto might undertake to address the PCB problem and provided:

> The committee believes there is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls … as nearly global environmental contaminants leading to the contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.[48]

122.   Moreover, the committee acknowledged that no course of action could be taken to prevent products containing PCBs from contaminating the environment, particularly waters and the marine environment.   The committee explained "the committee believes that there is no possible course of action that can so effectively police the uses of these PCB containing products as to prevent completely some environmental contamination."[105]   Further, the committee reported concern that vapor losses from PCB containing products likely results in contamination of an aquatic environment because based on published reports "even minute quantities of [PCB] vapors are eventually transferred to the water environment and accumulated therein."[106]

123.   Exactly as Monsanto's committee had acknowledged, PCBs have become a global contaminant and have accumulated in the waters of the Bay to the point where they are a public nuisance and require remediation and abatement.

/ / /

/ / /

---

[105] DSW 014612-014624, at 014615, attached as Exhibit M.
[106] *Id*. at DWS 014618.

### E. The San Diego Bay is a 303(d) Impaired Body of Water for PCBs.

124.   The Bay is one of the region's most widely used natural resources, and the PCB contamination affects all San Diegans, who reasonably would be disturbed by the presence of a hazardous, banned substance in the sediment, water, and wildlife.

125.   PCBs (specifically, Aroclor compounds 1254 and 1260) have been found in samples of sediments and water taken from the Bay at varying times and locations, requiring substantial remediation work and cost.  In addition, PCBs have been identified in tissues of fish and lobster in the Bay.

126.   PCBs are identified as a Primary Chemical of Concern ("COC") in California Regional Water Quality Control Board, San Diego Region ("Regional Water Board") Cleanup and Abatement Order ("CAO") No. R9-2012-0024, dated March 14, 2012, which directed the City to, among other things, remediate PCB contaminated sediments within a discrete area known as the Shipyard Sediment Site.

127.   Other areas of PCB deposition and impacts have been located, and it is probable that the Regional Water Board may  order remediation of PCB contaminated sediments in other areas.

128.   The Regional Water Board estimated human health risks due to the consumption of PCB contaminated fish tissue found in the Bay and employed human fish consumption rates and bioaccumulation factors in the analysis.

129.   The Regional Water Board also concluded that human ingestion of seafood caught within certain assessment areas can significantly increase cancer risk, specifically identifying PCBs as a carcinogenic chemical.

130.   PCBs have entered the Bay through various sources.  PCBs leach from landfills and are found in commercial and industrial waste water as a result of Monsanto's directions to its customers on proper disposal methods when it knew, in fact, that disposal of PCBs in landfills was not proper.  PCBs also leach out of

paints, caulk, sealants and other applications and are transported by air and water to the Bay.  Plaintiff also manages and operate a municipal stormwater system, which collects and transports stormwater to be discharged into the Bay.  In order to discharge stormwater into the Bay, Plaintiff is required to receive a Municipal Regional Stormwater Permit from the Regional Water Board, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act.

131.   As stormwater system owners and operators, Plaintiff has spent substantial amounts of money to limit the amount of PCBs in the Bay.  Plaintiff will also likely continue to incur costs to remove PCBs from the Bay and to keep PCBs from entering the Bay for the foreseeable future.

132.   PCBs are a substantial factor in causing the City to incur costs and damages to retrofit its system. Plaintiff will continue to suffer damages and injuries as it will continue to retrofit its system to prevent the health hazard caused by PCBs in the Bay.

133.   Monsanto's conduct, as set forth above, was committed with malice, oppression and/or fraud, as those terms are defined in Civil Code § 3294. Monsanto's conduct was despicable and in conscious disregard to the rights and safety of others, including Plaintiff.  Monsanto's despicable conduct has subjected unjust hardship in conscious disregard to Plaintiff, who is the former trustee of waters, sediments, and tideland properties in and surrounding the Bay.  Defendants intentionally misrepresented and concealed material facts from governmental entities in the state with the intent of causing injury.  In addition to Plaintiff's entitlement to actual damages and request for abatement, Plaintiff is entitled to recover exemplary damages.

## FIRST CAUSE OF ACTION

## CONTINUING PUBLIC NUISANCE

134.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

135.   Monsanto manufactured, distributed, marketed and promoted PCBs in a manner that created or participated in creating a continuing public nuisance that is harmful to health and obstructs the free use of the Bay.  Monsanto also directed its customers and the public to dispose of PCB containing materials improperly, resulting in PCBs leaching from landfills and entering the Bay.

136.   The presence of PCBs interferes with the comfortable enjoyment of the Bay for its customary uses for commercial and sport fishing, swimming and other water activities.

137.   The presence of PCBs interferes with the free use of the Bay for the promotion of commerce, navigation and fisheries.

138.   The presence of PCBs interferes with the free use of the Bay for ecological preservation and habitat restoration.

139.   The San Diego Bay is listed as impaired due to PCB, pursuant to the Clean Water Act and the 303(d) list.

140.   The Regional Water Board found that the presence of PCBs in San Diego Bay meets all three criteria for a "nuisance" as defined by California Water Code section 13050 (m) because it: (1) is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; (2) affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal; and (3) occurs during, or as a result of, the treatment or disposal of wastes.

141.   The presence of PCBs adversely affects the quality of water in the Bay and causes inconvenience and annoyance to any reasonable person.

142.   The condition affects a substantial number of people who use the Bay for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe resources and environment.

143.   An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals and humans and degrade water quality and destroy marine habitats.

144.   The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human health and the environment.

145.   Plaintiff has suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, because the City owns and operates a stormwater system that requires stormwater retrofits to manage, remove, and reduce Monsanto's PCBs.

146.   Plaintiff did not consent to the conduct that resulted in the nuisance.

147.   Monsanto's conduct was a substantial factor in causing the harm to the City.  Without relief, Plaintiff will continue to suffer injuries, and the hazards caused by PCBs will continue.

148.   Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was causing the type of contamination now found in the Bay.  Monsanto knew that PCBs would leach out of products and escape into the environment, that there was no way to contain PCBs and prevent such escape, and that PCBs would accumulate in an aquatic environment like the Bay.  Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish species, and would endanger birds and animals.  In addition, Monsanto knew that PCBs are associated with serious illnesses and cancers in humans and knew that humans may be exposed to PCBs through ingestion and dermal contact.  As a result, it was foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters or by eating fish from those waters.  Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any coastal marine

1 areas.

2      149.   As a direct and proximate result of Monsanto's creation of a public

3 nuisance, Plaintiff has suffered and continues to suffer actual damages and injuries

4 to property requiring abatement and other costs to be determined at trial.

### PRAYER FOR RELIEF

6      Plaintiff prays for judgment that Defendants are liable to the City, jointly

7 and severally, for creation of the public nuisance and must pay as follows:

8         1) Any and all compensatory damages according to proof;

9         2) Punitive damages;

10         3) Litigation costs and attorney's fees as provided by law;

11         4) Pre-judgment and post-judgment interest;

12         5) Any other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

14      Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the

15 Federal Rules of Civil Procedure.

16

17 Dated:  December 22, 2016        Respectfully submitted,

18

19         By:  s/ John P. Fiske
        **GOMEZ TRIAL ATTORNEYS**

20         John H. Gomez (SBN 171485)

21         John P. Fiske (SBN 249256)

22         **BARON & BUDD, P.C.**

23         Scott Summy (admitted Pro Hac Vice)

24         Carla Burke Pickrel (admitted Pro Hac Vice)
        Celeste Evangelisti (SBN 225232)

25

26         **OFFICE OF THE CITY ATTORNEY**
        JAN I. GOLDSMITH, City Attorney

27         California State Bar No. 70988
        DAVID J. KARLIN,

28         Assistant City Attorney – Interim

California State Bar No. 156178
PAUL F. PRATHER, Deputy City Attorney
California State Bar No. 252985

***Attorneys for the City of San Diego***