# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN DIEGO, a municipal corporation,<br><br>                    Plaintiff,<br>v.<br><br>MONSANTO COMPANY; SOLUTIA INC., and PHARMACIA LLC,<br><br>                    Defendants. | CASE NO. 15cv578-WQH-AGS<br><br>ORDER |

HAYES, Judge:

The matter before the Court is the Motion to Dismiss the City of San Diego's Second Amended Complaint. (ECF No. 108).

## I. BACKGROUND

On March 13, 2015, Plaintiffs San Diego Unified Port District (the "Port District") and City of San Diego (the "City") commenced this action by filing the Complaint. (ECF No. 1). On August 3, 2015, the City and the Port District filed separate First Amended Complaints ("FACs") against Defendants Monsanto Company, Solutia Inc., and Pharmacia Corporation. (ECF Nos. 24, 25). On August 31, 2015, Monsanto filed a Motion to Dismiss the City's FAC (ECF No. 31) and a Motion to Dismiss the Port District's FAC (ECF No. 32). On September 28, 2016, the Court issued an Order granting in part and denying in part Monsanto's Motion to Dismiss the Port District's FAC and granting Monsanto's Motion to Dismiss the City's FAC in its entirety. (ECF No. 81).

On November 28, 2016, the City filed a Motion for Leave to File a Second Amended Complaint. (ECF No. 85). On December 20, 2016, Monsanto filed a Statement of Non-Opposition to the City's Motion. (ECF No. 89). On December 21, 2016, the Court granted the City's Motion for Leave to File a Second Amended Complaint. (ECF No. 91).

On December 22, 2016, the City filed the Second Amended Complaint ("SAC") alleging a single cause of action against Monsanto for continuing public nuisance.[1] (ECF No. 93). On March 24, 2017, Monsanto filed Motion to Dismiss the SAC. (ECF No. 108). On April 7, 2017, the City filed a response in opposition. (ECF No. 109). On April 17, 2017, Monsanto filed a reply. (ECF No. 111).

On July 28, 2017, the Court held oral argument. (ECF No. 133).

## II. ALLEGATIONS OF THE COMPLAINT

Plaintiff City is a "California Charter City and municipal corporation." (ECF No. 93 at ¶ 11). "The City was a trustee of certain relevant tidelands and submerged lands in and around the [San Diego] Bay from the early 1900s through 1963, when that property was transferred to the Port District." *Id.*

Defendants Monsanto Company, Pharmacia LLC, and Solutia Inc. (collectively, "Monsanto") are three separate corporations spun off from the original Monsanto Company. *Id.* ¶¶ 13-17. "Mosanto Company has repeatedly held itself out as the sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name 'Aroclor for certain PCB compounds." *Id.* ¶ 2.

"Polychlorinated biphenyls (or 'PCBs') are man-made chemical compounds that have become notorious as global environmental contaminants – found in bays, oceans, rivers, streams, soil, and air." *Id.* ¶ 1. "In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health

---

[1] The Port District is currently proceeding on its causes of action for public nuisance and purpresture. The Court does not address any claims by the Port District in this Order.

effects." *Id.*

"Monsanto's commercially-produced PCBs . . . were used in a wide range of industrial applications in the United States, including electrical equipment such as transformers, motor start capacitors and lighting ballasts. In addition, PCBs were incorporated into a variety of products such as caulks, paints and sealants." *Id.* ¶ 80. "PCBs easily migrate or leach out of their original source material or enclosure and contaminate nearby surfaces, air, water, soil, and other materials." *Id.* ¶ 82.

Despite knowledge of PCB toxicity, Monsanto continued to "promot[e] the use and sale of Aroclor and other PCB compounds." *Id.* ¶ 95. "Monsanto remained steadfast in its production of . . . PCBs." *Id.* ¶ 103. "While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities . . . that the compounds were not toxic and that the company would not expect to find PCBs in the environment in a widespread manner." *Id.* ¶ 117. "Although Monsanto knew for decades that PCBs were toxic, knew that they could not be contained and as a result were widely contaminating all natural resources and living organisms, and knew that there was no safe way to dispose of PCBs, Monsanto concealed these facts and continued producing PCBs until Congress . . . banned the manufacture of and most uses of PCBs as of January 1, 1979." *Id.* ¶ 2.

"Instead of having customers return fluids, Monsanto instructed its customers to dispose of PCB containing material in local landfills, knowing that landfills were not suitable for PCB contaminated waste." *Id.* ¶ 112. "Monsanto had determined that the only effective mothed [sic] of disposing of PCBs was incineration, and it constructed an incinerator for disposal of its own PCB contaminants." *Id.* "Nevertheless . . . Monsanto instructed its customers to dispose of PCB contaminated waste in landfills . . . ." *Id.*

"PCBs have traveled into San Diego Bay and the City of San Diego's stormwater system by a variety of ways." *Id.* ¶ 4. "The Bay is one of the region's most widely

used natural resources, and the PCB contamination affects all San Diegans, who reasonably would be disturbed by the presence of a hazardous, banned substance in the sediment, water, and wildlife." *Id.* ¶ 124. "PCBs . . . have been found in samples of sediments and water taken from the Bay at varying times and locations, requiring substantial remediation work and cost." *Id.* ¶ 125. "PCBs are identified as a Primary Chemical of Concern ('COC') in California Regional Water Quality Control Board, San Diego Region ('Regional Water Board') Cleanup and Abatement Order ('CAO') No. R9-2012-0024 . . . which directed the City to, among other things, remediate PCB contaminated sediments within a discrete area known as the Shipyard Sediment Site." *Id.* ¶ 126. "Other areas of PCB deposition and impacts have been located, and it is probable that the Regional Water Board may order remediation of PCB contaminated sediments in other areas." *Id.* ¶ 127. "PCBs leach from landfills and are found in commercial and industrial waste water as a result of Monsanto's directions to its customers on proper disposal methods when it knew . . . that disposal of PCBs in landfills was not proper." *Id.* ¶ 130. "PCBs regularly leach, leak, off-gas, and escape their intended applications, causing runoff during naturally occurring storm and rain events, after being released into the environment. The runoff originates from multiple sources and industries and enters the City of San Diego's stormwater system and San Diego Bay through stormwater and dry weather runoff." *Id.* ¶ 4.

"The City has property rights in its stormwater system, captured stormwater, and tidelands or submerged lands, and other public trust lands that are contaminated with Monsanto's PCBs, to the extent the City of San Diego owns or holds lands in public trust." *Id.* ¶ 25. "The City owns, manages, and operates a municipal stormwater and dry weather runoff system, which captures, collects, reuses for beneficial purposes, and/or transports stormwater and dry weather runoff." *Id.* ¶ 26. "Monsanto's PCBs have contaminated and damaged multiple facilities within the City's stormwater and dry weather runoff systems." *Id.* ¶ 27. "As a result of Monsanto's PCB's presence, the City cannot operate many of its stormwater and dry weather runoff systems as designed

because the system now requires upgrades and retrofits to accommodate Monsanto's PCBs." *Id.* ¶ 28. "The City has incurred and will continue to incur costs to reduce PCBs from stormwater and dry weather runoff, which includes efforts to capture and beneficially use stormwater and dry weather runoff to augment existing water supplies." *Id.* ¶ 29. "The City's stormwater and dry weather runoff management system is damaged such that multiple facilities within the City's system has [sic] been and must be further retrofitted and improved in order to reduce and remove PCBs from stormwater and dry weather runoff. The retrofits and improvements required to reduce PCBs from stormwater and dry weather runoff have cost and will continue to cost the City money." *Id.* ¶ 30. "Retrofits . . . are required to reduce and remove Monsanto's PCBs to prevent further contamination of the San Diego Bay." *Id.* ¶ 33.

The municipal stormwater system "collects and transports stormwater to be discharged into the Bay." *Id.* ¶ 130. "In order to discharge stormwater into the Bay, [the City] is required to receive a Municipal Regional Stormwater Permit from the Regional Water Board, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act." *Id.* "As stormwater system owners and operators, [the City] has spent substantial amounts of money to limit the amount of PCBs in the Bay. [The City] will also likely continue to incur costs to remove PCBs from the Bay and to keep PCBs from entering the Bay for the foreseeable future." *Id.* ¶ 131.

California's Stormwater Resources Planning Act "authorizes the City to develop a stormwater resource plan, including compliance with stormwater regulations and beneficial capture of stormwater" and "confer[s] use or usufructuary rights on the City regarding . . . dry weather runoff and stormwater." *Id.* ¶ 41. Further, in Assembly Bill 2594, "[t]he Legislature passed legislation confirming and codifying the Cities' use rights in stormwater." *Id.* ¶ 36. "The City built, and owns, and manages an entire stormwater system, including plans and programs designed and intended to capture stormwater for beneficial uses outlined in The Stormwater Resources Planning Act . . . ." *Id.* ¶ 50. "The City has a usufructuary right and property interest in stormwater and

dry weather runoff by its beneficial capture and use of stormwater." *Id.* ¶ 49.

"The City of San Diego has specific water rights and property interests in the San Diego River, and other rivers and streams in San Diego, through Pueblo Rights." *Id.* ¶ 75. The San Diego River "transports stormwater and dry weather runoff" and "is part of the stormwater management system and plan for the City of San Diego." *Id.* ¶ 77. The San Diego River operates "as the main stormwater thoroughfare for all flows from the San Diego River Watershed to drain to the ocean." *Id.*

**III. LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Federal Rule of Civil Procedure 8(a) provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."

*Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotations and citation omitted).

**IV. REQUEST FOR JUDICIAL NOTICE**

Monsanto requests judicial notice of the following documents: (1) Excerpts of Waste Discharge Requirements, issued by the California Regional Water Quality Control Board, San Diego Region, Order No. R9-2007-0001, NPDES No. CAS0108758, dated January 24, 2007; (2) Excerpts of Re-Issued Waste Discharge Requirements, issued by the California Regional Water Quality Control Board, San Diego Region, Order No. R9-2013-0001, NPDES No. CAS0109266, dated May 8, 2013; (3) Excerpts of Amended Waste Discharge Requirements, issued by the California Regional Water Quality Control Board, San Diego Region, Order Nos. R9-2015-0001, R9-2015-0100, NPDES No. CAS0109266, dated November 18, 2015; (4) Excerpts of a Test Claim for Unfunded Mandate Relating to California Water Quality Control Board, San Diego Region, Order No. R9-2007-0001, Test Claim No. 07-TC-09, filed by the County of San Diego, dated June 20, 2008; (5) A Test Claim for Unfunded Mandate Relating to California Water Quality Control Board, San Diego Region, Order No. R9-2007-0001, Test Claim No. 07-TC-09, filed by the City of San Diego, dated July 25, 2008; (6) Excerpts of a Statement of Decision, issued by the Commission on State Mandates in In re Test Claim on San Diego Regional Water Quality Control Bd. Order No. R9-2007-0001, Permit CAS0108758, dated March 26, 2010; (7) Excerpts of a Test Claim for Unfunded Mandate Relating to California Water Quality Control Board, San Diego Region, Order No. R9-2013-0001, Test Claim No. 14-TC-03, filed by the County of San Diego, dated June 29, 2015; and, (8) Excerpts of a Joint Test Claim for Unfunded Mandate Relating to California Water Quality Control Board, San Diego Region, Order No. R9-2015-0001, Test Claim No. 15-TC-02, filed by the Orange County Flood Control District, dated June 30, 2016. (ECF No. 108-2). Monsanto contends that these documents may be properly considered on this motion to dismiss under the doctrine of incorporation by reference and as public records under Federal

Rule of Evidence 201.

"As a general rule, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). However, there are "exceptions to the requirement that consideration of extrinsic evidence converts a 12(b)(6) motion to a summary judgment motion." *Id.* Under Federal Rule of Evidence 201, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it . . . is generally known within the trial court's territorial jurisdiction; or . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed R. Evid. 201(b). "[U]nder Fed.R.Evid. 201, a court may take judicial notice of 'matters of public record.'" *Lee*, 250 F.3d at 689 (quoting *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986)).

The docket reflects that the City has not filed any opposition to this Request for Judicial Notice. The Court concludes that these documents are matters of public record properly subject to judicial notice under Federal Rule of Evidence 201. *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001); *San Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 732 (N.D. Cal. 2011). Monsanto's request for judicial notice is granted.

**V. DISCUSSION**

Under California law, a nuisance is defined as,

> Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway[.]

Cal. Civ. Code § 3479. A nuisance can be public or private. *See* Cal Civ. Code §§ 3479-3481. "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." Cal.

Civ. Code § 3480. Any nuisance that does not constitute a public nuisance is a private nuisance. Cal. Civ. Code § 3481.

California Code of Civil Procedure section 731 states,

> An action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by a nuisance, as defined in Section 3479 of the Civil Code, and by the judgment in that action the nuisance may be enjoined or abated as well as damages recovered therefor. A civil action may be brought in the name of the people of the State of California to abate a public nuisance, as defined in Section 3480 of the Civil Code, by the district attorney or county counsel of any county in which the nuisance exists, or by the city attorney of any town or city in which the nuisance exists. Each of those officers shall have concurrent right to bring an action for a public nuisance existing within a town or city. The district attorney, county counsel, or city attorney of any county or city in which the nuisance exists shall bring an action whenever directed by the board of supervisors of the county, or whenever directed by the legislative authority of the town or city.

Cal. Civ. Proc. Code § 731. "Where a public entity can show it has a property interest injuriously affected by the nuisance, then, like any other such property holder, it should be able to pursue the full panoply of tort remedies available to private persons." *Selma Pressure Treating Co. v. Osmose Wood Preserving Co.*, 271 Cal. Rptr. 596, 604 (Ct. App. 1990) (interpreting the term "person" in section 731 to include governmental units).[2]

In the SAC, the City brings a continuing public nuisance cause of action in a non-representative capacity against Monsanto under section 731. (ECF No. 93).[3] Monsanto moves the Court for an order dismissing the SAC because (1) the City lacks standing to bring the claim;(2) California law bars non-representative public nuisance claims for damages; (3) the claim is time-barred; and (4) the City has failed to exhaust

---

[2] Under section 3493, "A private person may maintain an action for a public nuisance, if it is specially injurious to himself, but not otherwise." Cal. Civ. Code § 3493. In *City of Los Angeles v. Shpegel-Dimsey, Inc.*, the court concluded, "Civil Code section 3493 provides no authority for . . . a public entity rather than a private party, to recover damages for a 'specially injurious' public nuisance . . ." 244 Cal. Rptr. 507, 512 (Ct. App. 1988); *see also Torrance Redevelopment Agency v. Solvent Coating Co.*, 763 F. Supp. 1060, 1065 (C.D. Cal. 1991). As a public entity, the City cannot and does not pursue a "specially injurious" public nuisance claim under section 3493.

[3] The SAC does not allege that the City is bringing its public nuisance claim "in the name of the people of the State of California." *See* Cal. Civ. Proc. Code. § 731.

its administrative remedies. (ECF No. 108).

**A. Standing**

Monsanto contends that the City lacks standing to recover damages for an alleged public nuisance in the Bay because it lacks the requisite property interest in the Bay. (ECF No. 108-1 at 21-23). Monsanto contends that the allegations regarding City's ownership of the MS4 system, the stormwater and dry weather runoff system, are insufficient to establish a property interest injuriously affected "by the alleged public nuisance *in the Bay*." (ECF No. 108-1 at 24). Monsanto contends that any alleged interest in the City's stormwater system is insufficient to confer standing because the alleged damage to the system is a regulatory cost not recoverable in tort. *Id.* at 23. Monsanto contends that the City "has no cognizable 'usufructuary interest' in uncaptured water . . . which is purposely abandoned and not beneficially used." *Id.* at 24-25, 28-29. Monsanto contends that the 2014 Stormwater Resource Planning Act and Assembly Bill 2594 are inapplicable because the City does not allege sufficient facts to establish that it is capturing and using the stormwater or that the captured stormwater is the subject of this lawsuit. *Id.* at 26-27.

The City contends that the SAC alleges property interests sufficient to support its non-representative public nuisance claim. (ECF No. 109 at 8, 11). The City contends that the SAC sufficiently alleges the following property interests injured by the presence of PCBs: (1) the municipal stormwater and dry weather runoff system owned by the City; (2) water rights and property interest in the San Diego River and other rivers and streams in San Diego pursuant to the Pueblo Rights Doctrine; (3) property rights in captured water and dry weather runoff. *Id.* at 11. The City contends that Monsanto misconstrues the factual allegations regarding contamination to the Bay. *Id.* at 12, 17. The City asserts that the SAC alleges facts regarding contamination of the Bay in order to establish the public nature of the nuisance. *Id.*

As a public entity bringing a claim under section 731, the City must establish standing for its non-representative public nuisance claim by alleging that its "property

is injuriously affected . . . by the nuisance." Cal. Civ. Proc. Code § 731; *Selma Pressure*, 271 Cal. Rptr. at 604. While the SAC contains allegations regarding harm to the Bay and the public nature of the harm to the Bay, the factual allegations of the SAC do not limit the scope of the nuisance to PCB contamination of the Bay. The City alleges, "PCBs have traveled into San Diego Bay and the City of San Diego's stormwater system by a variety of ways. . . . The runoff originates from multiple sources and industries and enters the City of San Diego's stormwater system and San Diego Bay through stormwater and dry weather runoff." (ECF No. 93 at ¶ 4). The City further alleges, "The City of San Diego was named in a California Regional Water Quality Control Board Clean Up and Abatement Order for PCBs in the San Diego Bay due in part to the City's ownership of its MS4 stormwater system and due in part to its status as a former trustee of the San Diego Bay." *Id.* ¶ 9. Construed in the light most favorable to the nonmoving party, the nuisance alleged in the SAC includes the presence of PCBs produced by Monsanto in the municipal stormwater system and in the Bay.

The City alleges the following property interests damaged by the presence of PCBs produced by Monsanto: (1) a property interest in the municipal stormwater and dry weather runoff system (ECF No. 93 at ¶¶ 25-35); (2) "water rights and property interests in the San Diego River, and other rivers and streams in San Diego, through Pueblo Rights" (*Id.* ¶ 75); and (3) a property interest in captured stormwater and dry weather runoff. (*Id.* ¶ 36-74). With respect to the municipal stormwater and dry weather runoff system,[4] the City alleges that it "owns, manages, and operates a municipal stormwater and dry weather runoff system, which captures, collects, reuses for beneficial purposes, and/or transports stormwater and dry weather runoff." *Id.* ¶ 26. The City alleges, "Monsanto's PCBs have contaminated and damaged multiple facilities

---

[4] Because the City has standing based on these allegations related to the municipal stormwater and dry weather runoff system, the Court does not address whether the remaining property interests alleged in the SAC provide any independent basis for standing to bring the nuisance cause of action.

within the City's stormwater and dry weather run off systems." *Id.* ¶ 27. The City alleges, "As a result of Monsanto's PCB presence, the City cannot operate many of its stormwater and dry weather runoff systems as designed because the system now requires upgrades and retrofits to accommodate Monsanto's PCBs." *Id.* ¶ 28. The City alleges that multiple facilities in the system have "been and must be further retrofitted and improved in order to reduce and remove PCBs from stormwater and dry weather runoff." *Id.* ¶ 30. The City further alleges that "[a]s a public property owner and former trustee of the Bay, [the City] seeks to recover damages for retrofit injuries to stormwater system property." *Id.* ¶ 8. The Court concludes that the City alleges sufficient facts to support a reasonable inference that the City has a property interest in its municipal stormwater system and that the municipal stormwater system has been injuriously affected by the presence of PCBs produced by Monsanto.[5]

### B. California Law on Public Nuisance Claim for Damages

Monsanto contends that California law precludes the City's non-representative public nuisance claim for damages as a "disguised products liability claim" under *County of Santa Clara v. Atlantic Richfield Co.*, 40 Cal. Rptr. 3d 313 (Ct. App. 2006). (ECF No. 108-1 at 30-31). The City contends that the Court "has already rejected Monsanto's argument that California law prevents the City from pursuing a public nuisance claim for damages." (ECF No. 109 at 18).

In the SAC, the City brings a public nuisance cause of action in a non-representative capacity for damages and abatement.[6] "[C]ausation [is] a necessary

---

[5] Monsanto relies on two cases from courts in Indiana to argue that the alleged injuries to the City's stormwater system are regulatory costs not recoverable in tort. *Cinergy Corp. v. Associated Elec. & Gas Ins. Servs., Ltd.*, 865 N.E.2d 571, 582 (Ind. 2007); *Newman Mfg., Inc. v. Transcontinental Ins. Co.*, 871 N.E.2d 396, 405 (Ind. Ct. App. 2007). These cases are inapposite and not binding on this Court. The Indiana cases address the interpretation of insurance policies rather than allegations sufficient to establish "property injuriously affected" under section 731 of the California Code of Civil Procedure for purposes of standing to bring a non-representative public nuisance cause of action.

[6] The Port District brought a claim for public nuisance in a representative capacity.

element of a public nuisance claim." *In re Firearm Cases*, 24 Cal. Rptr. 3d 659, 678 (Ct. App. 2005). "[L]iability for nuisance does not hinge on whether the defendant owns, possesses or controls the [nuisance-creating] property, nor on whether [the defendant] is in a position to abate the nuisance; the critical question is whether the defendant created or assisted in the creation of the nuisance." *City of Modesto Redev. Agency v. Superior Court*, 13 Cal. Rptr. 3d 865, 872 (Ct. App. 2004). California courts have generally not permitted nuisance claims by public entities against product manufacturers on the grounds that they knowingly sold hazardous products or failed to alert customers to proper methods of disposal. *See, e.g.*, *City of San Diego v. U.S. Gypsum Co.*, 35 Cal. Rptr. 2d 876, 883-84 (Ct. App. 1994) (concluding that manufacturers of asbestos-containing building materials were not liable to the City of San Diego for damages stemming from installation of asbestos in city-owned buildings under a nuisance theory); *City of Modesto*, 13 Cal. Rptr. 3d at 875-76. However, product manufacturers may be liable under a public nuisance theory if they "create or assist in creating a system that causes hazardous wastes to be disposed of improperly, or who instruct users to dispose of wastes improperly." *City of Modesto*, 13 Cal. Rptr. 3d at 874; *see also Team Enters., LLC v. W. Inv. Real Estate Trust*, 647 F.3d 901, 912 (9th Cir. 2011) (internal citations omitted) ("A defendant may be liable for assisting in the creation of a nuisance if he either (1) affirmatively instructs the polluting entity to dispose of hazardous substances in an improper or unlawful manner . . . or (2) manufactures or installs the disposal system[.]").

The City alleges PCBs are "man-made chemical compounds that have become notorious as global environmental contaminants – found in bays, oceans, rivers, streams, soil, and air." (ECF No. 93 at ¶ 1). The City alleges that Monsanto was the "sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name 'Aroclor' for certain PCB compounds." *Id.* ¶ 2. The City alleges that Monsanto knew that PCBs presented a health risk and "were causing widespread contamination of the environment, far beyond the areas of its use." *Id.* ¶ 100. The City

1  alleges that despite knowing of the health and environmental risks associated with
2  PCBs, Monsanto "promot[ed] the use and sale of Aroclor and other PCB compounds."
3  *Id.* ¶ 95. The City alleges that "Monsanto instructed its consumers to dispose of PCB
4  containing material in local landfills, knowing that landfills were not suitable for PCB
5  contaminated waste." *Id.* ¶ 112. The City alleges that Monsanto "had determined that
6  the only effective mothed [sic] of disposing of PCBs was incineration, and it
7  constructed an incinerator for disposal of its own PCB contaminants." *Id.* The City
8  alleges, "Nevertheless . . . Monsanto instructed its customers to dispose of PCB
9  contaminated waste in landfills . . . ." *Id*. The City alleges that PCBs "widely
10 contaminat[ed] all natural resources and living organisms" and have "traveled into [the
11 Bay] and the City of San Diego's stormwater systems by a variety of ways." *Id.* ¶¶ 2,4.
12 The Court concludes that these factual allegations permit a reasonable inference that
13 Monsanto's actions constituted affirmative conduct that assisted in the creation of the
14 public nuisance, the PCB contamination of the municipal stormwater system and the
15 Bay. *See City of Modesto*, 13 Cal. Rptr. 3d at 874.

16  In *County of Santa Clara*, the court allowed the representative public nuisance
17 claim for abatement against defendant lead manufacturers, but dismissed the
18 non-representative public nuisance claim for damages as a products liability action in
19 disguise. The non-representative claim alleged that the plaintiff local governmental
20 agencies "suffered a special injury with respect to the presence of Lead in homes,
21 buildings, and other property owned, managed, leased, controlled, and/or maintained
22 by them and that defendants' conduct had created a continuing public nuisance that was
23 injurious to them." 40 Cal. Rptr. 3d at 323 n.4 (internal citations omitted). The court
24 concluded that the non-representative claim was "at its core, an action for injuries
25 caused to plaintiffs' property by a product, while the core of the representative cause
26 of action [was] an action for remediation of a public health hazard." *Id.* at 331.

27  In this case, the City alleges a non-representative cause of action based on the
28 presence of PCBs in the Bay and in its stormwater system which "captures, collects,

reuses for beneficial purposes, and/or transports stormwater and dry weather runoff." (ECF No. 93 at ¶ 26). The SAC alleges that multiple facilities within the stormwater system "[have] been and must be further retrofitted and improved in order to reduce and remove PCBs from stormwater and dry weather runoff." *Id.* ¶ 30. The SAC alleges that the stormwater system "collects and transports stormwater to be discharged into the Bay." *Id.* ¶ 130. The SAC further describes how PCB contamination in the Bay affects all San Diegans and poses a health hazard. *Id.* at ¶¶ 124, 132. The Court concludes that the non-representative claim for damages alleged by the City in this case is distinguishable from the claim in *County of Santa Clara*, because it is aimed at the remediation of a public health hazard.

In *Selma Pressure Treating Co.*, the court of appeal stated, "Where a public entity can show it has a property interest injuriously affected by the nuisance, then, like any other such property holder, it should be able to pursue the full panoply of tort remedies available to private persons." 271 Cal. Rptr. 596 at 604 (citing Cal. Code Civ. Proc. § 731; Cal. Civ. Code § 3491); *see also Orange Cty Water Dist. v. Arnold Eng'g Co.*, 127 Cal. Rptr. 3d 328, 339 n.4 (Ct. App. 2011) ("In the second type of [public nuisance] action, a public entity may obtain both an abatement judgment and monetary damages if it establishes a property interest the nuisance injuriously affected."). The Court finds that the City has alleged sufficient facts to establish that it has "a property interest injuriously affected by the nuisance" and that Monsanto assisted in the creation of the public nuisance. *See Selma Pressure Treating Co.*, 271 Cal. Rptr. at 604. The Court concludes that the City has alleged sufficient facts to state a non-representative public nuisance claim for damages.

**C. Statute of Limitations**

Monsanto contends that the City's public nuisance claim is barred by the statute of limitations. (ECF No. 108-1 at 32). Monsanto contends that the City's non-representative claim for damages is governed by California Code of Civil Procedure section 338(b) which provides for a three year limitations period. *Id.* at 32-33.

Monsanto contends that the City has pled a permanent nuisance claim, rather than a continuing nuisance claim. *Id.* at 33.

The City contends that its claim is not time-barred because there is no applicable limitations period for a public nuisance pursuant to California Civil Code section 3490. (ECF No. 109 at 25). The City contends that the claim is not time-barred because the SAC alleges a continuing nuisance for which a plaintiff may bring successive actions until the nuisance is abated. *Id.* at 26. Further, the City contends that application of the continuing tort theory raises a factual question that cannot be resolved at this stage in the proceedings. *Id.* at 26-27.

"A claim may be dismissed as untimely pursuant to a 12(b)(6) motion 'only when the running of the statute [of limitations] is apparent on the face of the complaint.'" *U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*, 720 F.3d 1174, 1178 (9th Cir. 2013) (citing *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010)). The Court concludes that the running of any applicable statute of limitations is not apparent on the face of SAC. The motion to dismiss as barred by the statute of limitations is denied.

### D. Exhaustion of Administrative Remedies

Monsanto contends that the SAC must be dismissed for lack of jurisdiction because the City must first exhaust its administrative remedies before the Commission on State Mandates ("the Commission"). (ECF No. 108-1 at 17). Monsanto contends that the City must exhaust its administrative remedies because the tort damages the City seeks in this case are permit compliance costs that qualify as unfunded state mandates under *Department of Finance v. Commission on State Mandates*, 378 P.3d 356 (Cal. 2016). *Id.* Monsanto contends that the Commission has the "sole and exclusive" authority to adjudicate state mandates and that the City is required by statute to exhaust its administrative remedies before the Commission prior to bringing the current action. *Id.* at 17. Further, Monsanto contends that the Court has the discretion to dismiss or stay this matter pending resolution of the test claims through judicially-imposed

prudential exhaustion. Monsanto contends that public policy considerations favor exhaustion. *Id.* at 19. Monsanto contends that administrative review of the Test Claims could "obviate this action or limit its scope." *Id.* at 20.

The City contends that the Commission is not authorized to address the City's public nuisance claim for tort damages or to award tort damages for the costs of PCB removal. (ECF No. 109 at 18-19, 24). The City contends that administrative exhaustion is inapplicable because (1) no statute provides an administrative procedure for the City's nuisance claims; (2) the City is not pursuing grievances against an organization that provides internal remedies for its damages; and, (3) the Court does not need agency assistance or expertise to determine the City's public nuisance claims. *Id.* at 20. The City contends that the Court should not exercise its discretion to require exhaustion because any decision by the Commission will have no impact on this action. *Id.* at 24

Under the California State Constitution, "if the legislature or a state agency requires a local government to provide a new program or higher level of service, the local government is entitled to reimbursement from the state for the associated costs." *Dep't of Finance*, 378 P.3d at 360 (citing Cal. Const. art. XIII B, § 6, subd. (a)). An exception to this requirement provides that "if the new program or increased service is mandated by a federal law or regulation, reimbursement is not required." *Id.* (citing Cal. Gov. Code § 17556, subd.(c)). "[T]he Legislature established the Commission as a quasi-judicial body to carry out a comprehensive administrative procedure for resolving claims for reimbursement of state-mandated local costs arising out of article XIIIB, section 6 . . . of the California Constitution." *Redevelopment Agency v. Comm'n on State Mandates*, 51 Cal. Rptr. 2d 100, 102 (Ct. App. 1996). "[T]hus the statutory scheme contemplates that the Commission, as a quasi-judicial body, has the sole and exclusive authority to adjudicate whether a state mandate exists." *Id.* (citing *Cty of Los Angeles v. Comm'n on State Mandates*, 38 Cal. Rptr. 2d 304, 311 (Ct. App. 1995)).

In *Department of Finance*, the Regional Water Quality Control Board, a state

agency, issued permits to the Los Angeles County Flood Control District and 84 cities to operate storm drainage systems with certain permit conditions requiring that the operators "take various steps to reduce the discharge of waste and pollutants into state waters." 378 P.3d at 361. Some of the drainage system operators sought reimbursement through the Commission for the cost of satisfying the conditions as an unfunded state mandate. The Commission determined that "each required condition was a new program or higher level of service mandated by the state rather than by federal law." *Id.* Upon review of the decision, the trial court and the court of appeal found that all of the requirements were federally mandated. *Id.* However, the Supreme Court upheld the decision of the Commission and concluded that the permit conditions were not federally mandated. *Id.* at 371.

Under California law, "[w]here an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act." *Abelleira v. Dist. Court of Appeal*, 109 P.2d 942, 949 (Cal. 1941); *see also Campbell v. Regents of the Univ. of Cal.*, 106 P.3d 976, 982 (Cal. 2005). "[H]owever, this oft-quoted rule speaks only to the need to exhaust administrative remedies provided for a statutory right and does not govern rights and remedies outside the legislative scheme." *Rojo v. Kliger*, 801 P.2d 373, 385 (Cal. 1990). When required, "[e]xhaustion of administrative remedies is a jurisdictional prerequisite to resort to the courts." *Campbell*, 106 P.3d at 982 (quoting *Johnson v. City of Loma Linda*, 5 P.3d 874, 879 (Cal. 2000) (internal quotations omitted)).

The Ninth Circuit Court of Appeals has held that "[a]dministrative exhaustion can be either statutorily required or judicially imposed as a matter of prudence." *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007). "Where there is no explicit statutory requirement of exhaustion of administrative remedies, the application of exhaustion rules is a matter committed to the discretion of the district court." *Morrison-Knudsen Co., Inc. v. CHG Int'l, Inc.*, 811 F.2d 1209, 1223 (9th Cir. 1987) (citing *Wong v. Dep't of State*, 789 F.2d 1380, 1385 (9th Cir. 1986)). "Courts may require prudential

exhaustion if '(1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate by pass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review.'" *Puga*, 488 F.3d at 815 (citing *Noriega-Lopez v. Ashcroft*, 335 F.3d 874, 881 (9th Cir. 2003)).

In this case, the SAC alleges, "In order to discharge stormwater into the Bay, Plaintiff is required to receive a Municipal Regional Stormwater Permit from the Regional Water Board, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act." (ECF No. 93 at ¶ 130). The San Diego Regional Quality Control Board issued the City, among other permittees, an NPDES permit in 2007 and 2013, and 2015, each of which are the subject of test claims[7] before the Commission. (ECF Nos. 108-3, 108-4, 108-5). A test claim challenging certain provisions of the 2013 Permit and a test claim challenging certain provisions of the 2015 Permit are currently pending before the Commission. (ECF Nos. 108-9, 108-10). In a separate case, a petition for writ of mandate to overturn the Commission's decision that some permit requirements in the 2007 NPDES permit constitute an unfunded state mandate is currently pending before the state court of appeal.

The administrative mandate procedure before the Commission "is the exclusive way for a local agency to claim reimbursement for state mandated costs." *Lake Madrone Water Dist. v. State Water Res. Control Bd.*, 256 Cal. Rptr. 894, 902 (Ct. App. 1989); *see also Tri-County Special Educ. Local Plan Area v. Cty of Tuolomne*, 19 Cal. Rptr. 3d. 884, 889 (Ct. App. 2004) ("Without first exhausting the administrative remedies, the local agency cannot claim a section 6 violation in defense of its failure to perform its duty . . . . After a determination by the Commission that reimbursement is due, but only then, may the local government bring a traditional mandamus action . . .).

---

[7] "'Test claim' means the first claim filed with the commission alleging that a particular statute or executive order imposes costs mandated by the state[.]" Cal. Gov. Code § 17521.

However, in this case, the City brings a cause of action in tort for public nuisance against a private entity pursuant to applicable sections of the California Civil Code and the California Code of Civil Procedure. California law does not establish an administrative procedure for a public nuisance claim. *See Abelleira*, 109 P.2d at 949 ("[W]here an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act."). While some portion of the damages the City seeks from Monsanto in this public nuisance claim may overlap in part with unfunded state mandate costs at issue in pending test claims before the Commission, the jurisdictional requirement of administrative exhaustion is limited to "where an administrative remedy is required by statute." *Id.* The Court concludes that the City is not precluded from bringing its public nuisance claim by any statutory administrative exhaustion requirement. The Court further concludes that prudential exhaustion is not warranted at this stage in proceedings. The Court declines to exercise any discretion to stay or dismiss the City's suit pending resolution of the test claims. *See Morrison-Knudsen Co.*, 811 F.2d at 1223.

**VI. CONCLUSION**

IT IS HEREBY ORDERED THAT the motion to dismiss the City's Second Amended Complaint filed by Monsanto is DENIED. (ECF No. 108).

DATED: November 22, 2017

**WILLIAM Q. HAYES**
United States District Judge