UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO UNIFIED PORT DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY; SOLUTIA INC.; and PHARMACIA LLC,<br><br>Defendants. | Case No.: 15cv578-WQH-AGS<br><br>**ORDER** |
| PHARMACIA LLC; MONSANTO COMPANY; and SOLUTIA INC.,<br><br>Counter Claimants,<br><br>v.<br><br>SAN DIEGO UNIFIED PORT DISTRICT,<br><br>Counter Defendant. | |

HAYES, Judge:

The matters before the Court are the motion to strike affirmative defenses and the motion to dismiss counterclaims filed by Plaintiff San Diego Unified Port District. (ECF No. 112, 113).

## I. BACKGROUND

On August 3, 2015, the San Diego Unified Port District ("Port District") filed a First Amended Complaint ("FAC") against Defendants Monsanto Company, Pharmacia Corporation, and Solutia, Inc. ("Monsanto").[1] (ECF No. 25). The Port District alleged causes of action for public nuisance, equitable indemnity, and purpresture against Monsanto relating to PCB contamination of the San Diego Bay ("the Bay"). *Id.* The Port District seeks to recover compensatory damages for "past and future costs and expenses related to the investigation, remediation, and removal of PCBs from in and around the Bay, loss of the use of portions of the Bay, and diminution in value of real property in and around the Bay." *Id.* at 26. The Port District also seeks a judicial determination that Monsanto is liable for any and all future costs related to the investigation, remediation, and removal of PCBs from in and around the Bay, "[a]n order that Defendants pay for establishment of a fund used by Plaintiff Port District to abate the public nuisance created by the presence of PCBs in and around the Bay," "[a]n order that Defendants abate the purpresture created by the presence of PCBs in the Bay," and "[c]ompensatory damages to Plaintiff Port District for the injury to and loss of use of natural resources deriving from the presence of PCBs in and around the Bay." *Id.* at 26-27. The Port District further requests punitive and exemplary damages, litigation costs and attorney's fees, pre-judgment and post-judgment interest, and any other relief deemed proper by the Court. *Id.* at 27.

On September 28, 2016, the Court granted in part and denied in part a motion to dismiss the FAC filed by Monsanto. The Court granted the motion to dismiss with respect to equitable indemnity and denied the motion to dismiss with respect to public nuisance and purpresture. (ECF No. 81). The Court denied the motion to dismiss the public nuisance claim based on the Port District's allegations that Monsanto had, despite knowing the health and environmental risks associated with PCBs, continued to promote the use and

---

[1] The City of San Diego filed a separate amended complaint and is currently litigating independent causes of action against Monsanto.

sale of PCBs and had instructed its users to dispose of PCB in landfills, knowing that landfills were not suitable for PCB contaminated waste. *Id.* at 14-15.

On April 14, 2017, Monsanto filed a First Amended Answer and Counterclaim. (ECF No. 110). Monsanto asserts that it is not responsible for costs of remediating PCB contamination in the Bay and that the Port District should instead bear the responsibility for "taking and funding the actions necessary to address" PCB contamination of the Bay. *Id.* at 28. Monsanto seeks to hold the Port District liable for allegedly discharging and failing to prevent the discharge of PCBs into the Bay. The First Amended Answer and Counterclaim raises 85 affirmative defenses. *Id.* at 28-47. The First Amended Answer and Counterclaim brings the following causes of action against the Port District: (1) cost recovery under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"); (2) federal declaratory relief under CERCLA and the Declaratory Judgment Act; (3) unjust enrichment; (4) contribution under state law; (5) violations of the Clean Water Act ("CWA") and the Port District's NPDES Permit; (6) contribution and/or indemnity under the California Carpenter-Presley-Tanner Hazardous Substances Account Act ("HSAA"); (7) declaratory relief under the HSAA; (8) negligence; (9) negligence per se; (10) purpresture; and (11) violations of the public trust doctrine. *Id.* at 47-97.

On May 12, 2017, the Port District filed a motion to strike affirmative defenses and a motion to dismiss the counterclaims. (ECF Nos. 112, 113). On June 12, 2017, Monsanto filed responses in opposition. (ECF Nos. 122, 123). On June 23, 2017, the Port District filed replies. (ECF Nos. 125, 126).

On June 23, 2017, the Port District filed a request for judicial notice in support of the motion to dismiss the counterclaims. (ECF No. 127). The Port District requests that the Court take judicial notice pursuant to Federal Rule of Civil Procedure 201 of an "Excerpt from Monsanto Company's Form 10-K Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act for the fiscal year ended on August 31, 2016." *Id.* On July 19, 2017, Monsanto filed an objection to the request for judicial notice on the

grounds that the document has "no bearing on the resolution" of the motion to dismiss or the First Amended Answer and Counterclaim.[2] (ECF No. 129 at 3).

## II. ALLEGATIONS OF THE FIRST AMENDED ANSWER AND COUNTERCLAIM

"[T]he Port District holds the state-owned tidelands in trust for the people of the State of California for approximately one-third of the Bay." (Counterclaim, ECF No. 110 at ¶ 33). "The Port District has, from 1962 through the present, discharged or caused to be discharged, a variety of pollutants into the Bay, including PCBs." *Id.* ¶ 36. "[S]ources of the Port District's discharges include its (1) inadequate maintenance of sites under its control, (2) inadequate supervision of its lessees, (3) use of PCB containing products, (4) failure to follow best management practices with regard to construction and demolition activities, and (5) storm water discharges." *Id.* ¶ 37. The Port District leases tidelands to "industrial dischargers . . . despite its awareness of the lessees' discharges to the entire Bay." *Id.* ¶ 69. "The Port District has at all relevant times had the obligation and ability under its lease agreements to impose controls that could prevent or reduce such discharges, but it failed to do so . . . ." *Id.* "The Regional Board[3] has repeatedly held that the Port District has caused or permitted wastes to be discharged or deposited where they were discharged into the Bay through its trusteeship of the tidelands." *Id.* ¶ 71. "The Port District has . . . contributed to contamination in the Bay during periods where its tenants were insolvent or abandoned operations on the tidelands, and the Port District permitted the properties to fall into disrepair. By neglecting maintenance of those buildings, the Port District caused extensive discharges of pollutants into the Bay . . . ." *Id.* ¶ 77. "In addition to discharging contaminated wastewater and storm water that contain pollutants, including

---

[2] The Port District's request for judicial notice (ECF No. 127) is denied as unnecessary to the resolution of the instant motions. *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1058 n.2 (9th Cir. 2006) (denying judicial notice of documents "not relevant to the resolution of this appeal").

[3] San Diego Regional Water Quality Control Board

PCBs, the Port District and its tenants at all relevant times through today have purchased, used, and disposed of various PCB-containing products . . . ." *Id.* ¶ 89.

"The Port District's discharges of PCBs and other pollutants have caused Defendants/Counter-Claimants to incur response and defense costs and have also created significant contingent liability." *Id.* ¶ 97. This contingent liability "may arise" from the instant lawsuit, including the complaint by the City of San Diego, and "potential future, federal, state or local regulatory actions that could impose costs on Defendants/Counter-Claimants to clean up the Port District's discharges." *Id.* "This contingent liability continually expands with every discharge of PCBs by the Port District – which continues to the present day." *Id.* ¶ 98.

"As a result of the Port District's discharges" Monsanto has incurred and "will continue to incur response costs as the investigation proceeds, including potentially regulatory, litigation, and other response costs." *Id.* ¶ 58. Monsanto's "response costs in connection with the investigation and cleanup processes for San Diego Bay" include:

> (1) identification and analysis of historic and current sources of potential contamination and potentially responsible parties (including in particular the Port District) ("PRPs") for the Bay, including public records review, analysis of existing data, research on the conveyance and drainage systems, assessment of current and historic source control efforts at various Bay site locations, and investigatory costs to identify the volume and location of the PCBs discharged by the Port District; (2) analysis of the potential impacts on the Bay from Non-Monsanto Produced PCBs, and potential sources of those Non-Monsanto Produced PCBs; (3) review and analysis of sampling and investigation data from the Bay, and investigation of potential data gaps; (4) investigation and analysis of the contaminated sediments at certain locations in the Bay; (5) analysis of the potential source control and remediation options for the Bay; (6) analysis of PCBs in the Bay to assist with identification of the sources of current and historic PCB contamination; and (7) numerous other activities.

*Id.* ¶ 99. These costs are "directed to assessing, evaluating and monitoring releases of hazardous substances, including PCBs, in the Bay." *Id.* ¶ 101. Monsanto has "incurred response costs that would be necessary even in the absence of the present suit" and are "a

necessary predicate for cleanup efforts, since identifying sources of PCB discharges and the locations of the resulting PCB deposits are requisite first steps to any cleanup." *Id.* ¶ 102. "Additionally, the Port District's discharges and releases made incurrence of response costs necessary both due to the Port District's lawsuit and also to address other potential sources of contingent liability created by the Port District's conduct." *Id.* ¶ 103.

Monsanto has "incurred costs in defending the instant lawsuit" because this lawsuit "likely would never have been brought but for the Port District's discharges of PCBs." *Id.* ¶ 105. The Port District's actions have caused Monsanto "to expend additional costs as a result of this increased exposure." *Id.* ¶ 106. Monsanto has "incurred legal and other costs pertaining to the present suit as well as the consolidated suit filed by the City of San Diego, which are actually attributable to and caused by the Port District's own discharges." *Id.* ¶ 58.

Monsanto seeks in part "a judicial determination under CERCLA and the federal Declaratory Judgment Act that the Port District is liable for past and future response costs and damages, including reasonable attorneys' fees, expert witness' fees, oversight costs, and interest incurred by Defendants/Counter-Claimants to investigate, remediate, and/or restore the Bay." *Id.* at 95.

**III. MOTION TO STRIKE (ECF No. 112)**

In its First Amended Answer and Counterclaim, Monsanto pleads 85 affirmative defenses. The Port District contends that the Court should dismiss a number of these defenses pursuant to Federal Rule of Civil Procedure 12(f) because they are immaterial, redundant, or not affirmative defenses. The Port District contends that the CERCLA and HSAA affirmative defenses are immaterial because no party has brought a CERCLA or HSAA claim against Monsanto. The Port District contends that a number of the defenses raised are non-affirmative defenses because they attack elements of prima facie claims or assert a lack of standing. The Port District contends that other defenses should be stricken as redundant. The Port District contends that it will be prejudiced if the Court does not

grant this motion because the challenged defenses complicate discovery, confuse the jury as to the legal issues at stake, and result in a waste of judicial resources.

Monsanto contends that its CERCLA and HSAA defenses are material because they are related to the Port District's "repeated demands for Natural Resources Damages ('NRD') and cleanup costs." (ECF No. 122 at 6). Monsanto contends that the response costs the Port District asserts as damages in this action "squarely implicate cost allocation and contribution concerns typically reserved for CERCLA and HSAA actions." *Id.* at 6-7. Monsanto contends that any damages awarded to the Port District must account for the Port District's responsibility for contaminating the Bay through its storm water and sewer conveyance system discharges. Monsanto contends that the Port District's demands for recovery are available only to the extent authorized by CERCLA and HSAA. Monsanto asserts that its 64th affirmative defense is unrelated to CERCLA or the HSAA. Monsanto contends that its defenses are not redundant and that the Port District mischaracterizes the defenses as non-affirmative. Further, Monsanto contends that the Court should treat any non-affirmative defense as a specific denial rather than strike the defense. Monsanto contends that the Port District cannot demonstrate that any prejudice would result from allowing the challenged affirmative defenses.

A motion to strike an affirmative defense is allowable under Federal Rule of Civil Procedure 12(f). Rule 12(f) provides that "a court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial . . . ." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (citing *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993)). "'Immaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fogerty*, 984 F.2d at 1527 (internal quotation omitted) (quoting 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1382, at 706-07 (1990)). "The key to determining the sufficiency of pleading an

affirmative defense is whether it gives plaintiff fair notice of the defense." *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1023 (9th Cir. 2010). "Fair notice generally requires that the defendant state the nature and grounds for the affirmative defense." *Roe v. City of San Diego*, 289 F.R.D. 604, 608 (S.D. Cal. 2013).

Motions to strike are generally disfavored and "should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Neveau v. City of Fresno*, 392 F. Supp. 2d 1159, 1170 (E.D. Cal. 2005) (citing *Colaprico v. Sun Microsystems, Inc.*, 758 F. Supp. 1335, 1339) (N.D. Cal. 1991)). Courts often require that the moving party make a showing of prejudice before granting a 12(f) motion to strike. *See, e.g.*, *Fogerty*, 984 F.2d at 1528; *Cal. Dep't. of Toxic Substances Control v. Alco Pacific, Inc.*, 217 F. Supp. 2d 1028, 1033 (C.D. Cal. 2002). The decision to grant or deny a motion to strike under Rule 12(f) is within the discretion of the court. *See Fogerty*, 984 F.2d at 1528. On a motion to strike, the court views the pleadings in the light most favorable to the non-moving party. *See, e.g.*, *Cal. Dep't of Toxic Substances Control*, 217 F. Supp. 2d at 1033.

The Port District moves to strike defenses 31-35, 37-45, and 64 as immaterial because they are related to CERCLA and HSAA. Although no causes of action under CERCLA or HSAA have been asserted by the Port District, Monsanto asserts that these defenses will impact the relief and damages available to the Port District. The Court cannot determine at this early stage in proceedings that these affirmative defenses will have no possible bearing on the subject matter of the litigation.

The Port District moves to strike defenses 84, 20-22, and 57 as non-affirmative defenses because they attack a prima facie element of the Port District's causes of action. These defenses challenge the foreseeability of the Port District's injuries (84th defense), causation (20th and 21st defenses), and the remoteness of damages (22nd and 57th defenses). (ECF No. 110). Defenses challenging elements of a plaintiff's prima facie case are not appropriately characterized as affirmative defenses. *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) ("A defense which demonstrates that Plaintiff has not

8

15cv578-WQH-AGS

met its burden of proof is not an affirmative defense."). However, district courts within this circuit have held that denials that are improperly pled as defenses should not be stricken on that basis alone. *See, e.g.*, *Weddle v. Bayer AG Corp.*, No. 11CV817 JLS, 2012 WL 1019824, at *4 (S.D. Cal. Mar. 26, 2012); *Mattox v. Watson*, No. 07-5006, 2007 WL 4200213 (C.D. Cal. Nov. 15, 2007); *Smith v. Wal-Mart Stores*, No. 06-2069, 2006 WL 2711468 (N.D. Cal. Sept. 20, 2006). The motion to strike defenses 84, 20-22, and 57 on the grounds that they are not affirmative defenses is denied.

The Port District moves to strike defenses 8, 46-48, and 74-76 as non-affirmative defenses because they challenge the Port District's standing to assert a cause of action. The Court concludes that these affirmative defenses provide the Port District with fair notice of the defenses. Further, the Court cannot conclude at this early stage in proceedings that these defenses will have no possible bearing on the subject matter of the litigation.

The Port District moves to strike as redundant defenses 62, 65, 52, 54, 53, and 72.[1] Upon review, the Court concludes that these defenses provide the Port District with fair notice and are not sufficiently redundant to warrant being stricken under Rule 12(f).

The affirmative defenses challenged in the Port District's motion provide fair notice of the defenses and are not otherwise insufficient, redundant, or immaterial. *See* Fed. R. Civ. P. 12(f). The Port District's motion to strike is denied.

**IV. MOTION TO DISMISS FIRST AMENDED ANSWER AND COUNTERCLAIMS (ECF No. 113)**

**A. Legal Standard**

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to move for dismissal on the grounds that the court lacks jurisdiction over the subject matter. Fed. R. Civ. P. 12(b)(1). The party asserting subject matter jurisdiction has the burden to establish that the court properly has subject matter jurisdiction over an action. *See Assoc.*

---

[1] The Port District does not identify which of these alleged redundant defenses it requests the Court to strike.

*of Med. Colleges v. United States,* 217 F.3d 770, 778-779 (9th Cir. 2000). A jurisdictional attack pursuant to Rule 12(b)(1) may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). "In a facial attack, the challenger asserts that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

### B. Article III Standing

The Port District contends that Monsanto fails to establish standing under Article III with respect to any of its counterclaims and the Court therefore lacks subject matter jurisdiction over the counterclaims. The Port District contends that Monsanto's "'response costs' resulting from its defense-minded investigations and analyses of contamination in the Bay and its efforts to identify other parties who may be held responsible for the eventual cleanup" are litigation costs that cannot establish Article III injury-in-fact. (ECF No. 113-1 at 17). The Port District contends that Monsanto launched its own investigations and analyses for the purpose of defending itself in this litigation. The Port District contends that Monsanto's legal expenses in this suit are not recoverable under the American Rule. The Port District contends that Monsanto cannot satisfy Article III standing requirements through its allegations of contingent liability because Monsanto had not established a genuine threat of future harm at the time the counterclaims were filed.

Monsanto asserts that as a result of the Port District's discharges into the Bay, Monsanto has "incurred multiple forms of economic harm sufficient to confer standing, including past, present, and future response costs in connection with, among other things, investigating San Diego Bay." (ECF No. 123 at 19-20). Monsanto contends that its defense and litigation costs constitute an injury-in-fact because the Port District's discharges are a "substantial cause of contamination in the Bay, and therefore a cause of this litigation and defense costs." *Id.* at 20. Monsanto contends that a party may rely on litigation-related costs to establish injury-in-fact for purposes of a counterclaim because

10

"defendants are hauled into court against their will and suffer involuntary, concrete economic harm as a result." *Id.* at 21. Monsanto contends that it may recover litigation costs in connection with the CWA claim. Further, Monsanto contends that its contingent liability satisfies Article III standing requirements. Monsanto contends that contingent liability exists because the Port District continues to discharge PCBs into the Bay, while seeking to hold Monsanto legally responsible for the presence of PCBs in the Bay. Monsanto contends that this potential liability constitutes "a present or threatened harm that is not speculative" due to the City's separate claim seeking damages related to the Bay and further litigation by other San Diego Bay dischargers. *Id.* at 22.

The Article III standing doctrine limits federal court jurisdiction. *See La Asociacon de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). "[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). In order "to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan*, 504 U.S. at 560–61). "To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). The party invoking federal jurisdiction bears the burden of establishing that the standing requirements of Article III are satisfied. *Id.* at 1547. In this case, Monsanto alleges that three types of injury-in-fact support Article III standing to assert counterclaims: response costs, defense costs, and contingent liability.

### 1. Response Costs and Defense Costs

Monsanto alleges that it has incurred and will continue to incur a variety of "response costs in connection with the investigation and cleanup processes for San Diego Bay" and asserts that these response costs are sufficient to establish an injury-in-fact. (ECF No. 110 at ¶ 99).

The alleged response costs form the basis of Monsanto's CERCLA counterclaim. CERCLA "authorizes private parties to institute civil actions to recover the costs involved in the cleanup of hazardous wastes from those responsible for their creation." *3550 Stevens Creek Assocs. v. Barclays Bank*, 915 F.2d 1355, 1357 (9th Cir. 1990); *see also United States v. Atl. Research Corp.,* 551 U.S. 128, 136 (2007); *Key Tronic Corp. v. United States*, 511 U.S. 809, 818 (1994) ("§ 107 unquestionably provides a cause of action for private parties to seek recovery of cleanup costs.").

> To prevail in a private cost recovery action, a plaintiff must establish that (1) the site on which the hazardous substances are contained is a "facility" under CERCLA's definition of that term, Section 101(9), 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, 42 U.S.C. § 9607(a)(4); (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan," 42 U.S.C. §§ 9607(a)(4) and (a)(4)(B); and (4) the defendant is within one of four classes of persons subject to the liability provisions of Section 107(a).

*Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 870 (9th Cir. 2001) (quoting *3550 Stevens Creek Assocs.*, 915 F.2d at 1358) (internal quotation marks omitted). "In determining whether response costs are 'necessary,' we focus . . . on whether there is a threat to human health or the environment and whether the response action is addressed to that threat." *Id.* at 872; *see also United States v. Iron Mountain Mines, Inc.*, 987 F. Supp. 1263, 1271 (E.D. Cal. 1997) (quoting *United States v. Hardage*, 982 F.2d 1436, 1448 (10th Cir. 1992)) ("Necessary costs are costs that are 'necessary to the containment and cleanup of hazardous releases.'"); *Young v. United States*, 394 F.3d 858, 863 (10th Cir. 2005) ("[S]everal circuit courts of appeal have concluded a response cost is only 'necessary' if the cost is closely tied to the *actual cleanup* of hazardous releases.").

The Port District contends that Monsanto has not alleged facts sufficient to establish that it incurred response costs necessary to cleanup a hazardous release. The Port District contends that Monsanto's alleged response costs to investigate and analyze contamination in the Bay are not closely tied to a cleanup of hazardous waste and are litigation costs unrecoverable under CERCLA.

Monsanto contends that it has adequately plead "necessary" response costs by alleging facts to demonstrate that "a plausible threat to human health or the environment in the Bay" exists and that it has "incurred response costs 'addressed to' the health and environment threat" in the Bay. (ECF No. 123 at 13-14). Monsanto contends that there is no requirement that an ongoing, actual cleanup exists for response costs to be necessary and that response costs incurred before a cleanup are recoverable under Ninth Circuit precedent. Monsanto contends that its alleged costs are not unrecoverable litigation costs.

Monsanto alleges that the response costs it has incurred include:

> (1) identification and analysis of historic and current sources of potential contamination and potentially responsible parties (including in particular the Port District) ("PRPs") for the Bay, including public records review, analysis of existing data, research on the conveyance and drainage systems, assessment of current and historic source control efforts at various Bay site locations, and investigatory costs to identify the volume and location of the PCBs discharged by the Port District; (2) analysis of the potential impacts on the Bay from Non-Monsanto Produced PCBs, and potential sources of those Non-Monsanto Produced PCBs; (3) review and analysis of sampling and investigation data from the Bay, and investigation of potential data gaps; (4) investigation and analysis of the contaminated sediments at certain locations in the Bay; (5) analysis of the potential source control and remediation options for the Bay; (6) analysis of PCBs in the Bay to assist with identification of the sources of current and historic PCB contamination; and (7) numerous other activities.

(ECF No. 110 at ¶ 99). Monsanto alleges that these costs are "directed to assessing, evaluating and monitoring releases of hazardous substances, including PCBs, in the Bay." *Id.* ¶ 101. Monsanto alleges that it has "incurred response costs that would be necessary even in the absence of the present suit" and are "a necessary predicate for cleanup efforts,

13

since identifying sources of PCB discharges and the locations of the resulting PCB deposits are requisite first steps to any cleanup." *Id.* ¶ 102.

Investigation costs may support a CERCLA cost recovery claim; however, these response costs must be necessary to the cleanup of hazardous wastes. *See Wickland Oil Terminals v. ASARCO, Inc.*, 792 F.2d 887, 892 (9th Cir. 1986) (concluding that "investigatory costs" could be response costs under § 107(a)); *see also Atl. Research Corp.*, 551 U.S. at 139 ("Moreover, § 107(a) permits a PRP to recover only the costs it has 'incurred' in cleaning up a site."). The allegations in the First Amended Answer and Counterclaim are insufficient to plausibly support an inference that Monsanto has incurred response costs necessary and addressed to an actual containment and cleanup of hazardous releases under CERCLA.[4] *See Carson Harbor Village*, 270 F.3d at 872 (holding that response costs are "necessary" when the response action is addressed to a threat to human health or the environment); *Young*, 394 F.3d at 864-65 ("Plaintiffs' alleged response costs were not 'necessary' to the containment or cleanup of hazardous releases because the costs were not tied in *any* manner to the actual cleanup of hazardous releases."); *see also City of Spokane v. Monsanto Co.*, 237 F. Supp. 3d 1086, 1094 (E.D. Wash. 2017) ("Monsanto alleges no facts from which the Court could plausibly conclude that Monsanto's alleged response costs were necessary to the actual containment and cleanup of hazardous releases."). The factual allegations of the Counterclaim support the conclusion that Monsanto incurred the alleged costs in connection with this litigation. *See* ECF No. 110

---

[4] The CERLCA claim is also subject to dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6) due to insufficient factual allegations as to necessary response costs. The HSAA claim for contribution and indemnity fails to state a claim for the same reasons as the CERCLA cost-recovery claim. See *Western Properties Service Corp. v. Shell Oil*, 358 F.3d 678, 682 (9th Cir. 2004) (stating that California Health & Safety Code § 2563(e) "parallels CERCLA"); *Gregory Village Partners, L.P. v. Chevron U.S.A. Inc.*, 805 F. Supp. 2d 888, 897 (N.D. Cal. 2011) ("A claim under the HSAA has the same elements as a claim under CERCLA."). Further, the counterclaim for declaratory relief under section 113 of CERCLA and the declaratory judgment act and the counterclaims for declaratory relief under the HSAA also fail pursuant to Rule 12(b)(6). *See City of Colton v. American Promotional Events, Inc-West*, 614 F.3d 998, 1007 (9th Cir. 2010).

at ¶ 103 ("Additionally, the Port District's discharges and releases made incurrence of response costs necessary both due to the Port District's lawsuit and also to address other potential sources of contingent liability created by the Port District's conduct."); *Id.* ¶ 58 ("In addition to past costs, Defendants/Counter-Claimants will continue to incur response costs as the investigation proceeds, including potentially regulatory, litigation, and other response costs."). The costs of legal services are not recoverable as "necessary costs of response" under CERCLA. *See Key Tronic*, 511 U.S. at 819 ("We nevertheless view such work as primarily protecting Key Tronic's interests as a defendant in the proceedings that established the extent of its liability. As such, these services do not constitute 'necessary costs of response' and are not recoverable under CERCLA."); *id.* at 820 ("[S]ome lawyers' work that is closely tied to the actual cleanup may constitute a necessary cost of response in and of itself under the terms of § 107(a)(4)(B).").

Further, Monsanto contends that its allegations related to costs defending this litigation are sufficient to establish standing. Monsanto alleges, "As a result of the Port District's conduct, Defendants/Counter-Claimants have also incurred costs in defending the instant lawsuit." (ECF No. 110 at ¶ 105). Monsanto alleges this lawsuit would not have been initiated absent the Port District's discharges of PCBs and mismanagement of PCB sources within its jurisdiction and that these actions increased Monsanto's litigation exposure, causing the expenditure of additional costs. *Id.* ¶¶ 105-106.

Litigation costs are insufficient to establish standing for purposes of Article III. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Obviously, however, a plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit. The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself. An 'interest in attorney's fees is . . . insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim.'"); *La Asociacion de Trabajadores*, 624 F.3d at 1088 ("An organization suing on its own behalf . . . cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that

15

15cv578-WQH-AGS

otherwise would not affect the organization at all."); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (quoting *Walker v. City of Lakewood,* 272 F.3d 1114, 1124 n. 3 (9th Cir. 2001)) ("But 'standing must be established independent of the lawsuit filed by the plaintiff.'"). Monsanto fails to allege sufficient facts to support a plausible inference that the alleged defense costs and response costs are not litigation costs incurred solely in connection with this lawsuit. *See Spokeo*, 136 S. Ct. at 1547 (holding that the party invoking federal jurisdiction bears the burden of establishing standing).

### 2. Contingent Liability

Monsanto alleges that "[t]he Port District's discharges of PCBs and other pollutants have caused [it] to incur response and defense costs and have also created significant contingent liability." (ECF No. 110 at ¶ 97). Monsanto alleges that contingent liability "may arise" from the instant lawsuit, including the complaint by the City of San Diego, and "potential future, federal, state, or local regulatory actions that could impose costs of Defendants/Counter-Claimants to clean up the Port District's discharges." *Id.* Monsanto alleges that "[t]his contingent liability continually expands with every discharge of PCBs by the Port District – which continues to the present day." *Id.* ¶ 98.

"[T]he injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). To support Article III standing, an injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548. A contingent liability can present a sufficient injury to establish Article III standing. *Clinton v. City of New York*, 524 U.S. 417, 429-31 (1998). The Supreme Court has held that a contingent liability is sufficient to confer Article III standing where it presents a "significant immediate injury." *See id.* at 431-32.

In *Clinton v. City of New York*, the Supreme Court determined that the City of New York had standing to challenge the constitutionality of the Line Item Veto Act, 110 Stat.

1200, 2 U.S.C. § 691 *et seq*. because its contingent liability constituted an injury-in-fact. Congress enacted a law including a provision granting New York relief from liability for an estimated $2.6 billion to the federal government. President Clinton exercised a line-item veto of this provision. *Id.* at 422-23. The Court stated that New York "suffered an immediate, concrete injury the moment that the President used the Line Item Veto . . . and deprived them of the benefits of that law." *Id.* at 430. The Court stated, "The revival of a substantial contingent liability immediately and directly affects the borrowing power, financial strength, and fiscal planning of the potential obligor." *Id.*

In this case, Monsanto's alleged contingent liability is premised on liability that "may arise" in this action and pending and future litigation and regulatory action over Monsanto's responsibility for the presence of PCBs in the Bay. (ECF No. 110 at ¶ 97). Monsanto has failed to set forth factual allegations to demonstrate a "significant immediate injury" that is "directly" affecting Monsanto. *Clinton*, 524 U.S. at 430, 431. The threat that Monsanto may be found liable in this action, the action brought by the City of San Diego, or future actions remains speculative. *See also Essilor Labs. of America v. St. Paul Fire and Marine Ins. Co.*, No. 08-C-296, 2009 WL 142323, *4 (E.D. Wisc. 2009) (determining that an alleged prospective liability was insufficient to establish standing where it was contingent on the outcome of a question certified to the Wisconsin Supreme Court). Monsanto's allegation that the Port District is responsible for the presence of PCBs in the Bay fails to establish contingent liability because Monsanto cannot be held liable for harm it did not cause. The allegations in support of Monsanto's counterclaims regarding the Port District's contributions to the presence of PCBs in the Bay are relevant to establish affirmative defenses and denials Monsanto has raised in its First Amended Answer. *See, e.g.*, First Amended Answer, ECF No. 110 at ¶¶ 12, 14, 17, 20, 26. However, these allegations are insufficient to demonstrate a probable economic injury to Monsanto caused by the Port District that may be redressed by the relief Monsanto seeks in connection with its counterclaims. *Friends of the Earth*, 528 U.S. at 180–81 (stating that a party asserting Article III standing must also establish a likelihood that an injury-in-fact will be redressed

by a favorable decision). Monsanto fails to allege facts sufficient to permit a reasonable inference that its purported contingent liability constitutes an "actual or imminent" injury-in-fact sufficient to confer Article III standing. *Spokeo*, 136 S. Ct. at 1548.

Monsanto fails to allege sufficient facts to establish Article III standing to assert its counterclaims premised on defense costs, response costs, or contingent liability. Because Monsanto has failed to allege sufficient facts to establish standing, this Court lacks jurisdiction over Monsanto's counterclaims at this stage proceedings.

## V. CONCLUSION

IT IS HEREBY ORDERED that the Motion to Strike Affirmative Defenses filed by the Port District is DENIED. (ECF No. 112).

IT IS FURTHER ORDERED that the Motion to Dismiss the Counterclaims (ECF No. 113) filed by the Port District is GRANTED. The Counterclaims alleged in the First Amended Answer and Counterclaim filed by Monsanto against the Port District are dismissed without prejudice.

Dated: January 30, 2018

Hon. William Q. Hayes
United States District Court