UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN DIEGO,<br><br>       Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY; SOLUTIA INC., and PHARMACIA CORPORATION,<br><br>       Defendants.<br><br>MONSANTO COMPANY; SOLUTIA INC., and PHARMACIA CORPORATION,<br><br>       Counter Claimants,<br><br>v.<br><br>CITY OF SAN DIEGO,<br><br>       Counter Defendant. | Case No.: 15cv578-WQH-AGS<br><br>**ORDER** |

HAYES, Judge:

  The matter before the Court is the Motion to Dismiss the First Amended Counterclaims filed by Plaintiff City of San Diego. (ECF No. 208).

///

## I. BACKGROUND

On December 22, 2016, the City of San Diego (the "City") filed the Second Amended Complaint ("SAC") against Defendants Monsanto Company, Solutia Inc., and Pharmacia Corporation (collectively, Monsanto). (ECF No. 93). The City brings a single cause of action against Monsanto for a continuing nuisance arising from alleged PCB contamination of the San Diego Bay ("the Bay") and the City's municipal stormwater system.[1] The City alleges that "Plaintiff has suffered and continues to suffer actual damages and injuries to property requiring abatement and other costs to be determined at trial" as a result of Monsanto's creation of a public nuisance through its production and marketing of PCBs and improper disposal directions related to PCBs. *Id.* at 46. The City alleges that Monsanto is liable to the City for the creation of a public nuisance. The City seeks the following relief: (1) any and all compensatory damages according to proof; (2) punitive damages; (3) litigation costs and attorney's fees; (4) pre-judgment and post-judgment interest; and (5) "any other and further relief as the Court deems just and proper." *Id.*

On November 22, 2017, this Court denied a motion to dismiss the City's SAC filed by Monsanto. (ECF No. 163). The Court concluded that the City adequately alleged a property interest in its municipal stormwater system which had been injuriously affected by the presence of PCBs produced by Monsanto and that the City alleged sufficient facts to state a non-representative public nuisance claim. The Court further denied a motion to stay or dismiss the suit under administrative exhaustion principles pending resolution of the City's test claims before the California Commission on State Mandates. *Id.*[2]

On February 22, 2018, Monsanto filed the First Amended Answer and Counterclaims. (ECF No. 203). Monsanto denies liability for the alleged contamination

---

[1] The San Diego Unified Port District is currently litigating independent causes of action against Monsanto alleged in a separate First Amended Complaint.

[2] In addition, the Court denied a motion for reconsideration of the denial of the stay of litigation on prudential administrative exhaustion grounds on April 17, 2018. (ECF No. 212).

of the Bay and injuries claimed by the City. Further, Monsanto alleges that the City is responsible for the contamination of the Bay because "throughout the twentieth century to the present," the City has "discharged, or caused to be discharged, a variety of pollutants into the Bay, including PCBs." *Id.* ¶ 38; *see also id.* ¶¶ 19–21. Monsanto brings the following two causes of actions as counterclaims against the City: (1) unjust enrichment and (2) violations of the Clean Water Act ("CWA") and the City's NPDES[3] permit.

## II. ALLEGATIONS OF THE FIRST AMENDED ANSWER AND COUNTERCLAIMS (ECF No. 203)

> [A]ll relevant U.S. manufacturing of the product at issue by Old Monsanto terminated in 1977, the original manufacturer is not alleged to have done *anything* since the 1970s, and Defendants are not alleged to have discharged any PCBs into the Bay *ever*. Instead the City's own conduct vis-à-vis the Bay is marked by decades of neglect, mismanagement, and contamination, which has led to the conditions about which it complains.

(ECF No. 203 at ¶ 20). "The City has, throughout the twentieth century to the present, discharged, or caused to be discharged, a variety of pollutants into the Bay, including PCBs." *Id.* ¶ 38. "Notable sources of the City's discharges include its: (1) storm water discharges; (2) inadequate maintenance of sites under its control; (3) failure to follow best management practices with regard to construction and demolition activities; and (4) use and disposal of PCB-containing products." *Id.* ¶ 43.

"For many decades, the Bay served as the final destination point for city-wide industrial discharges, intentionally facilitated by the City for economic gain." *Id.* ¶ 33. The City operated a downtown landfill and incinerator that discharged industrial waste into the Bay prior to the early 1950s. *Id.* ¶¶ 33–34. "From 1943–1963, the City located its

---

[3] National Pollutant Discharge Elimination System ("NPDES"). "NPDES permits impose limitations on the discharge of pollutants, and establish related monitoring and reporting requirements, in order to improve the cleanliness and safety of the Nation's waters." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000).

main sewage treatment plant along the Bay . . . [and] allowed direct discharges of raw sewage (containing industrial byproducts) to the Bay . . . ." *Id.* ¶ 35.

> The City owns and operates a [municipal separate storm sewer system ("MS4")] through which it discharges waste commonly found in urban runoff to the Bay. Throughout the twentieth century and continuing to this day, the City's MS4 has discharged waste commonly found in urban runoff into the Bay subject to the conditions of NPDES Permits.

*Id.* ¶ 45. The City's storm water discharges into the Bay include a variety of pollutants, including PCBs. *Id.* ¶ 46. "[B]ecause the City fails to take reasonable measures to reduce the discharge of PCBs, the City's storm water continues to include PCBs at levels that are greater than the CWA allows." *Id.* ¶ 49. "[D]uring the over fifty years in which the City controlled the San Diego Bay tidelands and chose its industrial tenants, in exchange for rental income, the City leased tideland properties to heavy industrial dischargers that used and disposed of PCBs and other contaminants, without ensuring adequate pollution controls." *Id.* ¶ 37. The City has been specifically identified as a "liable discharger of PCBs and other contaminants under California Water Code Section 13304" in a Cleanup and Abatement Order ("CAO") issued by the State of California. *Id.* ¶ 40. The City is a "significant property owner" and "has failed to require even the most basic measures to prevent PCB discharges from its own construction, renovation, and demolition activities." *Id.* ¶¶ 68, 70. "[T]he City at all relevant times through today has purchased, used, and disposed of a variety of PCB-containing products . . . in a manner that has resulted in discharges into the Bay." *Id.* ¶ 75.

> The City's past and ongoing discharges of PCBs and other pollutants have caused [Monsanto] to incur investigation costs related to conditions in the Bay caused by the City's discharges, and have also created significant contingent liability in the instant lawsuit, as well as the First Amended Complaint filed by the Port District. This contingent liability continually increases with every discharge of PCBs and other pollutants by the City – which continue to the present day.

*Id.* ¶ 84.

> As a result of the City's discharges of PCBs and other pollutants, [Monsanto] ha[s] incurred, and will continue to incur, a variety of investigation costs in connection with the Bay. These costs include but are not limited to: (1) identification and analysis of historic and current sources of potential contamination for the Bay, including public records review, analysis of existing data, research on the conveyance and drainage systems, assessment of current and historic source control efforts at various Bay site locations, and investigatory costs to identify the volume and location of the PCBs discharged by the City; (2) analysis of the potential impacts on the Bay from Non-Monsanto Produced PCBs, and potential sources of those Non-Monsanto Produced PCBs; (3) review and analysis of sampling and investigation data from the Bay, and investigation of potential data gaps; (4) investigation and analysis of the contaminated sediments at certain locations in the Bay; (5) analysis of the potential source control and other options to address conditions in the Bay; and (6) analysis of PCBs in the Bay to assist with identification of the sources of current and historic PCB contamination.

*Id.* ¶ 85. "These efforts are ongoing and [Monsanto] will continue to incur investigation costs for the foreseeable future." *Id.* ¶ 86.

> The investigations and analyses . . . are directed to assessing, evaluating, and monitoring releases of hazardous substances, including PCBs, in the Bay. These activities will generate information that is necessary to determine what, if any, source control measures are warranted, and help identify source control efforts that are tailored to the contamination, including efforts to address the City's non-compliance with the CWA and its NPDES Permits.

*Id.* ¶ 87.

> [Monsanto] ha[s] incurred investigation costs that would be necessary to address the City's discharges even in the absence of the present suit. Incurrence of these costs is a necessary predicate for addressing contamination in the Bay, since identifying sources of PCB discharges and the locations of the resulting PCB deposits are requisite first steps to addressing and remedying the City's PCB-laden storm water discharges in violation of the CWA and it NPDES Permits.

*Id.* ¶ 88.

> As a result of the City's conduct, [Monsanto] ha[s] also incurred costs in defending the City's and Port District's lawsuits. On its face, this lawsuit likely would never have been brought but for the City's discharges of PCBs,

5

> ownership and operation of PCB-contaminated facilities, and mismanagement of PCB sources within its jurisdiction. That is particularly true as the City seeks as damages increased regulatory costs and infrastructure improvements to reduce its discharges of PCBs in its storm water . . . . If the City were not discharging PCBs in violation of the CWA and its NPDES Permits in the first place, it would have no need to bring this lawsuit to recover the costs of reducing its own PCB discharges.

*Id.* ¶ 92. "Even if the City's and Port District's lawsuits would have occurred without the City's own actions, inactions, and discharges, those PCB-laden discharges increase [Monsanto's] potential liability in this case and thus have reasonably caused [Monsanto] to expend additional costs as a result of this increased exposure." *Id.* ¶ 93. "[T]he City's management decisions with respect to PCB-containing products and discharges have increased [Monsanto's] litigation exposure, which has reasonably caused [Monsanto] to expend additional costs as a result of the increased exposure." *Id.* ¶ 94.

"In 2008, the County of San Diego [], along with the City and 20 other municipalities within the County ('Claimants') filed a 'test claim' with the Commission [on State Mandates] that challenged certain provisions of the City's 2007 MS4 Permit and contended that those provisions constituted an unfunded State mandate for which the Claimants are entitled to reimbursement." *Id.* ¶ 97. The test claim ultimately reached the California Court of Appeal. *Id.* "On December 19, 2017, the California Court of Appeal, Third District, issued an opinion affirming the Commission's decision that virtually every category of permit compliance costs the City seeks in this action is an unfunded State mandate." *Id.* ¶ 98. "The Court of Appeal's determination entitles the City to reimbursement from the State of California of up to $66 million in storm water permit compliance costs – the very same storm water permit compliance costs that the City is seeking to recover from Defendants as 'damages' in this tort action." *Id.* Only the amount of recovery is now left to be determined by the Commission." *Id.*

Monsanto brings a counterclaim for unjust enrichment against the City, alleging that the City is attempting to impose the costs of its compliance with required upgrades to its

storm water and treatment systems upon Monsanto and that some of the relief potentially afforded to the City in this action will constitute an unjust benefit. *Id.* ¶¶ 106–118. Monsanto also brings a counterclaim for violations of the Clean Water Act and the City's NPDES permits. *Id.* ¶¶ 119–147.

### III. LEGAL STANDARDS

#### A. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Federal Rule of Civil Procedure 8(a) provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)). When considering a motion to dismiss, a court must accept as true all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). However, a court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted).

#### B. Article III Standing under Rule 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to move for dismissal for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A jurisdictional attack pursuant to Rule 12(b)(1) may be facial or factual. *White v. Lee*, 227

7

15cv578-WQH-AGS

F.3d 1214, 1242 (9th Cir. 2000). "In a facial attack, the challenger asserts that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial attack on subject matter jurisdiction, the court assumes the factual allegations of the complaint to be true and draws all reasonable inferences in favor of the plaintiff. *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009).

The Article III standing doctrine limits federal court jurisdiction. *See La Asociacon de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). "[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). In order "to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan*, 504 U.S. at 560–61). "To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). The party invoking federal jurisdiction bears the burden of establishing that the standing requirements of Article III are satisfied. *Id.* at 1547; *see also Assoc. of Med. Colleges v. United States*, 217 F.3d 770, 778–79 (9th Cir. 2000). Lack of Article III standing is grounds for dismissal under Federal Rule of Civil Procedure 12(b)(1). *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

IV. **CONTENTIONS OF THE PARTIES**

The City contends that both the CWA and the unjust enrichment counterclaims must be dismissed because Monsanto has not and cannot establish Article III standing. The City contends that the alleged litigation costs, investigation costs, and contingent liability are insufficient to create an injury in fact under Article III. The City contends that Monsanto fails to state a claim for unjust enrichment because unjust enrichment is not a standalone cause of action. Further, the City contends that any damages that may be awarded to the City in this action would not be unjust or inequitable because California law specifically provides for an appropriate apportionment of fault at the time any judgment is awarded. The City contends that Monsanto's argument that damages awarded in this case would unjustly enrich the City in light of the unfunded state mandate proceedings is an "attempt[] to relitigate the same failed arguments" previously raised by Monsanto. (ECF No. 208-1 at 18). The City contends that any costs it may recover from the state as an unfunded state mandate are "merely hypothetical and cannot form the basis in this case for the equitable principle of unjust enrichment." *Id.* The City contends that Monsanto lacks standing to sue under the citizen suit provision of the CWA because Monsanto has not alleged a cognizable injury to itself. The City contends that Monsanto's counterclaims do not fall within the zone of interests protected by the CWA. The City contends that economic interests alone are insufficient to establish standing in a citizen CWA where the "longstanding basis for standing" has been "through a plaintiff's recreational, aesthetic, or other personal interests." (ECF No. 215 at 7). The City contends that the remedies permitted in CWA citizen suits would not redress the injuries alleged by Monsanto. *Id.* at 10–11

Monsanto contends that standing must be evaluated for each claim and form of relief requested. Monsanto contends that it has pled facts sufficient to establish Article III standing with respect to its unjust enrichment claim. Monsanto contends that it has "adequately alleged contingent liability arising from an adverse judgment in the City's lawsuit that would be eliminated or significantly reduced by a favorable decision on [its] unjust enrichment claim." (ECF No. 210 at 15). Monsanto contends that an "unwilling

defendant" has standing to bring a counterclaim that is contingent on the outcome of the underlying action. *Id.* at 16. Monsanto contends that its injury in fact is not speculative or hypothetical but rather contingent "only on the outcome of the City's claims in this lawsuit, which [Monsanto] ha[s] been litigating for three years." *Id.* at 19. Monsanto contends that unjust enrichment is a standalone cause of action under California law and that the factual allegations are sufficient to state an unjust enrichment claim. Monsanto contends that its unjust enrichment claim is "broader than an offset for the City's comparative fault." *Id.* at 21. Monsanto contends that the City will suffer no prejudice by allowing the unjust enrichment claim to proceed. Monsanto contends that it has standing to pursue a CWA citizen suit. Monsanto contends that it sufficiently alleges a cognizable injury with respect to its CWA claim through allegations of economic harm and contingent liability. Monsanto contends that its injuries are fairly traceable to the City's violations of the CWA and that its injuries would be redressed by a successful CWA claim.

## V. UNJUST ENRICHMENT COUNTERCLAIM

The Court addresses Article III standing with respect to each of the counterclaims alleged by Monsanto. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[O]ur standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press."). With respect to the unjust enrichment counterclaim, Monsanto asserts that its "contingent liability arising from an adverse judgment in the City's lawsuit that would be eliminated or significantly reduced by a favorable decision on [its] unjust enrichment claim" provides the basis for Article III standing. (ECF No. 210 at 15).

"[T]he injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). To support Article III standing, an injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548. A contingent liability can present a sufficient injury to establish Article III standing. *Clinton v. City of New York*, 524 U.S.

417, 429–31 (1998). The Supreme Court has held that a contingent liability is sufficient to confer Article III standing where it presents a "significant immediate injury." *Id.* at 431.

In *Clinton v. City of New York*, the Supreme Court determined that the City of New York had standing to challenge the constitutionality of the Line Item Veto Act, 110 Stat. 1200, 2 U.S.C. §§ 691 et seq. because its contingent liability constituted an injury in fact. In *Clinton*, Congress had enacted a law including a provision granting New York relief from liability for an estimated $2.6 billion to the federal government. President Clinton exercised a line-item veto of this provision. *Id.* at 422–23. The Court stated that New York "suffered an immediate, concrete injury the moment that the President used the Line Item Veto . . . and deprived them of the benefits of that law." *Id.* at 430. The Court stated, "The revival of a substantial contingent liability immediately and directly affects the borrowing power, financial strength, and fiscal planning of the potential obligor." *Id.* at 431.

In this case, Monsanto alleges that "[t]he City's past and ongoing discharges of PCBs and other pollutants have . . . created significant contingent liability in the instant lawsuit, as well as the First Amended Complaint filed by the Port District. This contingent liability continually increases with every discharge of PCBs and other pollutants by the City – which continue to the present day." (ECF No. 203 at ¶ 84). As with the counterclaims brought against the Port District, Monsanto has failed to set forth factual allegations demonstrating a "significant immediate injury" that is "directly" affecting Monsanto. *See Clinton*, 524 U.S. at 430, 431. The threat that Monsanto may be found liable in this action or the action brought by the Port District remains speculative at this stage in litigation. *See also Essilor Labs. of America v. St. Paul Fire and Marine Ins. Co.*, No. 08-C-296, 2009 WL 142323, *4 (E.D. Wisc. 2009) (determining that an alleged prospective liability was insufficient to establish standing where it was contingent on the outcome of a question certified to the Wisconsin Supreme Court). Monsanto's allegation that the City is responsible for the presence of PCBs in the Bay fails to establish any contingent liability because Monsanto cannot be held liable to the City in this case for harm it did not cause. The allegations in support of Monsanto's unjust enrichment counterclaim regarding the

City's contributions to the presence of PCBs in the Bay are relevant to establish affirmative defenses and denials Monsanto has raised in its First Amended Answer. *See, e.g.*, First Amended Answer, ECF No. 203 at ¶¶ 9, 11, 13, 16, 19, 23, 24, 75. However, these allegations are insufficient to establish an "actual or imminent" contingent liability satisfying the injury in fact requirements of Article III. *See Spokeo*, 136 S. Ct. at 1548.

Monsanto asserts that constitutional standing requirements for a plaintiff to bring a claim are different from constitutional standing requirements for a defendant to bring a counterclaim. *See, e.g.*, ECF No. 210 at 17 ("Defendants are postured differently from the cases where plaintiffs create harm by filing their own lawsuit."). However, cases cited by Monsanto in support of this assertion do not specifically address the injury in fact requirements of Article III standing, nor do they address claims premised on contingent liability as the constitutional injury. *See Springs v. First Nat'l Bank of Cut Bank*, 835 F.2d 1293 (9th Cir. 1988) (holding that a negligence cause of action was a barred by res judicata because it should have been brought as a compulsory counterclaim in a previous action); *City of Saint Paul, Alaska v. Evans*, 344 F.3d 1029, 1033 (9th Cir. 2003) (analyzing "whether [a] six-year statute of limitations bars [a party] from asserting its claims in the form of affirmative defenses to TDX's counterclaims")[4]; *AGCS Marine Ins. Co. v. Tutor Perini Corp.*, No. C 17-00544 WHA, 2017 WL 2720187, at *3 (N.D. Cal. June 22, 2017) (determining whether a compulsory counterclaim is improper under Federal Rule of Civil Procedure 13(a)). Further, the Court finds Monsanto's allegations of contingent liability in support of an unjust enrichment cause of action distinguishable from the allegations of harm required of a defendant attempting to bringing a third-party action for indemnification against a third-party defendant. *See* Fed. R. Civ. P. 14(a)(1) ("A defending party may, as

---

[4] Monsanto relies on a footnote in this opinion in which the Court of Appeals notes "Many of the counterclaims were contingent and sought various forms of relief in the event that the court ruled in favor of the City and declared the Agreement to be invalid. In any event, the district court's Rule 54(b) judgment granted only a declaratory judgment that the Agreement was valid and enforceable against the City and federal defendants, and that the City had breached the Agreement. The order did not dispose of the remaining counterclaims." *Saint Paul*, 344 F.3d at 1033 n.6.

third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it."); *Cox v. Ametek, Inc.*, No. 317CV00597GPCAGS, 2017 WL 4792429, at *3 (S.D. Cal. Oct. 24, 2017) ("The Court also notes that if this situation did not confer standing on the third-party plaintiff, no third-party claim under Rule 14 could ever go forward prior to an issuance of judgment against the third-party plaintiff in the original suit."). The Court concludes that Monsanto fails to allege sufficient facts to permit a reasonable inference that its purported contingent liability constitutes an "actual or imminent" injury in fact sufficient to confer Article III standing with respect to the unjust enrichment claim. *See Spokeo*, 136 S. Ct. at 1548.

Even assuming that the Court could properly exercise subject matter jurisdiction over this cause of action, Monsanto fails to state a claim for unjust enrichment. "[I]n California, there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with 'restitution.'" *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (citing *Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 699 (Ct. App. 2010); *Jogani v. Superior Court*, 81 Cal. Rptr. 3d 503, 511 (Ct. App. 2008)); *see also Munoz v. MacMillan*, 124 Cal. Rptr. 3d 664, 675 (Ct. App. 2011) ("Common law principles of restitution require a party to return a benefit when the retention of such benefit would unjustly enrich the recipient; a typical cause of action involving such remedy is 'quasi-contract.'"). Unjust enrichment is typically sought in connection with a "quasi-contractual" claim in order to avoid unjustly conferring a benefit upon a defendant where there is no valid contract. *McBride v. Boughton*, 20 Cal. Rptr. 3d 115, 121–22 (Ct. App. 2004). Unjust enrichment "describe[s] the theory underlying a claim that a defendant has been unjustly conferred a benefit 'through mistake, fraud, coercion, or request.'" *Astiana*, 783 F.3d at 762 (citing 55 Cal. Jur. 3d Restitution § 2).

A court may construe an unjust enrichment cause of action as a quasi-contract claim seeking restitution. *Rutherford Holdings, LLC v. Plaza Del Ray*, 166 Cal. Rptr. 3d 864, 872 (Ct. App. 2014).

Under the law of restitution, "[a]n individual is required to make restitution if

he or she is unjustly enriched at the expense of another. [Citations.] A person is enriched if the person receives a benefit at another's expense. [Citation.]" [Citation.] However, "[t]he fact that one person benefits another is not, by itself, sufficient to require restitution. The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it. [Citation.]"

*Durell*, 108 Cal. Rptr. 3d at 699 (quoting *McBride*, 20 Cal. Rptr. 3d at 122).

In this case, Monsanto alleges that the City would be unjustly enriched if Monsanto is held liable for the public nuisance and the City retains any portion of damages and costs that are duplicative of recovery from the Commission on State Mandates or not attributable to Monsanto's actions. Specifically Monsanto alleges,

> If the City prevails on any of its claims, it would be unjust and inequitable for the City to retain any portion of that judgment for which its conduct was a substantial cause. . . . [Monsanto's] costs to upgrade and retrofit a storm water system to remove pollutants (other than PCBs produced by Old Monsanto), to the extent imposed by the Court, will confer a benefit on the City, which would be unjust and inequitable for the City to retain. . . . If the City prevails on any of its claims here, it would be unjust and inequitable for the City to retain any portion of that judgment which is duplicative of the recovery the City obtains from the Commission as an unfunded state mandate . . . .

(ECF No. 203 at ¶¶ 111–114). Monsanto does not allege any contractual or quasi-contractual relationship between Monsanto and the City. Monsanto's standalone cause of action for unjust enrichment is not cognizable under California law. *See Melchior v. New Line Prods., Inc.*, 131 Cal. Rptr. 2d 347, 357 (Ct. App. 2003). Further, Monsanto has not alleged sufficient facts to support an inference that the City has obtained a benefit from Monsanto; Monsanto's allegations are related to damages or costs that may be conferred upon the City in the future. *See McBride*, 20 Cal. Rptr. 3d at 122 ("Alternatively, restitution may be awarded where the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct. In such cases, the plaintiff may choose not to sue in tort, but instead to seek restitution on a quasi-contract theory."); *Durell*, 108 Cal. Rptr. 3d at 699; *see also City of Spokane v. Monsanto Co.*, No. 2:15-CV-00201-SMJ, 2017 WL

2945729, at *7 (E.D. Wash. July 10, 2017) ("Monsanto fails to establish that the circumstances of a court judgment for Spokane could constitute an unjust benefit to Spokane . . . .").

The unjust enrichment counterclaim is dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6).

## VI. CLEAN WATER ACT COUNTERCLAIM

"The Clean Water Act allows any citizen to sue 'any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter or . . . an order issued by the [EPA] Administrator or a State with respect to such a standard or limitation.'" *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F. 3d 1141, 1145 (9th Cir. 2000) (citing 33 U.S.C. § 1365). "The CWA's citizen suit provision extends standing to the outer boundaries set by the 'case or controversy' requirement of Article III of the Constitution." *Id.* at 1147. "Because the statutory and constitutional standing issues therefore merge, the only standing issue . . . is whether the plaintiffs have standing under Article III to proceed to the merits of their lawsuit." *Id.* Accordingly, as the party asserting federal jurisdiction, Monsanto must demonstrate that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth*, 528 U.S. 180–81 (citing *Lujan*, 504 U.S. at 560–61).

Monsanto contends that its allegations of economic harm and contingent liability satisfy Article III.[5] (ECF No. 210 at 26). In the First Amended Counterclaim, Monsanto alleges,

---

[5] Monsanto does not allege that it owns any property affected by the contamination of the Bay allegedly caused by the City's discharge of pollutants, nor does Monsanto allege any other interest in the Bay, as is common in environmental cases. *See Ecological Rights Found.*, 230 F.3d at 1147 ("The 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct.").

15

> The City's past and ongoing discharges of PCBs and other pollutants have caused [Monsanto] to incur investigation costs related to conditions in the Bay caused by the City's discharges, and have also created significant contingent liability in the instant lawsuit, as well as the First Amended Complaint filed by the Port District. This contingent liability continually increases with every discharge of PCBs and other pollutants by the City – which continue to the present day.

(ECF No. 203 at ¶ 84). With respect to the alleged injury in fact arising from contingent liability, the Court again concludes that Monsanto has failed to set forth factual allegations demonstrating that its alleged contingent liability constitutes a "significant immediate injury" that is "directly" affecting Monsanto. *See Clinton*, 524 U.S. at 430, 431.

Monsanto additionally asserts that it has and will continue to incur investigation costs as a result of the City's discharges of PCBs and contends that this harm is sufficient to establish constitutional injury in fact. Monsanto alleges that these investigation costs include:

> (1) identification and analysis of historic and current sources of potential contamination for the Bay, including public records review, analysis of existing data, research on the conveyance and drainage systems, assessment of current and historic source control efforts at various Bay site locations, and investigatory costs to identify the volume and location of the PCBs discharged by the City; (2) analysis of the potential impacts on the Bay from Non-Monsanto Produced PCBs, and potential sources of those Non-Monsanto Produced PCBs; (3) review and analysis of sampling and investigation data from the Bay, and investigation of potential data gaps; (4) investigation and analysis of the contaminated sediments at certain locations in the Bay; (5) analysis of the potential source control and other options to address conditions in the Bay; and (6) analysis of PCBs in the Bay to assist with identification of the sources of current and historic PCB contamination.

*Id.* ¶ 85. Monsanto alleges that these "investigations and analyses . . . are directed to assessing, evaluating, and monitoring releases of hazardous substances, including PCBs in the Bay." *Id.* ¶ 87. Monsanto alleges that these "investigation costs . . . would be necessary to address the City's discharges even in the absence of the present suit. Incurrence of these costs is a necessary predicate for addressing contamination in the Bay, since identifying

16

sources of PCB discharges and the locations of the resulting PCB deposits are requisite first steps to addressing and remedying the City's PCB-laden storm water discharges in violation of the CWA and its NPDES Permits." *Id.* ¶ 88.

Litigation costs are insufficient to establish standing for purposes of Article III. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Obviously, however, a plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit. The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself. An 'interest in attorney's fees is . . . insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim.'"); *La Asociacion de Trabajadores*, 624 F.3d at 1088 ("An organization suing on its own behalf . . . cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all."); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (quoting *Walker v. City of Lakewood*, 272 F.3d 1114, 1124 n. 3 (9th Cir. 2001)) ("But 'standing must be established independent of the lawsuit filed by the plaintiff.'"). Monsanto fails to allege sufficient facts to support a plausible inference that the alleged investigation costs are more than litigation costs incurred solely in connection with this lawsuit. *See Spokeo*, 136 S. Ct. at 1547 (holding that the party invoking federal jurisdiction bears the burden of establishing standing). The counterclaim under the CWA is dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.

## VII. CONCLUSION

IT IS HEREBY ORDERED that the motion to dismiss the counterclaims (ECF No. 208) is GRANTED. The counterclaims for unjust enrichment and violations of the Clean Water Act are dismissed without prejudice.

Dated: August 10, 2018

Hon. William Q. Hayes
United States District Court