**KELLEY DRYE & WARREN LLP**
William J. Jackson (admitted *Pro Hac Vice*)
Texas Bar No. 00784325
Micheal W. Dobbs (admitted *Pro Hac Vice*)
Texas Bar No. 24012533
Kenneth O. Corley (admitted *Pro Hac Vice*)
Texas Bar No. 24048405
Nancy K. Yanochik (admitted *Pro Hac Vice*)
Texas Bar No. 01293000
515 Post Oak Blvd., Suite 900
Houston, Texas 77027
Telephone: (713) 355-5000

**KELLEY DRYE & WARREN LLP**
Andrew W. Homer (SBN 259852)
7825 Fay Ave., Suite 200
La Jolla, CA 92037
Telephone: (858) 795-0426

**SAN DIEGO UNIFIED PORT DISTRICT**
**OFFICE OF THE GENERAL COUNSEL**
Thomas A. Russell, SBN 108607, Gen. Counsel
Ellen F. Gross, SBN 149127, Asst. Gen. Counsel
John N. Carter, SBN 246886, Dep. Gen. Counsel
3165 Pacific Highway
P.O. Box 120488
San Diego, CA  92112-0488
Telephone: (619) 686-6219

*Attorneys for Plaintiff San Diego Unified Port District*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA, SAN DIEGO

| | |
|---|---|
| SAN DIEGO UNIFIED PORT DISTRICT, a public corporation; and CITY OF SAN DIEGO, a municipal corporation,<br><br>Plaintiffs,<br><br>v.<br><br>MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION,<br><br>Defendants. | Case No. 3:15-CV-0578-WQH-AGS<br><br>**PLAINTIFF SAN DIEGO UNIFIED PORT DISTRICT'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT (PUBLIC NUISANCE) (ECF NO. 424)**<br><br>*[FILED CONCURRENTLY WITH DECLARATION OF KENNETH O. CORLEY]*<br><br>Judge: Hon. William Q. Hayes<br>Filed Date:  March 13, 2015<br>Trial Date:  February 18, 2020<br><br>**NO ORAL ARGUMENT UNLESS ORDERED BY THE COURT** |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................ 1

II.    SUMMARY OF THE RESPONSE .......................................................... 1

III.   STATEMENT OF FACTS ........................................................................ 4

    A.   Monsanto's PCBs adversely impact the Bay in numerous ways. ............. 4

    B.   Monsanto manufactured, marketed and sold at least 1.4 billion pounds of PCBs, more than 99% of the PCBs sold in the United States. .................. 6

    C.   Monsanto knew that PCB exposure posed risks to human health since the 1930s and 1940s ................................................................................... 7

    D.   Monsanto knew PCBs would persist, bioaccumulate and biomagnify ...... 9

    E.   Monsanto knew hundreds of millions of pounds of PCBs were being released into the environment. ................................................................. 10

    F.   Monsanto was aware that the release of PCBs into the environment posed a threat to human health and the environment. ........................................ 11

    G.   Monsanto improperly instructed users regarding disposal of PCBs. ........ 12

IV.    PUBLIC NUISANCE ELEMENTS AND STANDARD ................................. 13

    A.   Interference with or obstruction of the free and comfortable use and enjoyment of a bay, is a public nuisance by definition. ............................ 13

    B.   The interference is substantial and unreasonable if it is offensive, inconvenient, annoying, disturbing or intolerable to the reasonable person. .................................................................................................. 13

    C.   Causing or contributing to the contamination of a waterway or its fish is clearly defined as a public nuisance in California law. ........................... 14

    D.   Promoting a product with actual knowledge that its use would contribute to the creation of a hazardous condition results in liability for public nuisance. ................................................................................................ 15

    E.   Improperly instructing users about disposal also imposes liability where disposal of that product creates a nuisance condition. ............................. 15

V.     ARGUMENT AND AUTHORITY .................................................................. 15

    A.   The Fish Consumption Advisory, in and of itself, evidences the interference resulting from Monsanto's PCBs in the Bay ...................... 16

    B.   There is evidence of increased health risks from PCB exposure through fish consumption from the Bay ............................................................. 18

    C.   Monsanto's PCBs pose ecological risks to Bay fish and birds. .............. 22

D.    The remedial caps at Campbell Shipyard and Convair Lagoon are evidence of the nuisance created by Monsanto's PCBs in the Bay ........ 22

E.    Elevated PCB levels in Bay sediments require diversion of Port resources that would otherwise be used to enhance the Bay for the public............. 23

F.    As this Court has already determined, the Port has standing to abate a public nuisance to protect, preserve and enhance the Bay ...................... 25

VI.    CONCLUSION ................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beck Development Co. v. Southern Pacific Transp. Co.*,
  44 Cal. App. 4th 1160 (1996)...................................................................................21

*Carter v. Chotiner*,
  210 Cal. 288 (1930) .......................................................................................14

*City of Modesto Redevelopment Agency v. Superior Court*,
  119 Cal. App. 4th 28 [13 Cal. Rptr. 3d 865] ..............................................15

*City of San Jose v. Monsanto Company*,
  231 F.Supp.3d 357 (N.D. Cal. 2017) ..........................................................15

*City of Spokane v. Monsanto Company*,
  2016 WL 6275164 (E.D. Wash., Oct. 26, 2016) ..........................................4

*Clary v. City of Crescent City*,
  11 Cal. App. 5th 274 (2017)...............................................................18, 21

*People ex rel. Gallo v. Acuna*,
  14 Cal.4th 1090 (1997).............................................................................13

*Jordan v. City of Santa Barbara*,
  46 Cal. App. 4th 1245 (1996)...................................................................14

*Newhall Land & Farming Co. v. Superior Court*,
  19 Cal. App. 4th 334 (1993) .....................................................................14

*Oppen v. Aetna Ins. Co.*,
  485 F.2d 252 (1973) ...................................................................................13

*People v Atlantic Richfield Co.*,
  No. 100-CV-788657, 2014 WL 1385823 (Cal.Super. Mar. 26, 2014) ........20

*People v. ConAgra Grocery Products Co.*,
  17 Cal. App. 5th 51 (2017).................................................................*passim*

*People v. Glenn-Colusa Irrigation Dist.*,
  127 Cal. App. 30 (Dist. Ct. App. 1932) ......................................................14

*People v. Truckee Lumber Co.*,
  116 Cal. 397 (1897)...............................................................................14, 16

*San Diego Gas & Elec. Co. v. Superior Court*,
  13 Cal. 4th 893 (1996)................................................................................14

*Tesoro Refining and Marketing Co. v. City of Long Beach*,
  334 F.Supp.3d 1031 (N.D. Cal. 2017) ......................................................14

*Venuto v. Owens-Corning Fiberglass Corp.*,
  22 Cal. App. 3d 116 ...................................................................................13, 25

*Williams v. Moulton Niguel Water Dist.*,
  22 Cal. App. 5th 1198 (2019) ................................................................23

**Statutes**

Cal. Civ. Code § 3479.............................................................................18, 21, 23

Cal. Pub. Res. Code § 6009.1(e) ..............................................................25

Clean Water Act § 303(d).........................................................................1, 4

"Port Act," Harb. & Nav. Code App. 1 § 70 .............................................3, 25

**Other Authorities**

43 C.F.R. § 11.62(f)(1)(iii) .......................................................................5, 16

## I.   INTRODUCTION[1]

Plaintiff San Diego Unified Port District (the "Port") files this Response in Opposition to Monsanto's Motion for Summary Judgment (Public Nuisance) (ECF No. 424). The Court should deny the motion in its entirety because Monsanto cannot establish, as a matter of law, that the Port's public nuisance claim fails in any respect. There is ample evidence of a public nuisance in San Diego Bay (the "Bay") resulting from Monsanto's polychlorinated biphenyls ("PCBs").

## II.   SUMMARY OF THE RESPONSE

Notwithstanding the undisputed fact that PCBs are a widespread contaminant of the Bay, Monsanto argues that the conditions its PCBs create in the Bay are not substantial and unreasonable enough to constitute a public nuisance, as a matter of law. Monsanto argues this, despite evidence that:

- PCBs have contaminated sediment, water and marine ecosystems of the Bay. Pursuant to the Clean Water Act, the California Regional Water Quality Control Board, San Diego Region ("SDRWQCB") and the State Water Resources Control Board ("SWRCB") designated the Bay as an "impaired" waterway due to PCBs in fish tissue.

- PCB levels are so high in Bay fish tissue that California advises people to limit, or avoid altogether, consumption of certain commonly consumed Bay fish, such that a majority of the public can no longer freely and comfortably consume popular fish from the Bay (the "Fish Consumption Advisory" or "FCA").[2]

- PCBs are associated with cancer and non-cancer human health risks. They are recognized as carcinogenic by the Environmental Protection Agency ("EPA"), the International Agency for Research on Cancer, as well as the National Toxicology

---

[1] All "**Ex. #**" references are to exhibits to the Corley Declaration, submitted herewith.
[2] In 2013, the California Office of Environmental Health Hazard Assessment ("OEHHA") issued a health hazard advisory regarding the consumption of fish from the Bay. It was subsequently revised to be more restrictive. **Ex. 1a-e**, Fish Consumption Advisory Documents.

Program. PCBs are known to the State of California to cause cancer.

- Increased exposure to PCBs increases risk of cancer and non-cancer adverse health effects, especially to sensitive populations such as children and women of childbearing age.

- Women and children are consuming PCB-contaminated fish from the Bay at levels that exceed the state's human health warnings.

- The contamination necessitating the Fish Consumption Advisory interferes with angler use and enjoyment of Bay resources.

- PCBs threaten ecological harm to benthic communities, fish species and bird populations in the Bay.

- Sediment contaminant levels have required remedial caps over tidelands in a way that obstructs public use and development of the Bay.

- The Port has been addressing the PCB problem for decades and estimates that is has incurred at least $80-100 million in connection therewith.

Despite this evidence, Monsanto argues that no jury could ever determine that such interferences with the public's use and enjoyment of the Bay constitute a public nuisance. Monsanto is wrong.

Anything that unreasonably interferes with or obstructs the free and comfortable use and enjoyment of a bay, or which poses a threat to human health, is a nuisance. California law clearly dictates that contamination of water, as well as water pollution that harms fish used and enjoyed by the community, is a public nuisance. Likewise, a condition that creates risk to human health is a public nuisance. The law is clear on these principles. The conditions created by Monsanto's PCBs fit squarely within the definition of a nuisance. Monsanto's PCBs: (a) interfere with the free and comfortable consumption of fish from the Bay, (b) pose a human health risk to San Diegans who consume Bay fish, (c) pose a risk of harm to marine life in the Bay, (d) obstruct the use of the Bay and (e) require the Port to divert funds from enhancing the Bay for the public. Though Monsanto

1    artificially focuses on only three conditions of nuisance (ignoring other evidence of
2    nuisance), each of those interferences are independently and collectively sufficient to
3    establish the existence of a public nuisance.

4         In its motion, Monsanto goes to great lengths to detail how people still visit the
5    Bay, tour the U.S.S. Midway, attend the Parade of Lights, go on Hornblower Cruises and
6    use the Bay for other purposes—none of which have anything to do with the nuisance
7    conditions of which the Port seeks to abate. People still use the Bay, but Monsanto's
8    PCBs substantially and unreasonably interfere with their right to freely and comfortably
9    eat fish from it. Monsanto's own expert admits that somewhere between *65-81% of fish*
10   *caught from the Bay are precluded from consumption* by children or women under age
11   45. An overwhelming majority of people in and around San Diego cannot safely consume
12   the majority of the fish typically caught and kept from the Bay. However, the evidence
13   shows that people are, in fact, consuming fish in excess of California's FCA levels. The
14   Port seeks an abatement fund to mitigate PCB contamination in Bay sediments, water and
15   fish to levels that will no longer interfere with the free use and enjoyment of the resource
16   and decrease the associated human health risk.

17        Monsanto portrays the Port as a rogue actor fixing a problem that should simply
18   be ignored and suggests that the PCB problem is not substantial or unreasonable enough
19   for a reasonable person to find inconvenient, annoying, offensive or intolerable. But the
20   unreasonableness of the interference is a question of fact to be determined by the jury,
21   not Monsanto. Moreover, the Port's efforts to mitigate the risk associated with PCBs in
22   fish tissue are identical to expressly stated goals of state agencies, including SDRWCQB,
23   to reduce fish tissue contamination and remove the FCA. The type of relief the Port seeks
24   has been granted by California courts under similar circumstances to address a public
25   nuisance created by lead paint. This Court has already determined that the Port has
26   standing to pursue abatement of a public nuisance, pursuant to the Port Act. The Court
27   should deny Monsanto's motion in its entirety.

28

## III.    STATEMENT OF FACTS

"Polychlorinated biphenyls (PCBs) are synthetic chemical compounds that were widely produced and used during much of the twentieth century for various industrial and commercial applications before they were mostly banned by 1979. The production, use, and disposal of PCBs has resulted in widespread environmental contamination … ." *City of Spokane v. Monsanto Company*, 2016 WL 6275164, at *1 (E.D. Wash., Oct. 26, 2016). PCBs "adversely affect human health and the environment around the world."[3]

### A.    Monsanto's PCBs adversely impact the Bay in numerous ways.

The uses for which Monsanto promoted PCBs left a legacy of PCB contamination throughout the sediment, water and biota of the Bay.[4] PCBs are biomagnified within the marine food chain, including humans.[5] In fact, fish tissue samples taken by state agencies show that the Bay suffers from some of *the highest PCB concentrations in the region*.[6] In fact, the Bay is among the most PCB-contaminated water bodies in the country.[7] Consequently, state agencies have designated the Bay as an "impaired" water body, pursuant to § 303(d) of the Clean Water Act, due to the presence of elevated levels of PCBs in fish tissue.[8] SDRWQCB has repeatedly recognized that various areas of the Bay have contamination levels that "may adversely affect San Diego Bay beneficial uses"[9] and pose a risk to human health and the environment.[10]

Because of the well-established human health risks associated with exposure to PCBs, in 2013, California's Office of Environmental Health Hazard Assessment ("OEHHA") determined that PCB contamination levels were so high that people should

___

[3] **Ex. 2**, Matson Rep. at 2-3; **Ex. 85**, Trapp Rep. at 5; 14.
[4] **Ex. 3**, Douglas Rep. at 7; 8-14; **Ex. 4**, Golightly Rep. at 4-5; **Ex. 86**, Declaration of Jones.
[5] **Ex. 3**, Douglas Rep. at 7.
[6] **Ex. 5**, SWAMP Report at 47.
[7] **Ex. 85**, Trapp Rep. at 14.
[8] **Ex. 6**, CWA § 305(b); 303(d) Integrated Report; **Ex. 7**, Port Corp. Rep. at 77:4-6; 1035:7-24; 1725:14-19; **Ex. 85**, Trapp Rep. at 14-15; **Ex. 8**, Woodyard Dep. at 127:16-18; **Ex. 9**, CAO No. R9-2017-0021; **Ex. 4**, Golightly Rep. at 4.
[9] **Ex. 10**, CAO No. R9-2004-0295 at 24.
[10] **Ex. 8**, Woodyard Dep. at 129:3-8; **Ex. 11**, CAO No. R9-2015-0018 at 3; **Ex. 9**, CAO No. R9-2017-0021 at 5.

limit, or avoid altogether, the consumption of certain fish from the Bay.[11] OEHHA amended the FCA in 2018 to further restrict consumption due to the presence of PCBs.[12]

Consumption advisories are *de facto* harms under federal regulations because they interfere with the public's free and comfortable use of a resource.[13] That reality is just as true in the Bay, where the data suggests anglers who are aware of the FCA consume less fish[14] and statewide consumption rates were higher before the FCA.[15] According to Monsanto's expert, somewhere between 65-81% of fish caught from the Bay are precluded from consumption by children or women of childbearing age.[16] For example, Monsanto's expert admits that the most often caught and consumed fish, the Pacific chub mackerel, is subject to a "Do Not Eat" advisory for children and women under 45,[17] a population demographic that represents the majority of the San Diego population.[18]

Monsanto's PCBs have created a continuing health hazard in and around the Bay. EPA and Monsanto's risk assessment expert agree that "the types of PCBs likely to be bioaccumulated in fish and bound to sediments are the most carcinogenic PCB mixtures,"[19] and an increase in human exposure to PCBs results in an increased risk of developing cancer and other adverse health effects.[20] PCB exposure to sensitive populations is especially dangerous.[21] Despite this, Monsanto's consumption expert concedes that *children are in fact consuming* "*more than one child-sized portion ... every week*" of "Do Not Eat" fish from the Bay.[22] In fact, a full 7.5% of consumers who

---

[11] **Ex. 1a-e**, Fish Consumption Advisory Documents; **Ex. 4**, Golightly Rep. at 4; **Ex. 12**, Jones Rep. at 1; 4; **Ex. 13**, Jones Rebuttal at 13-14; **Ex. 14**, Toll Rebuttal at 2; **Ex. 85**, Trapp Rep. at 14; **Ex. 86**, Declaration of Jones.
[12] *Id*.
[13] **Ex. 13**, Jones Rebuttal at 7; *see also* 43 C.F.R. § 11.62(f)(1)(iii).
[14] **Ex. 13**, Jones Rebuttal at 17.
[15] **Ex. 14**, Toll Rebuttal at 8, Fg. 2-1.
[16] **Ex. 15**, Desvousges Dep. at 91:19-92:5.
[17] *Id*. at 101:20-24; 102:4-10 (opinion that "97.7% of the fish … can be eaten," is only true for men and women over 45. *Id*. at 109:7-13.
[18] **Ex. 16**, San Diego Census Data.
[19] **Ex. 17**, EPA PCB Info; **Ex. 18**, Keenan Dep. at 80:10-81:9.
[20] **Ex. 19**, Olson Rep. at 2; 19-49; *see also* **Ex. 13**, Jones Rebuttal at 6-7.
[21] **Ex. 19**, Olson Rep. at 2; 19-49.
[22] **Ex. 20**, Sunding Rep., at 20-23; **Ex. 13**, Jones Rebuttal at 13-14. Monsanto's expert testified that on visit to local fishing pier, majority of anglers were children. **Ex. 15**,

voluntarily responded to the San Diego Fish Consumption Study reported consuming "Do Not Eat" fish.[23] Site-specific evidence suggests that certain ethnic minority groups engage in subsistence fishing at a much higher rate than the general population, meaning the risk to those communities is even higher.[24]

At the same time, there is evidence that Monsanto's PCBs pose risks to marine life in the Bay. While PCB impacts to marine life have not been fully quantified, PCBs exist in the Bay at levels that pose potential threats to organisms, such as invertebrates, fish and birds.[25]

PCB contamination has required substantial expenditure of funds—estimated to be at least $80-100 million[26]—from the Port that otherwise would have been invested in enhancing the Bay for the benefit of the people of California. PCB contamination has also necessitated the placement of remedial caps over PCB-laden sediments to prevent further PCB exposure, resulting in areas of the Bay that are now restricted from use and development.[27] Contrary to Monsanto's suggestions, PCBs are a public nuisance in the Bay,[28] and mitigating the risk associated with human exposure is a priority for SDRWQCB.[29] In fact, the Executive Officer of the SDRWQCB stated in a declaration submitted in connection with this Opposition, that the agency is focused on restoring the fish and shellfish beneficial use, which is impaired by PCBs.[30] In August 2019, board members expressed the goal of protecting anglers and sensitive populations by mitigating the contamination causing the FCA.[31]

**B.    Monsanto manufactured, marketed and sold at least 1.4 billion pounds of**

---

Desvousges Dep. at 17:25-18:8; 23:24-24:8.

[23] **Ex. 13**, Jones Rebuttal at 13-14.

[24] **Ex. 13**, Jones Rebuttal at 17; **Ex. 21**, Environmental Health Coalition Survey; **Ex. 86**, Declaration of Jones at ¶20.

[25] **Ex. 12**, Jones Rep. at 3; **Ex. 13**, Jones Rebuttal at 3; **Ex. 85**, Trapp Rep. at 14; **Ex. 86**, Declaration of Jones at ¶8-9.

[26] **Ex. 7**, Port Corp. Rep. at 1783:6-1784:6; 1963:3-11 and 1214:18-1216:25.

[27] **Ex. 22**, Declaration of Paul Brown.

[28] **Ex. 13**, Jones Rebuttal at 6-7 ("presence of FCA … constitutes a public nuisance …"); **Ex. 4**, Golightly Rep. at 2; 34.

[29] **Ex. 23,** Declaration of David Gibson, Executive Officer, SDRWQCB.

[30] *Id.*

[31] *Id.*

1    **PCBs, more than 99% of the PCBs sold in the United States.**

2    This impairment of the Bay is the result of Monsanto's conduct. For decades,

3    Monsanto sold over a billion pounds of PCBs despite knowing they were virtually

4    indestructible chemical compounds that would persist in the environment and pose health

5    risks to humans. For nearly 50 years, Monsanto produced 99% of the PCBs used in the

6    U.S.,[32] more than 1.4 billion pounds of PCBs.[33] Monsanto's PCB sales dramatically

7    increased in the mid-1960s and continued to increase to a sales apex in 1971.[34]

8    Monsanto promoted numerous and diverse uses of PCBs.[35] PCBs were promoted

9    for "closed" and "semi-open" uses, such as capacitors and transformers, but Monsanto

10   knew that such systems routinely and consistently leaked and failed in normal use,

11   releasing PCBs into the environment.[36] Monsanto also promoted PCBs for "open" uses,

12   like paints, caulks, adhesives, surface coatings, plasticizers and pesticide extenders,

13   which by the nature of their intended use, were exposed or applied directly to the

14   environment.[37] By 1961, there were approximately 40 categories of "open" uses, sales

15   for which increased from 1958 to 1971.[38] Monsanto promoted PCBs specifically for open

16   use in marine environments, with specially-formulated coatings and paints used on

17   vessels, marine structures and buildings or equipment near marine environments such as

18   the Bay.[39]

19   **C.   Monsanto knew that PCB exposure posed risks to human health since the 1930s and 1940s.**

20   During the 1930s, several published studies associated PCB exposure with

---

23   [32] **Ex. 3**, Douglas Rep. at 6; **Ex. 2**, Matson Rep. at 3n.3.
     [33] **Ex. 2**, Matson Rep. at 3; 9; **Ex. 25**, PCB Disposal Procedures.
24   [34] **Ex. 2**, Matson Rep. at 10-11.
     [35] **Ex. 85**, Trapp Rep. at 5.
25   [36] **Ex. 3**, Douglas Rep. at 3-4; **Ex. 2**, Matson Rep. at 3-4.
     [37] *Id; see also* **Ex. 26**, Monsanto Corp. Rep. at 340:15-25; 339:14-356:25; **Ex. 27**, Oct. 2,
26   1969 Report Aroclor "Ad Hoc" Comm.; **Ex. 28**, 1935 Aroclor Uses; **Ex. 29**, 1937 Aroclor
     Uses; **Ex. 30**, Monsanto Bulletin P-124. "[A]ll open uses involve some release of PCBs
27   into the environment." **Ex. 26**, Monsanto Corp. Rep. at 355:16-356:25.
     [38] **Ex. 2**, Matson Rep. at 13, 15-16.
28   [39] **Ex. 3**, Douglas Rep. at 3-4; **Ex. 2**, Matson Rep. at 3-4.

chloracne, liver damage and multiple deaths.[40] Indeed, Monsanto's own workers suffered from exposure to PCBs.[41] By the mid-1930s, the public health problem was significant enough to attract the attention of academic researchers,[42] and multiple studies published and provided to Monsanto during the 1930s consistently reported systemic toxicity.[43] In 1937, Monsanto internally recognized that "repeated oral ingestion will lead to systemic toxic effects."[44] There is no question that Monsanto knew in the 1930s that exposure to PCBs posed risks to human health.[45]

In 1944, the danger associated with PCB exposure was further settled by the National Institutes of Health, when Dr. Miller, a doctor with the United States Public Health Service, confirmed systemic toxicity in a multi-species, multi-exposure pathway study.[46] Across all series of tests, Monsanto's product caused "conspicuous liver damage" and other harm.[47] By 1954, it was known that even mild, continued exposure posed a risk to human health.[48] Indeed, by 1955, Monsanto stopped allowing its workers to eat in the PCB department, fearing PCB exposure through consumption of contaminated food— "and it would be extremely difficult on the basis of past literature to counter such claims."[49]

Monsanto's Dr. Kelly also recognized the dilemma posed by uncontrolled PCB exposure to customers—and the legal liability that could flow from public use.[50] During

---

[40] **Ex. 2**, Matson Rep. at 17; **Ex. 19**, Olson Rep. at 4-6; **Ex. 31**, Markowitz/Rosner Rep. at 1-2; 466-470.
[41] **Ex. 2**, Matson Rep. at 17; **Ex. 31**, Markowitz/Rosner Rep. at 1-2; 466-470.
[42] **Ex. 19**, Olson Rep. at 5; **Ex. 31**, Markowitz/Rosner Rep. at 466-470.
[43] **Ex. 19**, Olson Rep. at 5; **Ex. 31**, Markowitz/Rosner Rep. at 1-2; 466-470. Monsanto admits awareness of all PCB toxicity studies published after 1937. **Ex. 26**, Monsanto Corp. Rep. at 186:18-187:8; **Ex. 32**, 1971 Kelly Ltr.
[44] **Ex. 33**, 1937 Note; **Ex. 26**, Monsanto Corp. Rep. at 178:3-15.
[45] **Ex. 26**, Monsanto Corp. Rep. at 178:3-182:25; **Ex. 33** 1937 Note; **Ex. 34**, 1938 Report to Monsanto; **Ex. 35**, Monsanto Report No. 2215.
[46] **Ex. 26**, Monsanto Corp. Rep. at 194:10-196:14; **Ex. 19**, Olson Rep. at 7; **Ex. 50**, DeGrandchamp Rep. at 74-80; **Ex. 36**, 1944 Miller USPHS Study.
[47] **Ex. 26**, Monsanto Corp. Rep. at 195:14-16; **Ex. 50**, DeGrandchamp Rep. at 74-80; **Ex. 36**, 1944 Miller USPHS Study.
[48] **Ex. 19**, Olson Rep. at 8.
[49] **Ex. 31**, Markowitz/Rosner Rep. at 476; **Ex. 37**, 1955 Monsanto Memo.
[50] *Id.*

the 1960s, Monsanto repeatedly learned that its customers were experiencing adverse health effects associated with PCB exposure.[51] And by 1960, Monsanto's Dr. Kelly reiterated what the scientific community had being indicating for decades: exposure to PCBs could lead to death.[52]

### D. Monsanto knew PCBs would persist, bioaccumulate and biomagnify.

Monsanto understood that PCBs were "virtually indestructible"[53] from the start—indeed, their persistence that gave PCBs their core functionality, and Monsanto affirmatively promoted that characteristic beginning in the 1930s.[54] Their purpose stability under all conditions.[55] Monsanto advertised their PCBs as resistant to biological degradation and "utterly inert."[56] Due to their extraordinary environmental persistence, Monsanto promoted PCBs as "pesticide extenders" and "permanent soil poisons" during the 1940s and 1950s.[57] Monsanto knew that "experience gained over many years indicate[d] that Aroclors are highly stable under all known conditions present in the environment."[58] In fact, when Monsanto investigated locations where PCBs were poured onto soil in 1939, it found that virtually none of the PCBs had biodegraded 30 years later.[59] From decades of experience, Monsanto knew that PCBs were "[s]o stable, in fact, that it takes an unbearable number of years to decompose when exposed to the elements of nature, especially water."[60]

---

[51] **Ex. 26**, Monsanto Corp. Rep. at 224:2-235:9; **Ex. 38**, 1960 Monsanto Memo; **Ex. 39**, 1961 Allen Ltr,; **Ex. 40**, 1965 Monsanto Memo.
[52] **Ex. 26**, Monsanto Corp. Rep. at 225:12-21; **Ex. 38**, 1960 Monsanto Memo.
[53] **Ex. 26**, Monsanto Corp. Rep. at 20:3-6.
[54] **Ex. 26**, Monsanto Corp. Rep. at 21:13-24; 34:16-38:5; 51:8-11; 52:17-20; **Ex. 41**, Monsanto Bulletin P-134; **Ex. 42**, 1948 Benignus Ltr.; **Ex. 43**, 1961 Aroclor Genie. Monsanto was aware of the "inherent stability" of PCBs in 1930s and 1940s. **Ex. 44**, Miller Dep. (2001) at 22-23.
[55] **Ex. 26**, Monsanto Corp. Rep. at 58:18-59:3; **Ex. 45**, Monsanto Pollution Control.
[56] **Ex. 26**, Monsanto Corp. Rep. at 50:15-52:16; **Ex. 43**, 1961 Aroclor Genie.
[57] **Ex. 26**, Monsanto Corp. Rep. at 37:7-38:5; 39:21-40:2 and 42:11-46:1; **Ex. 42**, 1948 Benignus Ltr.; **Ex. 46**, Monsanto Bulletin P-141.
[58] **Ex. 26**, Monsanto Corp. Rep. at 55:17-58:12; **Ex. 47**, 1970 Papageorge Ltr.
[59] **Ex. 26**, Monsanto Corp. Rep. at 62:2-63:13; **Ex. 48**, 1969 Monsanto Memo; **Ex. 49**, Sept. 1970 Monsanto Memo.
[60] **Ex. 26**, Monsanto Corp. Rep. at 58:5-60:4; **Ex. 45**, Monsanto Pollution Control; **Ex. 47**, 1970 Papageorge Ltr.

Monsanto was also aware that its PCBs would bioaccumulate and biomagnify in the environment.[61] Plaintiffs' experts and Monsanto's corporate representative confirmed that the principal characteristics that determine bioaccumulation are persistence and fat solubility.[62] In turn, persistence and fat solubility are determined by the chemical structure of PCBs,[63] which has been known since the 1800s.[64] Monsanto admits that it knew in the 1930s that PCB chemical properties[65] would lead to bioaccumulation in the environment.[66] What Monsanto already knew was publicly confirmed by the scientific community in 1966 with the publication of Soren Jensen's findings that PCBs were accumulating in the tissue of birds, fish and people.[67] Shortly thereafter, Monsanto's medical department communicated internally that "frightening levels of PCBs were accumulating in human fat."[68]  Nevertheless, Monsanto continued to increase its PCB sales through the 1960s and into the 1970s. [69]

### E.   Monsanto knew hundreds of millions of pounds of PCBs were being released into the environment.

Monsanto knew from at least the 1940s that PCB spills and releases into the environment were a serious problem[70] during manufacture, transportation, use and disposal. At its plants, Monsanto's practice was to discharge PCBs directly into streams and rivers during the 1940s.[71] At its Krummrich plant, Monsanto released at least 700-800 pounds per day.[72] At its Anniston plant, hundreds of pounds of PCBs were released

---

[61] **Ex. 50**, DeGrandchamp Rep. at 97-138; **Ex. 31**, Markowitz/Rosner Rep. at 1; **Ex. 2**, Matson Rep. at 5: 6; 18.
[62] *Id*.; *see also* **Ex. 26**, Monsanto Corp. Rep. at 64:19-65:9.
[63] **Ex. 26**, Monsanto Corp. Rep. at 64:19-65:9.
[64] *Id*. at 21:21-22:16; 34:8-15.
[65] *Id*. at 67:20-25.
[66] Bioaccumulation and/or biomagnification of its products was not a new concept for Monsanto. It was aware, in the 1950s that DDT was bioaccumulating in the environment. **Ex. 26**, Monsanto Corp. Rep. at 76:17-77:1; 97:10-20.
[67] **Ex. 31**, Markowitz/Rosner Rep**.** at 482-84.
[68] **Ex. 26**, Monsanto Corp. Rep. at 83:5-84:4; **Ex. 51**, Oct. 1970 Monsanto Memo.
[69] **Ex. 2**, Matson Rep. at 10-11.
[70] **Ex. 26**, Monsanto Corp. Rep. at 170:22-171:7; **Ex. 52**, 1947 Monsanto Press Release.
[71] **Ex. 26**, Monsanto Corp. Rep. at 172:17-20.
[72] *Id*. at 322:10-14; *see also* **Ex. 53**, 1967 Aroclor Progress Report.

per day.[73] Monsanto also knew that through shipment, even more PCBs were released into the environment.[74]

Monsanto also knew that PCBs were released into the environment through normal customer uses from the 1930s forward.[75] For example, Monsanto was aware in the 1950s that heat transfer systems leaked PCBs[76]—often times into food products—leading to very public human poisonings in the 1960s. Monsanto knew transformers and capacitors leaked as a matter of course for decades,[77] and the service of those transformers generated approximately 1 million gallons of PCB waste *per year* that was "dumped or disposed of in streams … over the course of decades."[78] Monsanto estimated that 900,000 gallons of PCB wastes were generated per year from capacitors, that much of it ended up in dumps,[79] and that at least ten million pounds of PCBs were released into the environment annually for decades from hydraulic fluids uses alone—for a total of 200 million pounds.[80] Monsanto knew the only way to properly destroy PCBs was by high temperature incineration.[81] In fact, Monsanto had the only incinerator capable of properly disposing of its PCBs but chose to quietly dismantle it to avoid cost and "social responsibility" of properly disposing of its harmful product.[82]

## F.   Monsanto was aware that the release of PCBs into the environment posed a threat to human health and the environment.

In 1944, Monsanto sales manuals stated that "all chlorinated hydrocarbons have measurable degrees of toxicity to the animal organism. Aroclors [PCBs] are no

---

[73] **Ex. 26**, Monsanto Corp. Rep. at 325:9-326:2; **Ex. 54**, Aug. 1970 Monsanto Memo (high PCB levels in bass, FDA investigation, and Monsanto attempts to avoid publicity).
[74] **Ex. 26**, Monsanto Corp. Rep. at 326:18-333:22; **Ex. 55**, 1963 Monsanto Memo; **Ex. 56**, Dec. 1971 Monsanto Memo; **Ex. 57**, 1972 Monsanto Memo.
[75] **Ex. 26**, Monsanto Corp. Rep. at 337:8-20.
[76] *Id*. at 412:9-16.
[77] *Id*. at 423:2-424:12.
[78] *Id*. at 435:6-436:21; *see also* **Ex. 58**, 1970 Meeting Minutes.
[79] **Ex. 26**, Monsanto Corp. Rep. at 445:8-448:13; **Ex. 58**, 1970 Meeting Minutes.
[80] **Ex. 26**, Monsanto Corp. Rep. at 396:4-398:3; **Ex. 59**, 1969 Metcalf Report.
[81] **Ex. 26**, Monsanto Corp. Rep. at 20:22-21:7.
[82] *Id*. at 484:4-486:5; 486:21-25; *see also*, **Ex. 60**, 1977 Monsanto Memo.

exception."[83] During the 1950s, Monsanto was aware of the risk that PCBs would contaminate food and water.[84] By 1957, Monsanto's stream pollution control advisor, Jack Garrett, foresaw the risk of harm that now exists in the Bay. First, Mr. Garrett warned of "chronic exposure to humans of chemicals that have been released into the waterways."[85] Second, he warned of the deleterious effects on aquatic life resulting from releases into the environment.[86] As he stated in 1957, "industry today cannot afford to be wrong."[87] By 1969, Monsanto privately conceded that "the PCB problem"—would lead to "a number of legal implications including financial liability … ."[88] Outwardly, however, Monsanto paid Industrial Bio-Test ("IBT") to falsify and "fudge" PCB toxicological study results to misrepresent the risks associated with PCBs—conduct which led to criminal fraud convictions for IBT and Monsanto employees.[89]

### G. Monsanto improperly instructed users regarding disposal of PCBs.

Despite this knowledge, Monsanto was instructing its customers to "discard by dumping" or "burying" used PCBs until at least 1971.[90] In fact, Monsanto informed customers that dumping PCBs (1248) *was not* an environmental problem[91] and that as long as PCBs were not exposed to water, there was no environmental threat.[92] Internally, however, Monsanto was aware that PCBs discarded in municipal dumps would likely lead to releases into waterways[93] or dispersion and aerial deposition through low

---

[83] **Ex. 26**, Monsanto Corp. Rep. at 242: 5-15; 243:13-15; **Ex. 61**, Aroclor Sales Manual.
[84] **Ex. 26**, Monsanto Corp. Rep. at 369:21-370:17.
[85] **Ex. 26**, Monsanto Corp. Rep. at 251:21-252:7; 249:10-252:7. "A tremendous amount of data on the effects of chemical materials on aquatic organisms are available … ." **Ex. 26**, Monsanto Corp. Rep. at 254:6:17; **Ex. 62**, Toxicity Considerations in Pollution Control.
[86] **Ex. 62**, Toxicity Considerations in Pollution Control; **Ex. 26**, Monsanto Corp. Rep. at 251:21-252:7; 249:10-252:7.
[87] **Ex. 26**, Monsanto Corp. Rep. at 255:20-256:4; **Ex. 62**, Toxicity Considerations in Pollution Control.
[88] **Ex. 63**, Oct. 15, 1969 Report of Aroclor "Ad Hoc" Committee.
[89] **Ex. 26**, Monsanto Corp. Rep. at 292:5-311:14 ("ashamed" to publish false PCB conclusions); 317:13-19 (custom and practice of IBT to falsify toxicological studies).
[90] **Ex. 26**, Monsanto Corp. Rep. at 463:18-23; **Ex. 64**, July 1971 Monsanto Memo.
[91] **Ex. 26**, Monsanto Corp. Rep. at 466:1-14; **Ex. 65**, 1970 Schalk Ltr.
[92] **Ex. 26**, Monsanto Corp. Rep. at 460:8-14; **Ex. 66**, 1973 Papageorge Ltr.
[93] **Ex. 26**, Monsanto Corp. Rep. at 459:4-7.

temperature incineration.[94] Incredibly, Monsanto created instructions for consumers entitled "Keeping PCBs Out of the Environment" *for the first time* in 1972.[95] In fact, the first time any label instructions directing consumers to avoid contaminating the environment with PCBs occurred in 1970.[96]

## IV. PUBLIC NUISANCE ELEMENTS AND STANDARD

### A. Interference with or obstruction of the free and comfortable use and enjoyment of a bay, is a public nuisance by definition.

"California nuisance law is quite clear." *Oppen v. Aetna Ins. Co.*, 485 F.2d 252, 259 (1973). "*Anything* which is injurious to health … or is … an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property … is a nuisance." *People v. ConAgra Grocery Products Co.*, 17 Cal. App. 5th 51, 111-112 (2017) (emphasis in original) (citing CAL. CIV. CODE § 3479). More specifically, "anything which … unlawfully obstructs … free use, in the customary manner, of any … bay … is a public nuisance." *Oppen*, 485 F.2d at 259. Public nuisance does not require a showing of direct damage to property or personal injury, but rather, an "interference with the interests of the community or the comfort and convenience of the general public and includes interference with the public health, comfort and convenience." *Venuto v. Owens-Corning Fiberglass Corp.*, 22 Cal. App. 3d 116 at 123; see also *Oppen*, 485 F.2d at 259.

### B. The interference is substantial and unreasonable if it is offensive, inconvenient, annoying, disturbing or intolerable to the reasonable person.

The objective, reasonable person standard governs whether a condition is a nuisance. "So long as the interference is substantial and unreasonable, and such as would be offensive or inconvenient to the normal person, virtually any disturbance of the enjoyment of the property may amount to a nuisance." *Venuto*, 22 Cal. App. 3d at 126. A situation is not substantial enough to constitute a nuisance if normal persons in the locality

---

[94] *Id.* at 399:7-24.
[95] *Id.* at 469:7-11; *see also* **Ex. 67**, 1972 Status Report.
[96] **Ex. 26**, Monsanto Corp. Rep. at 469:12-470:12; **Ex. 67**, 1972 Status Report.

1  would not be "substantially annoyed or disturbed by the situation." *People ex rel. Gallo*

2  *v. Acuna*, 14 Cal.4th 1090, 1105 (1997). On the other hand, an interference is

3  unreasonable if reasonable persons, looking at the whole situation impartially and

4  objectively, would consider it definitely offensive, seriously annoying or intolerable."

5  *San Diego Gas & Elec. Co. v. Superior Court*, 13 Cal. 4th 893, 938 (1996). This

6  reasonableness determination is generally a question of fact. *Id.*

7
8
### C. Causing or contributing to the contamination of a waterway or its fish is clearly defined as a public nuisance in California law.

9  Under California law, causing or contributing to the pollution of a waterway

10 constitutes a public nuisance. *Tesoro Refining and Marketing Co. v. City of Long Beach*,

11 334 F.Supp.3d 1031, 1054 (N.D. Cal. 2017) (a claim for contamination of public water

12 is a claim for public nuisance); *Jordan v. City of Santa Barbara*, 46 Cal. App. 4th 1245

13 (1996) (pollution of water constitutes a public nuisance); *Newhall Land & Farming Co.*

14 *v. Superior Court*, 19 Cal. App. 4th 334-341 (1993) (pollution of water is a nuisance by

15 definition); *Carter v. Chotiner*, 210 Cal. 288, 291 (1930) ("[t]here is no doubt that

16 pollution of water constitutes a nuisance").

17 **It has been well-settled for nearly a century that contamination which causes**

18 **harm to fish used and enjoyed by the people of California is a public nuisance**,

19 because it obstructs the free and comfortable use and enjoyment of a valuable resource.

20 *People v. Truckee Lumber Co.*, 116 Cal. 397, 399-401 (1897) (contamination of a

21 waterway and fish by a mill made section of the river "unfit for use" of fish in "violation

22 of the rights of the people"). The Supreme Court reached the same conclusion in *People*

23 *v. Stafford Packing Co.*, holding again that contamination that caused harm to fish used

24 and enjoyed by the people of California was clearly a public nuisance: "**that such acts**

25 **constitute a nuisance** … **is not open to serious question.**" 193 Cal. 719, 726-27 (1924)

26 (emphasis added). *See also People v. Glenn-Colusa Irrigation Dist.*, 127 Cal. App. 30,

27 34 (Dist. Ct. App. 1932) (same holding).

28

**D.  Promoting a product with actual knowledge that its use would contribute to the creation of a hazardous condition results in liability for public nuisance.**

Under California law, affirmatively promoting a product with actual knowledge that its use would create a hazardous condition results in liability for public nuisance. *ConAgra*, 17 Cal. App. 5th at 83-91, 133 (abatement fund to mitigate the "prospective hazard" created by the lead paint). Though the standard under *ConAgra* is "actual knowledge" of the risks associated with the use of the product, "[p]roof of actual knowledge focuses on what information a defendant must have been aware of" or "must have known," demonstrated through reasonable inferences using circumstantial evidence. *Id*. at 86. However, it is not necessary to prove that the defendant knew "precisely how" the harm could occur or the "specific pathway" by which "significant risk of harm" existed. *Id*. at 89. The critical question is whether the defendant "*created or assisted in the creation of the nuisance*" by promoting a product with "actual knowledge of the *risk* of harm." *Id*. at 91 (emphasis added). If so, it is liable for public nuisance, regardless of whether it possesses or controls the impacted property or is in a position to abate the nuisance itself. *Id*. at 109. It is not necessary to show that abatement will eliminate harm, only that it will reduce the risk. *Id*. at 110, 116.

**E.  Improperly instructing users about disposal also imposes liability where disposal of that product creates a nuisance condition.**

Under California law, a defendant who instructs users to improperly dispose of wastes is similarly liable for the condition of nuisance resulting therefrom. *City of Modesto Redevelopment Agency v. Superior Court*, 119 Cal. App. 4th 28, 41 [13 Cal. Rptr. 3d 865, 874], as modified on denial of reh'g (June 28, 2004); *City of San Jose v. Monsanto Company*, 231 F.Supp.3d 357, 365 (N.D. Cal. 2017).

## V.   ARGUMENT AND AUTHORITY

Monsanto's motion challenges whether the harms resulting from its conduct are sufficiently substantial and unreasonable to constitute a public nuisance. In doing so,

1    Monsanto overlooks the profound contamination of the Bay—which is a public nuisance
2    by definition—in search of a "harm" to such things as tourism and commerce, as if
3    environmental and human health risks in and around the Bay are not harmful enough. It
4    is, as the multiple cases cited above clearly demonstrate. There is no question that the
5    Bay is impaired due to Monsanto's PCBs, as described in Section III.A, above, and as
6    discussed further in this section, or that such impairment is legally sufficient to constitute
7    a nuisance.

8        Monsanto chooses to challenge only three particular conditions of nuisance that
9    exist in the Bay, suggesting that each is insufficiently significant, as a matter of law.[97]
10   But for each specific condition challenged by Monsanto, as well as other nuisance
11   conditions Monsanto chose not to address (described in Section V.C and V.E), there is
12   significant evidence that PCBs in the Bay substantially and unreasonably interfere with
13   the public's free and comfortable use of the Bay.

14   ## A.   The Fish Consumption Advisory, in and of itself, evidences the interference resulting from Monsanto's PCBs in the Bay.
15

16       In and of itself, the FCA is a quintessential example of the type of harm Monsanto's
17   PCBs cause in the Bay. It is well-established in scientific literature that fish consumption
18   advisories lead to a decline in the benefits associated with recreational fishing, as anglers
19   forgo fishing entirely, choose alternate sites, decline consumption of fish caught, and/or
20   enjoy the fishing experience less.[98] Federal environmental regulations regarding damages
21   to natural resources identify fish consumption advisories as *de facto* harm.[99] This is for
22   good reason—such advisories exemplify an interference with the public's customary use
23   of a waterway due to environmental contamination. Interference with the public's right
24   to freely and comfortably use and enjoy fish has been a public nuisance under California

25

26   [97] The Port's witness *did not* confirm that the three nuisance conditions Monsanto chose
27   to focus on were the only conditions of nuisance that the Port alleges. **Ex. 7**, Port Corp. Rep. at 283:4-13.
     [98] **Ex. 13**, Jones Rebuttal at 7; **Ex. 86**, Declaration of Jones at ¶11.
28   [99] *Id.*; *see also* 43 C.F.R. § 11.62(f)(1)(iii).

law for more than a century. *See, e.g., Truckee*, 116 Cal. at 399-401; *Stafford*, 193 Cal. at 726-27.

Such interference is occurring in the Bay. The U.S. Department of Human Health Services, USDA and OEHHA all recommend weekly consumption of fish for nutritional benefits.[100] But because of Monsanto's PCBs, fish that were once safe to eat without limitation are now unsafe to consume except in limited quantities for men and altogether unsafe to eat for certain sensitive groups such as children and women of child-bearing age. **Monsanto's expert admits that somewhere between *65-81% of fish caught from the Bay are precluded from consumption* by children or women under age 45.**[101] Consumption of *at least 10 fish species from the Bay are restricted* due to the presence of PCBs.[102] Even the most often caught and consumed fish, the Pacific chub mackerel, is subject to a "Do Not Eat" advisory for children and women under 45,[103] a population demographic that represents, by far, the majority of the population in and around San Diego.[104] Consequently, an overwhelming majority of people in and around San Diego cannot safely consume a majority of the fish typically caught and consumed from the Bay. This is a significant interference by any measure.

Furthermore, the evidence suggests that anglers who are aware of the FCA consume less fish on average than do unaware anglers,[105] and statewide consumption rates before the FCA were higher than after.[106] These limitations, individually and collectively, are clear proof of a substantial and unreasonable interference with the community's use of Bay resources, which a reasonable person would find substantially annoying, disturbing, offensive or intolerable.[107] As such, there is ample evidence of a

---

[100] **Ex. 14**, Toll Rebuttal at 2.
[101] **Ex. 15**, Desvousges Dep. at 91:19-92:5.
[102] **Ex. 1a-e**, Fish Consumption Advisory Documents; **Ex. 14**, Toll Rebuttal at 2.
[103] **Ex. 15**, Desvousges Dep. at 101:20-24; 101:20-102:3; 102:4-10; 109:7-13.
[104] **Ex. 16**, San Diego Census Data.
[105] **Ex. 13**, Jones Rebuttal at 17. The Port displays prominent FCA signage at public fishing piers and on its website. **Ex. 7**, Port Corp. Rep. at 1478:19-1479:24.
[106] **Ex. 14**, Toll Rebuttal at 8, Fg. 2-1; **Ex. 86**, Declaration of Jones at ¶11.
[107] Suggestions that the Bay is used for aquaculture are flatly false. No witness has testified that food is grown for human consumption in the Bay. **Ex. 68**, Cloward Dep. at

1   public nuisance.[108]

2   **B.      There is evidence of increased health risks from PCB exposure through**
3   **fish consumption from the Bay.**

4   Monsanto argues that there can be no nuisance without a threat to human health

5   and that no such threat exists in the Bay from PCBs. Monsanto is wrong on both fronts.

6   Nuisance law requires *either* a human health threat *or* an interference with use, not both.

7   CAL. CIV. CODE § 3479; *Clary v. City of Crescent City*, 11 Cal. App. 5th 274, 292 (2017).

8   However, Monsanto's PCBs interfere with use *and* pose a threat to human health.

9   According to EPA, "PCBs have been demonstrated to cause a variety of adverse

10  health effects," "[s]tudies in humans support evidence for potential carcinogenic and non-

11  carcinogenic effects of PCBs," and "the data strongly suggests that PCBs are probable

12  human carcinogens."[109] EPA is not alone in its classification of PCBs as potential human

13  carcinogens—the International Agency for Research on Cancer and the National

14  Toxicology Program, among others, have also identified PCBs as carcinogenic to

15  humans.[110] The State of California lists PCBs as a chemical "known to the state of

16  California to cause cancer."[111]

17  PCBs also cause an increased risk of other adverse health effects and

18  developmental effects, including but not limited to diabetes, liver injury, immune system

19  dysfunction, neurobehavioral effects, impaired thyroid function, reproductive system

20

21  107:8-12, 208:6-209:13. **Ex. 69**, Abell Dep. at 105:14-106:13; 110:20-112:3; 132:12-14).
22  Similarly, Monsanto's insinuations about the Port promoting kids fishing tournaments
    are misleading: the events involved purchased fish "brought in" … and placed in
    "temporary fishing pens." **Ex. 7**, Port Corp. Rep. at 1476:21-1477:7; 1481:2-8. The
23  documents Monsanto cite indicate that the kids were served BBQ, not Bay fish.
24  [108] But for PCBs in fish tissue: at least 1 of the 2 demographics whose consumption is
    limited could consume 1 more serving of 9 of the 15 restricted fish species. For the other
    6 species, women and children could enjoy 1 serving per week instead of none. **Ex. 14**,
25  Toll Rebuttal at 6. Similarly, "[i]f PCBs were not present in barred sand bass, spotted
    sand bass or Pacific chub mackerel, there would not be a 'Do Not Eat' advisory for these
26  species for sensitive populations … ." **Ex. 13**, Jones Rebuttal. at 8.
    [109] **Ex. 17**, EPA PCB Info; **Ex. 18**, Keenan Dep.  at 71:4-75:14; **Ex. 86**, Declaration of
27  Jones at ¶5-8.
    [110] **Ex. 17**, EPA PCB Info; **Ex. 18**, Keenan Dep.  at 84:19-85:24.
28  [111] **Ex. 17**, EPA PCB Info; **Ex. 18**, Keenan Dep.  at 88:10-14.

impairment, cardiovascular disease and skin irritation.[112] Adverse health effects associated with PCB exposure have been observed *even at background environmental exposure levels*.[113] Due to various and multiple exposure pathways that result in long-term bioaccumulation of PCBs in humans, the higher the levels of PCBs in the body, the higher the risk of adverse health effects.[114]

The parties agree that "the types of PCBs likely to be bioaccumulated in fish and bound to sediments are the most carcinogenic PCB mixtures,"[115] and EPA has further concluded that "people who ingest PCB-contaminated fish … may be exposed to PCB mixtures that are even more toxic than the PCB mixtures contacted by workers."[116] An increase in human exposure to PCBs results in an increased risk of developing cancer and other adverse health effects,[117] with sensitive populations in increased danger.[118] Consequently, SDRWQCB has repeatedly identified "unhealthy levels of PCBs in fish tissue" as the "Human Health Impairment" in connection with remediation at PCB sites around the Bay.[119]

The parties also agree that *children are in fact consuming "more than one child-sized portion … every week"* of "Do Not Eat" fish from the Bay.[120] Remarkably, however, Monsanto suggests that this cannot be evidence of a public nuisance because *an insignificant number of children* are consuming dangerous levels of PCBs. The Port's expert, on the other hand, opines that Monsanto's estimate is "absurd and grossly misrepresents the potential health risk posed to children from consuming PCB-contaminated fish."[121] Even without reasonably extrapolating to the greater population, data from anglers who responded to the San Diego Fish Consumption Study indicate that

---

[112] **Ex. 19**, Olson Rep. at 2; 15-49; **Ex. 86**, Declaration of Jones at ¶5-8.
[113] **Ex. 19**, Olson Rep. at 2; 19-49.
[114] *Id*. at 4; 19-49.
[115] **Ex. 17**, EPA PCB Info; **Ex. 18**, Keenan Dep.  at 80:10-81.
[116] **Ex. 17**, EPA PCB Info; **Ex. 18**, Keenan Dep.  at 81-15-20.
[117] **Ex. 19**, Olson Rep. at 2; 19-49.
[118] *Id*.
[119] *See, e.g.* **Ex. 11**, CAO No. R9-2015-0018 at 3; **Ex. 9**, CAO No. R9-2017-0021 at 5.
[120] **Ex. 20**, Sunding Rep. at 20-23; **Ex. 13**, Jones Rebuttal at 13-14.
[121] **Ex. 13**, Jones Rebuttal at 13-14.

hundreds of children consume "Do Not Eat" fish from the Bay at levels deemed to pose an unacceptable health risk by OEHHA.[122] A full 7.5% of consumers reported consuming "Do Not Eat" fish.[123] The evidence further suggests that, despite multi-language signage reflecting consumption limits in numerous locations around the Bay,[124] approximately half of the anglers surveyed were unaware of the FCA and may not be limiting their consumption of PCB-contaminated fish at all.[125] The Port's expert appropriately opines that *any* number of people, especially children, consuming PCB-laden fish in excess of OEHHA warnings, is contrary to the risk-based limits established by OEHHA.[126]

The *ConAgra* court similarly understood that, though "Defendants rely on statistics and percentages[,] [w]hen translated into the lives of children that is not a persuasive position." *People v Atlantic Richfield Co.*, No. 100-CV-788657, 2014 WL 1385823, at *54 (Cal.Super. Mar. 26, 2014). The court held that through an abatement plan, "there are thousands of California children … whose lives can be improved" by mitigating exposure to a hazardous substance. *Id*. at *54. While Monsanto paid experts to disagree with the import of OEHHA's human-health advisory, those opinions are irrelevant— OEHHA (not Monsanto) has the authority to make such determinations for the people of California.

It is also undisputed that there are San Diego-area families that were not subject to the survey, for whom the full extent and nature of consumption of PCB-contaminated fish is not fully understood. However, site-specific information suggests that certain ethnic minority groups engage in subsistence fishing at a much higher rate than the general population.[127] Among subsistence anglers, over 60% eat what they catch, and 41% share their catch with their children.[128] Unlike Monsanto, SDRWQCB thinks this is

---

[122] *Id*.
[123] *Id*.
[124] The Port displays multi-language FCA warnings at public fishing piers and on its website. **Ex. 7**, Port Corp. Rep. at 1478:19-1479:24.
[125] **Ex. 13**, Jones Rebuttal at 13-14; **Ex. 15**, Desvousges Dep. at 95:11-16.
[126] *Id. See also* **Ex. 12**, Jones Rep. at 5 (PCBs negatively impacting Bay angler health).
[127] **Ex. 13**, Jones Rebuttal at 17; **Ex. 21**, Environmental Health Coalition Survey.
[128] *Id*.

a problem: "These advisories and fish consumption limits make the fish and shellfish consumption key beneficial use a very high priority for us in the bay because there are disadvantaged and environmental justice communities located very close to the bay that are likely consuming fish and shellfish on a regular basis which may disproportionately affect the health of these communities."[129]

In the face of this situation, Monsanto audaciously argues that there is no harm because there is no evidence that people are presently sick or dying from exposure to PCBs. Contrary to Monsanto's suggestions, the law does not require sickness and death before PCB contamination can be considered a public nuisance and abated. "[S]omething may be a nuisance without being 'injurious to public health' under the Civil Code so long as it falls within one of the other categories listed [in Cal. Civ. Code. § 3479]." *Clary*, 11 Cal. App. 5th at 292. Moreover, there is no need to wait for an injury to occur before a nuisance can be abated. *Beck Development Co. v. Southern Pacific Transp. Co.*, 44 Cal. App. 4th 1160, 1213 (1996). Similarly, the Court in *ConAgra* explained that the purpose of creating an abatement fund is "**prospective removal of the hazards defendants had created**," not compensation of past injury that has already occurred. 17 Cal. App. 5th at 133 (emphasis added). The Port seeks a similar abatement fund in this case—not to compensate for past injuries—but to mitigate the risk of harms associated with the nuisance Monsanto created.

This goal is consistent, not in conflict, with stated objectives of relevant agencies, such as SDRWQCB. At its August 2019 board meeting, SDRWQCB explained that "we expect to see reduction in these pollutants [PCBs and Mercury] in fish and shellfish which, in turn, *helps protect the anglers, restore the beneficial uses, and provide the ultimate goal of taking down the fish advisory signs*."[130] Agencies need not and do not wait for death and destruction before ordering remedial action to abate nuisances.

---

[129] **Ex. 23,** Declaration of David Gibson, Executive Officer, SDRWQCB. August 2019 Board Meeting: Chiu at 45:19-46:2.

[130] **Ex. 23,** Declaration of David Gibson, Executive Officer, SDRWQCB. August 2019 Board Meeting: Anderson at 59:23-60:9 (emphasis added).

Monsanto's expert confirmed that, in evaluating conditions of PCB pollution in numerous areas of the Bay, SDRWQCB routinely considered *potential risk of harm to human health or the environment*, not whether actual harm has already occurred.[131]

### C. Monsanto's PCBs pose ecological risks to Bay fish and birds.

Contrary to Monsanto's suggestion that PCBs are harmless in the Bay, there is evidence of adverse ecological impacts in the Bay. Though this harm is not readily measurable, PCBs exist in certain Bay organisms, such as invertebrates, fish and birds, at levels above risk thresholds.[132] For example, survey results revealed PCB levels in spotted sand bass ranging from 89 ppb to 1,075 ppb—but toxic effects on fish are reported in scientific literature at concentrations as low as 30 ppb.[133] A 2016 bioaccumulation study performed in San Diego Bay determined that accumulation and biomagnification of PCBs by marine organisms posed potential harm to all trophic levels.[134] Furthermore, piscivore bird species, including sensitive species nesting in the San Diego Bay National Wildlife Refuge, may be at reproductive risk due to PCB concentrations in eggs above screening levels.[135] Additionally, at past PCB remediation sites in the Bay, SDRWQCB has recognized PCB levels in sediment that exceed Effects Range Low ("ERL"), (the concentration below which environmental toxic effects are scarcely observed or predicted), and/or Effects Range Median ("ERM"), (the concentration above which environmental toxic effects are generally or always observed).[136] SDRWQCB has repeatedly identified PCB sediment contamination as a potential threat to aquatic life.[137]

### D. The remedial caps at Campbell Shipyard and Convair Lagoon are evidence of the nuisance created by Monsanto's PCBs in the Bay.

Monsanto suggests that because the Port consented to the remedial caps, there

---

[131] **Ex. 8**, Woodyard Dep. at 130:2-133:8; **Ex. 70**, Tentative IO No. R9-2018-0035.
[132] **Ex. 12**, Jones Rep. at 3; **Ex. 86**, Declaration of Jones at ¶8-9.
[133] *Id.*
[134] **Ex. 85**, Trapp Rep. at 14.
[135] **Ex. 12**, Jones Rep. at 3.
[136] **Ex. 85**, Trapp Rep. at 14; **Ex. 8**, Woodyard Dep. at 130:2-133:8; **Ex. 70**, Tentative IO No. R9-2018-0035 at 4.
[137] *See, e.g.*, **Ex. 11**, CAO No. R9-2015-0018 at 3; **Ex. 9**, CAO No. R9-2017-0021.

cannot possibly be a nuisance associated with their existence. But Monsanto fails to distinguish between the condition constituting a nuisance and the consequences of it. The case law Monsanto cites, however, clearly distinguishes "the act or condition constituting the nuisance from the consequences of the act or condition." *Williams v. Moulton Niguel Water Dist.*, 22 Cal. App. 5th 1198, 1205 (2019). In *Williams*, the court explained that it is the condition of nuisance that must be expressly authorized by law, not the consequences of the nuisance. *Id.* Here, Monsanto claims that the Port consented to the remedial caps. But the caps are not the condition of nuisance, they are the consequence: artificial barriers designed to limit further exposure to Monsanto's PCBs. None of the cases cited by Monsanto hold that, where a party consents to measures intended to mitigate a nuisance, it somehow consents to the nuisance that required the mitigation.

Though Monsanto does not directly challenge whether the remedial caps obstruct the free use of the Bay (which is, by Code definition, a public nuisance), there is certainly evidence of such obstruction. For instance, where the Campbell Cap covers PCB-laden sediment, conspicuous buoys are marked "KEEP OUT" and "DO NOT DISTURB" … "SUBMERGED OBSTRUCTIONS ARE PRESENT."[138] At the Convair Cap, signage dictates "DANGER" and "DO NOT ANCHOR" to boaters and further states: "NO FISHING ALLOWED."[139] Clearly, there is evidence that PCB contamination has led to an *obstruction* of the free use of the Bay, which is, by definition, a nuisance. Cal. Civ. Code § 3479. As further discussed in the Port's opposition to Monsanto's motion for summary judgment (purpresture), the required caps impede development of the Bay.[140]

### E.   Elevated PCB levels in Bay sediments require diversion of Port resources that would otherwise be used to enhance the Bay for the public.

---

[138] **Ex. 22**, Declaration of Paul Brown at Ex. 6A-6B.
[139] *Id.* at 5A-5B.
[140] Monsanto does not challenge the evidence that the Port has lost the ability to develop capped areas for the benefit of the people of California. **Ex. 71**, Cicchetti Dep. at 132:3-134:2;  162:13-165:7;  170:3-171:11;  172:2-174:4;  175:2-177:13;  184:2-16;  192:14-194:9;  197:15-202:13;  204:1-23;  212:2-213:8;  213:20-214:20;  225:16-226:25;  230:11-18;  231:1-22;  233:14-235:20;  236:16-239:2;  246:4-247:7;  283:13-284:15;  307:20-308:12; 308:18-311:2.

Contrary to Monsanto's disingenuous claims that PCBs are not an issue for the Port, the Port's environmental group program manager explained that "PCBs are a big problem in the Bay."[141] In fact, the Port has been dealing with the PCB problem for decades. As early as the mid-1980s, the Port was involved in addressing PCB contamination, including funding for the San Diego Bay Cleanup Project.[142] The Port has been involved in numerous PCB cleanups around the Bay,[143] including operating as the lead in the Campbell Shipyard remediation. For decades, the Port has facilitated various iterations of a legacy pollutant reduction program.[144] More recently, the Port partnered with SDRWCQB in a project to assess contaminants in fish and shellfish in the Bay[145] and funded the San Diego Fish Consumption Study.[146] Currently, the Port and SDRWCQB, are actively engaged in prioritizing PCB contamination related issues to restore the beneficial use of fish impaired by PCBs and the resulting FCA.[147]

The Port routinely incurs PCB-related costs at sites throughout the Bay, and those costs require the Port to divert funding from projects that would enhance the Bay for the benefit the public.[148] Dr. Johns testified that the Port uses both internal staff resources and outside consultants to participate in and/or oversee PCB-impacted cleanup sites.[149] The Port's former general counsel estimated that the Port incurred at least $80-100 million in costs to participate in various remediation around the Bay.[150] Port revenues, by law, must be reinvested in the Port's plan for the Bay. Consequently, if costs are diverted to deal with the PCB problem, rather than enhancing the Bay, the public loses the benefit. Monsanto does nothing to challenge this evidence, which in and of itself demonstrates a

---

[141] **Ex. 72**, Brown Dep. at 61:1.
[142] **Ex. 73**, 1987 Port Ltr.; **Ex. 74**, 1987 Health Risk Study Correspondence.
[143] **Ex. 72**, Brown Dep. at 98:17-19; 231:1-19.
[144] *Id.* at 96:15-18.
[145] **Ex. 75**, State Agency Document re Assessing Contaminants in Fish and Shellfish.
[146] **Ex. 76**, 2017 SCCWRP Fish Consumption Study.
[147] **Ex. 23,** Declaration of David Gibson, Executive Officer, SDRWQCB.
[148] **Ex. 7**, Port Corp. Rep. at 1991:4-24; 1268:9-14.
[149] *Id.* at 190:4-191:5.
[150] *Id.* at 1214:18-1217:1; *see also* 1263:9-1264:6 (noting that these costs are not an exhaustive total of costs incurred by the Port due to the presence of PCBs in the Bay).

public nuisance requiring denial of Monsanto's motion.

### F.   As this Court has already determined, the Port has standing to abate a public nuisance to protect, preserve and enhance the Bay.

Monsanto argues that the Port "does not own or manage the fish," so it lacks standing to pursue a public nuisance claim. Whether the Port somehow "owns" title to the fish is immaterial. As this Court already recognized (Order, ECF No. 81), the Port is expressly authorized by the Legislature to bring a public nuisance action to "protect, preserve, and enhance" the Bay by seeking an abatement of a public nuisance. HARB. & NAV. CODE App. 1 § 70. Through the Port Act, the Port was given the power to "protect, preserve, and enhance" (1) the physical access to the Bay; (2) the natural resources of the Bay, including plant and animal life; and (3) the quality of water in the Bay. *Id*; *See also* Order, ECF No. 81 at p. 8-12 (finding Port standing to assert public nuisance claim for harm to Bay). As this Court explained, in connection with the Port Act, the State of California and the cities of San Diego, Chula Vista, Coronado, National City and Imperial Beach specifically conveyed authority to bring a public nuisance claim regarding the Bay to the Port. For these reasons, Monsanto's reliance on Code § 731 to suggest that the Port somehow lacks standing to assert a public nuisance claim misunderstands the effect of the Port Act and the Public Resources Code.[151] Monsanto's motion fails to establish, as a matter of law, that the Port does not have standing.

## VI.   CONCLUSION

There is ample evidence of a public nuisance in the Bay as a result of Monsanto's PCBs—more than sufficient to raise genuine issues of material fact. The Court should deny Monsanto's Motion for Summary Judgment (Public Nuisance) in all respects.[152]

---

[151] The Port, as a trustee of the Bay as a public resource, may bring an action for public nuisance. CAL. PUB. RES. CODE § 6009.1(e). Furthermore, California law does not require a public nuisance plaintiff to own the property interest with respect to which a nuisance exists. A public nuisance claim is designed to protect "the interests of the community or the comfort and convenience of the general public," *Venuto*, 22 Cal. App. 3d at 123.

[152] To the extent the Court is inclined to entertain a cross-motion for summary judgment on the issues raised herein, the Port would submit such motion expeditiously.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Respectfully submitted,

Dated:  October 1, 2019

By: */s/ Kenneth O. Corley*

**KELLEY DRYE & WARREN LLP**
William J. Jackson (admitted *Pro Hac Vice*)
Texas Bar No. 00784325
Micheal W. Dobbs (admitted *Pro Hac Vice*)
Texas Bar No. 24012533
Kenneth O. Corley (admitted *Pro Hac Vice*)
Texas Bar No. 24048405
Nancy K. Yanochik *(*admitted *Pro Hac Vice*)
Texas Bar No. 01293000
515 Post Oak Blvd., Suite 900
Houston, TX 77027
Telephone: 713-355-5000

**KELLEY DRYE & WARREN LLP**
Andrew W. Homer (SBN 259852)
7825 Fay Ave., Suite 200
La Jolla, CA 92037
Telephone: (858) 795-0426

**SAN DIEGO UNIFIED PORT DISTRICT**
**OFFICE OF THE GENERAL COUNSEL**
Thomas A. Russell, SBN 108607, Gen. Counsel
Ellen F. Gross, SBN 149127, Asst. Gen. Counsel
John N. Carter, SBN 246886, Dep. Gen. Counsel
3165 Pacific Highway
P.O. Box 120488
San Diego, CA 92112-0488

**ATTORNEYS FOR THE SAN DIEGO**
**UNIFIED PORT DISTRICT**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 1, 2019, I electronically filed the foregoing PLAINTIFF SAN DIEGO UNIFIED PORT DISTRICT'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT (PUBLIC NUISANCE) through this Court's electronic filing system (ECF) and served through the Notice of Electronic Filing (NEF) hyperlink, to the parties and/or counsel who are registered CM/ECF Users set forth in the service list obtained from this Court on the Electronic Mail Notice List.

Dated: October 1, 2019                          By:  */s/ Kenneth O. Corley*