**KELLEY DRYE & WARREN LLP**
William J. Jackson (admitted *Pro Hac Vice*)
Texas Bar No. 00784325
Micheal W. Dobbs (admitted *Pro Hac Vice*)
Texas Bar No. 24012533
Kenneth O. Corley (admitted *Pro Hac Vice*)
Texas Bar No. 24048405
Nancy K. Yanochik (admitted *Pro Hac Vice*)
Texas Bar No. 01293000
515 Post Oak Blvd., Suite 900
Houston, Texas 77027
Telephone: (713) 355-5000

**KELLEY DRYE & WARREN**
Andrew W. Homer (SBN 259852)
7825 Fay Ave., Suite 200
La Jolla, CA 92037
Telephone: (858) 795-0426

**SAN DIEGO UNIFIED PORT DISTRICT
OFFICE OF THE GENERAL COUNSEL**
Thomas A. Russell, SBN 108607, Gen. Counsel
Ellen F. Gross, SBN 149127, Asst. Gen. Counsel
John N. Carter, SBN 246886, Dep. Gen. Counsel
3165 Pacific Highway
P.O. Box 120488
San Diego, CA 92112-0488
Telephone: (619) 686-6219

*Attorneys for Plaintiff San Diego Unified Port District*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA, SAN DIEGO

SAN DIEGO UNIFIED PORT
DISTRICT, a public corporation; and
CITY OF SAN DIEGO, a municipal
corporation,

            Plaintiffs,

    v.

MONSANTO COMPANY, SOLUTIA
INC., and PHARMACIA
CORPORATION,

            Defendants.

Case No. 3:15-CV-0578-WQH-AGS

**PLAINTIFF SAN DIEGO UNIFIED PORT DISTRICT'S SEPARATE STATEMENT OF MATERIAL UNDISPUTED FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT (PUBLIC NUISANCE)**

*[FILED CONCURRENTLY WITH RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT (NUISANCE), DECLARATION OF KENNETH O. CORLEY]*

Judge: Hon. William Q. Hayes
Filed Date: March 13, 2015
Trial Date: February 18, 2020

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Local Rule 7.1 and the Court's Civil Pretrial & Trial Procedures, Plaintiff the San Diego Unified Port District ("Port") submits the following Separate Statement of Undisputed Material Facts ("Port's Separate Statement") in Opposition to Defendants Monsanto Company, Solutia Inc., and Pharmacia LLC ("Monsanto's") *Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (Public Nuisance)* (ECF No. 424).

The Port's Separate Statement includes 146 undisputed material facts, listed in table form, each with reference to supporting evidence in the record. <u>Attachment A</u> to the Port's Separate Statement includes a table that responds to Monsanto's *Separate Statement in Support of Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment Against the San Diego Unified Port District (Public Nuisance)* (ECF No. 424-2). <u>**As shown in Attachment A, most of the facts Monsanto positions as undisputed are plainly in dispute.**</u>

All references to "Corley Decl. Ex. [#]" in this Separate Statement and <u>Attachment A</u> refer to the exhibits to the *Declaration of Kenneth O. Corley in Support of Plaintiff San Diego Unified Port District's Response in Opposition to Defendants' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (Public Nuisance)*, filed concurrently herewith. All references to "Dobbs Decl. Ex. [#]" in this Separate Statement and <u>Attachment A</u> refer to the *Declaration of Michael W. Dobbs in Support of Plaintiff San Diego Unified Port District's Response in Opposition to Defendants' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (Purpresture)*. As <u>Attachment A</u> responds to Monsanto's purported undisputed material facts, and in large part discusses the evidence Monsanto submitted in support thereof, for ease of reference and to avoid duplication in materials the Court must consider, the Port has referred to evidence submitted by Monsanto where possible. As such, references in this Separate Statement and <u>Attachment A</u> to "Howard Decl. Ex. [#]" refer to the exhibits to the *Omnibus Declaration of Robert M. Howard in Support of Motions for Summary*

*Judgment or, in the Alternative, Partial Summary Judgment against Plaintiffs City of San Diego and San Diego Unified Port District* (ECF No. 425).

## SAN DIEGO UNIFIED PORT DISTRICT'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| **A. Monsanto's PCBs adversely impact the Bay in numerous ways.** | |
| 1. The Port's witness *did not confirm* that the three nuisance conditions Monsanto chose to focus on were the only conditions of nuisance that the Port alleges. | Corley Decl. Ex. 7, Port Corp. Rep. at 283:4-13. |
| 2. "Polychlorinated biphenyls (PCBs) are synthetic chemical compounds that were widely produced and used during much of the twentieth century for various industrial and commercial applications before they were mostly banned by 1979. The production, use, and disposal of PCBs has resulted in widespread environmental contamination" | *City of Spokane v. Monsanto Company,* 2016 WL 6275164, at *1 (E.D. Wash., Oct. 26, 2016). |
| 3. PCBs are classified as a "persistent bioaccumulative and toxic" pollutant "that adversely affect human health and the environment around the world." | Corley Decl. Ex. 2, Matson Rep. at 2-3; Corley Decl. Ex. 85, Trapp Rep. at 5, 14. |
| 4. The uses for which Monsanto promoted PCBs left a legacy of PCB contamination throughout the sediment, water and fish of the Bay. | Corley Decl. Ex. 3, Douglas Rep. at 7; 8-14; Corley Decl. Ex. 4, Golightly Rep. at 4-5; Corley Decl. Ex. 86, Ann S. Jones Declaration. |
| 5. Dispersed PCBs are biomagnified within the marine food chain, including humans. | Corley Decl. Ex. 3, Douglas Rep. at 7. |
| 6. Fish tissue samples taken by state agencies show that the Bay suffers from some of *the highest PCB concentrations in the region*. | Corley Decl. Ex. 5, SWAMP Report at 47. |
| 7. The Bay is among the most PCB-contaminated water bodies in the country. | Corley Decl. Ex. 85, Trapp Rep. at 14. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 8. The California Regional Water Quality Control Board ("SDRWQCB") and State Water Resources Control Board ("SWRCB") have designated the Bay, in its entirety, as an "impaired" water body, due to the presence of elevated levels of PCBs in fish tissue, pursuant to § 303(d) of the Clean Water Act. | Corley Decl. Ex. 6, CWA §305(b); 303(d) Integrated Report; Corley Decl. Ex. 7, Port Corp. Rep. at 77:4-6; 1035:7-24; 1725:14-19; Corley Decl. Ex. 8, Woodyard Dep. at 127:16-18; Corley Decl. Ex. 9, CAO No. R9-2017-0021. Corley Decl. Ex. 82, Boehm Dep. at 329:20-332:18; Corley Decl. Ex. 85, Trapp Rep. at 14-15. |
| 9. The SDRWQCB has repeatedly recognized that various areas of the Bay have contamination levels that "may adversely affect San Diego Bay beneficial uses" and pose a risk to human health and the environment. | Corley Decl. Ex. 10, CAO No. R9-2004-0295 at 24; Corley Decl. Ex. 8, Woodyard Dep. at 129:3-8; Corley Decl. Ex. 11, CAO No. R9-2015-0018 at 3; Corley Decl. Ex. 9, CAO No. R9-2017-0021 at 5. |
| 10. Because of the well-established human health risks associated with exposure to PCBs, in 2013, California's Office of Environmental Health Hazard Assessment ("OEHHA") determined that PCB contamination levels were so high that people should limit, or avoid altogether, the consumption of certain fish from the Bay. OEHHA amended the FCA in 2018 to implement even more stringent restrictions for children and women of childbearing age. | Corley Decl. Ex. 1a-e, Fish Consumption Advisory; Corley Decl. Ex. 13, Jones Rebuttal at 13-14; Corley Decl. Ex. 85, Trapp Rep. at 14; Corley Decl. Ex. 86, Ann S. Jones Declaration. |
| 11. Consumption advisories are de facto harms under federal regulations because they interfere with the public's free and comfortable use of a resource. | Corley Decl. Ex. 13, Jones Rebuttal at 7; 43 C.F.R. § 11.62(f)(1)(iii). |
| 12. Data suggests that anglers in the Bay who are aware of the FCA consume less fish. | Corley Decl. Ex. 13, Jones Rebuttal at 17. |
| 13. Statewide consumption rates were higher before the FCA was issued in 2013. | Corley Decl. Ex. 14, Toll Rebuttal at 8, Fg. 2-1; Corley Decl. Ex 86, Ann S. Jones Declaration at ¶11. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 14. According to Monsanto's expert, somewhere between 65-81% of fish caught from the Bay are precluded from consumption by children or women under age 45. | Corley Decl. Ex. 15, Desvouges Dep. at 91:19-92:5. |
| 15. Monsanto's expert admits that the most often caught and consumed fish, the Pacific chub mackerel, is subject to a "Do Not Eat" advisory for children and women under 45, which affects a population demographic that represents the majority of the population in and around San Diego. | Corley Decl. Ex. 15, Desvouges Dep. at 101:20-24; 102:4-10; Corley Decl. Ex. 16, San Diego Census Data. |
| 16. Monsanto's expert also admits that his opinion that "97.7% of the fish … can be eaten," is only true for men and women over 45. | Corley Decl. Ex. 15, Desvouges Dep. at 109:7-13. |
| 17. EPA, as well as Monsanto's risk assessment expert, agree that "the types of PCBs likely to be bioaccumulated in fish and bound to sediments are the most carcinogenic PCB mixtures," and an increase in human exposure to PCBs results in an increased risk of developing cancer and other adverse health effects. | Corley Decl. Ex. 17, EPA PCB Info; Corley Decl. Ex. 18, Keenan Dep. at 80:10-81:9; Corley Decl. Ex. 19, Olson Rep. at 2; 19-49. |
| 18. PCB exposure to sensitive populations, including children, women of childbearing age, and pregnant women, is especially dangerous. | Corley Decl. Ex. 19, Olson Rep. at 2; 19-49. |
| 19. Monsanto's consumption expert concedes that *children are in fact consuming "more than one child-sized portion … every week"* of "Do Not Eat" fish from San Diego Bay. | Corley Decl. Ex. 20, Sunding Rep., at 20-23; Corley Decl. Ex. 13, Jones Rebuttal at 13-14. |
| 20. Monsanto's expert testified that on visit to local fishing pier, majority of fishermen were children. | Corley Decl. Ex. 15, Desvouges Dep. at 17:25-18:8; 23:24-24:8. |
| 21. In fact, a full 7.5% of consumers who voluntarily responded to the San Diego Fish Consumption Study reported consuming "Do Not Eat" fish. | Corley Decl. Ex. 13, Jones Rebuttal at 13-14. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 22. Site-specific data for the Bay suggests that certain ethnic minority groups engage in subsistence fishing at a much higher rate than the general population, meaning the risk to those communities is dramatically higher. | Corley Decl. Ex. 13, Jones Rebuttal at 17;<br><br>Corley Decl. Ex. 21, Environmental Health Coalition Survey of Fishers;<br><br>Corley Decl. Ex. 86, Ann S. Jones Declaration at ¶20. |
| 23. There is evidence that Monsanto's PCBs pose risks to marine life in the Bay. While PCB impacts to marine life have not been fully quantified, PCBs exist in Bay organisms, such as invertebrates, fish and birds, at levels above risk thresholds. | Corley Decl. Ex. 12, Jones Rep. at 3;<br><br>Corley Decl. Ex. 13, Jones Rebuttal at 3;<br><br>Corley Decl. Ex. 85, Trapp Rep. at 14;<br><br>Corley Decl. Ex. 86, Ann S. Jones Declaration at ¶¶8-9. |
| 24. PCB contamination has required substantial expenditure of funds—estimated to be at least $80-100 million—from the Port that otherwise would have been invested in enhancing the Bay for the benefit of the people of California. | Corley Decl. Ex. 7, Port Corp. Rep. at 1783:6-1784:6; 1963:3-11 and 1214:18-1216:25. |
| 25. PCB contamination has also necessitated the placement of remedial caps over PCB-laden sediments to prevent further exposure to the Bay, resulting in areas of the Bay that are now restricted from use and development. | Corley Decl. Ex. 22, Declaration of Paul Brown;<br><br>Dobbs Decl. Ex. 8, Cicchetti Report at 20, 22-23, 25-30.<br><br>Dobbs Decl. Ex. 9, Cicchetti Rebuttal Report at 4 n.17, 4 n.19, 5-6.<br><br>Dobbs Decl. Ex. 50, Memo on potential development of Convair Lagoon, SDUPD-0000154822-835; DEFEXP-GL-00000348-361.<br><br>Dobbs Decl. Ex. 51, Memo of Board of Port Commissioners on Development of portion of Campbell, SDUPD-0001144472-75. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 26. PCBs are a significant problem in the Bay, and mitigating the risk associated with human exposure is a priority for the SDRWQCB. In fact, the Executive Officer of the SDRWQCB stated in a declaration submitted in support of the Port, that the agency is focused on restoring the fish and shellfish consumption beneficial use, which is directly impaired by PCBs. In August 2019 the full SDRWQCB expressed its priority of mitigating the contamination underlying the FCA. | Corley Decl. Ex. 13, Jones Rebuttal at 6-7; Corley Decl. Ex. 4, Golightly Rep. at 2, 34. Corley Decl. Ex. 23, Declaration of David W. Gibson, SDRWQCB. |
| **B. Monsanto manufactured. marketed and sold over 99% of the 1.4 billion pounds of PCBs sold in the United States.** | |
| 27. For nearly 50 years, Monsanto produced 99% of the PCBs used in the United States. | Corley Decl. Ex. 3, Douglas Rep. at 6; Corley Decl. Ex. 2, Matson Rep. at 3 n.3; |
| 28. Monsanto manufactured and sold more than 1.4 billion pounds of PCBs inside the United States. | Corley Decl. Ex. 2, Matson Rep. at 3; 9; Corley Decl. Ex. 25, PCB Disposal Procedures. |
| 29. Monsanto's sales of PCBs in the United States dramatically increased in the mid-1960s, and continued to increase to a sales apex in 1971. | Corley Decl. Ex. 2, Matson Rep. at 10-11. |
| 30. Monsanto promoted numerous and diverse uses of PCBs. PCBs were promoted for "closed" and "semi-open" uses, such as capacitors and transformers, but such systems routinely and consistently leaked and failed as part of normal use, releasing PCBs into the environment. | Corley Decl. Ex. 85, Trapp Rep. at 5; Corley Decl. Ex. 3, Douglas Rep. at 3-4; Corley Decl. Ex. 2, Matson Rep. at 3-4. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 31. Monsanto promoted PCBs for "open" uses, such as paints, caulks, adhesives, surface coatings, plasticizers, and pesticide extenders, which by the nature of their intended use, were exposed or applied directly to the environment. | Corley Decl. Ex. 3, Douglas Rep. at 3-4; <br><br> Corley Decl. Ex. 2, Matson Rep. at 3-4; <br><br> Corley Decl. Ex. 26, Monsanto Corp. Rep. at 340:15-25; 339:14-356:25; <br><br> Corley Decl. Ex. 27, Oct. 2, 1969 Report Aroclor "Ad Hoc" Comm.; <br><br> Corley Decl. Ex. 28, 1935 Aroclor Uses; <br><br> Corley Decl. Ex. 29, 1937 Aroclor Uses; <br><br> Corley Decl. Ex. 30, Monsanto Bulletin P-124. "[A]ll open uses involve some release of PCBs into the environment." <br><br> Corley Decl. Ex. 26, Monsanto Corp. Rep. at 355:16-356:25. |
| 32. By 1961, there were approximately 40 categories of "open" uses, sales for which increased from 1958 to 1971. | Corley Decl. Ex. 2, Matson Rep. at 13, 15-16. |
| 33. Monsanto promoted PCBs specifically for open use in marine environments, with specially-formulated surface coatings and paints used on vessels, marine structures, as well as buildings near marine environments such as the Bay. | Corley Decl. Ex. 3, Douglas Rep. at 3-4; <br><br> Corley Decl. Ex. 2, Matson Rep. at 3-4. |
| **C.  Monsanto knew that PCB exposure posed risks to human health since the 1930s and 1940s.** | |
| 34. During the 1930s, several documented reports associated PCB exposure with chloracne, liver damage, and multiple deaths. | Corley Decl. Ex. 2, Matson Rep. at 17; <br><br> Corley Decl. Ex. 19, Olson Rep. at 4-6; <br><br> Corley Decl. Ex. 31, Markowitz/Rosner Rep. at 1-2; 466-470. |
| 35. Monsanto's own workers suffered from exposure to PCBs. | Corley Decl. Ex. 2, Matson Rep. at 17; Corley Decl. Ex. 31, Markowitz/Rosner Rep. at 1-2; 466-470. |

7

CASE NO. 3:15-CV-00578-WQH-AGS
SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 36. By the mid-1930s, the public health problem was significant enough to attract the attention of academic researchers. | Corley Decl. Ex. 19, Olson Rep. at 5; Corley Decl. Ex. 31, Markowitz/Rosner Rep. at 466-470. |
| 37. Multiple studies published and provided to Monsanto during the 1930s consistently reported systemic toxicity. | Corley Decl. Ex. 19, Olson Rep. at 6; Corley Decl. Ex. 31, Markowitz/Rosner Rep. at 1-2; 466-470. |
| 38. Monsanto admits awareness of all PCB toxicity studies published after 1937. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 186:18-187:8; Corley Decl. Ex. 32, 1971 Kelly Ltr. |
| 39. In 1937, Monsanto internally recognized that "repeated oral ingestion will lead to systemic toxic effects." | Corley Decl. Ex. 33, 1937 Note; Corley Decl. Ex. 26, Monsanto Corp. Rep. at 178:3-15. |
| 40. Monsanto knew in the 1930s that exposure to PCBs posed risks to human health. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 178:3-182:25; Corley Decl. Ex. 33 1937 Note; Corley Decl. Ex. 34, 1938 Report to Monsanto; Corley Decl. Ex. 35, Monsanto Report No. 2215. |
| 41. In 1944, the danger associated with PCB exposure was confirmed and publicly stated by the United States Public Health Service, when Dr. Miller confirmed systemic toxicity in a multi-species, multi-exposure pathway study. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 194:10-196:14; Corley Decl. Ex. 19, Olson Rep. at 7; Corley Decl. Ex. 36, 1944 Miller USPHS Study. |
| 42. Across all series of tests performed by Dr. Miller, Monsanto's product caused "conspicuous liver damage." | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 195:14-16; Corley Decl. Ex. 36, 1944 Miller USPHS Study. |
| 43. By 1954, it was generally known that even mild, continued exposure to PCBs posed a risk to human health. | Corley Decl. Ex. 19, Olson Rep. at 8. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 44. By 1955, Monsanto would not even allow its own workers to eat lunch in the PCB department for fear they would be exposed through consumption of contaminated food—"and it would be extremely difficult on the basis of past literature to counter such claims." | Corley Decl. Ex. 31, Markowitz/Rosner Rep. at 476; Corley Decl. Ex. 37, 1955 Monsanto Memo. |
| 45. Monsanto's Dr. Kelly also recognized the dilemma posed by uncontrolled PCB exposure to customers—and the legal liability that could flow from public use. | Corley Decl. Ex. 31, Markowitz/Rosner Rep. at 476; Corley Decl. Ex. 37, 1955 Monsanto Memo. |
| 46. During the 1960s, Monsanto was informed on more than one occasion that its customers were experiencing adverse human health effects associated with PCB exposure. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 224:2-235:9; Corley Decl. Ex. 38, 1960 Monsanto Memo; Corley Decl. Ex. 39, 1961 Allen Ltr,; Corley Decl. Ex. 40, 1965 Monsanto Memo. |
| 47. And by 1960, Monsanto's Dr. Kelly reiterated what the scientific community had being saying for decades: exposure to PCBs could lead to death. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 225:12-21; Corley Decl. Ex. 38, 1960 Monsanto Memo. |
| **D.   Monsanto knew PCBs would persist, bioaccumulate and biomagnify.** | |
| 48. At all relevant times Monsanto understood PCBs were "virtually indestructible." | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 20:3-6. |
| 49. The persistence of PCBs made them advantageous in industry and the marketplace, a quality which Monsanto affirmatively promoted as early as the 1930s. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 21:13-24; 34:16-38:5; 51:8-11; 52:17-20; Corley Decl. Ex. 41, Monsanto Bulletin P-134; Corley Decl. Ex. 42, 1948 Benignus Ltr.; Corley Decl. Ex. 43, 1961 Aroclor Genie. |
| 50. Monsanto was aware of the "inherent stability" of PCBs in 1930s and 1940s. | Corley Decl. Ex. 44, Miller Dep. (2001) at 22-23. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 51.   PCBs were produced with the purpose of being stable under all conditions. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 58:18-59:3;<br><br>Corley Decl. Ex. 45, Monsanto Pollution Control. |
| 52.   Monsanto advertised their PCBs as resistant to biological degradation, "utterly inert" and promoted that PCBs "stubbornly refuse to … disintegrate, burn, condense, or corrode." | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 50:15-52:16;<br><br>Corley Decl. Ex. 43, 1961 Aroclor Genie. |
| 53.   For the very reason that PCBs would persist in the environment, Monsanto promoted PCBs as "pesticide extenders" and "permanent soil poisons" during the 1940s and 1950s. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 37:7-38:5; 39:21-40:2, and 42:11-46:1;<br><br>Corley Decl. Ex. 42, 1948 Benignus Ltr.;<br><br>Corley Decl. Ex. 46, Monsanto Bulletin P-141. |
| 54.   Monsanto knew that "experience gained over many years indicate[d] that Aroclors are highly stable under all known conditions present in the environment." | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 55:17-58:12;<br><br>Corley Decl. Ex. 47, 1970 Papageorge Ltr. |
| 55.   When Monsanto investigated soil testing locations where PCBs were poured onto soil in 1939—it found that virtually none of the PCBs had biodegraded 30 years later. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 62:2-63:13;<br><br>Corley Decl. Ex. 48, 1969 Monsanto Memo;<br><br>Corley Decl. Ex. 49, Sept. 1970 Monsanto Memo. |
| 56.   From decades of experience, Monsanto knew that PCBs were "[s]o stable, in fact, that it takes an unbearable number of years to decompose when exposed to the elements of nature, especially water." | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 58:5-60:4;<br><br>Corley Decl. Ex. 45, Monsanto Pollution Control;<br><br>Corley Decl. Ex. 47, 1970 Papageorge Ltr. |
| 57.   Monsanto was also aware that its PCBs would bioaccumulate and biomagnify in the environment. | Corley Decl. Ex. 50, DeGrandchamp Rep. at 97-138;<br><br>Corley Decl. Ex. 31, Markowitz/Rosner Rep. at 1;<br><br>Corley Decl. Ex. 2, Matson Rep. at 5: 6; 18. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 58. Plaintiffs' experts, as well as Monsanto's corporate representative confirmed that the principal characteristics that determine whether a substance will bioaccumulate are persistence and fat solubility. | Corley Decl. Ex. 50, DeGrandchamp Rep. at 97-138; Corley Decl. Ex. 31, Markowitz/Rosner Rep. at 1; Corley Decl. Ex. 2, Matson Rep. at 5: 6; 18; Corley Decl. Ex. 26, Monsanto Corp. Rep. at 64:19-65:9. |
| 59. Persistence and fat solubility are determined by the chemical structure of PCBs, which was known since the 1800s. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 21:21-22:16; 34:8-15; 64:19-65:9. |
| 60. Monsanto admits that it knew in the 1930s that PCB chemical properties would lead to bioaccumulation in the environment. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 67:20-25. |
| 61. Monsanto was aware in the 1950s that other chemical – specifically DDT – were bioaccumulating and biomagnifying in the environment. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 76:17-77:1; 97:10-20. |
| 62. The fact that PCBs would persist, bioaccumulate and biomagnify in the environment was publicly confirmed by the scientific community in 1966, with the publication of Soren Jensen's findings that PCBs were accumulating in the tissue of birds, fish and people. | Corley Decl. Ex. 31, Markowitz/Rosner Rep. at 482-84. |
| 63. In 1970, Monsanto's medical department communicated internally that "frightening levels of PCBs were accumulating in human fat." | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 83:5-84:4; Corley Decl. Ex. 51, Oct. 1970 Monsanto Memo. |
| **E. Monsanto knew hundreds of millions of pounds of PCBs were being released into the environment.** | |
| 64. Monsanto knew from at least the 1940s that PCB spills and releases into the environment were a serious problem during manufacture, transportation, use and disposal. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 170:22-171:7; Corley Decl. Ex. 52, 1947 Monsanto Press Release. |
| 65. At its plants, it was Monsanto's practice to simply allow PCBs to discharge into streams and rivers during the 1940s. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 172:17-20. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 66. At Krummrich, at least 700-800 pounds per day were released. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 322:10-14;<br><br>Corley Decl. Ex. 53, 1967 Aroclor Progress Report. |
| 67. Hundreds of pounds per day were released at Anniston as well. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 325:9-326:2;<br><br>Corley Decl. Ex. 54, Aug. 1970 Monsanto Memo |
| 68. Through shipment, even more PCBs were released into the environment. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 326:18-333:22;<br><br>Corley Decl. Ex. 55, 1963 Monsanto Memo;<br><br>Corley Decl. Ex. 56, Dec. 1971 Monsanto Memo;<br><br>Corley Decl. Ex. 57, 1972 Monsanto Memo. |
| 69. PCBs were released into the environment in connection with Monsanto customer use as well, from the 1930s forward. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 337:8-20. |
| 70. Monsanto was aware in the 1950s that heat transfer systems leaked PCBs—often times into food products—leading to very public human poisonings in the 1960s. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 412:9-16. |
| 71. Monsanto knew transformers and capacitors leaked as a matter of course for decades, and the service of those transformers generated approximately 1 million gallons of PCB waste *per year* that was "dumped or disposed of in streams … over the course of decades." | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 423:2-424:12; 435:6-436:21;<br><br>Corley Decl. Ex. 58, 1970 Meeting Minutes. |
| 72. From capacitors, Monsanto estimated that 900,000 gallons of PCB wastes were generated per year, that much of it ended up in dumps. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 5:8-448:13;<br><br>Corley Decl. Ex. 58, 1970 Meeting Minutes. |
| 73. Monsanto knew that from hydraulic fluids uses alone, at least ten million pounds of PCBs were released into the environment annually for decades—for a total of 200 million pounds. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 396:4-398:3;<br><br>Corley Decl. Ex. 59, 1969 Metcalf Report. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 74. Monsanto knew there was only one way to properly dispose of PCBs—by high temperature incineration. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 20:22-21:7. |
| 75. Monsanto had the only incinerator capable of properly disposing of its PCBs but chose to quietly dismantle it to avoid cost and "social responsibility" of having the only incinerator. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 484:4-486:5; 486:21-25; see also, Corley Decl. Ex. 60, 1977 Monsanto Memo. |
| **F.  Monsanto was aware that the release of PCBs into the environment posed a threat to human health and the environment.** | |
| 76. In 1944, Monsanto sales manuals stated that "all chlorinated hydrocarbons have measurable degrees of toxicity to the animal organism. Aroclors [PCBs] are no exception." | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 242: 5-15; 243:13-15; Corley Decl. Ex. 61, Aroclor Sales Manual. |
| 77. During the 1950s, Monsanto was aware of the risk that PCBs released into the environment would contaminate food that would later be ingested by humans. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 369:21-370:17; Corley Decl. Ex. 54, Aug. 1970 Monsanto Memo. |
| 78. By 1957, Monsanto's stream pollution control advisor, Jack Garrett, foresaw the risk of harm that is currently manifested in the Bay. First, Mr. Garrett warned of "chronic exposure to humans of chemicals that have been released into the waterways." | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 251:21-252:7; 249:10-252:7; 254:6:17 Corley Decl. Ex. 62, Toxicity Considerations in Pollution Control. |
| 79. By 1957, Monsanto's stream pollution control advisor, Jack Garrett, warned of the deleterious effects on aquatic life resulting from releases into the environment. | Corley Decl. Ex. 62, Toxicity Considerations in Pollution Control; Corley Decl. Ex. 26, Monsanto Corp. Rep. at 251:21-252:7; 249:10-252:7. |
| 80. In 1957, Monsanto's stream pollution control advisor, Jack Garrett, stated "industry today cannot afford to be wrong" about the deleterious effects on aquatic life resulting from releases of chemicals into the environment. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 255:20-256:4; Corley Decl. Ex. 62, Toxicity Considerations in Pollution Control. |
| 81. By 1969, Monsanto knew that its conduct had been wrong all along, and that "the PCB problem"—would lead to "a number of legal implications including financial liability … ." | Corley Decl. Ex. 63, Oct. 15, 1969 Report of Aroclor "Ad Hoc" Committee. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 82. Outwardly, however, Monsanto paid Industrial Bio-Test ("IBT") to falsify and "fudge" PCB toxicological study results to misrepresent the risks associated with PCBs—conduct which led to criminal fraud convictions for IBT and Monsanto employees. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 292:5-311:14 ("ashamed" to publish false PCB conclusions); 317:13-19 (custom and practice of IBT to falsify toxicological studies). |
| **G.   Monsanto improperly instructed users regarding disposal of PCBs.** | |
| 83. As late as 1971, however, Monsanto was instructing its customers to "discard by dumping" or "burying" used PCBs. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 463:18-23; Corley Decl. Ex. 64, July 1971 Monsanto Memo. |
| 84. Monsanto informed its customers that dumping PCBs *was not* an environmental problem and that as long as PCBs were not exposed to water, there was no environmental threat. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 466:1-14; 460:8-14<br><br>Corley Decl. Ex. 65, 1970 Schalk Ltr.<br><br>Corley Decl. Ex. 66, 1973 Papageorge Ltr |
| 85. Monsanto was aware that PCBs discarded in municipal dumps could lead to releases into waterways or dispersion and aerial deposition through low temperature incineration. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 399:7-24; 459:4-7. |
| 86. Incredibly, Monsanto created instructions for consumers entitled "Keeping PCBs Out of the Environment" *for the first time* in 1972. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 469:7-11;<br><br>Corley Decl. Ex. 67, 1972 Status Report. |
| 87. In fact, the first time any label instructions directing consumers to avoid contaminating the environment with PCBs occurred in 1970, at the earliest. | Corley Decl. Ex. 26, Monsanto Corp. Rep. at 469:12-470:12;<br><br>Corley Decl. Ex. 67, 1972 Status Report. |
| **H.   The Fish Consumption Advisory evidences the interference resulting from Monsanto's PCBs in the Bay**. | |
| 88. It is well-established in scientific literature that fish consumption advisories lead to a decline in the benefits associated with recreational fishing, as anglers forgo fishing entirely, choose alternate sites, decline consumption of fish caught, and/or enjoy the fishing experience less. | Corley Decl. Ex. 13, Jones Rebuttal at 7;<br><br>Corley Decl. Ex. 86, Ann S. Jones Declaration at ¶11. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 89. Federal environmental regulations regarding damages to natural resources identify fish consumption advisories as *de facto* harm. | Corley Decl. Ex. 13, Jones Rebuttal at 7 (citing 43 C.F.R. § 11.62(f)(1)(iii)). |
| 90. HHS, USDA and OEHHA recommend weekly consumption of fish for nutritional benefits. | Corley Decl. Ex. 14, Toll Rebuttal at 2. |
| 91. Monsanto's expert admits that somewhere between *65-81% of fish caught from San Diego Bay are precluded from consumption* by children or women under age 45. | Corley Decl. Ex. 15, Desvousges Dep. at 91:19-92:5. |
| 92. Consumption of *at least 10 fish species from the Bay are restricted* due to the presence of PCBs. | Corley Decl. Ex. 1a-e, Fish Consumption Advisory Documents; Corley Decl. Ex. 14, Toll Rebuttal at 2. |
| 93. Even the most often caught and consumed fish, the Pacific chub mackerel, is subject to a "Do Not Eat" advisory for children and women under 45, a population demographic that represents, by far, the majority of the population in and around San Diego. | Corley Decl. Ex. 15, Desvousges Dep. at 101:20-102:10; 109:7-13. |
| 94. Monsanto's expert admits that the highest percentage of Bay fish kept for consumption was the Pacific chub mackerel, at 65%, which cannot be eaten by children or women under 45. | Corley Decl. Ex. 15, Desvousges Dep. at 101:20-102:3. |
| 95. Furthermore, the data suggests that anglers who are aware of the FCA consume less fish on average than do unaware anglers, and statewide consumption rates before the FCA were higher than after. | Corley Decl. Ex. 13, Jones Rebuttal at 17; <br><br> Corley Decl. Ex. 14, Toll Rebuttal at 8, Fg. 2-1; <br><br> Corley Decl. Ex 86, Ann S. Jones Declaration at ¶11. |
| 96. The Port displays prominent signage about the Fish Consumption Advisory at public fishing piers around the Bay and on its website. | Corley Decl. Ex. 7, Port Corp. Rep. at 1478:19-1479:24. |
| 97. The PTA witness was unaware of any food-grade aquaculture in the Bay. | Corley Decl. Ex. 68, Cloward Dep. at 107:8-12, 208:6-209:13. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 98. San Diego Bay Aquaculture has not grown any food whatsoever in the Bay. | Corley Decl. Ex. 69, Abell Dep. at 105:14-106:13; 110:20-112:3; 132:12-14. |
| 99. Sunken Seaweed is engaged in a pilot program to test growth methods for seaweed in the Bay, but does not intend and has never intended to grow seaweed for human consumption in the Bay. | Howard Decl. Ex. 13, T. Polizzi Dep. Tr. at 73:1-5; 82:2-81:1; 102:14-20. |
| 100. But for PCBs in fish tissue: at least one of the two demographics whose consumption is limited could consume one more serving of 9 of the 15 restricted fish species, and for the other 6 species, women and children could enjoy one serving per week, instead of none. | Corley Decl. Ex. 14, Toll Rebuttal at 6. |
| 101. If PCBs were not present in barred sand bass, spotted sand bass or Pacific chub mackerel, there would not be a 'Do Not Eat' advisory for these species for sensitive populations. | Corley Decl. Ex. 13, Jones Rebuttal. at 8. |
| 102. Similarly, arguments about the Port promoting kids fishing tournaments is misleading and irrelevant: the events involved purchased fish "brought in" …; and placed in "temporary fishing pens." | Corley Decl. Ex. 7, Port Corp. Rep. at 1476:21-1477:7; 1481:2-8. |
| I.  There is evidence of increased health risks from PCB exposure through fish consumption from the Bay. | |
| 103. According to EPA, "PCBs have been demonstrated to cause a variety of adverse health effects," "[s]tudies in humans support evidence for potential carcinogenic and non-carcinogenic effects of PCBs," and "the data strongly suggests that PCBs are probable human carcinogens." | Corley Decl. Ex. 17, EPA PCB Info; Corley Decl. Ex. 18, Keenan Dep. at 71:4-75:14; Corley Decl. Ex 86, Ann S. Jones Declaration at ¶¶5-8. |
| 104. The International Agency for Research on Cancer, as well as the National Toxicology Program, have identified PCBs as carcinogenic to humans. | Corley Decl. Ex. 17, EPA PCB Info; Corley Decl. Ex. 18, Keenan Dep. at 84:19-85:24 |
| 105. The State of California lists PCBs as a chemical "known to the state of California to cause cancer." | Corley Decl. Ex. 17, EPA PCB Info; Corley Decl. Ex. 18, Keenan Dep. at 88:10-14. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 106. PCBs also cause an increased risk of a number of adverse health effects, developmental effects, diabetes, liver injury, immune system dysfunction, neurobehavioral effects, impaired thyroid function, reproductive system impairment, cardiovascular disease, and skin irritation. | Corley Decl. Ex. 19, Olson Rep. at 2; 15-49;<br><br>Corley Decl. Ex 86, Ann S. Jones Declaration at ¶¶5-8. |
| 107. Adverse health effects associated with PCB exposure have been observed even at background environmental exposure levels. | Corley Decl. Ex. 19, Olson Rep. at 2; 19-49. |
| 108. Due to various and multiple exposure pathways that result in long-term bioaccumulation of PCBs in humans, the higher the levels of PCBs in the body, the higher the risk of adverse health effects. | Corley Decl. Ex. 19, Olson Rep. at 2; 19-49. |
| 109. The types of PCBs likely to be bioaccumulated in fish and bound to sediments are the most carcinogenic PCB mixtures. | Corley Decl. Ex. 17, EPA PCB Info;<br><br>Corley Decl. Ex. 18, Keenan Dep. at 80:10-81 |
| 110. EPA has concluded that "people who ingest PCB-contaminated fish … may be exposed to PCB mixtures that are even more toxic than the PCB mixtures contacted by workers." | Corley Decl. Ex. 17, EPA PCB Info;<br><br>Corley Decl. Ex. 18, Keenan Dep. at 81-15-20. |
| 111. An increase in human exposure to PCBs results in an increased risk of developing cancer and other adverse health effects, with sensitive populations in increased danger. | Corley Decl. Ex. 19, Olson Rep. at 2; 19-49. |
| 112. The SDRWQCB has repeatedly identified "unhealthy levels of PCBs in fish tissue" as the "Human Health Impairment," in connection with remedial action at polluted sites around the Bay. | Corley Decl. Ex. 11, CAO No. R9-2015-0018 at 3;<br><br>Corley Decl. Ex. 9, CAO No. R9-2017-0021 at 5. |
| 113. Children are in fact consuming "more than one child-sized portion … every week" of "Do Not Eat" fish from San Diego Bay. | Corley Decl. Ex. 20, Sunding Rep. at 20-23; Corley Decl. Ex. 13, Jones Rebuttal at 13-14. |
| 114. The Port's expert concluded that Monsanto's estimate of Bay fish consumption grossly misrepresents the potential health risk posed to children from consuming PCB-contaminated fish." | |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 115. Without reasonably extrapolating to the greater population, data from those anglers who responded to the San Diego Fish Consumption Study indicates that hundreds of children consume "Do Not Eat" fish from San Diego Bay at levels deemed to pose an unacceptable health risk by OEHHA. | Corley Decl. Ex. 13, Jones Rebuttal at 13-14. |
| 116. 7.5% of consumers who voluntarily responded to the San Diego Fish Consumption Study reported consuming "Do Not Eat" fish. | Corley Decl. Ex. 13, Jones Rebuttal at 13-14. |
| 117. Despite the Port's maintenance of multi-language signage reflecting consumption limits in numerous locations around the Bay (including on public fishing piers), approximately half of the anglers surveyed were unaware of the FCA, and may not be limiting their consumption of PCB-contaminated fish meat at all. | Corley Decl. Ex. 7, Port Corp. Rep. at 1478:19-1479:24; Corley Decl. Ex. 13, Jones Rebuttal at 13-14. |
| 118. The Port's expert concluded that that *any* number of people, especially children, consuming PCB-laden fish tissue in excess of OEHHA warnings, is contrary to the risk-based limits established by OEHHA. | Corley Decl. Ex. 13, Jones Rebuttal at 13-14. |
| 119. Site-specific data suggests that certain ethnic minority groups engage in subsistence fishing in the Bay at a much higher rate than the general population. | Corley Decl. Ex. 21, Environmental Health Coalition Survey of Fishers |
| 120. Nearly 60% of Filipino respondents to the San Diego Fish Consumption Study fish daily or almost daily and 23% of Latino respondents fish every week. | Corley Decl. Ex. 21, Environmental Health Coalition Survey of Fishers |
| 121. Among Filipino and Latino respondents to the San Diego Fish Consumption Study 60% eat what they catch, and 41% share their catch with their children. | Corley Decl. Ex. 21, Environmental Health Coalition Survey of Fishers |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 122. SDRWQCB thinks this is a problem: "These advisories and fish consumption limits make the fish and shellfish consumption key beneficial use a very high priority for us in the bay because there are disadvantaged and environmental justice communities located very close to the bay that are likely consuming fish and shellfish on a regular basis which may disproportionately affect the health of these communities." | Corley Decl. Ex. 23, SDRWQCB, August 2019 Board Meeting: Chiu at 45:19-46:2. |
| 123. At its August 2019 board meeting, SDRWQCB explained that "we expect to see reduction in these pollutants in fish and shellfish which, in turn, *helps protect the anglers, restore the beneficial uses, and provide the ultimate goal of taking down the fish advisory signs*." | Corley Decl. Ex. 23, Declaration of David W. Gibson, SDRWQCB, August 2019 Board Meeting: Anderson at 59:23-60:9 (emphasis added). |
| 124. Monsanto's expert confirmed that, in evaluating conditions of PCB pollution in numerous areas of San Diego Bay, the SDRWQCB evaluated *potential risk of harm to human health or the environment*, not whether actual harm has already occurred. | Corley Decl. Ex. 8, Woodyard Dep. at 130:2-133:8; Corley Decl. Ex. 70, Tentative IO No. R9-2018-0035. |
| **J.   Monsanto's PCBs pose ecological risks to Bay fish and birds.** | |
| 125. PCBs exist in certain Bay organisms, such as invertebrates, fish and birds, at levels above risk thresholds. | Corley Decl. Ex. 12, Jones Rep. at 3; Corley Decl. Ex. 85, Trapp Rep. at 14; Corley Decl. Ex 86, Ann S. Jones Declaration at ¶¶8-9. |
| 126. Survey results revealed PCB levels in spotted sand bass ranging from 89 ppb to 1,075 ppb—and toxic effects on fish are reported in scientific literature at concentrations as low as 30 ppb. | Corley Decl. Ex. 12, Jones Rep. at 3. |
| 127. A 2016 bioaccumulation study performed in San Diego Bay determined that accumulation and biomagnification of PCBs by marine organisms posed potential harm to all trophic levels. | Corley Decl. Ex. 85, Trapp Rep. at 14. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 128. Piscivore bird species, including sensitive species of concern nesting in the San Diego Bay National Wildlife Refuge, may be at reproductive risk due to PCB levels in bird eggs above screening levels for adverse effects. | Corley Decl. Ex. 12, Jones Rep. at 3. |
| 129. At PCB remediation sites in the Bay, the SDRWQCB has recognized PCB levels in sediment that exceed Effects Range Low ("ERL"), the concentration (below which environmental toxic effects are scarcely observed or predicted), and/or Effects Range Median ("ERM"), (the concentration above which environmental toxic effects are generally or always observed). | Corley Decl. Ex. 85, Trapp Rep. at 14; Corley Decl. Ex. 8, Woodyard Dep. at 130:2-133:8; Corley Decl. Ex. 70, Tentative IO No. R9-2018-0035 at 4. |
| 130. SDRWQCB has repeatedly identified PCB sediment contamination as a potential threat to aquatic life. | Corley Decl. Ex. 11, CAO No. R9-2015-0018 at 3; Corley Decl. Ex. 9, CAO No. R9-2017-0021. |
| **K. The remedial caps at Campbell Shipyard and Convair Lagoon are evidence of the nuisance created by Monsanto's PCBs in the Bay.** | |
| 131. Where the Campbell Cap covers PCB-laden sediment, conspicuous buoys are marked "KEEP OUT" and "DO NOT DISTURB" … "SUBMERGED OBSTRUCTIONS ARE PRESENT." | Corley Decl. Ex. 22, Declaration of Paul Brown at 6A-6B. |
| 132. At the Convair Cap, signage dictates "DANGER" and "DO NOT ANCHOR" to boaters, and further states: "NO FISHING ALLOWED." | Corley Decl. Ex. 22, Declaration of Paul Brown at 5A-5B. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 133. The need to install engineered caps at the Convair Lagoon and Campbell Shipyard sites to preclude additional PCB exposure has significantly impaired development opportunities for those sites. | Dobbs Decl. Ex. 8, Cicchetti Report at 20, 22-23, 25-30.<br><br>Dobbs Decl. Ex. 9, Cicchetti Rebuttal Report at 4 n.17, 4 n.19, 5-6.<br><br>Dobbs Decl. Ex. 50, Memo on potential development of Convair Lagoon, SDUPD-0000154822-835; DEFEXP-GL-00000348-361.<br><br>Dobbs Decl. Ex 51, Memo of Board of Port Commissioners on Development of portion of Campbell, SDUPD-0001144472-75.<br><br>Corley Decl. Ex. 71, Cicchetti Dep. at 132:3-134:2; 162:13-165:7; 170:3-171:11; 172:2-174:4; 175:2-177:13; 184:2-16; 192:14-194:9; 197:15-202:13; 204:1-23; 212:2-213:8; 213:20-214:20; 225:16-226:25; 230:11-18; 231:1-22; 233:14-235:20; 236:16-239:2; 246:4-247:7; 283:13-284:15; 307:20-308:12; 308:18-311:2. |
| **L.   Elevated PCB levels in Bay sediments require diversion of Port resources that would otherwise be used to enhance the Bay for the public.** | |
| 134. From the Port's perspective PCBs are a big problem in the Bay. | Corley Decl. Ex. 72, Brown Dep. at 61:1. |
| 135. The Port has been dealing with the PCB problem for decades and as early as the mid-1980s, the Port was involved in addressing PCB contamination, including funding for the San Diego Bay Cleanup Project. | Corley Decl. Ex. 73, 1987 Port Ltr.;<br><br>Corley Decl. Ex. 74, 1987 Health Risk Study Correspondence. |
| 136. The Port has been involved in numerous PCB cleanups around the Bay. | Corley Decl. Ex. 72, Brown Dep. at 98:17-19; 231:1-19. |
| 137. The Port lead the Campbell Shipyard remediation. | Corley Decl. Ex. 72, Brown Dep. at 98:17-19; 231:1-19. |
| 138. For decades, the Port has facilitated various iterations of a legacy pollutant reduction program. | Corley Decl. Ex. 72, Brown Dep. at 96:15-18. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 139. The Port partnered with the Regional Water Quality Control Board in a project to assess contaminants in fish and shellfish in San Diego Bay and funded the San Diego Fish Consumption Study. | Corley Decl. Ex. 75, State Agency Document re Assessing Contaminants in Fish and Shellfish. Corley Decl. Ex. 76, 2017 SCCWRP Fish Consumption Study. |
| 140. The Port and SDRWQCB are actively engaged in prioritizing PCB contamination related issues. | Corley Decl. Ex. 23, Declaration of David W. Gibson, SDRWQCB. |
| 141. The Port routinely incurs PCB-related costs at sites throughout the Bay, and those costs in turn require the Port to divert funding from projects that would enhance the Bay for the benefit the public. | Corley Decl. Ex. 7, Port Corp. Rep. at 1991:4-24; 1268:9-14. |
| 142. The Port uses both internal staff resources and outside consultants to participate in and/or oversee PCB-impacted cleanup sites. | Corley Decl. Ex. 7, Port Corp. Rep. at 190:4-191:5. |
| 143. The Port's former General Counsel estimated that the Port incurred $80-100 million in costs to participate in various remediation around the Bay. | Corley Decl. Ex. 7, Port Corp. Rep. 1214:18-1216:25; *see* 1263:9-1264:6 (noting that these costs are not an exhaustive total of costs spent by the Port District to deal with the presence of PCBs in the Bay.). |
| **M.** **This Court has already determined, the Port has standing to abate a public nuisance to protect, preserve and enhance the Bay.** | |
| 144. The Port is expressly authorized by the Legislature to bring a public nuisance action to "protect, preserve, and enhance" the Bay by seeking an abatement of a public nuisance. | HARB. & NAV. CODE App. 1 § 70. |
| 145. Through the Port Act, the Port was given the power to "protect, preserve, and enhance" (1) the physical access to the bay; (2) the natural resources of the bay, including plant and animal life; and (3) the quality of water in the bay." | HARB. & NAV. CODE App. 1 § 70. |

| Port District Undisputed Material Fact | Supporting Evidence |
|---|---|
| 146. This Court concluded that the Legislature expressed its intention in specific and clear terms to grant the Port the power to abate such a nuisance. | *San Diego Unified Port District v. Monsanto Company*, No. 15-CV-578-WQH-JLB, 2016 WL 5464551, at *5–6 (S.D. Cal., Sept. 28, 2016) (holding Port standing to assert public nuisance claim for harm to Bay). |
| 147. The State of California and the cities of San Diego, Chula Vista, Coronado, National City, and Imperial Beach conveyed authority to bring a public nuisance claim regarding the Bay to the Port. | Order, ECF No. 81*, San Diego Unified Port District v. Monsanto Company*, No. 15-CV-578-WQH-JLB, 2016 WL 5464551, at *5–6 (S.D. Cal., Sept. 28, 2016) (holding Port standing to assert public nuisance claim for harm to Bay). |

1                                            Respectfully submitted,

2   Dated:  October 1, 2019              By: */s/ Kenneth O. Corley*

3

4                                            **KELLEY DRYE & WARREN LLP**
William J. Jackson (admitted *Pro Hac Vice*)
Texas Bar No. 00784325

5                                            Micheal W. Dobbs (admitted *Pro Hac Vice*)
Texas Bar No. 24012533

6                                            Kenneth O. Corley (admitted *Pro Hac Vice*)
Texas Bar No. 24048405

7                                            Nancy K. Yanochik *(*admitted *Pro Hac Vice*)
Texas Bar No. 01293000

8                                            515 Post Oak Blvd., Suite 900
Houston, TX 77027

9                                            Telephone: 713-355-5000

10                                          **KELLEY DRYE & WARREN LLP**
Andrew W. Homer (SBN 259852)

11                                          7825 Fay Ave., Suite 200
La Jolla, CA 92037

12                                          Telephone: (858) 795-0426

13                                          **SAN DIEGO UNIFIED PORT DISTRICT**
**OFFICE OF THE GENERAL COUNSEL**

14                                          Thomas A. Russell, SBN 108607, Gen. Counsel
Ellen F. Gross, SBN 149127, Asst. Gen. Counsel

15                                          John N. Carter, SBN 246886, Dep. Gen. Counsel
3165 Pacific Highway

16                                          P.O. Box 120488
San Diego, CA 92112-0488

17

18                                          **ATTORNEYS FOR THE SAN DIEGO**
**UNIFIED PORT DISTRICT**

19

20

21

22

23

24

25

26

27

28

CASE NO. 3:15-CV-00578-WQH-AGS
SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

# ATTACHMENT A

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| 1. During discovery, the Port identified only three alleged PCB-related impairments to the Bay: (1) the Campbell cap and (2) the Convair cap, insofar as the caps create "limitations to boating activities that could occur . . . because of the restrictions on being able to anchor up in those areas," and (3) the limited fish advisory that the Office of Environmental Health Hazard Assessment ("OEHHA") issued in 2013 recommending that consumers of fish | [Howard Decl.] Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 282:9-283:24.<br><br>Ex. 44, Port 30(b)(6) (M. Johns) Dep. Ex. 34 (2013 OEHHA fish advisory). | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as outside of the scope and a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below.<br><br>RESPONSE:<br><br>First, Dr. Johns was not designated as a Port District 30(b)(6) witness on the topic of all of the PCB-related impairments in the Bay. In fact, on April 25, 2019, Judge Schopler struck a Monsanto-proposed 30(b)(6) topic that would have covered these items. Corley Decl. Ex. 80a, ECF No. 360. That topic was:<br><br>"*44. The Port District's knowledge concerning the public nuisance allegedly created by the presence of PCBs in the Bay, including but not limited to the areas of the Bay where the Port District contends such a nuisance existed or continues to exist and the approximate date(s) when the Port District obtained knowledge of such conditions of public nuisance.*"<br><br>Corley Decl. Ex. 79, Port 30(b)(6) (M. Johns) Dep. Ex. 1 (Monsanto Rule 30(b)(6) Deposition Notice to Port District)(April 27, 2017); Corley Decl. Ex. 80a-b, ECF No. 360 at 30-32 (striking Monsanto 30(b)(6) topic 44 and providing rationale), ECF No 354 (tentative decision regarding same).<br><br>By striking this topic, Judge Schopler made clear that it was not the proper subject of Port District 30(b)(6) testimony. As such, any testimony by Dr. Johns |

[1] With the exception of each instance of "[Howard Decl.]" and the addition of the qualifier "[Monsanto]" in the column headings, all text in the areas of this table shaded grey is copied directly from Monsanto's *Separate Statement in Support of Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment Against the San Diego Unified Port District (Public Nuisance)* (ECF No. 424-2).

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| from San Diego Bay limit their consumption of certain types of fish because of mercury and PCBs. | | | or any other 30(b)(6) witness as to certain PCB-related impairments is neither binding as the Port District's final position, nor exhaustive. Second, Monsanto misrepresents the Port District's testimony in any event. When Monsanto's counsel stated the three impairments listed in Monsanto's statement of undisputed facts and asked Dr. Johns to confirm if there are others, Dr. Johns stated "I don't know," clearly indicating that the list may not be complete and not adopting it as the Port District's position as to the only types of PCB-related impairments to the Bay. Howard Decl. Ex. 6, Port 30(b)(6) (M. Johns) Dep. Tr. at 283:4-13. CONTROVERTING EVIDENCE: Third, Monsanto ignores controverting evidence and misrepresents the Port District's testimony about how PCB's impair the Bay in ways outside of the three impairments Monsanto lists. For example: • As multiple Port District 30(b)(6) witnesses testified, the Port District routinely incurs PCB-related costs at sites throughout the Bay, and those costs in turn require the Port District to divert funding from projects that would enhance the Bay and benefit the public. Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1991:4-24 (Port District spends money addressing PCBs in the Bay); *see* Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1268:9-14 (Port District revenues must be reinvested in the Bay and tidelands). • Dr. Johns testified that the Port District uses both internal staff resources and outside consultants to participate in and/or oversee PCB impacted cleanup sites. Howard Decl. Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 190:4-191:5. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | • Testifying as a 30(b)(6) witness, the Port District's Director of Environmental Protection (Karen Holman) testified that the Port District incurs costs to participate in various regional environmental monitoring programs that are driven by PCBs. Port 30(b)(6) Howard Decl. Ex. 3 (K. Holman) Dep. Tr. at 1783:6-1784:6, 1963:3-11).<br><br>• The Port has been dealing with the PCB problem for decades. As early as the mid-1980s, the Port was involved in addressing PCB contamination, including funding for the San Diego Bay Cleanup Project. Corley Decl. Ex. 73, 1987 Port Ltr.; Corley Decl. Ex. 74, 1987 Health Risk Study Correspondence.<br><br>• The Port has been involved in numerous PCB cleanups around the Bay. Corley Decl. Ex. 72, Brown Dep. at 98:17-19; 231:1-19.<br><br>• The Port lead the Campbell Shipyard remediation. Corley Decl. Ex. 72, Brown Dep. at 98:17-19; 231:1-19.<br><br>• Also in his capacity as a Port District 30(b)(6) witness, the Port District's former General Counsel (Duane Bennett) testified that the Port District has incurred past costs of approximately $80-100MM at and related to PCB cleanup sites. Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1214:18-1217:1. *see* Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1263:9-1264:6 (noting that these costs are not an exhaustive total of costs spent by the Port District to deal with the presence of PCBs in the Bay.).<br><br>• More recently, the Port partnered with SDRWCQB in a project to assess contaminants in fish and shellfish in the Bay and funded the San Diego Fish Consumption Study. Corley Decl. Ex. Ex. 75, State Agency Document |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | re Assessing Contaminants in Fish and Shellfish; Corley Decl. Ex. 76, 2017 SCCWRP Fish Consumption Study. <br><br> • The uses for which Monsanto promoted PCBs left a legacy of PCB contamination throughout the sediment, water and biota of the Bay. Corley Decl. Ex. 3, Douglas Rep. at 7; 8-14; Corley Decl. Ex. 4, Golightly Rep. at 4-5; Corley Decl. Ex. 86, Ann S. Jones Declaration. <br><br> Monsanto also ignores significant controverting evidence regarding other ecological impacts and risks that PCBs present to fish and wildlife in the Bay, as well as risks to human health. For example: <br><br> • Dr. Johns, Ms. Holman, and Mr. Bennett all also testified as Port District 30(b)(6) witnesses that the Regional Water Quality Control Board listed the entire Bay as impaired for PCBs in fish tissue in approximately 2006, and that the Bay remains so listed. Howard Decl. Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 77:4-6; Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1725:14-19; Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1035:7-24 (during Mr. Bennett's tenure as General Counsel the Port District received notice from the Regional Water Quality Control Board that the entire Bay was impaired by PCBs); *see* Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1263:9-1264:6 (noting that these costs are not an exhaustive total of costs spent by the Port District to deal with the presence of PCBs in the Bay.). <br><br> • Monsanto's own expert testified that the Bay is listed as impaired for purposes of Section 303(d) of the federal Clean Water Act and that the SDRWQCB is "considering" implementing a Total Maximum Daily Load mechanism to reduce inputs of PCBs, with the only major sources listed as "contaminated sediments" and "urban runoff/storm sewers." Corley Decl. Ex. 82, Boehm Dep. Tr. at 329:20-332:18. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | • PCBs exist in certain Bay organisms, such as invertebrates, fish and birds, at levels above risk thresholds. Corley Decl. Ex. 12, Jones Rep. at 3.<br><br>• Survey results revealed PCB levels in spotted sand bass ranging from 89 ppb to 1,075 ppb—and toxic effects on fish are reported in scientific literature at concentrations as low as 30 ppb. Corley Decl. Ex. 12, Jones Rep. at 3.<br><br>• A 2016 bioaccumulation study performed in San Diego Bay determined that accumulation and biomagnification of PCBs by marine organisms posed potential harm to all trophic levels. Corley Decl. Ex. 85, Trapp Rep. at 14.<br><br>• Piscivore bird species, including sensitive species of concern nesting in the San Diego Bay National Wildlife Refuge, may be at reproductive risk due to PCB levels in bird eggs above screening levels for adverse effects. Corley Decl. Ex. 12, Jones Rep. at 3.<br><br>• At PCB remediation sites in the Bay, the SDRWQCB has recognized PCB levels in sediment that exceed Effects Range Low ("ERL"), the concentration (below which environmental toxic effects are scarcely observed or predicted), and/or Effects Range Median ("ERM"), (the concentration above which environmental toxic effects are generally or always observed). Corley Decl. Ex. 8, Woodyard Dep. at 130:2-133:8; Corley Decl. Ex. 70, Tentative IO No. R9-2018-0035 at 4; Corley Decl. Ex. 85, Trapp Rep. at 14.<br><br>• SDRWQCB has repeatedly identified PCB sediment contamination as a potential threat to aquatic life. Corley Decl. Ex. 11, CAO No. R9-2015-0018 at 3; Corley Decl. Ex. 9, CAO No. R9-2017-0021. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | <ul><li>According to EPA, "PCBs have been demonstrated to cause a variety of adverse health effects," "[s]tudies in humans support evidence for potential carcinogenic and non-carcinogenic effects of PCBs," and "the data strongly suggests that PCBs are probable human carcinogens." Corley Decl. Ex. 17, EPA PCB Info; Corley Decl. Ex. 18, Keenan Dep. at 71:4-75:14; Corley Decl. Ex. 86, Declaration of Jones at ¶5-8.</li><li>EPA is not alone in its classification of PCBs as potential human carcinogens—the International Agency for Research on Cancer and the National Toxicology Program, among others, have also identified PCBs as carcinogenic to humans. Corley Decl. Ex. 17, EPA PCB Info; Corley Decl. Ex. 18, Keenan Dep. at 84:19-85:24.</li><li>The State of California lists PCBs as a chemical "known to the state of California to cause cancer." Corley Decl. Ex. 17, EPA PCB Info; Ex. 18, Keenan Dep. at 88:10-14.</li><li>PCBs also cause an increased risk of other adverse health effects and developmental effects, including but not limited to diabetes, liver injury, immune system dysfunction, neurobehavioral effects, impaired thyroid function, reproductive system impairment, cardiovascular disease and skin irritation. Corley Decl. Ex. 19, Olson Rep. at 2, 15-49; Corley Decl. Ex. 86, Ann S. Jones Declaration at ¶5-8.</li><li>Adverse health effects associated with PCB exposure have been observed *even at background environmental exposure levels*. Due to various and multiple exposure pathways that result in long-term bioaccumulation of PCBs in humans, the higher the levels of PCBs in the body, the higher the risk of adverse health effects. Corley Decl. Ex. 19, Olson Rep. at 2, 19-49.</li><li>EPA, as well as Monsanto's risk assessment expert, agree that "the types of PCBs likely to be bioaccumulated in fish and bound to sediments are the</li></ul> |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | most carcinogenic PCB mixtures," and an increase in human exposure to PCBs results in an increased risk of developing cancer and other adverse health effects. Corley Decl. Ex. 17, EPA PCB Info; Corley Decl. Ex. 18, Keenan Dep. at 80:10-81:9; Corley Decl. Ex. 19, Olson Rep. at 2; 19-49.<br><br>Monsanto ignores other controverting evidence. For example:<br><br>• With respect to the Campbell Shipyard and Convair Lagoon sediment caps, Monsanto ignores the fact that these impair potential use in ways other than "limitations to boating activities that could occur . . . because of the restrictions on being able to anchor up in those areas." The Port District has presented significant evidence that the engineered caps in these locations has also precluded continued use for past commercial purposes and future development opportunities in these locations. Dobbs Decl. Ex. 8, Cicchetti Report at 20, 22-23, 25-30; Dobbs Decl. Ex. 9, Cicchetti Rebuttal Report at 4 n.17, 4 n.19, 5-6; Dobbs Decl. Ex. 50, Memo on potential development of Convair Lagoon, SDUPD-0000154822-835; DEFEXP-GL-00000348-361; Dobbs Decl. Ex. 51, Memo of Board of Port Commissioners on Development of portion of Campbell, SDUPD-0001144472-75.<br><br>• Monsanto does not challenge the evidence that the Port has lost the ability to develop capped areas for the benefit of the people of California. Corley Decl. Ex. 71, Cicchetti Dep. at 132:3-134:2; 162:13-165:7; 170:3-171:11; 172:2-174:4; 175:2-177:13; 184:2-16; 192:14-194:9; 197:15-202:13; 204:1-23; 212:2-213:8; 213:20-214:20; 225:16-226:25; 230:11-18; 231:1-22; 233:14-235:20; 236:16-239:2; 246:4-247:7; 283:13-284:15; 307:20-308:12; 308:18-311:2. |
| 2. The Port describes San Diego Bay as "one of the cleanest | [Howard Decl.] Ex. 1, Port 30(b)(6) (M. | Disputed | OBJECTION: |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| metropolitan bays in the world." | Johns) Dep. Tr. at 142:9-17.<br><br>[Howard Decl.] Ex. 39, Port 30(b)(6) (M. Johns) Dep. Ex. 14 (Sept. 2013 Joint Navy-Port Integrated Natural Resources Management Plan) at 2-19. | | Monsanto ignores significant clarifying evidence as described below.<br><br>RESPONSE/CONTROVERTING EVIDENCE:<br><br>Monsanto omits critical context. In fact, the relevant portion of the September 2013 Joint Navy-Port Integrated Natural Resources Management Plan that Monsanto cites states "In 1971, San Diego Bay was reportedly considered one of the world's cleanest metropolitan bays." Howard Decl. Ex. 39, Port 30(b)(6) (M. Johns) Dep. Ex. 14 (Sept. 2013 Joint Navy-Port Integrated Natural Resources Management Plan) at 2-19. When asked if the Port District agreed with that characterization (which was not the Port District's description even in 1971) Dr. Johns responded only "in terms of general conditions." Howard Decl. Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 141:23-142:17. As Dr. Johns testified immediately after being asked to adopt this statement by Monsanto's counsel, it was not until 1978 that the Regional Water Quality Control Board began to focus on pollutants in Bay sediments – where PCBs reside – so the 1971 statement about the overall quality of water in the Bay does not specifically relate to such contamination. Howard Decl. Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 142:22-143:16. |
| 3. The Executive Director of the California Regional Water Quality Control Board, San Diego Region ("Regional Board") stated in 2014 that the Bay "is better now than it's been any time in the last | [Howard Decl.] Ex. 5, Port 30(b)(6) (J. Giffen) Dep. Tr. at 1505:6-1510:21. | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below.<br><br>RESPONSE:<br><br>Monsanto misrepresents the Port District's testimony by leaving out critical context. The actual quote from the Executive Director of the Regional Water |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| 100 years, and getting better." | | | Quality Control Board, as read into the record by Monsanto's counsel, is as follows: "And in the video, Mr. Gibson states, 'The San Diego Bay now is, in part as a result of the [Campbell Shipyard] cleanup, in' – 'is better than at any time in the last 100' – 'in the last hundred years and getting better.'" Howard Decl. Ex. 5, Port 30(b)(6) (J. Giffen) Dep. Tr. at 1509:18-22. Monsanto's purported undisputed fact leaves out the critical context – that of course the Bay is in better condition after the completion of the Campbell Shipyard remediation that the video relates to than it was before that remediation was complete. It also leaves out Mr. Giffen's explanation of the Port District's position, which follows: "From the Port's perspective, we're doing everything we can to continue to improve the water quality of San Diego Bay, and when we look at a broad range of indicators, water quality continues to improve." Howard Decl. Ex. 5, Port 30(b)(6) (J. Giffen) Dep. Tr. at 1510:1-5. <u>CONTROVERTING EVIDENCE</u>: More importantly, Monsanto omits significant and critical controverting evidence about the ecological problems PCBs have created in the Bay, ignoring the fact that the Bay can simultaneously cleaner than it has been in the past yet still impaired in ways that create a public nuisance. For example: <ul><li>Fish tissue samples taken by state agencies show that the Bay suffers from some of the highest PCB concentrations in the region. Corley Decl. Ex. 5, SWAMP Report at 47.</li></ul> |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | <ul><li>In fact, the Bay is among the most PCB-contaminated water bodies in the country. Corley Decl. Ex. 85, Trapp Rep. at 14.</li><li>The SDRWQCB and SWRCB have designated the Bay, in its entirety, as an "impaired" water body, due to the presence of elevated levels of PCBs in fish tissue, pursuant to § 303(d) of the Clean Water Act. Corley Decl. Ex. 6, CWA §305(b); 303(d) Integrated Report; Corley Decl. Ex. 7, Port Corp. Rep. at 77:4-6; 1035:7-24; 1725:14-19; Corley Decl. Ex. 8, Woodyard Dep. at 127:16-18; Corley Decl. Ex. 9, CAO No. R9-2017-0021; Corley Decl. Ex. 85, Trapp Rep. at 14-15.</li><li>Monsanto's own expert testified that the Bay is listed as impaired for purposes of Section 303(d) of the federal Clean Water Act and that the SDRWQCB is "considering" implementing a Total Maximum Daily Load mechanism to reduce inputs of PCBs, with the only major sources listed as "contaminated sediments" and "urban runoff/storm sewers." Corley Decl. Ex. 82, Boehm Dep. Tr. at 329:20-332:18.</li><li>The SDRWQCB has repeatedly recognized that various areas of the Bay have contamination levels that "may adversely affect San Diego Bay beneficial uses" and pose a risk to human health and the environment. Corley Decl. Ex. 10, CAO No. R9-2004-0295 at 24; Corley Decl. Ex. 8, Woodyard Dep. at 129:3-8; Corley Decl. Ex. 11, CAO No. R9-2015-0018 at 3; Corley Decl. Ex. 9, CAO No. R9-2017-0021 at 5.</li><li>Because of the well-established human health risks associated with exposure to PCBs, in 2013, California's Office of Environmental Health Hazard Assessment ("OEHHA") determined that PCB contamination levels were so high that people should limit, or avoid altogether, the consumption of certain fish from the Bay. OEHHA amended the FCA in 2018 to implement even more stringent restrictions for children and women of childbearing age. Corley Decl. Ex. 1a-e, Fish Consumption Advisory;</li></ul> |

CASE NO. 3:15-CV-00578-WQH-AGS
ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Corley Decl. Ex. 13, Jones Rebuttal at 13-14; Corley Decl. Ex. 14, Toll Rebuttal at 2; Corley Decl. Ex. 85, Trapp Rep. at 14; Corley Decl. Ex. 86, Ann S. Jones Declaration. <br><br>• Consumption advisories are de facto harms under federal regulations because they interfere with the public's free and comfortable use of a resource. Corley Decl. Ex. 13, Jones Rebuttal at 7; 43 C.F.R. § 11.62(f)(1)(iii). <br><br>• Data suggests that anglers in the Bay who are aware of the FCA consume less fish, and statewide consumption rates before the FCA were higher than after. Corley Decl. Ex. 13, Jones Rebuttal at 17; Corley Decl. Ex. 14, Toll Rebuttal at 8, Fg. 2-1; Corley Decl. Ex. 86, Ann S. Jones Declartion at ¶11. <br><br>• According to Monsanto's expert, somewhere between 65-81% of fish caught from the Bay are precluded from consumption by children or women under age 45. Corley Decl. Ex. 15, Desvousges Dep. at 91:19-92:5. <br><br>• Monsanto's expert admits that the most often caught and consumed fish, the Pacific chub mackerel, is subject to a "Do Not Eat" advisory for children and women under 45, which affects a population demographic that represents the majority of the population in and around San Diego. Corley Decl. Ex. 15, Desvousges Dep. at 101:20-24; 102:4-10; Corley Decl. Ex. 16, San Diego Census Data. <br><br>• A full 7.5% of consumers who voluntarily responded to the San Diego Fish Consumption Study reported consuming "Do Not Eat" fish. Corley Decl. Ex. 13, Jones Rebuttal at 13-14; Corley Decl. Ex. 76, SCWRRP San Diego Bay Fish Consumption Study (2017). <br><br>• Site-specific data for the Bay suggests that certain ethnic minority groups engage in subsistence fishing at a much higher rate than the general |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | population, meaning the risk to those communities is dramatically higher. Corley Decl. Ex. 13, Jones Rebuttal at 17; Corley Decl. Ex. 21, Environmental Health Coalition Survey of Fishers; Corley Decl. Ex. 86, Ann S. Jones Declaration at ¶ 20.<br><br>• There is evidence that Monsanto's PCBs pose risks to marine life in the Bay. While PCB impacts to marine life have not been fully quantified, PCBs exist in Bay organisms, such as invertebrates, fish and birds, at levels above risk thresholds. Corley Decl. Ex. 12, Jones Rep. at 3; Corley Decl. Ex. 13, Jones Rebuttal at 3; Ann S. Jones Declaration at ¶¶7-9.<br><br>• The Port has been dealing with the PCB problem for decades. As early as the mid-1980s, the Port was involved in addressing PCB contamination, including funding for the San Diego Bay Cleanup Project. Corley Decl. Ex. 73, 1987 Port Ltr.; Corley Decl. Ex. 74, 1987 Health Risk Study Correspondence.<br><br>• The Port has been involved in numerous PCB cleanups around the Bay. Corley Decl. Ex. 72, Brown Dep. at 98:17-19; 231:1-19.<br><br>• The Port lead the Campbell Shipyard remediation. Corley Decl. Ex. 72, Brown Dep. at 98:17-19; 231:1-19.<br><br>• PCB contamination has required substantial expenditure of funds— estimated to be at least $80-100 million—from the Port that otherwise would have been invested in enhancing the Bay for the benefit of the people of California. Corley Decl. Ex. 7, Port Corp. Rep. 1214:18-1216:25; *see* Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1263:9-1264:6 (noting that these costs are not an exhaustive total of costs spent by the Port District to deal with the presence of PCBs in the Bay.). |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | • More recently, the Port partnered with SDRWCQB in a project to assess contaminants in fish and shellfish in the Bay and funded the San Diego Fish Consumption Study. Corley Decl. Ex. Ex. 75, State Agency Document re Assessing Contaminants in Fish and Shellfish; Corley Decl. Ex. 76, 2017 SCCWRP Fish Consumption Study. <br><br> • In the view of the SDRWQCB, PCBs are a significant problem in the Bay, and mitigating the risk associated with human exposure is a priority for the SDRWQCB. In fact, the Executive Officer of the SDRWQCB stated in a declaration submitted in support of the Port, that the agency is focused on restoring the fish and shellfish consumption beneficial use, which is directly impaired by PCBs. In August 2019 the full SDRWQCB expressed its priority of mitigating the contamination underlying the FCA. Corley Decl. Ex. 13, Jones Rebuttal at 6-7; Corley Decl. Ex. 4, Golightly Rep. at 2, 34. Corley Decl. Ex. 23, Declaration of David W. Gibson, Executive Director, SDRWQCB |
| 4.  Hotel, restaurant, and shipyard industries on the Bay are busy and doing well across the board. | [Howard Decl.] Ex. 11, Port Tenants Association ("PTA") (S. Cloward) Dep. Tr. at 51:19-53:1. | Disputed | OBJECTION: <br><br> The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the third party witness testimony Monsanto cites in support, as an improper expert opinion, and as lacking foundation. As demonstrated in her own testimony, Ms. Cloward's statements are not based on personal knowledge, and in fact are based on inadmissible hearsay. <br><br> RESPONSE: <br><br> The state of the economy and performance of certain business or industries located in or around the Bay is not relevant to any party's claims or defenses, and specifically not determinative of whether a public nuisance exists in the Bay. Strong economic performance is not mutually exclusive to the existence of |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | a nuisance, and the Port District has not alleged poor economic performance of these industries as an impairment caused by the PCB nuisance in the Bay.<br><br>Monsanto misrepresents the Port Tenants Association's Testimony by leaving out critical context. In fact, the Port Tenants Association representative testified that she and the Association have no expertise or particularized knowledge in the financial performance of its members or the region, and do not gather or possess actual data or formal reports regarding the state of any members' business:<br><br>"Q Let me follow up a little bit on the data that the -- the -- that the Port Tenants Association keeps. I'm trying to get a sense on -- on whether the Port Tenants Association monitors the overall level of public activity on the bay. So does the Port Tenants Association keep data in terms of how many people come to the bay on an annual basis?<br><br>A We don't keep data, like actual data in a file. No, we do not keep data.<br><br>Q Okay. Do you keep data in terms of the overall revenues that your Port Tenant Association members are -- are achieving on any given year?<br><br>A I get reports at a board meeting, an oral report; like, how the hotels are doing, the restaurants are doing. But it's not data that we, at the Port Tenants Association, collects and puts in a computer. I just get reports at a general board meeting.<br><br>Q How many board meetings do you have a year?<br><br>A We have 11 board meetings.<br><br>Q So roughly once a month?<br><br>A Yes. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Q And during the course of those board meetings, is one of the topics you discuss the -- how the – the members are -- are doing financially or from a business perspective?<br><br>A It will depend on whatever the subject matter. So it could be brought up. It's not like it's on the agenda: 'How are we doing?' It just gets brought up based on maybe one of our agenda items that we have on there. So it's -- it's in generic form. It's not like a formal thing on our agenda."<br><br>Howard Decl. Ex. 11, Port Tenants Association  (S. Cloward) Dep. Tr. at 49:12-50:18 |
| 5. Eelgrass is an important nursery habitat for fish, and it traps sediment and provides a food source for fish, birds, and turtles. | [Howard Decl.] Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 765:25-766:6. | Undisputed | |
| 6. The Bay supports nearly 20 percent of all eelgrass habitat in California, and 50 percent of all eelgrass in Southern California, which is | [Howard Decl.] Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 766:7-19. | Undisputed | |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| an indication of a healthy Bay. | | | |
| 7. The National Oceanic and Atmospheric Administration ("NOAA") considers eelgrass to be a "valuable tool in examining long-term trends in ecosystem health." | [Howard Decl.] Ex. 2, Port 30(b)(6) (E. Maher) Dep. Ex. 89 at slide 2 (2008 San Diego Bay Eelgrass Inventory and Bathymetry Update). | Disputed | OBJECTION: The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) testimony and underlying exhibit Monsanto cites in support. RESPONSE: Monsanto omits critical context. The full bullet at Port 30(b)(6) (E. Maher) Dep. Ex. 89 at slide 2 describes eelgrass as a "Valuable tool in examining long-term trends in ecosystem health <u>due to its location at watershed/coast interface and adaptability to a wide range of stressors</u>." (emphasis added). Howard Decl. Ex. 46, Port 30(b)(6) (E. Maher) Dep. Ex. 89 at slide 2 (2008 San Diego Bay Eelgrass Inventory and Bathymetry Update). The underlined/omitted text is important as it indicates that eelgrass may thrive despite the presence of contaminants, which are ecosystem stressors. The Port District has not claimed that PCBs impair eelgrass growth or abundancy, and it is misleading to suggest that the presence of eelgrass indicates that PCBs do not impact the Bay and tidelands. In fact, the Port District's Director of Environmental Conservation (Eileen Maher) – an eelgrass specialist – testified that she is not aware of PCBs having a harmful effect on eelgrass. Howard Decl. Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 773:10-15. |
| 8. The Port acknowledges that eelgrass reached "optimal" levels, | [Howard Decl.] Ex. 2, Port 30(b)(6) (E. | Disputed | The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| with "eelgrass growing pretty much everywhere it can grow in San Diego Bay." | Maher) Dep. Tr. at 721:13-25. | | Monsanto omits key clarifying testimony. Ms. Maher testified that all prime eelgrass habitat that can currently support growth is doing so, but that additional habitat can be created through mitigation projects: |

Q Can you explain to me sort of the -- the zone in which eelgrass will thrive?

A The optimum growing zone for eelgrass is minus four to minus six feet mean lower low water. Eelgrass does depend on sunlight to grow. It is a plant. So it needs that photosynthesis. And it can grow in shallower depths and deeper depths depending on water clarity.

Q Is my understanding correct that, once you get below six feet in depth, the ability of eelgrass to sustain itself drops off dramatically until about ten feet, where it's very difficult for eelgrass to grow?

A It can grow a little deeper, but that's not optimum.

Q So, ideally, you're trying to find depths of somewhere between four to six feet within the bay that eelgrass tends to do the best.

A: Yes.

Howard Decl. Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 770:1-19.

Q Does the Port believe that it wants to cultivate and expand more eelgrass within the tidelands?

A Yes.

Q And, as you testified, then, if that's to take place, then some artificial habitat would have to be created to sustain the appropriate depth for that; correct?

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | A Yes.<br><br>Howard Decl. Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 775:5-13.<br><br>Q Does the Port have a priority list of where within the bay or the tidelands it would like to create more eelgrass habitat?<br><br>A We have a list of areas that would -- if you placed beneficial reuse of dredge materials into these areas, you would create the habitat.<br><br>Howard Decl. Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 776:5-10. |
| 9. The Port has used dredge spoils for beach replenishment on regional beaches and for in-Bay habitat creation. | [Howard Decl.] Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 686:11-13. | Undisputed | |
| 10. Since 1993, four million cubic yards of sand have been dredged from the Bay and used on the region's beaches. | [Howard Decl.] Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 758:20-760:17. | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) testimony Monsanto cites in support.<br><br>RESPONSE:<br><br>Monsanto mischaracterizes the witness's testimony. On cross examination the witness testified that the document Monsanto's counsel discussed with her in the quoted passage in fact does not indicate that the four million cubic yards of |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | sand it describes as being used for regional beach replenishment originated in San Diego Bay:<br><br>Q So the concluding sentence, again, is "Since 1993, at least ten opportunistic sand dredging projects have resulted in the replenishment of four million cubic yards of sand to the region's beaches"; correct?<br><br>A Yes.<br><br>Q Does anything in this section you just read indicate that four million cubic yards of sand came from San Diego Bay?<br><br>A No.<br><br>Q Does anything in there indicate which agency spearheaded the use of community, local, state, federal resources to develop nourishment strategy for the region?<br><br>A Oh. SANDAG.<br><br>Q And what is SANDAG?<br><br>A San Diego Association of Governments.<br><br>Q Okay.<br><br>A It's the cities and county within the -- San Diego County.<br><br>Q The larger region?<br><br>A Yes. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Q Does it encomp- -- Does it -- does SANDAG represent or relate to more than just the five cities that ring the bay and appoint commissioners to the Port District?<br><br>A Yes.<br><br>Q There's a sentence in here. It's the – the second -- excuse me. It's the first full sentence on page 5-22. "The Navy delivered dredged material from San Diego Bay to LA-5 and committed to dredging clean sand from ocean sources to meet its beach nourishment obligations." Do you understand ocean sources to be within the bay?<br><br>A They are not.<br><br>Howard Decl. Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 856:1-857:11. |
| 11. Dredged material from maintenance dredging is generally "clean." PCBs have not disqualified for purposes of beach replenishment the use of dredge spoils obtained from channel deepening. | [Howard Decl.] Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 673:4-14, 686:20-687:16. | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) testimony Monsanto cites in support.<br><br>RESPONSE:<br><br>Monsanto mischaracterizes the witness's testimony. Neither quoted passage supports the general statement that PCBs have never disqualified dredge spoils from channel deepening for use in beach replenishment. The witness testified that a key difference between "environmental" and "maintenance" dredging is that environmental dredging by its very nature targets contaminated sediments and therefore is more complicated to complete. Howard Decl. Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 673:4-24. The witness was then asked to provide an example of when dredged spoils from the Bay were used for beach |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | replenishment. Howard Decl. Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 686 14-16. The witness recounted a single example, in which spoils from a maintenance dredging project were tested and determined to be suitable for particular beach replenishment project. Howard Decl. Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 686:20-687:16. The witness did not testify – in the testimony Monsanto cites or anywhere else – that PCBs have never disqualified dredged spoils from use as beach replenishment. Howard Decl. Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 673:4-14, 686:20-687:16. |
| 12. The Port has provided numerous presentations to the Port Tenants Association regarding its desire to develop aquaculture in the Bay as a new source of Port income. | [Howard Decl.] Ex. 11, PTA (S. Cloward) Dep. Tr. at 106:24-107:12. | Disputed | OBJECTION: <br><br> The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the third party witness testimony Monsanto cites in support, and as lacking foundation. As demonstrated in her own testimony, Ms. Cloward's statements are not based on personal knowledge, and in fact are based on inadmissible hearsay. <br><br> RESPONSE: <br><br> Monsanto mischaracterizes the witness's testimony. First, the quoted testimony states that the Port District has given presentations to the Board of Port Commissioners, not the Port Tenants Association. Second, the witness did not state that those presentations said anything about the Port District's "desire to develop aquaculture as a new source of income." Rather, the witness stated "I think it will be a – a new bus - -- source of income." Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 106:24-107:12 (emphasis added). Immediately thereafter, the witness went on to testify that she did not know how actively the Port District is recruiting new business opportunities in the area of aquaculture. Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 107:13-107:23. The witness further testified that (a) she does not have actual knowledge of the specific aquaculture agreements the Port District has entered into, and (b) to her |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | knowledge the Port District's program consists only of "pilot programs," and (c) to her knowledge none involves growing food quality, consumption-grade aquaculture products in the Bay. Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 107:8-11, 208:6-209:14. |
| 13. In 2016, the Port established the Blue Economy Program, seeking to "encourage the implementation of innovative technologies and aquaculture and blue-tech businesses that support the [Port's] purposes of promoting commerce, navigation, fisheries, recreation, and environmental stewardship." | [Howard Decl.] Ex. 5, Port 30(b)(6) (J. Giffen) Dep. Ex. 186 at 1 (Port and Sunken Seaweed Blue Economy Agreement). | Undisputed | |
| 14. In September 2017, as part of the Blue Economy Program, the Port partnered | [Howard Decl.] Ex. 53, Port 30(b)(6) (J. Giffen) Dep. Ex. 183 at 2 (July 2018 Port | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) testimony and underlying exhibit Monsanto |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| with San Diego Bay Aquaculture for a five-year pilot program for growing oysters for human consumption in the Bay. | and San Diego Bay Aquaculture Blue Economy Agreement). [Howard Decl.] Ex. 5, Port 30(b)(6) (J. Giffen) Dep. Tr. 1526:2-1527:14. | | cites in support. Additionally, Monsanto ignores significant controverting evidence as described below. RESPONSE: First, nothing in the quoted testimony states that the San Diego Bay Aquaculture pilot is designed to grow – or even to determine the possibility of growing – "oysters for human consumption in the Bay." In fact, the witness testified immediately after the quoted passage that there could be a number of non-food uses and markets for oysters that are raised from larvae to juvenile before being transported to aquaculture farms outside of the Bay to be raised to market size. Howard Decl. Ex. 5, Port 30(b)(6) (J. Giffen) Dep. Tr. at 1528:15-1529:17. CONTROVERTING EVIDENCE: Moreover, when Monsanto took the deposition of Norman Abell, one of the Managing Partners of San Diego Bay Aquaculture, Mr. Abell testified as follows: • As part of its ongoing pilot program, San Diego Bay Aquaculture purchases oyster seed from land based hatcheries outside of San Diego County, typically Hawaii, Washington, or Northern California and then raises oyster larvae in a floating upweller system or "FLUPSY" to be raised from seed to "juvenile" stage. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 91:3-93:12. • Juvenile oysters raised in the FLUPSY live a relatively short amount of their lives (assuming growth to market sizes) in the FLUPSY, before being shipped elsewhere to be grown to maturity outside of San Diego Bay. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 94:19-95:4. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | • While in the FLUPSY, juvenile oysters are suspended in screened aluminum bins in the water column and do not come in contact with Bay sediments. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 95:5-100:7.<br><br>• San Diego Bay Aquaculture is exploring numerous markets for juvenile oysters it raises then would sell to distant farms to raise to maturity. These include culinary, environmental restoration, remediation, and mitigation, and even for shells. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 100:8-102:25.<br><br>• The Blue Economy Agreement that was introduced as Exhibit 183 to Monsanto's 30(b)(6) deposition of the Port District and is cited in support of this purported undisputed fact in fact requires that oysters raised from seed to juvenile in the FLUPSY be sold to distant markets. The agreement reads, in pertinent part: "The current working model for a FLUPSY nursery operation in San Diego Bay relies on importing oyster seed (roughly 3-weeks old,) rearing them until they reach approximately three quarter inches, (roughly 3 to 4 months old,) then exporting them to a final grow-out location (in Northern California and Pacific northwest locations as far as far north as Alaska). In addition, international opportunities will be pursued in Mexico and British Columbia." Howard Decl. Ex. 12, N. Abell Dep. Tr. at 104:1-25.<br><br>• Mr. Abell is not aware of and has not spoken with anyone about opportunities to sell juvenile oysters to be raised to adult or market size in San Diego Bay. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 105:9-13.<br><br>• San Diego Bay Aquaculture does not have any plan to pursue a final grow-out location in San Diego Bay for juvenile oysters raised in its FLULPSY. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 110:1-5. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | • San Diego Bay Aquaculture has not grown any type of plant or animal for human consumption in its FLUPSY. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 105:14-106:13.<br><br>• San Diego Bay Aquaculture has not sold any juvenile oysters raised in its FLUPSY to other entities to be grown to maturity for human consumption, or for any other purpose. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 110:20-112:3.<br><br>• Raising and selling oysters and other shellfish and aquaculture products for human consumption requires permits from at least the California Department of Public Health ("CDPH") and the United States Food and Drug Administration ("FDA"). It is a heavily regulated process. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 114:10-115:19.<br><br>• CDPH and FDA do not regulate the raising of oyster seed through the juvenile stage, and do not require farms that are permitted to raise culinary oysters to disclose what hatcheries their seed and/or juvenile oysters were sourced from. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 116:9-117:14.<br><br>• Mr. Abell is not aware of anyone growing food for human consumption in San Diego Bay. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 132:12-14. |
| 15. San Diego Bay Aquaculture is farming juvenile oysters in the Bay, and the Port did not disclose any concerns about PCBs to its partner | [Howard Decl.] Ex. 5, Port 30(b)(6) (J. Giffen) Dep. Tr. at 1528:7-13. | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as not relevant, and as a mischaracterization of the 30(b)(6) and third party testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| or consider PCBs in the environmental analysis it conducted under the California Environmental Quality Act ("CEQA") as part of siting that project. | [Howard Decl.] Ex. 12, N. Abell Dep. Tr. at 30:6-15, 49:6-9. | | RESPONSE:<br><br>Monsanto omits critical context. The presence of PCBs in Bay sediments is insignificant for San Diego Bay Aquaculture's pilot program, which is designed to test whether oyster larvae can be grown to a size *inside the Bay* that allows them to be transferred and raised to market size *outside the Bay*. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 94:19-95:4.<br><br>Second, the fact that the CEQA analysis underlying San Diego Bay Aquaculture's pilot program does not mention PCBs is not relevant as a matter of law. The California Supreme Court has held that CEQA requires agencies to analyze the potential environmental impacts of a project on the environment, and specifically *does not require the agency to analyze the potential impacts of the environment on the project. California Bldg. Indus. Assn. v. Bay Area Air Quality Mgmt. Dist.*, 62 Cal. 4th 369, 387 (2015).<br><br>CONTROVERTING EVIDENCE:<br><br>Additionally, Monsanto ignores critical controverting evidence. When Monsanto took the deposition of Norman Abell, one of the Managing Partners of San Diego Bay Aquaculture, Mr. Abell testified as follows:<br><br>• As part of its ongoing pilot program, San Diego Bay Aquaculture purchases oyster seed from land based hatcheries outside of San Diego County, typically Hawaii, Washington, or Northern California and then raises oyster larvae in a floating upweller system or "FLUPSY" to be raised from seed to "juvenile" stage. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 91:3-93:12.<br><br>• Juvenile oysters raised in the FLUPSY live a relatively short amount of their lives (assuming growth to market sizes) in the FLUPSY, before being |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | shipped elsewhere to be grown to maturity outside of San Diego Bay. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 94:19-95:4.<br><br>• While in the FLUPSY, juvenile oysters are suspended in screened aluminum bins in the water column and do not come in contact with Bay sediments. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 95:5-100:7. |
| 16. The Port never discussed PCBs with San Diego Bay Aquaculture before authorizing the company to grow oysters in the Bay for human consumption. | [Howard Decl.] Ex. 12, N. Abell Dep. Tr. at 49:6-8. | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the third party testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below.<br><br>RESPONSE/CONTROVERTING EVIDENCE:<br><br>Monsanto mischaracterizes the witness's testimony and omits critical context. San Diego Bay does not and has never intended to grow oysters for human consumption in San Diego Bay. When Monsanto took the deposition of Norman Abell, one of the Managing Partners of San Diego Bay Aquaculture, Mr. Abell testified as follows:<br><br>• As part of its ongoing pilot program, San Diego Bay Aquaculture purchases oyster seed from land based hatcheries outside of San Diego County, typically Hawaii, Washington, or Northern California and then raises oyster larvae in a floating upweller system or "FLUPSY" to be raised from seed to "juvenile" stage. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 91:3-93:12.<br><br>• Juvenile oysters raised in the FLUPSY live a relatively short amount of their lives (assuming growth to market sizes) in the FLUPSY, before being |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | shipped elsewhere to be grown to maturity outside of San Diego Bay. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 94:19-95:4.<br><br>• While in the FLUPSY, juvenile oysters are suspended in screened aluminum bins in the water column and do not come in contact with Bay sediments. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 95:5-100:7.<br><br>• San Diego Bay Aquaculture is exploring numerous markets for juvenile oysters it raises then would sell to distant farms to raise to maturity. These include culinary, environmental restoration, remediation, and mitigation, and even for shells. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 100:8-102:25.<br><br>• The Blue Economy Agreement that was introduced as Exhibit 183 to Monsanto's 30(b)(6) deposition of the Port District and is cited in support of this purported undisputed fact in fact requires that oysters raised from seed to juvenile in the FLUPSY be sold to distant markets. The agreement reads, in pertinent part: ""The current working model for a FLUPSY nursery operation in San Diego Bay relies on importing oyster seed (roughly 3-weeks old,) rearing them until they reach approximately three quarter inches, (roughly 3 to 4 months old,) then exporting them to a final grow-out location (in Northern California and Pacific northwest locations as far as far north as Alaska). In addition, international opportunities will be pursued in Mexico and British Columbia." Howard Decl. Ex. 12, N. Abell Dep. Tr. at 104:1-25.<br><br>• Mr. Abell is not aware of and has not spoken with anyone about opportunities to sell juvenile oysters to be raised to adult or market size in San Diego Bay. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 105:9-13. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | • San Diego Bay Aquaculture does not have any plan to pursue a final grow-out location in San Diego Bay for juvenile oysters raised in its FLULPSY. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 110:1-5.<br><br>• San Diego Bay Aquaculture has not grown any type of plant or animal for human consumption in its FLUPSY. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 105:14-106:13.<br><br>• San Diego Bay Aquaculture has not sold any juvenile oysters raised in its FLUPSY to other entities to be grown to maturity for human consumption, or for any other purpose. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 110:20-112:3.<br><br>• Raising and selling oysters and other shellfish and aquaculture products for human consumption requires permits from at least the California Department of Public Health ("CDPH") and the United States Food and Drug Administration ("FDA"). It is a heavily regulated process. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 114:10-115:19.<br><br>• CDPH and FDA do not regulate the raising of oyster seed through the juvenile stage, and do not require farms that are permitted to raise culinary oysters to disclose what hatcheries their seed and/or juvenile oysters were sourced from. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 116:9-117:14.<br><br>• Mr. Abell is not aware of anyone growing food for human consumption in San Diego Bay. Howard Decl. Ex. 12, N. Abell Dep. Tr. at 132:12-14. |
| 17. The Port has partnered with Sunken Seaweed, LLC under its Blue | [Howard Decl.] Ex. 54, Port 30(b)(6) (J. Giffen) Dep. Ex. 186 (July 2018 Port and | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) testimony and underlying exhibits Monsanto |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| Economy Program to grown [sic] seaweed. | Sunken Seaweed Blue Economy Agreement). [Howard Decl.] Ex. 5, Port 30(b)(6) (J. Giffen) Dep. Tr. at 1520:19-23. | | cites in support. Additionally, Monsanto ignores significant controverting evidence as described below. RESPONSE: Monsanto mischaracterizes the testimony, underlying exhibits, and ignores clear evidence about the true nature of the Sunken Seaweed project. When Monsanto took the deposition of the co-founder of Sunken Seaweed, he testified that the project is a pilot only, and that if it moves forward to production scale "it was always in our mind to be outside of the bay." Howard Decl. Ex. 13, T. Pollizi Dep. Tr. at 73:1-5. The Port District's 30(b)(6) witness on the topic of aquaculture, Mr. Giffen, also repeatedly testified that the Sunken Seaweed project is a pilot only, as the agreement marked as Exhibit 186 to Monsanto's 30(b)(6) deposition of the Port District clearly states: Q: [Quoting Exhibit 184] "Sunken Seaweed is pursuing to establish a seaweed pilot farm in San Diego Bay to cultivate, outplant, grow, and harvest several species of native marine macroalgae as a culinary product and eventually take to market via direct sale to chefs, distribution companies, and Consumer Packaged Goods companies." Did I read that correctly? A Yes. Q So they are going to grow seaweed to sell to restaurants; right? A That's the aspiration. Q And are they still in a testing phase? A Yes. There still is -- they're still in the pilot. Howard Decl. Ex. 5, Port 30(b)(6) (J. Giffen) Dep. Tr. at 1536:3-16. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | CONTROVERTING EVIDENCE: <br><br> Monsanto omits critical context and controverting evidence. For example, when Monsanto took the deposition of one of the co-founders of Sunken Seaweed, Torre Polizzi, Mr. Polizzi testified that: <br><br> • Sunken Seaweed's project is a "pilot," and consists of only 2,000 square feet of area. Howard Decl. Ex. 13, T. Polizzi Dep. Tr. at 73:1-5. <br><br> • The intent of the pilot project is to test growth methods, not to grow seaweed for human consumption. Howard Decl. Ex. 13, T. Polizzi Dep. Tr. at 102:14-20. <br><br> • Mr. Polizzi believes that the Port District understood from inception of the pilot project that Sunken Seaweed's intent, if the pilot successfully demonstrates their growth methods, is to scale-up to a commercial farm or farms outside of San Diego Bay, and that special constraints alone would preclude a commercial-scale farm from being located in the Bay. Howard Decl. Ex. 13, T. Polizzi Dep. Tr. at 82:2-81:1. |
| 18. Sunken Seaweed, LLC is establishing a 4,140-square-foot seaweed pilot farm, the purpose of which is to "demonstrate the feasibility of using existing pier pilings, ropes, buoys, and anchors | [Howard Decl.] Ex. 54, Port 30(b)(6) (J. Giffen) Dep. Ex. 186 at 44 (July 2018 Port and Sunken Seaweed Blue Economy Agreement). | Disputed | OBJECTION: <br><br> The Port District objects to Monsanto's purported undisputed fact because Monsanto ignores significant controverting evidence, as described below. <br><br> RESPONSE/CONTROVERTING EVIDENCE: <br><br> Monsanto omits critical context and controverting evidence. For example, when Monsanto took the deposition of one of the co-founders of Sunken Seaweed, Torre Polizzi, Mr. Polizzi testified that: |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| for seaweed aquaculture in San Diego Bay." | | | • Sunken Seaweed's project is a "pilot," and consists of only 2,000 square feet of area. Howard Decl. Ex. 13, T. Polizzi Dep. Tr. at 73:1-5.<br><br>• The intent of the pilot project is to test growth methods, not to grow seaweed for human consumption. Howard Decl. Ex. 13, T. Polizzi Dep. Tr. at 102:14-20.<br><br>• Mr. Polizzi believes that the Port District understood from inception of the pilot project that Sunken Seaweed's intent, if the pilot successfully demonstrates their growth methods, is to scale-up to a commercial farm or farms outside of San Diego Bay, and that special constraints alone would preclude a commercial-scale farm from being located in the Bay. Howard Decl. Ex. 13, T. Polizzi Dep. Tr. at 82:2-81:1. |
| 19. In approving the Sunken Seaweed project, the Port expressed no concern regarding PCBs and conducted no analysis regarding whether the presence of PCBs may impact a kelp farm. | [Howard Decl.] Ex. 5, Port 30(b)(6) (J. Giffen) Dep. Tr. at 1541:22-25. | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as not relevant, and as a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below.<br><br>RESPONSE:<br><br>First, the fact that the Port District did not consider whether the presence of PCBs could impact the project is not relevant. The California Supreme Court has held that CEQA requires agencies to analyze the potential environmental impacts of a project on the environment, and specifically *does not require the agency to analyze the potential impacts of the environment on the project*. *California Bldg. Indus. Assn. v. Bay Area Air Quality Mgmt. Dist.*, 62 Cal. 4th 369, 387 (2015). |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | CONTROVERTING EVIDENCE:<br><br>Second, Monsanto omits critical context and controverting evidence. For example, when Monsanto took the deposition of one of the co-founders of Sunken Seaweed, Torre Polizzi, Mr. Polizzi testified that Sunken Seaweed's project is a "pilot." Howard Decl. Ex. 13, T. Polizzi Dep. Tr. at 73:1-5. Mr. Polizzi further testified that the intent of the pilot project is to test growth methods, not to grow seaweed for human consumption. Howard Decl. Ex. 13, T. Polizzi Dep. Tr. at 102:14-20. Mr. Polizzi testified that he believes that the Port District understood from inception of the pilot project that Sunken Seaweed's intent, if the pilot successfully demonstrates their growth methods, is to scale-up to a commercial farm or farms outside of San Diego Bay, and that special constraints alone would preclude a commercial-scale farm from being located in the Bay. Howard Decl. Ex. 13, T. Polizzi Dep. Tr. at 82:2-81:1.<br><br>• With respect to the presence of PCBs in the Bay, Mr. Polizzi testified as follows: "I wasn't aware of PCBs in the bay at the time of going forward with this project, but I think that is public knowledge. So that might have just been my own negligence on research. … We were concerned about, you know, fouling creatures, so anything you put in the bay is real estate for a whole lot of things to come and cling onto and live. So, you know, that makes a market-ready product very hard to do. You don't want crabs and stuff in your seaweed." Howard Decl. Ex. 13, Polizzi Dep. Tr. at 32:7-12.<br><br>• Mr. Polizzi went on to testify that Sunken Seaweed is only beginning to test for the presence of chemical contaminants in seaweed grown through its pilot project, and does not have results yet. Howard Decl. Ex. 13, Polizzi Dep. Tr. at 32:13-21. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| 20. The U.S.S. Midway attracts 1.4 million visitors to the Bay annually and is San Diego's most popular attraction. | [Howard Decl.] Ex. 11, PTA (S. Cloward) Dep. Tr. at 62:2-24.<br><br>[Howard Decl.] Ex. 36, PTA (S. Cloward) Dep. Ex. 8 (U.S.S. Midway Museum Fact Sheet). | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the third party witness testimony and underlying exhibit Monsanto cites in support, as an improper expert opinion, and as lacking foundation. As demonstrated in her own testimony, Ms. Cloward's statements are not based on personal knowledge, and in fact are based on inadmissible hearsay.<br><br>RESPONSE:<br><br>The "popularity" of a Naval museum is not relevant to any party's claims or defenses, and specifically not determinative of whether a public nuisance exists in the Bay. The "popularity" of a tourist attraction is not mutually exclusive to the existence of a nuisance, and the Port District has not alleged poor attendance at the U.S.S. Midway museum as an impairment caused by the PCB nuisance in the Bay.<br><br>Monsanto mischaracterizes the underlying deposition exhibit, as a result the corresponding testimony is also misleading. PTA Deposition Exhibit 8 is a December 2017 "Museum Fact Sheet" that appears to be published by the USS Midway Museum for purposes of promoting the USS Midway Museum. It does not claim that the USS Midway Museum is "San Diego's most popular attraction," which on its own is a statement without any basis or explanation of the measure of "popularity." Rather, Exhibit 8 states in a section called "Accolades" that, as of an unspecified date, the Museum was "[r]anked #1 among all major San Diego attractions on tripadvisor.com."<br><br>The witness testified that she had never seen the fact sheet, and offered no testimony about the basis and or credibility of "tripadvisor.com" or "popularity" rankings, ultimately concluding that she had no information about how many people attend other popular tourist destinations such as the San Diego Zoo or |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Legoland on an annual basis. Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 61:13-65:7. |
| 21. Cruise calls to the Bay have grown 14 percent from 2015 to 2017. | [Howard Decl.] Ex. 5, Port 30(b)(6) (J. Giffen) Dep. Tr. at 1433:18-23. | Undisputed | |
| 22. The Port sponsors many events annually through its Tidelands Activation Program, but the Port does not warn the public about the presence of PCBs in the Bay when promoting these events. | [Howard Decl.] Ex. 5, Port 30(b)(6) (J. Giffen) Dep. Tr. at 1472:4-10. | Disputed | OBJECTION:

The Port District objects to Monsanto's purported undisputed fact as a outside of the scope and a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below.

RESPONSE/CONTROVERTING EVIDENCE:

Monsanto omits key context and clarifying testimony. The Port District's Assistant Vice President, Planning and Green Port (Jason Giffen) testified during Monsanto's 30(b)(6) deposition of the Port District that many events that the Port District sponsors take place at public fishing piers, at which the Port District displays prominent signage about the State's PCB Fish Consumption Advisory. *See, e.g.*, Howard Decl. Ex. 5, Port 30(b)(6) (J. Giffen) Dep. Tr. at 1478:19-1479:24.

Further, Monsanto attributes this purported fact to 30(b)(6) testimony of Jason Giffen, but Mr. Giffen was not designated to testify on the topic of warnings to the public about PCBs. Monsanto initially issued a deposition notice pursuant to Rule 30(b)(6) with 110 separate topics. Corley Decl. Ex. 79, Port 30(b)(6) (M. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Johns) Dep. Ex. 1 (Monsanto Rule 30(b)(6) Deposition Notice to Port District)(April 27, 2017). One of those topics is as follows: "The Port District's communications, warnings, and/or instructions from 1963 to present concerning PCBs, including health or environmental risks associated with potential exposure to PCBs, testing or sampling for the presence of PCBs, and the presence of PCBs in the Bay or on Trust Property." Corley Decl. Ex. 79, Port 30(b)(6) (M. Johns) Dep. Ex. 1 (Monsanto Rule 30(b)(6) Deposition Notice to Port District)(April 27, 2017); Corley Decl. Ex. 81, Port 30(b)(6) (K. Holman) Dep. Ex. 187 (Chart of Holman-Designated Topics). As such, any testimony by Mr. Giffen regarding "[t]he Port District's communications, warnings, and/or instructions … concerning PCBs, including … the presence of PCBs in the Bay or on Trust Property" " is neither binding as the Port District's final position, nor exhaustive. |
| 23. The Bay is the host venue for large events attracting hundreds of thousands of visitors like the Fourth of July "Big Bay Boom," Baja Ha Ha Regatta, the Christmas Parade of Lights, and ongoing Hornblower Cruises (harbor cruises). PCBs | [Howard Decl.] Ex. 11, PTA (S. Cloward) Dep. Tr. at 83:13-16, 88:10-14, 102:1-22, 103:11-104:16. | Disputed | OBJECTION: The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the third party witness testimony Monsanto cites in support, as an improper expert opinion, and as lacking foundation. As demonstrated in her own testimony, Ms. Cloward's statements are not based on personal knowledge, and in fact are based on inadmissible hearsay. RESPONSE: The number of visitors to Bay-area attractions and events is not relevant to any party's claims or defenses, and specifically not determinative of whether a public nuisance exists in the Bay. Significant attendance and participation at these attractions and events is not mutually exclusive to the existence of a |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| have never interfered with these events. | | | nuisance, and the Port District has not alleged poor attendance at these attractions and events as an impairment caused by the PCB nuisance in the Bay.<br><br>Monsanto mischaracterizes the witness's testimony. None of the quoted testimony supports the statement that the described events "attract[] hundreds of thousands of visitors." The only mention of the number of attendees for any events in the quoted testimony is when the witness agreed with Monsanto's counsel's assertion that the annual parade of lights may attract "approximately 150,000 spectators along the shoreline of San Diego Bay" is "something that you would consider reasonably accurate." Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 103:11-104:10. The witness did not testify that she had knowledge of whether or not PCBs interfered with these events, which is irrelevant in any event.<br><br>The same witness *did testify* that she was not aware of the State of California's 2013 PCB Fish Consumption Advisory, which undisputedly exists and is in force, then went on to testify that "I don't know anything about PCBs other than it was banned from our water – banned a long time ago. .. and that it comes from boatyards and stuff like that." Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 190:15-18; 192:21-193:4. |
| 24. PCBs have never had any impact on historical events like America's Cup races held in the Bay from 1987 to 1995. | [Howard Decl.] Ex. 11, PTA (S. Cloward) Dep. Tr. at 86:8-11. | Disputed | <u>OBJECTION:</u><br><br>The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the third party witness testimony Monsanto cites in support, as an improper expert opinion, and as lacking foundation. As demonstrated in her own testimony, Ms. Cloward's statements are not based on personal knowledge, and in fact are based on inadmissible hearsay.<br><br><u>RESPONSE:</u> |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | The number of visitors to Bay-area attractions and events is not relevant to any party's claims or defenses, and specifically not determinative of whether a public nuisance exists in the Bay. Significant attendance and participation at these attractions and events is not mutually exclusive to the existence of a nuisance, and the Port District has not alleged poor attendance at these attractions and events as an impairment caused by the PCB nuisance in the Bay.<br><br>Monsanto mischaracterizes the witness's testimony. The witness offered only an unqualified, unsupported statement "No" in response to Monsanto's counsel's question "Do you have any information to indicate that PCBs ever impacted any decision in holding the America's Cup Races in San Diego Bay from 1987 to 1995?" Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 86:8-11. The same witness testified that she was not aware of the State of California's 2013 PCB Fish Consumption advisory, which undisputedly exists and is in force, then went on to testify that "I don't know anything about PCBs other than it was banned from our water – banned a long time ago. .. and that it comes from boatyards and stuff like that." Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 190:15-18; 192:21-193:4. |
| 25. Recreational boating and water sport activities in and on the Bay are very active and unaffected by PCBs. | [Howard Decl.] Ex. 11, PTA (S. Cloward) Dep. Tr. at 36:2-10, 109:18-110:7. | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the third party witness testimony Monsanto cites in support, as an improper expert opinion, and as lacking foundation. As demonstrated in her own testimony, Ms. Cloward's statements are not based on personal knowledge, and in fact are based on inadmissible hearsay.<br><br>RESPONSE:<br><br>The fact that the Bay is used for boating and watersports is not relevant to any party's claims or defenses, and specifically not determinative of whether a |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | public nuisance exists in the Bay. The fact that the Bay can be used for boating and other watersports is not mutually exclusive to the existence of a nuisance, and – other than where sediment caps preclude recreational boating – the Port District has not alleged any impact to boating and watersports as an impairment caused by the PCB nuisance in the Bay.<br><br>Monsanto mischaracterizes the witness's testimony. The first quoted passage describes the witness's understanding of marina occupancy rates in terms of "public demand for their – their services," and does not discuss PCBs. PTA (S. Cloward) Dep. Tr. at 36:2-10. The second quoted passage discusses boat shows and the witness's unsupported, unqualified opinion testimony, which was offered in terms of a mere "yes" agreement with Monsanto's counsel's statement that "as we speak, in 2019, that [boat show] industry seems to be doing well." Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 109:18-110:7. The same witness testified that she was not aware of the State of California's 2013 PCB Fish Consumption advisory, which undisputedly exists and is in force, then went on to testify that "I don't know anything about PCBs other than it was banned from our water – banned a long time ago. .. and that it comes from boatyards and stuff like that." Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 190:15-18; 192:21-193:4. |
| 26. The Port Tenants Association considers the sport fishing industry in the Bay to be "thriving," and the boat launch at Shelter Island is the busiest in the entire State of California, | [Howard Decl.] Ex. 11, PTA (S. Cloward) Dep. Tr. at 48:1-13, 95:18-21. | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the third party witness testimony Monsanto cites in support, as an improper expert opinion, and as lacking foundation.<br><br>RESPONSE:<br><br>The fact that the Bay is home port to a fleet of *offshore sport fishing vessels that take passengers far outside the Bay to fish* is not relevant to any party's claims |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| with an estimated 50,000 launches annually. | | | or defenses, and specifically not determinative of whether a public nuisance exists in the Bay. The fact that the Bay can be used to dock offshore fishing vessels and embark/disembark passengers to those vessels is not mutually exclusive to the existence of a nuisance. Other than where sediment caps preclude navigation of such vessels, the Port District has not alleged any impact to the offshore sportfishing industry as an impairment caused by the PCB nuisance in the Bay. |
| | | | Monsanto mischaracterizes the witness's testimony. The first quoted passage concerns usage of the Shelter Island Boat ramp, and the witness testified that she has no personal knowledge of how busy it is. Rather, the witness testified that she "understand through yacht brokers" that it is the busiest in California. Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 48:1-13. The witness went on to expressly testify that "we [the Port Tenants Association] don't keep data" about actual usage of the Bay, stating repeatedly when asked what type of data the Association collects that "we don't keep data, like actual data in a file. No we don't keep data. … I get reports at a board meeting, an oral report; like, how the hotels doing, the restaurants are doing, But it's not actual data that we, at the Port Tenants Association, collects and put in a computer. I just get reports at a general board meeting." Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 48:24-50:3. |
| | | | The second quoted passage is an entirely unsupported and unqualified opinion, stated as a mere "yes" to Monsanto's counsel's question "[W]ould you consider the sportfishing industry in San Diego Bay to be thriving?" Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 95:18-21. |
| 27. High Seas Fuel Dock, a long-time Port tenant, has seen continuous | [Howard Decl.] Ex. 14, High Seas Fuel Dock (R. Motta) Dep. | Disputed | OBJECTION:

The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the third party witness testimony Monsanto cites in |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| growth in the Bay, and this Port tenant has been turning a larger profit every year since 2013. | Tr. at 11:9-24, 19:20-25. | | support. Additionally, Monsanto ignores significant controverting evidence as described below.<br><br>RESPONSE/CONTROVERTING EVIDENCE:<br><br>The state of the economy and performance of a certain business located in or around the Bay is not relevant to any party's claims or defenses, and specifically not determinative of whether a public nuisance exists in the Bay. Strong economic performance is not mutually exclusive to the existence of a nuisance, and the Port District has not alleged poor economic performance of this (or any other) tenant business as an impairment caused by the PCB nuisance in the Bay.<br><br>Monsanto omits key context and clarifying testimony. When Monsanto took the deposition of High Seas Fuel Dock's Manager, Mr. Richard Motta II, Mr. Motta testified that the company's growth since 2013 related to his hiring in 2013 and improved management. Specifically, Mr. Motta testified as follows:<br><br>Q Okay. How has High Seas Fuel Dock performed over the past decade?<br><br>A There's been some lulls, as the owner's son was in charge until 2013 when I took over, and there was some -- some real issues but not necessarily because of any other factors other than our in-house issues. But we struggled, but we came out of it.<br><br>Q And since that time, has High Seas Fuel Dock grown?<br><br>A Every year, we've made more money since 2013. I can tell you that for a fact. Every year, we've sold more gallons and made more money since 2013 since I've been in charge. Every year. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Howard Decl. Ex. 14, High Seas Fuel Dock (R. Motta) Dep. Tr. at R. Motta Dep. Tr. at 19:13-25. |
| 28. The Port has never raised the topic of PCBs with High Seas Fuel Dock, and neighbors and customers have never complained to High Seas Fuel Dock about PCBs. | [Howard Decl.] Ex. 14, High Seas Fuel Dock (R. Motta) Dep. Tr. at 33:23-34:5, 35:21-36:9, 36:21-25. | Undisputed | |
| 29. PCBs have had no impact on swimming, military and civilian scuba diving, or marine recreation in the Bay, and paddle boarding is today the "number one" activity on the Bay. | [Howard Decl.] Ex. 11, PTA (S. Cloward) Dep. Tr. at 67:25-68:6, 104:17-21, 116:16-25. | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the third party witness testimony Monsanto cites in support, as an improper expert opinion, and as lacking foundation. As demonstrated in her own testimony, Ms. Cloward's statements are not based on personal knowledge, and in fact are based on inadmissible hearsay.<br><br>RESPONSE:<br><br>The fact that the Bay is used for watersports is not relevant to any party's claims or defenses, and specifically not determinative of whether a public nuisance exists in the Bay. The fact that the Bay can be used for watersports is not mutually exclusive to the existence of a nuisance, and – other than where sediment caps preclude access to watersports participants – the Port District has |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | not alleged any impact to watersports as an impairment caused by the PCB nuisance in the Bay.<br><br>Monsanto mischaracterizes the witness's testimony. The quoted passages are unqualified, unsupported opinions that include "Paddleboarding's like, probably the number one thing that you see out on the bay now." Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 67:25-68:6. As described in response to other purported undisputed facts about bay usage and cited to the Port Tenants Association deposition, the witness testified repeatedly that such assertions were not based on actual usage data, because the Association does not collect or have access to such data. Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 48:24-50:3.<br><br>The second quoted passage is merely the witness's response "No" to Monsanto's counsel's question "Do you have any information whether PCBs have impacted swimming or recreation in San Diego Bay at all?" It is not an assertion that the Port Tenants Association has information to support the statement that "PCBs have had no impact on swimming, military and civilian scuba diving, or marine recreation in the Bay. Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 104:17-21.<br><br>The third quoted passage states only that military and civilian divers participate in an annual bay cleanup event that the Port Tenants Association promotes, and again is not a statement as to whether diving has been impacted by PCBs or not. Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 116:16-25.<br><br>The same witness testified that she was not aware of the State of California's 2013 PCB Fish Consumption advisory, which undisputedly exists and is in force, then went on to testify that "I don't know anything about PCBs other than it was banned from our water – banned a long time ago. .. and that it comes |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | from boatyards and stuff like that." Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 190:15-18; 192:21-193:4. |
| 30. There are no environmental conditions or regulatory prohibitions that prevent the public from swimming in the Bay. | [Howard Decl.] Ex. 11, PTA (S. Cloward) Dep. Tr. at 55:6-9, 67:22-24. | Disputed | OBJECTION: <br><br> The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the third party witness testimony Monsanto cites in support, as an improper expert opinion, and as lacking foundation. As demonstrated in her own testimony, Ms. Cloward's statements are not based on personal knowledge, and in fact are based on inadmissible hearsay. <br><br> RESPONSE: <br><br> The fact that the Bay is used for watersports is not relevant to any party's claims or defenses, and specifically not determinative of whether a public nuisance exists in the Bay. The fact that the Bay can be used for watersports is not mutually exclusive to the existence of a nuisance, and – other than where sediment caps preclude access to watersports participants – the Port District has not alleged any impact to watersports as an impairment caused by the PCB nuisance in the Bay. <br><br> Monsanto mischaracterizes the witness's testimony. The first quoted passage states only that the witness is not personally aware of anything in terms of condition of the bay that prevents anyone from swimming in the bay. Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 55:6-9. <br><br> The second quoted passage states only that the witness is not personaly aware of regulatory prohibitions against swimming in the Bay. Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 67:22-24. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | The same witness testified that she was not aware of the State of California's 2013 PCB Fish Consumption advisory, which undisputedly exists and is in force, then went on to testify that "I don't know anything about PCBs other than it was banned from our water – banned a long time ago. .. and that it comes from boatyards and stuff like that." Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 190:15-18; 192:21-193:4. |
| 31. Shelter Island is a popular swimming beach that is "well-attended." | [Howard Decl.] Ex. 11, PTA (S. Cloward) Dep. Tr. at 48:14-21. | Disputed | OBJECTION: <br><br> The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the third party witness testimony Monsanto cites in support, as an improper expert opinion, and as lacking foundation. As demonstrated in her own testimony, Ms. Cloward's statements are not based on personal knowledge, and in fact are based on inadmissible hearsay. <br><br> RESPONSE/CONTROVERTING EVIDENCE: <br><br> The fact that the Bay is used for watersports is not  relevant to any party's claims or defenses, and specifically not determinative of whether a public nuisance exists in the Bay. The fact that the Bay can be used for watersports is not mutually exclusive to the existence of a nuisance, and – other than where sediment caps preclude access to watersports participants – the Port District has not alleged any impact to watersports as an impairment caused by the PCB nuisance in the Bay. <br><br> Monsanto mischaracterizes the witness's testimony and omits key context. The quoted passage describes a picture shown to the witness by Monsanto's counsel, which counsel describes as "there's also a beach  -- it looks like on the left hand slide of that slide – and – and a small beach. Is that correct, a swimming beach?" The witness responds "Yes. There's – people go swimming off there. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | They do camping. They – family picnics." Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 48:14-21.<br><br>When asked immediately afterward by Monsanto's counsel whether the Port Tenants Association keeps any data to support that statement, the witness testified as follows:<br><br>Q Does the Port Tenants Association keep any data in terms of the amount of people using the bay?<br><br>A We don't keep data, but I report out about how busy the particular areas are to the port. And the reason I report out is because, when the port leases a park space for a wedding and we have other things happening on an area, I always like to let them know that we have a lot of things going on in this area so that they can actually suggest to do the wedding at a different place. So -- and, plus, I'm extremely familiar with Shelter Island because I walk it every single day.<br><br>…<br><br>Q So does the Port Tenants Association keep data in terms of how many people come to the bay on an annual basis?<br><br>A We don't keep data, like actual data in a file. No, we do not keep data.<br><br>Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 48:22-49:21. |
| 32. Approximately 99.7 percent of the Bay has never been subject to a Regional Board | [Howard Decl.] Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 265:10-15. | Undisputed | |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| Cleanup and Abatement Order ("CAO") for PCBs. | | | |
| 33. There is no evidence that fish, mammal, or bird populations in the Bay are harmed by PCBs. | [Howard Decl.] Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 239:12-18, 280:7-10.<br><br>[Howard Decl.] Ex. 20, A. Jones Dep. Tr. at 64:7-20. | Disputed | <u>OBJECTION:</u><br><br>The Port District objects to Monsanto's purported undisputed fact as outside of the scope and a mischaracterization of the 30(b)(6) and expert testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below.<br><br><u>RESPONSE:</u><br><br>Monsanto attributes this purported fact to 30(b)(6) testimony of Dr. Michael Johns, but Dr. Johns was not designated to testify on the topic of whether fish, mammal, or bird populations in the Bay are harmed by PCBs. Monsanto initially issued a deposition notice pursuant to Rule 30(b)(6) with 110 separate topics. Corley Decl. Ex. 79, Port 30(b)(6) (M. Johns) Dep. Ex. 1 (Monsanto Rule 30(b)(6) Deposition Notice to Port District)(April 27, 2017). After the parties removed some topics by negotiation, Judge Schopler struck many others on the Port District's motion on April 25, 2019. Corley Decl. Ex. 80a-b, ECF Nos. 360, 354. The remaining topics were designated, in advance of Monsanto's Rule 30(b)(6) deposition of the Port District, to be covered by specific witnesses.<br><br>One of Monsanto's specific topics that survived was "54. Studies assessing the presence and impacts of contamination in the Bay," which was assigned to the Port District's Director of Environmental Protection, Karen Holman. *See* Corley Decl. Ex. 81, Port 30(b)(6) (K. Holman) Dep. Ex. 187 (Chart of Holman-Designated Topics). None of the topics that Dr. Johns was designated as a witness on covered specific injury to "fish, mammal, or bird populations" due to |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | the presence of PCBs. As such, any testimony by Dr. Johns regarding "evidence that fish, mammal, or bird populations in the Bay are harmed by PCBs" is neither binding as the Port District's final position, nor exhaustive.<br><br>Monsanto also mischaracterizes the testimony of the Port District's expert witness, Dr. Ann Jones. Dr. Jones testified, in the cited passage of her deposition, that it would be difficult to attribute *individualized* impacts to waterfowl, fish, or mammals to PCBs. Howard Decl. Ex. 20, A. Jones Dep. Tr. at 64:7-20. She did not testify that *populations* of these organisms have not been impacted, and that would be outside of the scope of her assignment in this case.<br><br>CONTROVERTING EVIDENCE:<br><br>Monsanto also ignores significant controverting evidence regarding other ecological impacts and risks that PCBs present to fish and wildlife in the Bay. For example:<br><br>• Dr. Johns, Ms. Holman, and Mr. Bennett all also testified as Port District 30(b)(6) witnesses that the Regional Water Quality Control Board listed the entire Bay as impaired for PCBs in fish tissue in approximately 2006, and that the Bay remains so listed. Howard Decl. Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 77:4-6; Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1725:14-19; Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1035:7-24 (during Mr. Bennett's tenure as General Counsel the Port District received notice from the Regional Water Quality Control Board that the entire Bay was impaired by PCBs)<br><br>• Monsanto's own expert testified that the Bay is listed as impaired for purposes of Section 303(d) of the federal Clean Water Act and that the SDRWQCB is "considering" implementing a Total Maximum Daily Load mechanism to reduce inputs of PCBs, with the only major sources listed as |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | "contaminated sediments" and "urban runoff/storm sewers." Corley Decl. Ex. 82, Boehm Dep. at 329:20-332:18.<br><br>• PCBs exist in certain Bay organisms, such as invertebrates, fish and birds, at levels above risk thresholds. Corley Decl. Ex. 12, Jones Rep. at 3.<br><br>• Survey results revealed PCB levels in spotted sand bass ranging from 89 ppb to 1,075 ppb—and toxic effects on fish are reported in scientific literature at concentrations as low as 30 ppb. Corley Decl. Ex. 12, Jones Rep. at 3.<br><br>• A 2016 bioaccumulation study performed in San Diego Bay determined that accumulation and biomagnification of PCBs by marine organisms posed potential harm to all trophic levels. Corley Decl. Ex. 85, Trapp Rep. at 14.<br><br>• Piscivore bird species, including sensitive species of concern nesting in the San Diego Bay National Wildlife Refuge, may be at reproductive risk due to PCB levels in bird eggs above screening levels for adverse effects. Corley Decl. Ex. 12, Jones Rep. at 3.<br><br>• At PCB remediation sites in the Bay, the SDRWQCB has recognized PCB levels in sediment that exceed Effects Range Low ("ERL"), the concentration (below which environmental toxic effects are scarcely observed or predicted), and/or Effects Range Median ("ERM"), (the concentration above which environmental toxic effects are generally or always observed). Corley Decl. Ex. 8, Woodyard Dep. at 130:2-133:8; Corley Decl. Ex. 70, Tentative IO No. R9-2018-0035 at 4; Corley Decl. Ex. 85, Trapp Rep. at 14. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | • SDRWQCB has repeatedly identified PCB sediment contamination as a potential threat to aquatic life. Corley Decl. Ex. 11, CAO No. R9-2015-0018 at 3; Corley Decl. Ex. 9, CAO No. R9-2017-0021.<br><br>• Fish tissue samples taken by state agencies show that the Bay suffers from some of the highest PCB concentrations in the region. Corley Decl. Ex. 5, SWAMP Report at 47.<br><br>• In fact, the Bay is among the most PCB-contaminated water bodies in the country. Corley Decl. Ex. 85, Trapp Rep. at 14.<br><br>• The SDRWQCB and SWRCB have designated the Bay, in its entirety, as an "impaired" water body, due to the presence of elevated levels of PCBs in fish tissue, pursuant to § 303(d) of the Clean Water Act. Corley Decl. Ex. 6, CWA §305(b); 303(d) Integrated Report; Corley Decl. Ex. 7, Port Corp. Rep. at 77:4-6; 1035:7-24; 1725:14-19; Corley Decl. Ex. 8, Woodyard Dep. at 127:16-18; Corley Decl. Ex. 9, CAO No. R9-2017-0021; Corley Decl. Ex. 85, Trapp Rep. at 14-15.<br><br>• Monsanto's own expert testified that the Bay is listed as impaired for purposes of Section 303(d) of the federal Clean Water Act and that the SDRWQCB is "considering" implementing a Total Maximum Daily Load mechanism to reduce inputs of PCBs, with the only major sources listed as "contaminated sediments" and "urban runoff/storm sewers." Corley Decl. Ex. 82, Boehm Dep. Tr. at 329:20-332:18.<br><br>• The SDRWQCB has repeatedly recognized that various areas of the Bay have contamination levels that "may adversely affect San Diego Bay beneficial uses" and pose a risk to human health and the environment. Corley Decl. Ex. 10, CAO No. R9-2004-0295 at 24; Corley Decl. Ex. 8, |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Woodyard Dep. at 129:3-8; Corley Decl. Ex. 11, CAO No. R9-2015-0018 at 3; Corley Decl. Ex. 9, CAO No. R9-2017-0021 at 5.<br><br>• Because of the well-established human health risks associated with exposure to PCBs, in 2013, California's Office of Environmental Health Hazard Assessment ("OEHHA") determined that PCB contamination levels were so high that people should limit, or avoid altogether, the consumption of certain fish from the Bay. OEHHA amended the FCA in 2018 to implement even more stringent restrictions for children and women of childbearing age. Corley Decl. Ex. 1a-e, Fish Consumption Advisory; Corley Decl. Ex. 13, Jones Rebuttal at 13-14; Corley Decl. Ex. 14, Toll Rebuttal at 2; Corley Decl. Ex. 85, Trapp Rep. at 14; Corley Decl. Ex. 86, Ann S. Jones Declaration.<br><br>• Consumption advisories are de facto harms under federal regulations because they interfere with the public's free and comfortable use of a resource. Corley Decl. Ex. 13, Jones Rebuttal at 7; 43 C.F.R. § 11.62(f)(1)(iii).<br><br>• Data suggests that anglers in the Bay who are aware of the FCA consume less fish, and statewide consumption rates before the FCA were higher than after. Corley Decl. Ex. 13, Jones Rebuttal at 17; Corley Decl. Ex. 14, Toll Rebuttal at 8, Fg. 2-1; Corley Decl. Ex. 86, Ann S. Jones Declartion at ¶11.<br><br>• According to Monsanto's expert, somewhere between 65-81% of fish caught from the Bay are precluded from consumption by children or women under age 45. Corley Decl. Ex. 15, Desvousges Dep. at 91:19-92:5.<br><br>• Monsanto's expert admits that the most often caught and consumed fish, the Pacific chub mackerel, is subject to a "Do Not Eat" advisory for children and women under 45, which affects a population demographic that represents the majority of the population in and around San Diego. Corley |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Decl. Ex. 15, Desvousges Dep. at 101:20-24; 102:4-10; Corley Decl. Ex. 16, San Diego Census Data.<br><br>• A full 7.5% of consumers who voluntarily responded to the San Diego Fish Consumption Study reported consuming "Do Not Eat" fish. Corley Decl. Ex. 13, Jones Rebuttal at 13-14; Corley Decl. Ex. 76, SCWRRP San Diego Bay Fish Consumption Study (2017).<br><br>• Site-specific data for the Bay suggests that certain ethnic minority groups engage in subsistence fishing at a much higher rate than the general population, meaning the risk to those communities is dramatically higher. Corley Decl. Ex. 13, Jones Rebuttal at 17; Corley Decl. Ex. 21, Environmental Health Coalition Survey of Fishers; Corley Decl. Ex. 86, Ann S. Jones Declaration at ¶ 20.<br><br>• There is evidence that Monsanto's PCBs pose risks to marine life in the Bay. While PCB impacts to marine life have not been fully quantified, PCBs exist in Bay organisms, such as invertebrates, fish and birds, at levels above risk thresholds. Corley Decl. Ex. 12, Jones Rep. at 3; Corley Decl. Ex. 13, Jones Rebuttal at 3; Ann S. Jones Declaration at ¶¶7-9.<br><br>• The Port has been dealing with the PCB problem for decades. As early as the mid-1980s, the Port was involved in addressing PCB contamination, including funding for the San Diego Bay Cleanup Project. Corley Decl. Ex. 73, 1987 Port Ltr.; Corley Decl. Ex. 74, 1987 Health Risk Study Correspondence.<br><br>• The Port has been involved in numerous PCB cleanups around the Bay. Corley Decl. Ex. 72, Brown Dep. at 98:17-19; 231:1-19. |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | • The Port lead the Campbell Shipyard remediation. Corley Decl. Ex. 72, Brown Dep. at 98:17-19; 231:1-19.

• PCB contamination has required substantial expenditure of funds— estimated to be at least $80-100 million—from the Port that otherwise would have been invested in enhancing the Bay for the benefit of the people of California. Corley Decl. Ex. 7, Port Corp. Rep. 1214:18-1216:25; *see* Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1263:9-1264:6 (noting that these costs are not an exhaustive total of costs spent by the Port District to deal with the presence of PCBs in the Bay.).

• More recently, the Port partnered with SDRWCQB in a project to assess contaminants in fish and shellfish in the Bay and funded the San Diego Fish Consumption Study. Corley Decl. Ex. Ex. 75, State Agency Document re Assessing Contaminants in Fish and Shellfish; Corley Decl. Ex. 76, 2017 SCCWRP Fish Consumption Study.

• In the view of the SDRWQCB, PCBs are a significant problem in the Bay, and mitigating the risk associated with human exposure is a priority for the SDRWQCB. In fact, the Executive Officer of the SDRWQCB stated in a declaration submitted in support of the Port, that the agency is focused on restoring the fish and shellfish consumption beneficial use, which is directly impaired by PCBs. In August 2019 the full SDRWQCB expressed its priority of mitigating the contamination underlying the FCA. Corley Decl. Ex. 13, Jones Rebuttal at 6-7; Corley Decl. Ex. 4, Golightly Rep. at 2, 34. Corley Decl. Ex. 23, Declaration of David W. Gibson, Executive Director, SDRWQCB |
| 34. The term "PCBs" cannot be found anywhere on the | [Howard Decl.] Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at | Disputed | OBJECTION: |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| Port website, in its Port Code, or in the Port's Master Plan. | 1799:4-8, 1971:18-25, 1972:4-12.<br><br>[Howard Decl.] Ex. 43, Port 30(b)(6) (M. Johns) Dep. Ex. 29 (2017 Port of San Diego Master Plan) (Aug. 2017). | | The Port District objects to Monsanto's purported undisputed fact as outside of the scope of the 30(b)(6) testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below.<br><br>RESPONSE:<br><br>Monsanto attributes this purported fact to 30(b)(6) testimony of Karen Holman and Dr. Michael Johns, but neither of these witnesses were designated or prepared to testify on the topics of whether specific terms can or cannot be "found anywhere" on the Port District's website, in the Port Code, or in the Port District's Master Plan. Monsanto initially issued a deposition notice pursuant to Rule 30(b)(6) with 110 separate topics. Corley Decl. Ex. 79, Port 30(b)(6) (M. Johns) Dep. Ex. 1 (Monsanto Rule 30(b)(6) Deposition Notice to Port District)(April 27, 2017). After the parties removed some topics by negotiation, Judge Schopler struck many others on the Port District's motion on April 25, 2019. Corley Decl. Ex. 80a-b, ECF Nos. 360, 354. The remaining topics were designated, in advance of Monsanto's Rule 30(b)(6) deposition of the Port District, to be covered by specific witnesses.<br><br>None of these topics covered or called for a witness to be prepared on the topic of whether of specific terms could be "found anywhere" across dynamic data sources. The Port District's website, Port Code, and Port District's Master Plan are all subject to change – and actually often changed. *See*, *e.g.* Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1960:19-22 ("And we recently -- and actually, we've had several iterations of revised web platforms that have been public facing, so we've been kind of in an ongoing revision to our website for several years now."). As such, any testimony by Ms. Holman, Dr. Johns or any other 30(b)(6) witness as to whether specific terms can or cannot be "found anywhere" on the Port District's website, in the Port Code, or in the Port District's Master Plan on is neither binding as the Port District's final position, nor exhaustive. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | CONTROVERTING EVIDENCE: Moreover, as counsel for Monsanto is well aware, as of the date of Ms. Holman's first day of 30(b)(6) deposition (May 16, 2019), the Port District in fact *did* include the OEHHA 2013 PCB Fish Consumption Advisory on its website. During Ms. Holman's deposition the following exchange occurred: "Q Okay. So, as you sit here today, it's unclear whether the fish advisory is posted on the Port 15 website; correct? A That's correct. Q Well, if I wanted to find out where on the Port website to find a fish advi- -- fish advisory, do you know where I'd look? A Probably under the environmental page or pages if it were to be on there, and if it were on there, I would guess that it would be a link to the OEHHA advisories." Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1791:13-23. The OEHHA 2013 PCB Fish Consumption Advisory does, in fact, include the term "PCB". *See* Corley Decl. Ex. 1a-e, Fish Consumption Advisory. After Ms. Holman testified that she believed that the OEHHA 2013 PCB Fish Consumption Advisory was on the Port District's website, on the next break counsel for the Port District pointed out that it *was* in fact included on the Port District's website. While this fact is not reflected in the transcript, counsel for Monsanto referenced it shortly afterward in the deposition. *See* Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1805:16-19 ("[a]nd unless Mr. Homer can -- can find it, as he's been finding other things, at some point, I'd like to see what a GA- -- GIS map of the Port's stormwater infrastructure looks like."). |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| 35. The Port acknowledges that PCBs are not its primary or sole environmental issue or concern for the Bay. | [Howard Decl.] Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 780:16-21.<br><br>[Howard Decl.] Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1921:2-19. | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as outside of the scope of the 30(b)(6) testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below.<br><br>RESPONSE:<br><br>Monsanto attributes this purported fact to 30(b)(6) testimony of Eileen Maher, but Ms. Maher was neither designated nor prepared to testify on the Port District's prioritization – if such prioritization even existed – of its "environmental issues or concerns." Monsanto initially issued a deposition notice pursuant to Rule 30(b)(6) with 110 separate topics. Corley Decl. Ex. 79, Port 30(b)(6) (M. Johns) Dep. Ex. 1 (Monsanto Rule 30(b)(6) Deposition Notice to Port District)(April 27, 2017). After the parties removed some topics by negotiation, Judge Schopler struck many others on the Port District's motion on April 25, 2019. Corley Decl. Ex. 80a-b, ECF Nos. 360, 354. The remaining topics were designated, in advance of Monsanto's Rule 30(b)(6) deposition of the Port District, to be covered by specific witnesses.<br><br>None of these topics covered or called for a witness to be prepared on the topic of prioritization even existed – of its "environmental issues or concerns." As such, any testimony by Ms. Maher on the Port District's prioritization of "environmental issues or concerns" is neither binding as the Port District's final position, nor exhaustive.<br><br>CONTROVERTING EVIDENCE:<br><br>Moreover, Monsanto ignores directly relevant and controverting evidence, including but not limited to the following: |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | • The Port District's Director of Environmental Protection, Karen Holman testified in her capacity as a 30(b)(6) witness that the Port District does not rank its pollution priorities. Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1699:20-1700:16.<br><br>• From the Port's perspective PCBs are a big problem in the Bay. Corley Decl. Ex. 72, Brown Dep. at 61:1.<br><br>• The Port has been dealing with the PCB problem for decades. As early as the mid-1980s, the Port was involved in addressing PCB contamination, including funding for the San Diego Bay Cleanup Project. Corley Decl. Ex. 73, 1987 Port Ltr.; Corley Decl. Ex. 74, 1987 Health Risk Study Correspondence.<br><br>• The Port has been involved in numerous PCB cleanups around the Bay. Corley Decl. Ex. 72, Brown Dep. at 98:17-19; 231:1-19.<br><br>• The Port lead the Campbell Shipyard remediation. Corley Decl. Ex. 72, Brown Dep. at 98:17-19; 231:1-19.<br><br>• In his capacity as a Port District 30(b)(6) witness, the Port District's former General Counsel (Duane Bennett) testified that the Port District has incurred past costs of approximately $80-100MM at and related to PCB cleanup sites. Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1214:18-1217:1. *see* Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1263:9-1264:6 (noting that these costs are not an exhaustive total of costs spent by the Port District to deal with the presence of PCBs in the Bay.).<br><br>• More recently, the Port partnered with SDRWCQB in a project to assess contaminants in fish and shellfish in the Bay and funded the San Diego Fish Consumption Study. Corley Decl. Ex. 75, State Agency Document |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | re Assessing Contaminants in Fish and Shellfish; Corley Decl. Ex. 76, 2017 SCCWRP Fish Consumption Study.<br><br>• In the view of the SDRWQCB, PCBs are a significant problem in the Bay, and mitigating the risk associated with human exposure is a priority for the SDRWQCB. In fact, the Executive Officer of the SDRWQCB stated in a declaration submitted in support of the Port, that the agency is focused on restoring the fish and shellfish consumption beneficial use, which is directly impaired by PCBs. In August 2019 the full SDRWQCB expressed its priority of mitigating the contamination underlying the FCA. Corley Decl. Ex. 13, Jones Rebuttal at 6-7; Corley Decl. Ex. 4, Golightly Rep. at 2, 34. Corley Decl. Ex. 23, Declaration of David W. Gibson, Executive Director, SDRWQCB |
| 36. The Port is not currently performing or planning any environmental dredging in the Bay. | [Howard Decl.] Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 616:20-24, 617:2-4. | Undisputed | |
| 37. The Port's Environmental Advisory Committee (which has met quarterly for 13 years and includes members of outside agencies | [Howard Decl.] Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 634:10-25, 635:23-636:4, 636:24-637:12. | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as outside of the scope and a mischaracterization of the 30(b)(6) testimony Monsanto cites in support.<br><br>RESPONSE: |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| and one Port Commissioner, Rafael Castellanos, as the Committee Chair) has never discussed PCBs. | | | Monsanto attributes a purported fact to 30(b)(6) testimony of Eileen Maher, but Ms. Maher was neither designated nor prepared to testify on the topic of the Port District's Environmental Advisory Committee and the contents of its proceedings since inception.<br><br>Monsanto initially issued a deposition notice pursuant to Rule 30(b)(6) with 110 separate topics. Corley Decl. Ex. 79, Port 30(b)(6) (M. Johns) Dep. Ex. 1 (Monsanto Rule 30(b)(6) Deposition Notice to Port District)(April 27, 2017). After the parties removed some topics by negotiation, Judge Schopler struck many others on the Port District's motion on April 25, 2019. Corley Decl. Ex. 80a-b, ECF Nos. 360, 354. The remaining topics were designated, in advance of Monsanto's Rule 30(b)(6) deposition of the Port District, to be covered by specific witnesses.<br><br>None of these topics covered or called for a witness to be prepared on the topic of the Port District's Environmental Advisory Committee and the contents of its proceedings since inception. As such, any testimony by Ms. Holman or any other 30(b)(6) witness as to the form or substance of Environmental Advisory Committee proceedings is neither binding as the Port District's final position, nor exhaustive. |
| 38. The Port's Director of Environmental Conservation has never been asked to prepare briefing materials regarding PCBs for the California State Lands Commission and has never been | [Howard Decl.] Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 624:3-5, 702:11-15, 704:20-25. | Disputed | OBJECTION/RESPONSE:<br><br>Since Monsanto filed this motion, the Port District has been requested to present to the SDRWQCB – and in fact did present to the SDRWQCB, on the issue of PCBs. Corley Decl. Ex. 23, Declaration of David W. Gibson, Executive Director, SDRWQCB |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| asked to make a presentation to the Regional Board about abating PCB conditions in the Bay. | | | |
| 39. The Port has never informed its tenants of its future plans to dredge their leaseholds for PCBs. | [Howard Decl.] Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 706:13-17. | Disputed | OBJECTION: The Port District objects to Monsanto's purported undisputed fact as outside of the scope and a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. RESPONSE: Monsanto attributes a purported fact to 30(b)(6) testimony of Eileen Maher, but Ms. Maher was neither designated nor prepared to testify on the topic of the Port District's Environmental Advisory Committee and the contents of its proceedings since inception. Monsanto initially issued a deposition notice pursuant to Rule 30(b)(6) with 110 separate topics. Corley Decl. Ex. 79, Port 30(b)(6) (M. Johns) Dep. Ex. 1 (Monsanto Rule 30(b)(6) Deposition Notice to Port District)(April 27, 2017). After the parties removed some topics by negotiation, Judge Schopler struck many others on the Port District's motion on April 25, 2019. Corley Decl. Ex. 80a-b, ECF Nos. 360, 354. In fact, on April 25, 2019, Judge Schopler struck a Monsanto-proposed 30(b)(6) topic that would have covered these items. Corley Decl. Ex. 80a, ECF No. 360. That topic was: *73. The location of all areas on Trust Property or in the Bay that the Port District contends have "Impacted Sediments," as defined by the Port District in* |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | *its Amended Damages and Abatement Disclosures served February 26, 2019, and the specific locations where the Port District intends to conduct "Targeted Removal Work" as set forth in the Amended Damages and Abatement Disclosures*<br><br>Corley Decl. Ex. 79, Port 30(b)(6) (M. Johns) Dep. Ex. 1 (Monsanto Rule 30(b)(6) Deposition Notice to Port District)(April 27, 2017); Corley Decl. Ex. 80a-b, ECF Nos. 360, 354 (striking Monsanto 30(b)(6) topic 73). By striking this topic, Judge Schopler made clear that it was not the proper subject of Port District 30(b)(6) testimony. Moreover, the Port District has not completed "future plans to dredge [tenants'] leaseholds for PCBs," and as such there is nothing for the Port District to inform those tenants of. As such, any testimony by Ms. Maher or any other 30(b)(6) witness as to the existence, lack of, or notice related to "future plans to dredge [tenants'] leaseholds for PCBs," is neither binding as the Port District's final position, nor exhaustive. |
| 40. The Regional Board has never ordered the Port or anyone else to eliminate PCBs from the Bay. | [Howard Decl.] Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 93:25-94:3. | Undisputed | |
| 41. In 2006, the Regional Board listed the Bay as "impaired" for PCBs under Clean Water Act Section | [Howard Decl.] Ex. 37, Port 30(b)(6) (M. Johns) Dep. Ex. 5 (Federal CWA Section 303(d) List Comment Letter) (Oct. 20, 2006). | Undisputed | |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| 303(d) ("Section 303(d) listing"). | | | |
| 42. The Port objected to the Section 303(d) listing in 2006, and repeatedly thereafter, and it has not withdrawn those objections. | [Howard Decl.] Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1226:7-1228:9.<br><br>[Howard Decl.] Ex. 2, Port 30(b)(6) (M. Johns) Dep. Ex. 5 (Oct. 20, 2006 Federal CWA Section 303(d) List Comment Letter). | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) testimony and underlying exhibit Monsanto cites in support.<br><br>RESPONSE:<br><br>Monsanto mischaracterizes the witness's testimony and the underlying exhibit. In fact, the Port District has not objected to the proposed Regional Water Quality Control Board's 2006 proposed Section 303(d) listing "repeatedly," and only did so twice, during the same year that the proposal was made. In his capacity as a 30(b)(6) witness, the Port District's former General Counsel Duane Bennett (who held the position at the time of the proposal) testified as follows:<br><br>Q: So when you -- when we talked yesterday about the Port objecting to the State's listing of the bay under 303(d), David Merk authored two letters – one dated January 19, 2006; the other one authored on October 20, 2006 -- outlining to the State the rationale for the Port's objection to the listing of San Diego Bay as impaired for PCBs; correct?<br><br>A Correct.<br><br>Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1226:6-13 (emphasis added); *see* Howard Decl. Ex. 37, Port 30(b)(6) (M. Johns) Dep. Ex. 5 (Oct. 20, 2006 Federal CWA Section 303(d) List Comment Letter) (one of the two 2006 letters referenced by Monsanto's counsel when examining Mr. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Bennett). Monsanto offers no evidence that the Port District has objected to the Regional Water Quality Control Board's action to list all of San Diego Bay as impaired for purposes of the Clean Water Act due to PCBs since October 20, 2006. |
| 43. In the 13 years since the Section 303(d) listing, the Regional Board has not promulgated a "total maximum daily load" ("TMDL") for PCBs anywhere in the Bay. | [Howard Decl.] Ex. 4, Port 30(b)(6) (M. Johns) Dep. Tr. at 80:4-81:4. | Disputed | OBJECTION: <br><br> Monsanto ignores significant controverting evidence as described below. <br><br> CONTROVERTING EVIDENCE: <br><br> Monsanto omits the following critical context: <br><br> Monsanto's expert Dr. Paul Boehm acknowledged in his deposition that the SDRWQCB's current (year 2016) 303(d) listing document states – with respect to PCBs in San Diego Bay – as follows: "Final listing decision: Do not Delist from 303(d) list, (TMDL required list)" and lists as sources "contaminated sediments" and "urban runoff/storm sewers." Corley Decl. Ex. 82, P. Boehm Dep. Tr. at 330:1-25 (emphasis added); Corley Decl. Ex. 6, CWA §305(b); 303(d) Integrated Report. <br><br> Dr. Boehm went on to testify as follows: <br><br> Q. Are PCBs on what the State Board described in this document as the TMDL required list? <br><br> A. That's what it says, but I'm not sure that the TMDL required list means that there's a TMDL in place for PCBs. I know it's being considered. <br><br> Corley Decl. Ex. 82, P. Boehm Dep. Tr. at 333:8-14 (emphasis added). |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| 44. No TMDL is under consideration for PCBs in the Bay. | [Howard Decl.] Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 93:20-24. | Disputed | OBJECTION: The Port District objects to Monsanto's purported undisputed fact a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below. RESPONSE: Monsanto mischaracterizes the witness's testimony, as Dr. Johns testified only that he was "not aware of any" TMDL for PCBs under consideration by the Regional Water Quality Control Board. Additionally, the Port District has no ability to meaningfully testify as to what the Regional Water Quality Control Board is "considering," because it is not the Regional Water Quality Control Board and is not privy to that agency's internal deliberations. CONTROVERTING EVIDENCE: However, Monsanto's expert Dr. Paul Boehm acknowledged in his deposition that the SDRWQCB's current (year 2016) 303(d) listing document states – with respect to PCBs in San Diego Bay – as follows: "Final listing decision: Do not Delist from 303(d) list, (TMDL required list)" and lists as sources "contaminated sediments" and "urban runoff/storm sewers." Corley Decl. Ex. 82, P. Boehm Dep. Tr. at 330:1-25 (emphasis added); Corley Decl. Ex. 6, CWA §305(b); 303(d) Integrated Report.. Dr. Boehm went on to testify as follows: Q. Are PCBs on what the State Board described in this document as the TMDL required list? |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | A. That's what it says, but I'm not sure that the TMDL required list means that there's a TMDL in place for PCBs. I know it's being considered. Corley Decl. Ex. 82, P. Boehm Dep. Tr. at 333:8-14 (emphasis added). |
| 45. The Regional Board has adopted four TMDLs for the Bay generally— including a copper TMDL for Shelter Island Yacht Basin, a bacteria TMDL for Shelter Island Shoreline Part, a metals TMDL for Chollas Creek, and a diazinon (pesticide) TMDL for Chollas Creek. | [Howard Decl.] Ex. 2, Port 30(b)(6) (K. Holman) Dep. Tr. at 1727:2-13. | Disputed | OBJECTION: Monsanto ignores significant controverting evidence as described below. CONTROVERTING EVIDENCE: Monsanto omits the following critical context: Monsanto's expert Dr. Paul Boehm acknowledged in his deposition that the SDRWQCB's current (year 2016) 303(d) listing document states – with respect to PCBs in San Diego Bay – as follows: "Final listing decision: Do not Delist from 303(d) list, (TMDL required list)" and lists as sources "contaminated sediments" and "urban runoff/storm sewers." Corley Decl. Ex. 82, P. Boehm Dep. Tr. at 330:1-25 (emphasis added); Corley Decl. Ex. 6, CWA §305(b); 303(d) Integrated Report. Dr. Boehm went on to testify as follows: Q. Are PCBs on what the State Board described in this document as the TMDL required list? A. That's what it says, but I'm not sure that the TMDL required list means that there's a TMDL in place for PCBs. I know it's being considered. Corley Decl. Ex. 82, P. Boehm Dep. Tr. at 333:8-14 (emphasis added). |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| 46. The Port acknowledges that PCB levels in the Bay are declining, and more generally, chemical constituents in the Bay sediments are decreasing. | [Howard Decl.] Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 70:9-22, 148:24-149:11. | Disputed | OBJECTION: <br><br> The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. <br><br> RESPONSE: <br><br> The fact that PCB levels are declining *based on the completion of remediation* is not relevant to any party's claims or defenses, and specifically not determinative of whether a public nuisance exists in the Bay. Gradual improvement of conditions in the Bay based on completion of large-scale remediation projects is not mutually exclusive to the existence of a nuisance, and does not demonstrate that the nuisance will be abated if nothing more is done to address it. <br><br> The testimony Monsanto cites is included below: <br><br> Q. Does the Port have any indication of declining PCB levels in San Diego Bay? <br><br> MR. HOMER: Object to the form. <br><br> (Court reporter interruption.) <br><br> A. Yeah, I think there's -- there's an indication that they have declined. <br><br> Q. Can you elaborate on that and what's that based on? <br><br> A. Yes. <u>Well, one is the cleanups of sites with elevated PCBs have occurred, and so that inventory or those concentrations have been removed from the bay and replaced with relatively clean cover material.</u> |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Q. Um-hum.<br><br>A. So those areas themselves have improved.<br><br>Howard Decl. Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 70:9-22 (emphasis added).<br><br>Immediately thereafter, Dr. Johns went on to testify as follows:<br><br>A. There has been no designed trend analysis study done for the bay, so it's very difficult to say that with certainty that's occurred. But I think – I believe the RHMP studies have noted that the bay has generally improved over time. And they do take stations. They're not the same exact stations each time, but they're randomly selected, by and large, stations. And they've come to that conclusion. But in terms of assuredly saying that the trend has -- has been for reductions is -- is not based on a singular study or a time series study, but given the fact that contaminated sites have been cleaned up and -- and the bay, in toto, has -- is certainly getting lower concentrations; cleaner.<br><br>Howard Decl. Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 70:24-71:12 (emphasis added). |
| 47. The Port has not done anything to investigate its tenants' uses of PCBs or PCB-containing products. | [Howard Decl.] Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 51:10-3.<br><br>[Howard Decl.] Ex. 3, Port 30(b)(6) (K. | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as outside of the scope and a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below.<br><br>RESPONSE/CONTROVERTING EVIDENCE: |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | Holman) Dep. Tr. 1771:25-1772:5.<br><br>[Howard Decl.] Ex. 7, Port 30(b)(6) (P. Brown) Dep. Tr. at 234:20-235:3. | | First, neither Ms. Holman, Dr. Johns, nor Mr. Brown were designated as the Port District's 30(b)(6) witness on the very specific following Monsanto-authored topic, which squarely covers this issue (Mr. Brown testified in his individual capacity only, and was never designated as a Port District 30(b)(6) witness at all):<br><br>"21. The Port District's knowledge of tenant practices regarding their purchase, use, storage and manner of disposal of PCBs."<br><br>Corley Decl. Ex. 79, Port 30(b)(6) (M. Johns) Dep. Ex. 1 (Monsanto Rule 30(b)(6) Deposition Notice to Port District)(April 27, 2017). Duane Bennett was. Port 30(b)(6) Corley Decl. Ex. 83, Dep. Ex. 108 (Chart of Bennett-Designated Topics). Similarly, neither Dr. Johns nor Mr. Brown were designated to cover these Monsanto-authored topics:<br><br>"24. Inspections conducted of the Port District's tenants, including but not limited to inspections relating to the storage, disposal or discharge of PCBs or of Contaminants on Trust Property or into the Bay.<br><br>32. The Port District's knowledge of, and investigations concerning, the sources of PCBs in the Bay or Conveyance System, including but not limited to the identities of persons or entities that discharged PCBs into the Conveyance System or into the Bay."<br><br>Corley Decl. Ex. 79, Port 30(b)(6) (M. Johns) Dep. Ex. 1 (Monsanto Rule 30(b)(6) Deposition Notice to Port District)(April 27, 2017). Karen Holman was. Corley Decl. Ex. 81, Port 30(b)(6) (K. Holman) Dep. Ex. 187 (Chart of Holman-Designated Topics). As such, any testimony by Dr. Johns or Mr. Brown as to "tenants uses' of PCBs or PCB-containing products or the Port District's corresponding knowledge of those uses is neither binding as the Port District's final position, nor exhaustive. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | With respect to the cited passage from Ms. Holman's deposition as the Port District's 30(b)(6) witness, Monsanto mischaracterizes the witness's testimony and omits key context. Ms. Holman was asked a much narrower question than is included in this purported fact, and gave a similarly narrow answer: "Q: Has the Port Department of Environmental Protection asked any of its tenants whether they discharge PCBs or PCB containing products? MR. DOBBS: Objection. Form. THE WITNESS: No." Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. 1771:25-1772:5. Prior to being asked the very specific question above by Monsanto's counsel, Ms. Holman testified that the Environmental Protection Department, <u>was not even created</u> until approximately two years prior to her May 16, 2019 deposition. Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1614:20-23. Then, when asked the question above, Ms. Holman responded "No", then asked Monsanto's counsel if he was asking whether the current Environmental Protection Department has asked Port District tenants if they currently use PCB-containing products, and Monsanto's counsel stated "Correct". Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. 1772:15-18. To this Ms. Holman responded "I guess I'm a little confused. … I thought PCBs were a banned product." Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. 1772:19-22. Monsanto selectively excerpted Ms. Holman's testimony, which clearly does not support the broad purported fact that "The Port has not done anything to investigate its tenants' uses of PCBs or PCB-containing products." |
| 48. The Port has created a program specific to identify | [Howard Decl.] Ex. 6, Port 30(b)(6) (C. | Disputed | <u>OBJECTION:</u> |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| asbestos in buildings that are to be renovated or remodeled by the Port. But the Port has no comparable program for identifying PCB-containing materials when renovating or remodeling buildings on the Port's property. | Tesoro) Dep. Tr. at 515:11-517:24.<br><br>[Howard Decl.] Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1205:14-23. | | The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. The Port District also objects to the relevance of this purported fact. Additionally, Monsanto ignores significant controverting evidence as described below.<br><br>RESPONSE/CONTROVERTING EVIDENCE:<br><br>Monsanto mischaracterizes the witness's testimony. Mr. Tesoro specified that the Port District does have a robust procedure for identifying and properly disposing of all hazardous materials when demolishing or renovating buildings. Specifically, Mr. Tesoro testified as follows:<br><br>Q All right. And the Port doesn't have – in connection with demolishing buildings, the Port does have some program to assess the presence of asbestos in buildings that are being demolished; is that correct?<br><br>A Yes.<br><br>Q And is that a written program?<br><br>A It's part of our -- our design policies and procedures.<br><br>Q Were you in charge of developing or drafting that asbestos removal program?<br><br>A No. I was not in charge of developing it. It was already developed.<br><br>Q Okay.<br><br>A Yeah. |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Q And while the Port has a program for assessment removal of asbestos from buildings being demolished or renovated, am I correct it does not have a similar program relating to PCBs, true?<br><br>MR. DOBBS: Objection. Form.<br><br>THE WITNESS: The -- the assessment of a building that's going to be demolished is not just specific to one pollutant of -- of concern like asbestos.<br><br>We -- we bring in a third-party consultant to look at -- you know, to look at it, see what else they might find in that -- in that building.<br><br>BY MR. BLAKEY:<br><br>Q Well, that's not quite my question. I think we just established that there is a program specific to asbestos for identifying asbestos in -- in buildings that are going to be renovated or remodeled. Am I right?<br><br>A Yes.<br><br>Q And specific to asbestos. So my question now is: Am I correct that there is no similar program specific to PCBs for identifying removing PCBs that may be associated with demolition or renovation. Correct?<br><br>A No.<br><br>MR. DOBBS: Objection. Form.<br><br>THE WITNESS: We have specifications that speak to the removal of PCBs in, in structures.<br><br>BY MR. BLAKEY: |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Q What's the name of that program?<br><br>A It's -- it's not a program. It's in our -- it's in part of our specifications. So if I could just walk you through this. So we'll say taking down a building, and our -- our analysis is that it does contain PCBs. When we go and bid that project, there will be a specific specification in there pertaining to how to handle PCBs during the demolition process of that building.<br><br>Q Is the provision specific to PCBs spelled out in the document that we marked as Exhibit 65, the technical specifications?<br><br>A I didn't check for that. But I do have – I mean, I do have that document.<br><br>Howard Decl. Ex. 6, Port 30(b)(6) (C. Tesoro) Dep. Tr. at 515:11-517:14. |
| 49. The Port purchases and uses pesticides, herbicides, motor oil, gasoline, diesel, asphalt tack, crack sealer, hydroseed, and PVC pipe—all of which are products commonly containing PCBs. | [Howard Decl.] Ex. 6, Port 30(b)(6) (C. Tesoro) Dep. Tr. at 560:13-561:14. | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. The Port District also objects to the relevance of this purported fact. Additionally, Monsanto ignores significant controverting evidence as described below.<br><br>RESPONSE/CONTROVERTING EVIDENCE:<br><br>Monsanto mischaracterizes the witness's testimony. Nothing in the cited testimony supports the purported fact that the products at issue are "products commonly containing PCBs." The cited testimony follows:<br><br>Q Does the Port District purchase and use pesticides and herbicides?<br><br>A Yes. |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Q Does it purchase and use motor oil? |
| | | | A Yes. |
| | | | Q I'm sure it uses gasoline and diesel? |
| | | | A Yes. |
| | | | Q How about dirt road dust suppressants, is that something the Port has purchased and used from time to time or over the years? |
| | | | A No, not the Port. Maybe a -- our contractor maybe on a project, but not the Port itself. |
| | | | Q How about asphalt tack? |
| | | | A Yes. |
| | | | Q How about crack sealer? |
| | | | A Yes. |
| | | | Q Asphalt release agent? |
| | | | A No. That would be something that one of our contractors, if we have a -- if we have a asphalt job would be -- would be using. |
| | | | Q Has the Port used and -- purchased and used hydroseed? |
| | | | A To the best of my knowledge, no. Not purchased hydroseed. |
| | | | Q Has it used it? |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | A Oh, yes, it's used it, but it's usually provided by a contractor on a project. Howard Decl. Ex. 6, Port 30(b)(6) (C. Tesoro) Dep. Tr. at 560:13-561:14. |
| 50. The Port has never attempted to evaluate whether products it purchases and uses contain PCBs. | [Howard Decl.] Ex. 6, Port 30(b)(6) (C. Tesoro) Dep. Tr. at 557:17-21. | Disputed | OBJECTION: The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. The Port District also objects to the relevance of this purported fact. RESPONSE: Monsanto mischaracterizes the witness's testimony. Nothing in the cited testimony supports the purported fact that the Port District has never attempted to evaluate whether products it purchases and uses contain PCBs." Howard Decl. Ex. 6, Port 30(b)(6) (C. Tesoro) Dep. Tr. at 557:17-21. |
| 51. The Port has taken no legislative action to limit or prohibit the Port's own purchase or use of PCB-containing products. | [Howard Decl.] Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1202:9-16. | Undisputed | |
| 52. The Port never sought information or instruction from Monsanto about | [Howard Decl.] Ex. 6, Port 30(b)(6) (C. | Undisputed | |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| how to use, handle, or properly dispose of PCBs. | Tesoro) Dep. Tr. at 493:21-494:3. | | |
| 53. The Port Hazmat Group Program Manager does not know where to find the Material Safety Data Sheet for PCBs. | [Howard Decl.] Ex. 7, Port 30(b)(6) (P. Brown) Dep. Tr. at 235:20-236:5. | Disputed | OBJECTION: |
| | | | The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the underlined individual witness testimony Monsanto cites in support, and not tied to – so therefore outside of the scope of – 30(b)(6) testimony. Additionally, Monsanto ignores significant controverting evidence as described below. The Port District also objects to the relevance of this purported fact. |
| | | | RESPONSE: |
| | | | As an initial matter, Mr. Brown testified in his individual capacity only, and was never designated as a Port District 30(b)(6) witness. Putting aside Monsanto's erroneous citation to Mr. Brown's deposition testimony as that of a 30(b)(6) witness, Monsanto also flagrantly mischaracterizes the underlying exhibit and ignores prior testimony about what it is and its source. |
| | | | Monsanto's counsel asked Mr. Brown during his June 11, 2019 deposition if Mr. Brown knew where in the Port District's files Exhibit 110 to Monsanto's 30(b)(6) deposition of the Port District could be found. After asking whether Monsanto's counsel meant the specific document, Mr. Brown stated that he would not know where to find it. Howard Decl. Ex. 7, P. Brown Dep. Tr. at 235:11-236:5. |
| | | | CONTROVERTING EVIDENCE: |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Exhibit 110 to Monsanto's Rule 30(b)(6) deposition is in fact a Material Safety Data Sheet for PCBs, dated, October 15, 1985, and bearing a Port District Bates label. It was first introduced during the 30(b)(60 deposition of the Port District's designee Duane Bennett. Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 903:22-904:8.

But as Monsanto's counsel well knows, this document was the subject of lengthy examination by the Port District's counsel during Day 2 of the Rule 30(b)(6) deposition of Karen Holman, just two days later on June 13, 2019. Ms. Holman's testimony made clear that the selectively excerpted Exhibit 110 was not a freestanding MSDS provided by Monsanto to the Port District and kept in the Port District's hazardous materials files in the ordinary course of business. Rather, this MSDS was attached to an application for an air permit submitted to the San Diego Air Pollution Control District by an environmental contractor in the year 2000 in connection with remediation of the Tow Basin site, one of the "Known PCB Sites" identified in this case. *See* Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1974:22-1984:14; Corley Decl. Ex. 84, Port 30(b)(6) Dep. Ex. 230 (Draft Remedial Design and Implementation Plan, Tow Basin Site)(January 2003). The document existed in the Port District's files in that form – attached to a permit application submitted by a contractor to a different agency, but related to a Port District tenant's property that was undergoing remediation for PCB's. Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1974:22-1984:14. It did not exist separately as an MSDS that would be stored with other documentation related to hazardous materials the Port District purchases and uses. Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1974:22-1984:14. |
| 54. The Port has identified bacteria, trash, and metals as its highest priority | [Howard Decl.] Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at | Disputed | <u>OBJECTION</u>:

The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| pollutants for its stormwater permit. | 1699:6-14, 1920:23-1921:15. | | Additionally, Monsanto ignores significant controverting evidence as described below. The Port District also objects to the relevance of this purported fact.<br><br>RESPONSE/CONTROVERTING EVIDENCE:<br><br>Monsanto mischaracterizes the witness's testimony and omits key context. First, the initial portion of the testimony that Monsanto cites deals with priority pollutants under the "San Diego Bay Watershed Management Area Water Quality Improvement Plan," not the Port District's "stormwater permit." Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1699:6-14, 1920:23-1921:15. The Water Quality Improvement Plan is prepared by numerous parties and covers the entirety of the San Diego Bay watershed. Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1914:8-1915:9. Immediately following the first cited testimony, Ms. Holman testified that the Port District does not rank its pollution priorities, and that bacteria, trash and metals are priorities under the multi-agency Water Quality Improvement Plan. Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1699:20-1700:16. Ms. Holman went on to testify that the Port District's stormwater permit does not require it to do anything specific with respect to PCBs in stormwater. Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 192116:-19. The permit – not the Port District – dictates the pollutants of concern. *See* Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1904:5-1905:15. 1910:11-16. |
| 55. The Port focuses its stormwater resources on non-PCB chemicals and does nothing specifically for PCBs. | [Howard Decl.] Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1921:16-19, 1924:22-1925:1, 1925:20-24. | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below. |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | RESPONSE/CONTROVERTING EVIDENCE: <br><br> Monsanto mischaracterizes the witness's testimony. Each of the quoted passages deals with what the Port District is <u>required</u> to do under the Jurisdictional Runoff Management Program, not what the Port District chooses to do or not do. Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1921:16-19, 1924:22-1925:1, 1925:20-24. The Jurisdictional Runoff Management Program is the document through which the Port District carries out its obligations under a joint stormwater permit issued by the Regional Water Quality Control Board to numerous municipalities in the San Diego region. The permit – not the Port District – dictates the pollutants of concern. *See* Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1904:5-1905:15, 1910:11-16. |
| 56. The Port has never done a holistic assessment of sources of PCBs into the Bay. | [Howard Decl.] Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1939:4-15. | Disputed | OBJECTION: <br><br> The Port District objects to the relevance of this purported fact. Additionally, Monsanto ignores significant controverting evidence as described below. <br><br> RESPONSE: <br><br> Whether the Port District has "done a holistic assessment of sources of PCBs into the Bay" is not relevant to any party's claims or defenses, and specifically not determinative of whether a public nuisance exists in the Bay. <br><br> CONTROVERTING EVIDENCE: <br><br> Monsanto's own expert testified that the Bay is listed as impaired for purposes of Section 303(d) of the federal Clean Water Act and that the SDRWQCB is "considering" implementing a Total Maximum Daily Load mechanism to reduce inputs of PCBs, with the only major sources listed as "contaminated |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | sediments" and "urban runoff/storm sewers." Corley Decl. Ex. 82, Boehm Dep. Tr. at 329:20-332:18. |
| 57. The Port considers copper to be a Bay-wide contaminant. | [Howard Decl.] Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1668:7-9. | Disputed | OBJECTION: The Port District objects to the relevance of this purported fact. RESPONSE: Whether the Port District "considers copper to be a Bay-wide contaminant" is not relevant to any party's claims or defenses, and specifically not determinative of whether a public nuisance exists in the Bay. |
| 58. The Port has sought and received grants to address copper in the Shelter Island Yacht Basin. | [Howard Decl.] Ex. 5, Port 30(b)(6) (J. Giffen) Dep. Tr. at 1580:13-22, 1584:1-7. | Disputed | OBJECTION: The Port District objects to the relevance of this purported fact. RESPONSE: Whether the Port District has "sought and received grants to address copper in the Shelter Island Yacht Basin" is not relevant to any party's claims or defenses, and specifically not determinative of whether a public nuisance exists in the Bay. |
| 59. The Port developed a Copper Reduction Program to address copper pollution in the Bay and to identify | [Howard Decl.] Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1956:14-17, 1962:23- | Disputed | OBJECTION: The Port District objects to the relevance of this purported fact. RESPONSE: |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| and encourage others to use alternative non-copper-containing products, but the Port has no equivalent "PCB Reduction Program." | 1963:2, 1963:12-14, 1964:7-13. | | Whether the Port District has "developed a Copper Reduction Program" is not relevant to any party's claims or defenses, and specifically not determinative of whether a public nuisance exists in the Bay. |
| 60. On May 24, 1995, the Regional Board issued CAO Order No. 95-21 to Campbell Industries for a multi- chemical cleanup at the Campbell Shipyards site. | [Howard Decl.] Ex. 41, Port 30(b)(6) (M. Johns) Dep. Ex. 18 (CAO No. 95-21) (May 24, 1995). | Undisputed | |
| 61. The Port terminated Campbell's lease 14 years early (on November 17, 1999) through a lease termination agreement so the Port could | [Howard Decl.] 50, Port 30(b)(6) (D. Bennett) Dep. Ex. 132 (Lease Termination Agreement) (Nov. 16, 1999). [Howard Decl.] Ex. 4, Port 30(b)(6) (D. | Disputed | OBJECTION: The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below. RESPONSE: |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| redevelop the site into a more lucrative hotel. | Bennett) Dep. Tr. at 1149:1-7, 1140:22-1142:3, 1162:8-14. | | Monsanto mischaracterizes the witness's testimony as to the Port District's intent when terminating the Campbell lease. In fact, the witness testified as follows:<br><br>"THE WITNESS: I can answer it this way – and of course I was not there then, but the Port had a -- in my estimation, had a twofold purpose of this agreement as well as some others. And one was for purposes of development. And in making a -- you know, the obligation for the Port District is to make the highest and best use of Port property, and so there was a belief here that there was a better use for Port property than the shipyard site there. <u>But I also understood that Campbell's operations were -- were winding down, and there was also an element of cleanup, you know, relative to the property. Let's clean it up.</u>"<br><br>Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1141:6-19 (emphasis added).<br><br><u>CONTROVERTING EVIDENCE:</u><br><br>Monsanto does not challenge the evidence that the Port has lost the ability to develop capped areas for the benefit of the people of California. Corley Decl. Ex. 71, Cicchetti Dep. at 132:3-134:2; 162:13-165:7; 170:3-171:11; 172:2-174:4; 175:2-177:13; 184:2-16; 192:14-194:9; 197:15-202:13; 204:1-23; 212:2-213:8; 213:20-214:20; 225:16-226:25; 230:11-18; 231:1-22; 233:14-235:20; 236:16-239:2; 246:4-247:7; 283:13-284:15; 307:20-308:12; 308:18-311:2. |
| 62. In August 2000 (nine months after the lease termination agreement), the Port ejected Campbell over its | [Howard Decl.] Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1156:7-11. | Disputed | <u>OBJECTION</u>:<br><br>The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| objections to expand the geographic scope of remediation to accommodate the new hotel. | | | RESPONSE:<br><br>Monsanto mischaracterizes the witness's testimony. Nothing in the quoted testimony speaks to the Port District's purported subjective intent to "expand the geographic scope of remediation to accommodate the new hotel." Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1156:7-11.<br><br>CONTROVERTING EVIDENCE:<br><br>Monsanto does not challenge the evidence that the Port has lost the ability to develop capped areas for the benefit of the people of California. Corley Decl. Ex. 71, Cicchetti Dep. at 132:3-134:2; 162:13-165:7; 170:3-171:11; 172:2-174:4; 175:2-177:13; 184:2-16; 192:14-194:9; 197:15-202:13; 204:1-23; 212:2-213:8; 213:20-214:20; 225:16-226:25; 230:11-18; 231:1-22; 233:14-235:20; 236:16-239:2; 246:4-247:7; 283:13-284:15; 307:20-308:12; 308:18-311:2. |
| 63. The Port served as the CEQA lead agency for the remediation at Campbell Shipyard, and it evaluated, designed, funded, approved, permitted, and constructed the Campbell cap. | [Howard Decl.] Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1239:3-14.<br><br>[Howard Decl.] Ex. 74, CEQA Findings for Campbell Sediment Remediation at § 7.0 (Dec. 2, 2003). | Undisputed | |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| 64. The Port engaged a consultant to design the Campbell cap, and it chose a cap depth of 4 to 6 feet to create the ideal elevation for eelgrass habitat. | [Howard Decl.] Ex. 7, Port 30(b)(6) (P. Brown) Dep. Tr. at 163:2-12.<br><br>[Howard Decl.] Ex. 74, CEQA Findings for Campbell Sediment Remediation at § 7.0 (Dec. 2, 2003). | Disputed | OBJECTION:<br><br>Mr. Brown testified in his individual capacity only, and was never designated as a Port District 30(b)(6) witness. |
| 65. The Port found that any potential significant impacts related to Navigational Safety at the Campbell Shipyard remediation "will be mitigated to below a level of significance because the Port will provide signage displaying the depths surrounding the ferry landing in order to make boaters aware of the depths of water | [Howard Decl.] Ex. 74, CEQA Findings for Campbell Sediment Remediation at § 4.6.6 (Dec. 2, 2003). | Undisputed | |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| surrounding these areas, and that the berthing of vessels along the ferry landing shall be avoided during dangerous weather conditions." | | | |
| 66. With mitigation, the Port found that the only significant remaining impact to the Campbell cap would be cumulative impacts associated with potential recontamination of the cap through Switzer Creek. | [Howard Decl.] Ex. 74, CEQA Findings for Campbell Sediment Remediation at § 7.0 (Dec. 2, 2003). | Undisputed | |
| 67. As part of the 2003 CEQA analysis, the Port evaluated an alternative that would have broadly dredged the Campbell site | [Howard Decl.] Ex. 74, CEQA Findings for Campbell Sediment Remediation at § 5.0 (Dec. 2, 2003). | Undisputed | |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| instead of capping 9.2 acres of it. | | | |
| 68. The Port rejected the alternative that would have broadly dredged the Campbell site instead of capping 9.2 acres of it both because it would create greater water quality impacts than the cap, and because the dredging alternative was more costly. | [Howard Decl.] Ex. 74, CEQA Findings for Campbell Sediment Remediation at § 5.3.8 (Dec. 2, 2003). [Howard Decl.] Ex. 7, Port 30(b)(6) (P. Brown) Dep. Tr. at 186:21-187:6. | Disputed | OBJECTION: Mr. Brown testified in his individual capacity only, and was never designated as a Port District 30(b)(6) witness. |
| 69. In 2004, the Port issued to itself a Coastal Development Permit to construct the Campbell cap. | [Howard Decl.] Ex. 49, Coastal Development Permit for Sediment Remediation at Former Campbell Shipyard (Aug. 31, 2004). | Undisputed | |
| 70. In its analysis of the Coastal Development | [Howard Decl.] Ex. 2, Port 30(b)(6) (E. Maher) Dep. Ex. 95 at | Disputed | OBJECTION: |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| Permit, the Port found that the post-shipyard cap, which provided for small-craft docks, would enhance public access. | 3 (Staff Report for Coastal Development Permit) (Aug. 10, 2004). | | The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) deposition exhibit Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below.<br><br>RESPONSE/CONTROVERTING EVIDENCE:<br><br>Monsanto omits critical context. The Port District's staff, in a Staff Report to the Board of Port Commissioners supporting a resolution to approve "sediment remediation and aquatic enhancement," did state that "[t]he proposed project will enhance the public's access to the bay by providing recreational boating access at two small-craft dock facilities for general public use." Port 30(b)(6) (E. Maher) Dep. Ex. 95 at 3 (Staff Report for Coastal Development Permit) (Aug. 10, 2004). However, when Monsanto took the deposition of Port District employee Paul Brown, Mr. Brown testified that the two floating docks in question were never built. P. Brown Dep. Tr. at 173:4-7. |
| 71. The Campbell site was cleaned up to the standards of the Regional Board. | [Howard Decl.] Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1145:8-18. | Undisputed | |
| 72. Once capped and remediated to the satisfaction of the Regional Board, the site is no longer a public nuisance | [Howard Decl.] Ex. 15, W. Golightly Dep. Tr. at 147:18-21. | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the expert testimony Monsanto cites in support. Monsanto ignores controverting evidence, as discussed below.<br><br>RESPONSE: |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| in the eyes of the Port or regulators. | | | Monsanto mischaracterizes the witness testimony. The complete quoted passage follows, and says nothing about what the Port District views as a public nuisance:<br><br>"A. NASSCO has met the requirements of the cleanup and abatement order. So from the eyes of the Regional Water Quality Control Board, there is no longer a condition of nuisance within the shipyard site."<br><br>W. Golightly Dep. Tr. at 147:18-21.<br><br>CONTROVERTING EVIDENCE:<br><br>But Mr. Golightly went on to explain this conclusion, and Monsanto declined to include the explanation, which follows:<br><br>Q. So when you used 'conditions of pollution or nuisance,' you're literally using the same terminology of the Regional Water Quality Control Board; correct?<br><br>A. That is correct.<br><br>Q. You're purposely using the same terminology as the Regional Water Quality Control Board; correct?<br><br>A. That is correct.<br><br>Q. So when I walk through this and I count 17 separate times where the Regional Board is talking about conditions of pollution or nuisance, you're following the same terminology and language used by the Regional Water Quality Control Board; correct?<br><br>A. That is absolutely correct. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Q. So if I were to ask you what's your definition of 'nuisance,' would you say whatever the California Regional Water Quality Control Board says? A. That's correct. Q. And have you asked the California Regional Water Quality Control Board how it defines 'nuisance'? A. I have not. Q. So the record is clear, your expert report, where it twice uses the terminology 'nuisance,' is based off of the language used by the California Regional Water Quality Control Board in its cleanup and abatement orders; correct? A. That is correct. Q. And you are providing no opinions beyond whatever the California Regional Water Quality Control Board has in mind with respect to conditions of pollution or nuisance? A. That is correct. Howard Decl. Ex. 5, W. Golightly Dep. Tr. at 202:7-203:12. Monsanto also ignores significant controverting evidence that the SDRWQCB considers baywide PCB contamination a high priority, to be addressed with additional measures aimed at restoring the fish and shellfish consumption beneficial use. For example: • In the view of the SDRWQCB, PCBs are a significant problem in the Bay, and mitigating the risk associated with human exposure is a priority for the SDRWQCB. In fact, the Executive Officer of the SDRWQCB stated in a declaration submitted in support of the Port, that |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | the agency is focused on restoring the fish and shellfish consumption beneficial use, which is directly impaired by PCBs. In August 2019 the full SDRWQCB expressed its priority of mitigating the contamination underlying the FCA. Corley Decl. Ex. 13, Jones Rebuttal at 6-7; Corley Decl. Ex. 4, Golightly Rep. at 2, 34. Corley Decl. Ex. 23, Declaration of David W. Gibson, Executive Director, SDRWQCB |
| 73. The Campbell cap is functioning as designed. | [Howard Decl.] Ex. 5, Port 30(b)(6) (J. Giffen) Dep. Tr. at 1507:17-25. | Disputed | OBJECTION: <br><br> The Port District objects to Monsanto's purported undisputed fact as outside of the scope and a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below. <br><br> RESPONSE/CONTROVERTING EVIDENCE: <br><br> Monsanto excludes critical context and additional information. Mr. Giffen, who was not the Port District's designated or trained 30(b)(6) witness on any issue related to the Campbell cap, testified that to the best of his knowledge the cap is functioning properly insofar as it is "encapsulate[ing] sediment and not allow[ing] it to commingle outside the boundaries of the cap. Howard Decl. Ex. 5, Port 30(b)(6) (J. Giffen) Dep. Tr. at 1507:17-25. But the Port District's expert William Golightly testified that there are significant questions as to whether the cap and the entire water-side portion of the Campbell site are being re-contaminated with PCBs that are arriving from other sites and/or storm drains, as follows: <br><br> "Q. I'm going to ask a specific question. Do you believe that there are any PCB-related impacts to the Campbell cap as you sit here today in June 2019? |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | A. Yes. Q. From what? A. From -- from potentially from sediments in the bay that are redepositing on the surface of the cap. There could also be sediments coming from the storm drain system. Howard Decl. Ex. 15, W. Golightly Dep. Tr. at 57:5-13. |
| 74. Any navigational impairments alleged in 2019 to be a public nuisance beyond the Port's control were a decade ago "a major design consideration" of the Port and its choice for the Campbell Shipyard remedy. | [Howard Decl.] Ex. 7, Port 30(b)(6) (P. Brown) Dep. Tr. at 180:14-22. | Disputed | OBJECTION: The Port District objects to Monsanto's purported undisputed fact as outside of the scope and a mischaracterization of the individual (non-30(b)(6))witness testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below. RESPONSE/CONTROVERTING EVIDENCE: As an initial matter, Mr. Brown testified in his individual capacity only, and was never designated as a Port District 30(b)(6) witness. Further, Monsanto mischaracterizes the witness's testimony and omits key context. Mr. Brown testified in the quoted passage that maintaining ship berthing and associated tug operations for the nearby Tenth Avenue Marine Terminal – not the area to be capped – was a "major design consideration." Specifically, Mr. Brown testified as follows: "Q: …Do you recall that the port was considering navigational impairments, or potential navigational impairments when it was designing and selecting the remedy for the Campbell cap? |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | A. So you're asking me that separately from any of this written here, just... Q. I am asking you – A. Yes. That was a major design consideration. Q. And the port actually conducted dredging specifically to protect navigation around the Campbell cap, correct? A. Yes. Q. So for example -- go ahead. A. You said "protect." I would use the word "to maintain" navigation over the cap. Q. So for example, there was some dredging done next to 10th Avenue Marine Terminal to ensure that it was deep enough that cargo ships could still get in, right? A. That is correct. Q. And there was some additional -- go ahead. A. Can I clarify? Q. You bet. A. That dredging along the marine terminal there was mainly to maintain navigation for tug boat depths, not the main vessels; not the larger ships. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Q. Understood. But there was additional dredging to allow ships to go side by side, correct? |
| | | | A. I'm really not certain on the exact final design criteria for the tug maneuvering area. I know there were some sketches with ships passing around ships, but I believe mainly it was to maintain navigable depths for oceangoing tugs that was the south end of the Campbell cap tug maneuvering area. |
| | | | Q. Who operates -- excuse me. Who operated the 10th Avenue Marine Terminal at that time? |
| | | | A. In terms of which operation? |
| | | | Q. Did the port operate the 10th Avenue Marine Terminal at that time? |
| | | | MR. CORLEY: Vague and ambiguous. |
| | | | THE WITNESS: In general, yes, the 10th Avenue Marine Terminal is operated by the port. There are many other operations with operators there, so it's a little bit confusing to just say there's one operator. |
| | | | Howard Decl. Ex. 7, P. Brown Dep. Tr. at 180:14-182:13 |
| 75. The Campbell cap currently supports new habitat and eelgrass, which is a resource that the Port seeks to preserve. | [Howard Decl.] Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 787:23-788:5, 816:23-25. | Undisputed | |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| 76. On October 17, 1986, the Regional Board issued CAO No. 86-92 to Teledyne Ryan Aeronautical for a multi-chemical site at Convair Lagoon. | [Howard Decl.] Ex. 40, CAO No. 86-92 at ¶ 8 (Oct. 17, 1986). | Undisputed | |
| 77. The Port was the permitting authority under the California Coastal Act and responsible for conducting an environmental review under CEQA. | [Howard Decl.] Ex. 72, Port 30(b)(6) (E. Maher) (EIR for Convair Lagoon Remediation) at § 2-1, p. 5.7-6 (Oct. 1993). | Undisputed | |
| 78. The Port prepared an EIR under CEQA analyzing Teledyne Ryan's proposed remedy of a nearshore containment facility and alternatives, | [Howard Decl.] Ex. 7, Port 30(b)(6) (P. Brown) Dep. Tr. at 111:23-112:3. [Howard Decl.] Ex. 72, Port 30(b)(6) (E. Maher) (EIR for Convair Lagoon | Disputed | OBJECTION: Mr. Brown testified in his individual capacity only, and was never designated as a Port District 30(b)(6) witness. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| including a sand cap. | Remediation) at § 1.1 (Oct. 1993). | | |
| 79. At the end of the environmental review process, the Port adopted CEQA findings approving a sand cap covered with eelgrass. | [Howard Decl.] Ex. 48, 30(b)(6) (E. Maher) Ex. 94 (Port's CEQA Findings for Convair Lagoon Remediation) at 3 (Oct. 19, 1993). | Undisputed | |
| 80. The Port found that the Convair cap would not have any significant impacts on the environment. | [Howard Decl.] Ex. 48, 30(b)(6) (E. Maher) Ex. 94 (Port's CEQA Findings for Convair Lagoon Remediation) at 5 (Oct. 19, 1993). | Undisputed | |
| 81. The Port found that with mitigation measures, the cap's impacts to recreational boating and navigational safety would be "reduced | [Howard Decl.] Ex. 48, 30(b)(6) (E. Maher) Ex. 94 (Port's CEQA Findings for Convair Lagoon Remediation) at 3 (Oct. 19, 1993). | Undisputed | |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| to insignificant, acceptable levels." | | | |
| 82. In 1996, the Port also issued a Coastal Development Permit to its tenant, Teledyne Ryan, the discharger responsible for the remediation and for the Convair Lagoon cap. | [Howard Decl.] Ex. 47, 30(b)(6) (E. Maher) Dep. Ex. 93 (Coastal Development Permit for Convair Lagoon Sandcapping Project) at 1 (Oct. 24, 1996). | Undisputed | |
| 83. In the Coastal Development Permit, the Port found that the cap is consistent with the Coastal Act's public-access and recreational policies, including California Public Resources Code section 30210, which requires the Port to maximize public access to | [Howard Decl.] Ex. 47, 30(b)(6) (E. Maher) Dep. Ex. 93 (Coastal Development Permit for Convair Lagoon Sandcapping Project) (Oct. 24, 1996). | Disputed | OBJECTION: The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the 30(b)(6) deposition exhibit Monsanto cites in support. RESPONSE/CONTROVERTING EVIDENCE: Monsanto mischaracterizes the document and omits key context. Nothing in the document describes the requirements of Public Resources Code 30210 as of October 24, 2016, nor the Port District's understanding of those requirements. The relevant text of the document states: "The project is fully consistent with Public Resources Code Sections 30604(c), 30210-30224, and the Coastal Act public access and recreation policies |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| coastal resources and recreational activities. | | | referenced therein. However, public access in the project area will be necessarily limited due to public health and safety concerns during the course of remediation." Howard Decl. Ex. 47, 30(b)(6) (E. Maher) Dep. Ex. 93 (Coastal Development Permit for Convair Lagoon Sandcapping Project) (Oct. 24, 1996). |
| 84. Convair Lagoon is currently covered with acres of eelgrass. | [Howard Decl.] Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 789:22-790:7. | Undisputed | |
| 85. A marina is incompatible with eelgrass, because eelgrass does not grow at the depths required for boating, and if a marina were built in Convair Lagoon, the eelgrass would be destroyed. | [Howard Decl.] Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 790:17-791:17. | Disputed | OBJECTION: The Port District objects to Monsanto's purported undisputed fact as outside of the scope and a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. RESPONSE: Monsanto mischaracterizes the witness's testimony. The quoted testimony makes no mention of Convair Lagoon, and merely is a brief examination about whether eelgrass can grow at typical marina depths, whether new eelgrass beds would have to be created if a developer dredged in areas of existing eelgrass beds to create a marina, and who would be responsible for that mitigation. Howard Decl. Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 790:17-791:17. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| 86. The Port views the eelgrass on top of the Convair cap as an asset that it wants to preserve. | [Howard Decl.] Ex. 2, Port 30(b)(6) (E. Maher) Dep. Tr. at 817:1-3. | Undisputed | |
| 87. The 2013 fish advisory does not prohibit fishing or eating fish from San Diego Bay; rather, it makes recommendations about fish servings, including expressly recommending that consumers continue to eat fish. | [Howard Decl.] Ex. 44, Port 30(b)(6) (M. Johns) Dep. Ex. 34 at 2 (2013 OEHHA fish advisory) (Oct. 2013). | Disputed | OBJECTION: The Port District objects to Monsanto's purported undisputed fact as outside of the scope of Monsanto's 30(b)(6) deposition of the Port District, and a mischaracterization of the 30(b)(6) deposition exhibit Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence, as discussed below. RESPONSE: Monsanto attributes a purported fact to an exhibit introduced during the 30(b)(6) testimony of Dr. Michael Johns, but Dr. Johns was not designated to testify on the topic of whether 2013 fish advisory prohibits fishing or eating fish from San Diego Bay, or any other topic related to the 2013 fish advisory.. Monsanto initially issued a deposition notice pursuant to Rule 30(b)(6) with 110 separate topics. Corley Decl. Ex. 79, Port 30(b)(6) (M. Johns) Dep. Ex. 1 (Monsanto Rule 30(b)(6) Deposition Notice to Port District)(April 27, 2017). After the parties removed some topics by negotiation, Judge Schopler struck many others on the Port District's motion on April 25, 2019. Corley Decl. Ex. 80a-b, ECF No. 360, 354. The remaining topics were designated, in advance of Monsanto's Rule 30(b)(6) deposition of the Port District, to be covered by specific witnesses. As counsel for the Port District stated during Monsanto's examination of Dr. Johns on the topic of the 2013 PCB Fish Consumption Advisory, the topic was |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | expressly included in Monsanto's notice and assigned to a different 30(b)(6) witness, Ms. Holman. Howard Decl. Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. 285:4-15; *see also* Corley Decl. Ex. 81, Port 30(b)(6) (K. Holman) Dep. Ex. 187 (Chart of Holman-Designated Topics). Ms. Holman was specifically designated and prepared on the following Monsanto-authored topic:

"The Port District's communication and collaboration with any federal, state or local regulatory authorities including, but not limited to, the United States Environmental Protection Agency ("EPA"), the U.S. Army Corps of Engineers, the U.S. Navy, the California Department of Toxic Substances Control, San Diego Regional Water Quality Control Board, <u>concerning the imposition and posting of consumption advisories for fish caught in the Bay for any contaminant, including, but not limited to PCBs; and the rationale or basis for the imposition and/or modification of any consumption advisory</u>."

*Id.* (emphasis added). Dr. Johns was not.

Further, and more fundamentally, Monsanto mischaracterizes the contents of the exhibit it bases this purported fact on and omits critical context. The 2013 PCB Fish Consumption Advisory does in fact say that consumers should continue eating fish generally, but says that with respect to fish caught in San Diego Bay certain populations should not eat any servings of certain species. For example, the 2013 PCB Fish Consumption Advisory states that women aged 18 through 45 years and children aged between 1 and 17 years should eat no servings of seven different species of fish if caught in San Diego Bay, including popular species such as Spotted Sand Bass and Barred Sand Bass. Howard Decl. Ex. 44, Port 30(b)(6) (M. Johns) Dep. Ex. 34 (2013 OEHHA fish advisory); Corley Decl. Ex. 1a-e, Fish Consumption Advisory Materials. Similarly, the 2013 PCB Fish Consumption Advisory recommends that women 45 and older eat no servings of two species, indicating that "Some fish have high levels of mercury or PCBs" and "PCBs can cause cancer." *Id.* |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | CONTROVERTING EVIDENCE: <br><br> Monsanto also ignores significant controverting evidence. For example: <br><br> • OEHHA amended the FCA in 2018 to implement even more stringent restrictions for children and women of childbearing age. Corley Decl. Ex. 1a-e, Fish Consumption Advisory; Corley Decl. Ex. 13, Jones Rebuttal at 13-14; Corley Decl. Ex. 14, Toll Rebuttal at 2; Corley Decl. Ex. 85, Trapp Rep. at 14; Corley Decl. Ex. 86, Ann S. Jones Declaration. <br><br> • Consumption advisories are de facto harms under federal regulations because they interfere with the public's free and comfortable use of a resource. Corley Decl. Ex. 13, Jones Rebuttal at 7; 3 C.F.R. § 11.62(f)(1)(iii). <br><br> • Data suggests that anglers in the Bay who are aware of the FCA consume less fish, and statewide consumption rates before the FCA were higher than after. Corley Decl. Ex. 13, Jones Rebuttal at 17; Corley Decl. Ex. 14, Toll Rebuttal at 8, Fg. 2-1; Corley Decl. Ex. 86, Ann S. Jones Declartion at ¶11. <br><br> • According to Monsanto's expert, somewhere between 65-81% of fish caught from the Bay are precluded from consumption by children or women under age 45. Corley Decl. Ex. 15, Desvousges Dep. at 91:19-92:5. <br><br> • Monsanto's expert admits that the most often caught and consumed fish, the Pacific chub mackerel, is subject to a "Do Not Eat" advisory for children and women under 45, which affects a population demographic that represents the majority of the population in and around San Diego. Corley Decl. Ex. 15, Desvousges Dep. at 101:20-24; 102:4-10; Corley Decl. Ex. 16, San Diego Census Data. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | • Monsanto's expert also admits that his opinion that "97.7% of the fish … can be eaten," is only true for men and women over 45. Corley Decl. Ex. 15, Desvousges Dep. at 109:7-13.<br><br>• EPA, as well as Monsanto's risk assessment expert, agree that "the types of PCBs likely to be bioaccumulated in fish and bound to sediments are the most carcinogenic PCB mixtures," and an increase in human exposure to PCBs results in an increased risk of developing cancer and other adverse health effects. Corley Decl. Ex. 17, EPA PCB Info; Corley Decl. Ex. 18, Keenan Dep. at 80:10-81:9; Corley Decl. Ex. 19, Olson Rep. at 2; 19-49.<br><br>• PCB exposure to sensitive populations, including children, women of childbearing age, and pregnant women, is especially dangerous. Corley Decl. Ex. 19, Olson Rep. at 2; 19-49.<br><br>• Monsanto's consumption expert concedes that children are in fact consuming "more than one child-sized portion … every week" of "Do Not Eat" fish from San Diego Bay. Corley Decl. Ex. 20, Sunding Rep., at 20-23; Corley Decl. Ex. 13, Jones Rebuttal at 13-14.<br><br>• Monsanto's expert testified that on visit to local fishing pier, majority of fishermen were children. Corley Decl. Ex. 15, Desvousges Dep. at 17:25-18:8; 23:24-24:8.<br><br>• In fact, a full 7.5% of consumers who voluntarily responded to the San Diego Fish Consumption Study reported consuming "Do Not Eat" fish. Corley Decl. Ex. 13, Jones Rebuttal at 13-14; Corley Decl. Ex. 76, SCWRRP San Diego Bay Fish Consumption Study (2017).<br><br>• Site-specific data for the Bay suggests that certain ethnic minority groups engage in subsistence fishing at a much higher rate than the general population, meaning the risk to those communities is dramatically higher. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Corley Decl. Ex. 13, Jones Rebuttal at 17; Corley Decl. Ex. 21, Environmental Health Coalition Survey of Fishers; Corley Decl. Ex. 86, Ann S. Jones Declaration at ¶ 20. |
| 88. The Port has no evidence that PCBs have harmed fish populations in San Diego Bay; available data do not indicate PCBs are having any measurable effects on waterfowl or fish. | [Howard Decl.] Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 239:12-18.<br><br>[Howard Decl.] Ex. 20, A. Jones Dep. Tr. at 64:7-20. | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact as outside of the scope and a mischaracterization of the 30(b)(6) and expert testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below.<br><br>RESPONSE:<br><br>Monsanto attributes this purported fact to the 30(b)(6) testimony of Dr. Michael Johns, but Dr. Johns was not designated to testify on the topic of whether fish, mammal, or bird populations in the Bay are harmed by PCBs. Monsanto initially issued a deposition notice pursuant to Rule 30(b)(6) with 110 separate topics. Corley Decl. Ex 79, Port 30(b)(6) (M. Johns) Dep. Ex. 1 (Monsanto Rule 30(b)(6) Deposition Notice to Port District)(April 27, 2017). After the parties removed some topics by negotiation, Judge Schopler struck many others on the Port District's motion on April 25, 2019. Corley Decl. Ex 80a-b, ECF Nos. 360, 354. The remaining topics were designated, in advance of Monsanto's Rule 30(b)(6) deposition of the Port District, to be covered by specific witnesses.<br><br>One of Monsanto's specific topics that survived was "54. Studies assessing the presence and impacts of contamination in the Bay," which was assigned to the Port District's Director of Environmental Protection, Karen Holman. *See* Corley Decl. Ex 81, Port 30(b)(6) (K. Holman) Dep. Ex. 187 (Chart of Holman-Designated Topics). None of the topics that Dr. Johns was designated as a witness on covered specific or general injury to "fish, mammal, or bird populations" due to the presence of PCBs. As such, any testimony by Dr. Johns |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | regarding "evidence that fish, mammal, or bird populations in the Bay are harmed by PCBs" is neither binding as the Port District's final position, nor exhaustive. |

Monsanto also mischaracterizes the testimony of the Port District's expert witness, Dr. Ann Jones. Dr. Jones testified, in the cited passage of her deposition, that it would be difficult to attribute *individualized* impacts to waterfowl, fish, or mammals to PCBs. Howard Decl., Ex. 20, A. Jones Dep. Tr. at 64:7-20. She did not testify that *populations* of these organisms have not been impacted, and that would be outside of the scope of her assignment in this case.

CONTROVERTING EVIDENCE:

Monsanto also ignores significant controverting evidence regarding other ecological impacts and risks that PCBs present to fish and wildlife in the Bay. For example:

- Dr. Johns, Ms. Holman, and Mr. Bennett all also testified as Port District 30(b)(6) witnesses that the Regional Water Quality Control Board listed the entire Bay as impaired for PCBs in fish tissue in approximately 2006, and that the Bay remains so listed. Howard Decl. Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 77:4-6; Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1725:14-19; Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1035:7-24 (during Mr. Bennett's tenure as General Counsel the Port District received notice from the Regional Water Quality Control Board that the entire Bay was impaired by PCBs)

- Monsanto's own expert testified that the Bay is listed as impaired for purposes of Section 303(d) of the federal Clean Water Act and that the SDRWQCB is "considering" implementing a Total Maximum Daily Load mechanism to reduce inputs of PCBs, with the only major sources listed as

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | "contaminated sediments" and "urban runoff/storm sewers." Corley Decl. Ex. 82, Boehm Dep. Tr. at 329:20-332:18.<br><br>• PCBs exist in certain Bay organisms, such as invertebrates, fish and birds, at levels above risk thresholds. Corley Decl. Ex. 12, Jones Rep. at 3.<br><br>• Survey results revealed PCB levels in spotted sand bass ranging from 89 ppb to 1,075 ppb—and toxic effects on fish are reported in scientific literature at concentrations as low as 30 ppb. Corley Decl. Ex. 12, Jones Rep. at 3.<br><br>• A 2016 bioaccumulation study performed in San Diego Bay determined that accumulation and biomagnification of PCBs by marine organisms posed potential harm to all trophic levels. Corley Decl. Ex. 85, Trapp Rep. at 14.<br><br>• Piscivore bird species, including sensitive species of concern nesting in the San Diego Bay National Wildlife Refuge, may be at reproductive risk due to PCB levels in bird eggs above screening levels for adverse effects. Corley Decl. Ex. 12, Jones Rep. at 3.<br><br>• At PCB remediation sites in the Bay, the SDRWQCB has recognized PCB levels in sediment that exceed Effects Range Low ("ERL"), the concentration (below which environmental toxic effects are scarcely observed or predicted), and/or Effects Range Median ("ERM"), (the concentration above which environmental toxic effects are generally or always observed). Corley Decl. Ex. 8, Woodyard Dep. at 130:2-133:8; Corley Decl. Ex. 70, Tentative IO No. R9-2018-0035 at 4; Corley Decl. Ex. 85, Trapp Rep. at 14. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | • SDRWQCB has repeatedly identified PCB sediment contamination as a potential threat to aquatic life. Corley Decl. Ex. 11, CAO No. R9-2015-0018 at 3; Corley Decl. Ex. 9, CAO No. R9-2017-0021.<br><br>• Fish tissue samples taken by state agencies show that the Bay suffers from some of the highest PCB concentrations in the region. Corley Decl. Ex. 5, SWAMP Report at 47.<br><br>• In fact, the Bay is among the most PCB-contaminated water bodies in the country. Corley Decl. Ex. 85, Trapp Rep. at 14.<br><br>• The SDRWQCB and SWRCB have designated the Bay, in its entirety, as an "impaired" water body, due to the presence of elevated levels of PCBs in fish tissue, pursuant to § 303(d) of the Clean Water Act. Corley Decl. Ex. 6, CWA §305(b); 303(d) Integrated Report; Corley Decl. Ex. 7, Port Corp. Rep. at 77:4-6; 1035:7-24; 1725:14-19; Corley Decl. Ex. 8, Woodyard Dep. at 127:16-18; Corley Decl. Ex. 9, CAO No. R9-2017-0021; Corley Decl. Ex. 85, Trapp Rep. at 14-15.<br><br>• Monsanto's own expert testified that the Bay is listed as impaired for purposes of Section 303(d) of the federal Clean Water Act and that the SDRWQCB is "considering" implementing a Total Maximum Daily Load mechanism to reduce inputs of PCBs, with the only major sources listed as "contaminated sediments" and "urban runoff/storm sewers." Corley Decl. Ex. 82, Boehm Dep. Tr. at 329:20-332:18.<br><br>• The SDRWQCB has repeatedly recognized that various areas of the Bay have contamination levels that "may adversely affect San Diego Bay beneficial uses" and pose a risk to human health and the environment. Corley Decl. Ex. 10, CAO No. R9-2004-0295 at 24; Corley Decl. Ex. 8, |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Woodyard Dep. at 129:3-8; Corley Decl. Ex. 11, CAO No. R9-2015-0018 at 3; Corley Decl. Ex. 9, CAO No. R9-2017-0021 at 5. <br><br> • Because of the well-established human health risks associated with exposure to PCBs, in 2013, California's Office of Environmental Health Hazard Assessment ("OEHHA") determined that PCB contamination levels were so high that people should limit, or avoid altogether, the consumption of certain fish from the Bay. OEHHA amended the FCA in 2018 to implement even more stringent restrictions for children and women of childbearing age. Corley Decl. Ex. 1a-e, Fish Consumption Advisory; Corley Decl. Ex. 13, Jones Rebuttal at 13-14; Corley Decl. Ex. 14, Toll Rebuttal at 2; Corley Decl. Ex. 85, Trapp Rep. at 14; Corley Decl. Ex. 86, Ann S. Jones Declaration. <br><br> • Consumption advisories are de facto harms under federal regulations because they interfere with the public's free and comfortable use of a resource. Corley Decl. Ex. 13, Jones Rebuttal at 7; 43 C.F.R. § 11.62(f)(1)(iii). <br><br> • Data suggests that anglers in the Bay who are aware of the FCA consume less fish, and statewide consumption rates before the FCA were higher than after. Corley Decl. Ex. 13, Jones Rebuttal at 17; Corley Decl. Ex. 14, Toll Rebuttal at 8, Fg. 2-1; Corley Decl. Ex. 86, Ann S. Jones Declartion at ¶11. <br><br> • According to Monsanto's expert, somewhere between 65-81% of fish caught from the Bay are precluded from consumption by children or women under age 45. Corley Decl. Ex. 15, Desvousges Dep. at 91:19-92:5. <br><br> • Monsanto's expert admits that the most often caught and consumed fish, the Pacific chub mackerel, is subject to a "Do Not Eat" advisory for children and women under 45, which affects a population demographic that represents the majority of the population in and around San Diego. Corley |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Decl. Ex. 15, Desvousges Dep. at 101:20-24; 102:4-10; Corley Decl. Ex. 16, San Diego Census Data.<br><br>• A full 7.5% of consumers who voluntarily responded to the San Diego Fish Consumption Study reported consuming "Do Not Eat" fish. Corley Decl. Ex. 13, Jones Rebuttal at 13-14; Corley Decl. Ex. 76, SCWRRP San Diego Bay Fish Consumption Study (2017).<br><br>• Site-specific data for the Bay suggests that certain ethnic minority groups engage in subsistence fishing at a much higher rate than the general population, meaning the risk to those communities is dramatically higher. Corley Decl. Ex. 13, Jones Rebuttal at 17; Corley Decl. Ex. 21, Environmental Health Coalition Survey of Fishers; Corley Decl. Ex. 86, Ann S. Jones Declaration at ¶ 20.<br><br>• There is evidence that Monsanto's PCBs pose risks to marine life in the Bay. While PCB impacts to marine life have not been fully quantified, PCBs exist in Bay organisms, such as invertebrates, fish and birds, at levels above risk thresholds. Corley Decl. Ex. 12, Jones Rep. at 3; Corley Decl. Ex. 13, Jones Rebuttal at 3; Ann S. Jones Declaration at ¶¶7-9.<br><br>• The Port has been dealing with the PCB problem for decades. As early as the mid-1980s, the Port was involved in addressing PCB contamination, including funding for the San Diego Bay Cleanup Project. Corley Decl. Ex. 73, 1987 Port Ltr.; Corley Decl. Ex. 74, 1987 Health Risk Study Correspondence.<br><br>• The Port has been involved in numerous PCB cleanups around the Bay. Corley Decl. Ex. 72, Brown Dep. at 98:17-19; 231:1-19. |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | • The Port lead the Campbell Shipyard remediation. Corley Decl. Ex. 72, Brown Dep. at 98:17-19; 231:1-19.<br><br>• PCB contamination has required substantial expenditure of funds—estimated to be at least $80-100 million—from the Port that otherwise would have been invested in enhancing the Bay for the benefit of the people of California. Corley Decl. Ex. 7, Port Corp. Rep. 1214:18-1216:25; *see* Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1263:9-1264:6 (noting that these costs are not an exhaustive total of costs spent by the Port District to deal with the presence of PCBs in the Bay.).<br><br>• More recently, the Port partnered with SDRWCQB in a project to assess contaminants in fish and shellfish in the Bay and funded the San Diego Fish Consumption Study. Corley Decl. Ex. Ex. 75, State Agency Document re Assessing Contaminants in Fish and Shellfish; Corley Decl. Ex. 76, 2017 SCCWRP Fish Consumption Study.<br><br>• In the view of the SDRWQCB, PCBs are a significant problem in the Bay, and mitigating the risk associated with human exposure is a priority for the SDRWQCB. In fact, the Executive Officer of the SDRWQCB stated in a declaration submitted in support of the Port, that the agency is focused on restoring the fish and shellfish consumption beneficial use, which is directly impaired by PCBs. In August 2019 the full SDRWQCB expressed its priority of mitigating the contamination underlying the FCA. Corley Decl. Ex. 13, Jones Rebuttal at 6-7; Corley Decl. Ex. 4, Golightly Rep. at 2, 34. Corley Decl. Ex. 23, Declaration of David W. Gibson, Executive Director, SDRWQCB |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| 89. The Port's experts acknowledge they lack evidence that even a single person has developed any condition or become ill because of PCBs in fish they consumed from the Bay. | [Howard Decl.] Ex. 20, A. Jones Dep. Tr. at 65:1-6.  [Howard Decl.] Ex. 22, R. DeGrandchamp Dep. Tr. at 72:10-19. | Disputed | The Port District objects to the relevance of this purported fact. Contrary to Monsanto's suggestions, the law does not require proof of illness and death before PCB contamination can be considered a public nuisance and abated. |
| 90. The Port testified that it does not "seek to increase the public's awareness of the 2013 fish advisory." | [Howard Decl.] Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1790:5-7. | Disputed | OBJECTION:  The Port District objects to Monsanto's purported undisputed fact a mischaracterization of the 30(b)(6) and expert testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below.  RESPONSE/CONTROVERTING EVIDENCE:  The testimony that Monsanto cites is a single question from Monsanto's lawyer and a one word answer from Ms. Holman, where Ms. Holman went on to testify at length about the Port District's efforts to make the public aware of the 2013 PCB Fish Consumption Advisory. Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1790:5-7; *see, e.g.,* at 1790:8-14.  In fact, Ms. Holman specifically expanded on and clarified the testimony that Monsanto cites in support of this purported fact, as follows: |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Q Okay. Thank you. That's it for this. Okay. Also, on day one of your 30(b)(6) deposition, do you remember talking to counsel for defendants about fish consumption advisory?<br><br>A. Yes, I do.<br><br>Q. And at one point in the day, counsel asked you, Does the Port seek to increase the public's awareness of the 2013 fish advisory?<br><br>A. Yes, I do remember that.<br><br>Q. You answered no. Do you remember that?<br><br>A. I do.<br><br>Q. And the next question was, Other than the posting of the advisory it appears in boat launches, has the Port done anything else over the last six years to make the public more aware of the fish advisory? Do you remember that?<br><br>A. I do.<br><br>Q. Okay. Did the Port District collaborate with OEHHA, the regional board, or any other agency in connection with the fish consumption advisory?<br><br>MR. BRUNTON: Object to form.<br><br>A. Yes, they did.<br><br>Q. How did the Port District do that? |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | A. We participated in a technical advisory committee on some of the SCCWRP studies that were being done. We participated with that committee on developing the signs to be posted.

Q. Okay. Did the Port District actually create the signs to be posted?

MR. BRUNTON: Object to form.

A. The Port District worked with the other entities to create the signs, and then our general services department actually did -- it's my understanding that they actually made the signs once the language and content and look and feel was developed.

Q. Was that a Port District expense?

A. That was a Port District expense.

Q. Did the Port District post the signs?

A. The Port District posted the signs, yes.

Q. Was that a Port District expense?

MR. BRUNTON: Object to form.

A. Yes, it was.

Q. Does the Port District maintain the signs?

A. Yes, it does.

MR. BRUNTON: Object to form. |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Q. Is that a Port District expense? <br><br> A. Yes. <br><br> Q. Are all of those expenses aimed at making the public more aware of the fish consumption advisory? <br><br> MR. BRUNTON: Object to form. <br><br> A. Yes. <br><br> Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1984:15-1986:16. |
| 91. The Port actively encourages people to fish in the Bay by promoting events like kids fishing derbies and fishing tournaments. | [Howard Decl.] Ex. 11, PTA (S. Cloward) Dep. Tr. at 76:4-77:4. | Disputed | OBJECTION: <br><br> The Port District objects to Monsanto's purported undisputed fact as a mischaracterization of the third party witness testimony Monsanto cites in support, as an improper expert opinion, and as lacking foundation. Additionally, Monsanto ignores significant controverting evidence as described below. <br><br> RESPONSE: <br><br> Monsanto mischaracterizes the witness's testimony. In the cited testimony, the witness stated only that *the Port Tenants Association* is supportive child and adult fishing events in the Bay. Howard Decl. Ex. 11, PTA (S. Cloward) Dep. Tr. at 76:4-77:4. The witness did go on to testify, immediately following the cited passage, that she believes that the Port District is supportive of such events, but offered no basis for that statement. *Id.* at 77:5-8. <br><br> CONTROVERTING EVIDENCE: |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Moreover, describing the same events – when asked by Monsanto's counsel – the Port District's Assistant Vice President of Planning and Green Port (Jason Giffen) testified in his capacity as a Port District 30(b)(6) witness as follows:<br><br>THE WITNESS: So, the way I understand it, adjacent to the docks, there's small kind of holding pens for fish. Fish are -- are brought in [from elsewhere]. And, you know, it's more about learning how to fish for typically smaller children.<br><br>Howard Decl. Ex. 5, Port 30(b)(6) (J. Giffen) Dep. Tr. at 1475:11-1476:25. |
| 92. The Port acknowledges that it does not own or manage the fish populations in San Diego Bay, it does not have authority to issue fish licenses or to allow the public to take fish from San Diego Bay, and it does not stock the Bay with fish or operate fish hatcheries. | [Howard Decl.] Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 235:12-236:3. | Disputed | OBJECTION:<br><br>The Port District objects to the relevance of this purported fact.<br><br>RESPONSE:<br><br>Whether the Port somehow "owns" title to the fish is immaterial. As this Court has already recognized, the Port is expressly authorized by the Legislature to bring a public nuisance action to "protect, preserve, and enhance" the Bay by seeking an abatement of a public nuisance. HARB. & NAV. CODE App. 1 § 70. |
| 93. The Port has jurisdiction over 29 percent of the | [Howard Decl.] Ex. 43, Port 30(b)(6) (M. Johns) Dep. Ex. 29 at | Disputed | OBJECTION: |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| water acres of the Bay (compared to the State of California with jurisdiction over 61 percent). | 4 (2017 Port Master Plan) (Aug. 2017). | | The Port District objects to the relevance of this purported fact.<br><br>RESPONSE:<br><br>Whether the Port somehow "owns" title to the fish is immaterial. As this Court has already recognized, the Port is expressly authorized by the Legislature to bring a public nuisance action to "protect, preserve, and enhance" the Bay by seeking an abatement of a public nuisance. HARB. & NAV. CODE App. 1 § 70. |
| 94. The Port has not incurred any costs or additional management requirements as a result of the 2013 fish advisory. | [Howard Decl.] Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1784:10-15. | Disputed | OBJECTION:<br><br>The Port District objects to Monsanto's purported undisputed fact a mischaracterization of the 30(b)(6) and expert testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below.<br><br>RESPONSE:<br><br>The testimony that Monsanto cites is a single question from Monsanto's lawyer and a one word answer from Ms. Holman, where Ms. Holman went on to testify at length about the Port District's efforts to make the public aware of the 2013 PCB Fish Consumption Advisory, and associated costs and management requirements. Howard Decl. Ex 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1790:5-7; *see, e.g., id.* at 1790:8-14.<br><br>CONTROVERTING EVIDENCE:<br><br>In fact, Ms. Holman specifically expanded on and clarified the testimony that Monsanto cites in support of this purported fact, as follows: |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Q Okay. Thank you. That's it for this. Okay. Also, on day one of your 30(b)(6) deposition, do you remember talking to counsel for defendants about fish consumption advisory?

A. Yes, I do.

Q. And at one point in the day, counsel asked you, Does the Port seek to increase the public's awareness of the 2013 fish advisory?

A. Yes, I do remember that.

Q. You answered no. Do you remember that?

A. I do.

Q. And the next question was, Other than the posting of the advisory it appears in boat launches, has the Port done anything else over the last six years to make the public more aware of the fish advisory? Do you remember that?

A. I do.

Q. Okay. Did the Port District collaborate with OEHHA, the regional board, or any other agency in connection with the fish consumption advisory?

MR. BRUNTON: Object to form.

A. Yes, they did.

Q. How did the Port District do that? |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | A. We participated in a technical advisory committee on some of the SCCWRP studies that were being done. We participated with that committee on developing the signs to be posted. |
| | | | Q. Okay. Did the Port District actually create the signs to be posted? |
| | | | MR. BRUNTON: Object to form. |
| | | | A. The Port District worked with the other entities to create the signs, and then our general services department actually did -- it's my understanding that they actually made the signs once the language and content and look and feel was developed. |
| | | | Q. Was that a Port District expense? |
| | | | A. That was a Port District expense. |
| | | | Q. Did the Port District post the signs? |
| | | | A. The Port District posted the signs, yes. |
| | | | Q. Was that a Port District expense? |
| | | | MR. BRUNTON: Object to form. |
| | | | A. Yes, it was. |
| | | | Q. Does the Port District maintain the signs? |
| | | | A. Yes, it does. |
| | | | MR. BRUNTON: Object to form. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Q. Is that a Port District expense? A. Yes. Q. Are all of those expenses aimed at making the public more aware of the fish consumption advisory? MR. BRUNTON: Object to form. A. Yes. Howard Decl. Ex 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1984:15-1986:16. |
| 95. The Port does not have a single employee assigned to oversee and manage the fish advisory. | [Howard Decl.] Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1774:25-1775:4. | Disputed | OBJECTION: The Port District objects to Monsanto's purported undisputed fact a mischaracterization of the 30(b)(6) and expert testimony Monsanto cites in support. RESPONSE: Ms. Holman testified that there is no specific individual assigned to oversee and manage the 2013 PCB Fish Consumption Advisory. To the extent Monsanto's purported fact could be read to mean that no Port District employees work on issues related to the Fish Consumption Advisory, it is misleading. As detailed in other responses to Monsanto's purported facts, Ms. Holman testified at length about the Port District's (and its employees') involvement in many aspects to the 2013 Fish Consumption Advisory. *See, e.g.*, Port District responses to Monsanto undisputed fact 94, above. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| 96. The Port has never held a public meeting about the fish advisory. | [Howard Decl.] Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1778:19-21. | Disputed | OBJECTION/RESPONSE:<br><br>Since Monsanto filed this motion, the Port District has been requested to present to the SDRWQCB – and in fact did present to the SDRWQCB, on the issue of PCBs and the Fish Consumption Advisory. Corley Decl. Ex. 23, Declaration of David W. Gibson, Executive Director, SDRWQCB In the view of the SDRWQCB, PCBs are a significant problem in the Bay, and mitigating the risk associated with human exposure is a priority for the SDRWQCB. In fact, the Executive Officer of the SDRWQCB stated in a declaration submitted in support of the Port, that the agency is focused on restoring the fish and shellfish consumption beneficial use, which is directly impaired by PCBs. In August 2019 the full SDRWQCB expressed its priority of mitigating the contamination underlying the FCA. Corley Decl. Ex. 23, Declaration of David W. Gibson, Executive Director, SDRWQCB |
| 97. Members of the public have never complained to the Port that fish populations in the Bay are inadequate to fish, the fish advisory is too strict, they want to consume fish in excess of the recommendations in the fish advisory, or consuming fish from the Bay has | [Howard Decl.] Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1784:17-1786:15.<br><br>[Howard Decl.] Ex. 20, A. Jones Dep. Tr. 70:21-71:8. | Undisputed | |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| made them sick because of PCBs. | | | |
| 98. There is no evidence that a single individual has stopped fishing, reduced fishing, or enjoyed fishing less because of PCBs or the fish advisory. | [Howard Decl.] Ex. 20, A. Jones Dep. Tr. at 58:12- 60:14, 74:18-23. | Disputed | OBJECTION: RESPONSE/CONTROVERTING EVIDENCE: Monsanto ignores significant controverting evidence as described below. |

In the right column of fact 98:

OBJECTION:

RESPONSE/CONTROVERTING EVIDENCE:

Monsanto ignores significant controverting evidence as described below.

- It is well-established in scientific literature that fish consumption advisories lead to a decline in the benefits associated with recreational fishing, as anglers forgo fishing entirely, choose alternate sites, decline consumption of fish caught, and/or enjoy the fishing experience less. Corley Decl. Ex. 13, Jones Rebuttal at 7; Ann S. Jones Declaration at ¶11.

- Dr. Johns, Ms. Holman, and Mr. Bennett all also testified as Port District 30(b)(6) witnesses that the Regional Water Quality Control Board listed the entire Bay as impaired for PCBs in fish tissue in approximately 2006, and that the Bay remains so listed. Howard Decl. Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 77:4-6; Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1725:14-19; Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1035:7-24 (during Mr. Bennett's tenure as General Counsel the Port District received notice from the Regional Water Quality Control Board that the entire Bay was impaired by PCBs)

- Monsanto's own expert testified that the Bay is listed as impaired for purposes of Section 303(d) of the federal Clean Water Act and that the SDRWQCB is "considering" implementing a Total Maximum Daily Load mechanism to reduce inputs of PCBs, with the only major sources listed as

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | "contaminated sediments" and "urban runoff/storm sewers." Corley Decl. Ex. 82, Boehm Dep. Tr. at 329:20-332:18.<br><br>• PCBs exist in certain Bay organisms, such as invertebrates, fish and birds, at levels above risk thresholds. Corley Decl. Ex. 12, Jones Rep. at 3.<br><br>• Survey results revealed PCB levels in spotted sand bass ranging from 89 ppb to 1,075 ppb—and toxic effects on fish are reported in scientific literature at concentrations as low as 30 ppb. Corley Decl. Ex. 12, Jones Rep. at 3.<br><br>• A 2016 bioaccumulation study performed in San Diego Bay determined that accumulation and biomagnification of PCBs by marine organisms posed potential harm to all trophic levels. Corley Decl. Ex. 85, Trapp Rep. at 14.<br><br>• Piscivore bird species, including sensitive species of concern nesting in the San Diego Bay National Wildlife Refuge, may be at reproductive risk due to PCB levels in bird eggs above screening levels for adverse effects. Corley Decl. Ex. 12, Jones Rep. at 3.<br><br>• At PCB remediation sites in the Bay, the SDRWQCB has recognized PCB levels in sediment that exceed Effects Range Low ("ERL"), the concentration (below which environmental toxic effects are scarcely observed or predicted), and/or Effects Range Median ("ERM"), (the concentration above which environmental toxic effects are generally or always observed). Corley Decl. Ex. 8, Woodyard Dep. at 130:2-133:8; Corley Decl. Ex. 70, Tentative IO No. R9-2018-0035 at 4; Corley Decl. Ex. 85, Trapp Rep. at 14. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | • SDRWQCB has repeatedly identified PCB sediment contamination as a potential threat to aquatic life. Corley Decl. Ex. 11, CAO No. R9-2015-0018 at 3; Corley Decl. Ex. 9, CAO No. R9-2017-0021.<br><br>• Fish tissue samples taken by state agencies show that the Bay suffers from some of the highest PCB concentrations in the region. Corley Decl. Ex. 5, SWAMP Report at 47.<br><br>• In fact, the Bay is among the most PCB-contaminated water bodies in the country. Corley Decl. Ex. 85, Trapp Rep. at 14.<br><br>• The SDRWQCB and SWRCB have designated the Bay, in its entirety, as an "impaired" water body, due to the presence of elevated levels of PCBs in fish tissue, pursuant to § 303(d) of the Clean Water Act. Corley Decl. Ex. 6, CWA §305(b); 303(d) Integrated Report; Corley Decl. Ex. 7, Port Corp. Rep. at 77:4-6; 1035:7-24; 1725:14-19; Corley Decl. Ex. 8, Woodyard Dep. at 127:16-18; Corley Decl. Ex. 9, CAO No. R9-2017-0021; Corley Decl. Ex. 85, Trapp Rep. at 14-15.<br><br>• Monsanto's own expert testified that the Bay is listed as impaired for purposes of Section 303(d) of the federal Clean Water Act and that the SDRWQCB is "considering" implementing a Total Maximum Daily Load mechanism to reduce inputs of PCBs, with the only major sources listed as "contaminated sediments" and "urban runoff/storm sewers." Corley Decl. Ex. 82, Boehm Dep. Tr. at 329:20-332:18.<br><br>• The SDRWQCB has repeatedly recognized that various areas of the Bay have contamination levels that "may adversely affect San Diego Bay beneficial uses" and pose a risk to human health and the environment. Corley Decl. Ex. 10, CAO No. R9-2004-0295 at 24; Corley Decl. Ex. 8, |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Woodyard Dep. at 129:3-8; Corley Decl. Ex. 11, CAO No. R9-2015-0018 at 3; Corley Decl. Ex. 9, CAO No. R9-2017-0021 at 5. <br><br> • Because of the well-established human health risks associated with exposure to PCBs, in 2013, California's Office of Environmental Health Hazard Assessment ("OEHHA") determined that PCB contamination levels were so high that people should limit, or avoid altogether, the consumption of certain fish from the Bay. OEHHA amended the FCA in 2018 to implement even more stringent restrictions for children and women of childbearing age. Corley Decl. Ex. 1a-e, Fish Consumption Advisory; Corley Decl. Ex. 13, Jones Rebuttal at 13-14; Corley Decl. Ex. 14, Toll Rebuttal at 2; Corley Decl. Ex. 85, Trapp Rep. at 14; Corley Decl. Ex. 86, Ann S. Jones Declaration. <br><br> • Consumption advisories are de facto harms under federal regulations because they interfere with the public's free and comfortable use of a resource. Corley Decl. Ex. 13, Jones Rebuttal at 7; 43 C.F.R. § 11.62(f)(1)(iii). <br><br> • Data suggests that anglers in the Bay who are aware of the FCA consume less fish, and statewide consumption rates before the FCA were higher than after. Corley Decl. Ex. 13, Jones Rebuttal at 17; Corley Decl. Ex. 14, Toll Rebuttal at 8, Fg. 2-1; Corley Decl. Ex. 86, Ann S. Jones Declartion at ¶11. <br><br> • According to Monsanto's expert, somewhere between 65-81% of fish caught from the Bay are precluded from consumption by children or women under age 45. Corley Decl. Ex. 15, Desvousges Dep. at 91:19-92:5. <br><br> • Monsanto's expert admits that the most often caught and consumed fish, the Pacific chub mackerel, is subject to a "Do Not Eat" advisory for children and women under 45, which affects a population demographic that represents the majority of the population in and around San Diego. Corley |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Decl. Ex. 15, Desvousges Dep. at 101:20-24; 102:4-10; Corley Decl. Ex. 16, San Diego Census Data.<br><br>• A full 7.5% of consumers who voluntarily responded to the San Diego Fish Consumption Study reported consuming "Do Not Eat" fish. Corley Decl. Ex. 13, Jones Rebuttal at 13-14; Corley Decl. Ex. 76, SCWRRP San Diego Bay Fish Consumption Study (2017).<br><br>• Site-specific data for the Bay suggests that certain ethnic minority groups engage in subsistence fishing at a much higher rate than the general population, meaning the risk to those communities is dramatically higher. Corley Decl. Ex. 13, Jones Rebuttal at 17; Corley Decl. Ex. 21, Environmental Health Coalition Survey of Fishers; Corley Decl. Ex. 86, Ann S. Jones Declaration at ¶ 20.<br><br>• There is evidence that Monsanto's PCBs pose risks to marine life in the Bay. While PCB impacts to marine life have not been fully quantified, PCBs exist in Bay organisms, such as invertebrates, fish and birds, at levels above risk thresholds. Corley Decl. Ex. 12, Jones Rep. at 3; Corley Decl. Ex. 13, Jones Rebuttal at 3; Ann S. Jones Declaration at ¶¶7-9.<br><br>• The Port has been dealing with the PCB problem for decades. As early as the mid-1980s, the Port was involved in addressing PCB contamination, including funding for the San Diego Bay Cleanup Project. Corley Decl. Ex. 73, 1987 Port Ltr.; Corley Decl. Ex. 74, 1987 Health Risk Study Correspondence.<br><br>• The Port has been involved in numerous PCB cleanups around the Bay. Corley Decl. Ex. 72, Brown Dep. at 98:17-19; 231:1-19. |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | • The Port lead the Campbell Shipyard remediation. Corley Decl. Ex. 72, Brown Dep. at 98:17-19; 231:1-19. <br><br> • PCB contamination has required substantial expenditure of funds—estimated to be at least $80-100 million—from the Port that otherwise would have been invested in enhancing the Bay for the benefit of the people of California. Corley Decl. Ex. 7, Port Corp. Rep. 1214:18-1216:25; *see* Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1263:9-1264:6 (noting that these costs are not an exhaustive total of costs spent by the Port District to deal with the presence of PCBs in the Bay.). <br><br> • More recently, the Port partnered with SDRWCQB in a project to assess contaminants in fish and shellfish in the Bay and funded the San Diego Fish Consumption Study. Corley Decl. Ex. Ex. 75, State Agency Document re Assessing Contaminants in Fish and Shellfish; Corley Decl. Ex. 76, 2017 SCCWRP Fish Consumption Study. <br><br> • In the view of the SDRWQCB, PCBs are a significant problem in the Bay, and mitigating the risk associated with human exposure is a priority for the SDRWQCB. In fact, the Executive Officer of the SDRWQCB stated in a declaration submitted in support of the Port, that the agency is focused on restoring the fish and shellfish consumption beneficial use, which is directly impaired by PCBs. In August 2019 the full SDRWQCB expressed its priority of mitigating the contamination underlying the FCA. Corley Decl. Ex. 13, Jones Rebuttal at 6-7; Corley Decl. Ex. 4, Golightly Rep. at 2, 34. Corley Decl. Ex. 23, Declaration of David W. Gibson, Executive Director, SDRWQCB |
| 99. The Port has never communicated with OEHHA about how | [Howard Decl.] Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at | Undisputed | |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| the advisory could be removed or whether the Port's proposed dredging and abatement projects would cause OEHHA to consider lifting the advisory. | 1711:4-9, 1775:12-25, 1781:6-20. | | |
| 100.   The Port has never communicated with OEHHA about whether planting more eelgrass would result in OEHHA lifting the fish advisory for mercury and PCBs. | [Howard Decl.] Ex. 2, Port 30(b)(6) Dep. (E. Maher) at 795:2-15. | Undisputed | |
| 101.   The Port has not undertaken any analysis of what would be needed to eliminate the 2013 fish advisory. | [Howard Decl.] Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1713:6-18. | Disputed | OBJECTION: The Port District objects to Monsanto's purported undisputed fact as outside of the scope and a mischaracterization of the 30(b)(6) testimony Monsanto cites in support. Additionally, Monsanto ignores significant controverting evidence as described below. RESPONSE: |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | First, Ms. Holman was not designated as a Port District 30(b)(6) witness on the topic of what would be needed to eliminate the 2013 fish consumption advisory. In fact, on April 25, 2019, Judge Schopler struck a Monsanto-proposed 30(b)(6) topic that would have covered these items. Corley Decl. Ex. 80a, ECF No. 360. That topic was:<br><br>*"The Port District's position concerning the level of PCBs in sediments or in the water column of the Bay and Trust Property that must be achieved in order to abate the alleged public nuisance."*<br><br>Corley Decl. Ex. 79, Port 30(b)(6) (M. Johns) Dep. Ex. 1 (Monsanto Rule 30(b)(6) Deposition Notice to Port District)(April 27, 2017); Corley Decl. Ex. 80a-b, ECF No. 360 at 28 (upholding tentative decision to strike topic 72 and others (attached to transcript), ECF No. 354).<br><br>By striking this topic, Judge Schopler made clear that it was not the proper subject of Port District 30(b)(6) testimony. As such, any testimony Ms. Holman or any other 30(b)(6) witness as to certain PCB-related impairments is neither binding as the Port District's final position, nor exhaustive. The Port District properly objected as to scope during the 30(b)(6) deposition.<br><br>CONTROVERTING EVIDENCE:<br><br>Monsanto also ignores clear controverting evidence. For example, the Port District's expert, Dr. John Toll, in fact modeled – in one scenario – the surface weighted average concentration that would need to be achieved in the Bay, through removal of PCBS in sediment, to bring PCB tissue concentrations a representative species with OEHHA's Advisory Tissue Levels, which would be required in order to remove the Fish Consumption Advisory. Corley Decl. Ex. 78, Toll Report at 39-40. |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| 102.    The Port has not shown that removing all PCBs from the Bay would result in OEHHA lifting the advisory for mercury and PCBs. | [Howard Decl.] Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1782:14-25. | Disputed | The Port District objects to this purported fact as not relevant. The Port District has never asserted or alleged that all PCBs need to be removed from the Bay in order for OEHHA to lift the fish consumption advisory. |
| 103.    State of California and Fish and Wildlife Service have primary authority over fish kills and fish habitat. | [Howard Decl.] Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 235:12-236:3, 236:18-238:4. | Undisputed | |
| 104.    The fish advisory is under the authority of the State of California's OEHHA. | [Howard Decl.] Ex. 44, Port 30(b)(6) (M. Johns) Dep. Ex. 34 (2013 OEHHA fish advisory) (Oct. 2013). | Undisputed | |
| 105.    The Port's experts on health and ecological impacts testified there is no | [Howard Decl.] Ex. 20, A. Jones Dep. Tr. at 63:18- 64:25. | Disputed | OBJECTION: Monsanto ignores significant controverting evidence. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| evidence of any measurable harm to humans or wildlife from PCBs in the Bay. | [Howard Decl.] Ex. 85, J. Olson Dep. Tr. 26:2-20, 29:3-19. | | CONTROVERTING EVIDENCE:<br><br>• PCBs exist in certain Bay organisms, such as invertebrates, fish and birds, at levels above risk thresholds. Corley Decl. Ex. 12, Jones Rep. at 3<br><br>• Survey results revealed PCB levels in spotted sand bass ranging from 89 ppb to 1,075 ppb—and toxic effects on fish are reported in scientific literature at concentrations as low as 30 ppb. Corley Decl. Ex. 12, Jones Rep. at 3.<br><br>• A 2016 bioaccumulation study performed in San Diego Bay determined that accumulation and biomagnification of PCBs by marine organisms posed potential harm to all trophic levels. Corley Decl. Ex. 85, Trapp Rep. at 14.<br><br>• Piscivore bird species, including sensitive species of concern nesting in the San Diego Bay National Wildlife Refuge, may be at reproductive risk due to PCB levels in bird eggs above screening levels for adverse effects. Corley Decl. Ex. 12, Jones Rep. at 3.<br><br>• At PCB remediation sites in the Bay, the Water Board has recognized PCB levels in sediment that exceed Effects Range Low ("ERL"), the concentration (below which environmental toxic effects are scarcely observed or predicted), and/or Effects Range Median ("ERM"), (the concentration above which environmental toxic effects are generally or always observed). Corley Decl. Ex. 8, Woodyard Dep. at 130:2-133:8; Corley Decl. Ex. 70, Tentative IO No. R9-2018-0035 at 4; Corley Decl. Ex. 85, Trapp Rep. at 14. |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | • SDRWQCB has repeatedly identified PCB sediment contamination as a potential threat to aquatic life. Corley Decl. Ex. 11, CAO No. R9-2015-0018 at 3; Corley Decl. Ex. 9, CAO No. R9-2017-0021. |
| 106.  The Port and its experts performed no risk assessment of PCBs in the Bay. | [Howard Decl.] Ex. 85, J. Olson Dep. Tr. at 21:18-22, 21:24-22:2.<br><br>[Howard Decl.] Ex. 22, R. DeGrandchamp Dep. Tr. at 71:5-8. | Disputed | <u>OBJECTION</u>:<br><br>Monsanto ignores significant controverting evidence regarding ecological impacts and risks that PCBs present to fish and wildlife in the Bay.<br><br><u>CONTROVERTING EVIDENCE</u>:<br><br>• Dr. Johns, Ms. Holman, and Mr. Bennett all also testified as Port District 30(b)(6) witnesses that the Regional Water Quality Control Board listed the entire Bay as impaired for PCBs in fish tissue in approximately 2006, and that the Bay remains so listed. Howard Decl. Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 77:4-6; Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1725:14-19; Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1035:7-24 (during Mr. Bennett's tenure as General Counsel the Port District received notice from the Regional Water Quality Control Board that the entire Bay was impaired by PCBs)<br><br>• The SDRWQCB and SWRCB have designated the Bay, in its entirety, as an "impaired" water body, due to the presence of elevated levels of PCBs in fish tissue, pursuant to § 303(d) of the Clean Water Act. Corley Decl. Ex. 6, CWA §305(b); 303(d) Integrated Report; Corley Decl. Ex. 7, Port Corp. Rep. at 77:4-6; 1035:7-24; 1725:14-19; Corley Decl. Ex. 8, Woodyard Dep. at 127:16-18; Corley Decl. Ex. 9, CAO No. R9-2017-0021; Corley Decl. Ex. 85, Trapp Rep. at 14-15.<br><br>• The SDRWQCB has repeatedly recognized that various areas of the Bay have contamination levels that "may adversely affect San Diego Bay |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | beneficial uses" and pose a risk to human health and the environment. Corley Decl. Ex. 10, CAO No. R9-2004-0295 at 24; Corley Decl. Ex. 8, Woodyard Dep. at 129:3-8; Corley Decl. Ex. 11, CAO No. R9-2015-0018 at 3; Corley Decl. Ex. 9, CAO No. R9-2017-0021 at 5.<br><br>• Monsanto's own expert testified that the Bay is listed as impaired for purposes of Section 303(d) of the federal Clean Water Act and that the SDRWQCB is "considering" implementing a Total Maximum Daily Load mechanism to reduce inputs of PCBs, with the only major sources listed as "contaminated sediments" and "urban runoff/storm sewers." Corley Decl. Ex. 82, Boehm Dep. Tr. at 329:20-332:18.<br><br>• PCBs exist in certain Bay organisms, such as invertebrates, fish and birds, at levels above risk thresholds. Corley Decl. Ex. 12, Jones Rep. at 3.<br><br>• Survey results revealed PCB levels in spotted sand bass ranging from 89 ppb to 1,075 ppb—and toxic effects on fish are reported in scientific literature at concentrations as low as 30 ppb. Corley Decl. Ex. 12, Jones Rep. at 3.<br><br>• A 2016 bioaccumulation study performed in San Diego Bay determined that accumulation and biomagnification of PCBs by marine organisms posed potential harm to all trophic levels. Corley Decl. Ex. 85, Trapp Rep. at 14.<br><br>• Piscivore bird species, including sensitive species of concern nesting in the San Diego Bay National Wildlife Refuge, may be at reproductive risk due to PCB levels in bird eggs above screening levels for adverse effects. Corley Decl. Ex. 12, Jones Rep. at 3.<br><br>• At PCB remediation sites in the Bay, the SDRWQCB has recognized PCB levels in sediment that exceed Effects Range Low ("ERL"), the |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | concentration (below which environmental toxic effects are scarcely observed or predicted), and/or Effects Range Median ("ERM"), (the concentration above which environmental toxic effects are generally or always observed). Corley Decl. Ex. 8, Woodyard Dep. at 130:2-133:8; Corley Decl. Ex. 70, Tentative IO No. R9-2018-0035 at 4; Corley Decl. Ex. 85, Trapp Rep. at 14. <br><br> • SDRWQCB has repeatedly identified PCB sediment contamination as a potential threat to aquatic life. Corley Decl. Ex. 11, CAO No. R9-2015-0018 at 3; Corley Decl. Ex. 9, CAO No. R9-2017-0021. <br><br> • Fish tissue samples taken by state agencies show that the Bay suffers from some of the highest PCB concentrations in the region. Corley Decl. Ex. 5, SWAMP Report at 47. <br><br> • In fact, the Bay is among the most PCB-contaminated water bodies in the country. Corley Decl. Ex. 85, Trapp Rep. at 14. <br><br> • Because of the well-established human health risks associated with exposure to PCBs, in 2013, California's Office of Environmental Health Hazard Assessment ("OEHHA") determined that PCB contamination levels were so high that people should limit, or avoid altogether, the consumption of certain fish from the Bay. OEHHA amended the FCA in 2018 to implement even more stringent restrictions for children and women of childbearing age. Corley Decl. Ex. 1a-e, Fish Consumption Advisory; Corley Decl. Ex. 13, Jones Rebuttal at 13-14; Corley Decl. Ex. 14, Toll Rebuttal at 2; Corley Decl. Ex. 85, Trapp Rep. at 14; Corley Decl. Ex. 86, Ann S. Jones Declaration. <br><br> • Consumption advisories are de facto harms under federal regulations because they interfere with the public's free and comfortable use of a |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | resource. Corley Decl. Ex. 13, Jones Rebuttal at 7; 43 C.F.R. § 11.62(f)(1)(iii). <br><br> • Data suggests that anglers in the Bay who are aware of the FCA consume less fish, and statewide consumption rates before the FCA were higher than after. Corley Decl. Ex. 13, Jones Rebuttal at 17; Corley Decl. Ex. 14, Toll Rebuttal at 8, Fg. 2-1; Corley Decl. Ex. 86, Ann S. Jones Declartion at ¶11. <br><br> • According to Monsanto's expert, somewhere between 65-81% of fish caught from the Bay are precluded from consumption by children or women under age 45. Corley Decl. Ex. 15, Desvousges Dep. at 91:19-92:5. <br><br> • Monsanto's expert admits that the most often caught and consumed fish, the Pacific chub mackerel, is subject to a "Do Not Eat" advisory for children and women under 45, which affects a population demographic that represents the majority of the population in and around San Diego. Corley Decl. Ex. 15, Desvousges Dep. at 101:20-24; 102:4-10; Corley Decl. Ex. 16, San Diego Census Data. <br><br> • A full 7.5% of consumers who voluntarily responded to the San Diego Fish Consumption Study reported consuming "Do Not Eat" fish. Corley Decl. Ex. 13, Jones Rebuttal at 13-14; Corley Decl. Ex. 76, SCWRRP San Diego Bay Fish Consumption Study (2017). <br><br> • Site-specific data for the Bay suggests that certain ethnic minority groups engage in subsistence fishing at a much higher rate than the general population, meaning the risk to those communities is dramatically higher. Corley Decl. Ex. 13, Jones Rebuttal at 17; Corley Decl. Ex. 21, Environmental Health Coalition Survey of Fishers; Corley Decl. Ex. 86, Ann S. Jones Declaration at ¶ 20. |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | • There is evidence that Monsanto's PCBs pose risks to marine life in the Bay. While PCB impacts to marine life have not been fully quantified, PCBs exist in Bay organisms, such as invertebrates, fish and birds, at levels above risk thresholds. Corley Decl. Ex. 12, Jones Rep. at 3; Corley Decl. Ex. 13, Jones Rebuttal at 3; Ann S. Jones Declaration at ¶¶7-9. |
| 107.   There is no evidence of human harm from PCBs and the fish advisory. | [Howard Decl.] Ex. 22, R. DeGrandchamp Dep. Tr. at 72:10-19.  [Howard Decl.] Ex. 20, J. Olson Dep. Tr. at 26:2-25, 29:3-19.  [Howard Decl.] Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1785:24-1786-15. | Disputed | OBJECTION:  Monsanto also ignores significant controverting evidence regarding other ecological impacts and risks that PCBs present to fish and wildlife in the Bay.  CONTROVERTING EVIDENCE:  • Dr. Johns, Ms. Holman, and Mr. Bennett all also testified as Port District 30(b)(6) witnesses that the Regional Water Quality Control Board listed the entire Bay as impaired for PCBs in fish tissue in approximately 2006, and that the Bay remains so listed. Howard Decl. Ex. 1, Port 30(b)(6) (M. Johns) Dep. Tr. at 77:4-6; Howard Decl. Ex. 3, Port 30(b)(6) (K. Holman) Dep. Tr. at 1725:14-19; Howard Decl. Ex. 4, Port 30(b)(6) (D. Bennett) Dep. Tr. at 1035:7-24 (during Mr. Bennett's tenure as General Counsel the Port District received notice from the Regional Water Quality Control Board that the entire Bay was impaired by PCBs).  • The SDRWQCB and SWRCB have designated the Bay, in its entirety, as an "impaired" water body, due to the presence of elevated levels of PCBs in fish tissue, pursuant to § 303(d) of the Clean Water Act. Corley Decl. Ex. 6, CWA §305(b); 303(d) Integrated Report; Corley Decl. Ex. 7, Port Corp. Rep. at 77:4-6; 1035:7-24; 1725:14-19; Corley Decl. Ex. 8, Woodyard Dep. at 127:16-18; Corley Decl. Ex. 9, CAO No. R9-2017-0021; Corley Decl. Ex. 85, Trapp Rep. at 14-15. |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | <ul><li>The SDRWQCB has repeatedly recognized that various areas of the Bay have contamination levels that "may adversely affect San Diego Bay beneficial uses" and pose a risk to human health and the environment. Corley Decl. Ex. 10, CAO No. R9-2004-0295 at 24; Corley Decl. Ex. 8, Woodyard Dep. at 129:3-8; Corley Decl. Ex. 11, CAO No. R9-2015-0018 at 3; Corley Decl. Ex. 9, CAO No. R9-2017-0021 at 5.</li><li>Monsanto's own expert testified that the Bay is listed as impaired for purposes of Section 303(d) of the federal Clean Water Act and that the SDRWQCB is "considering" implementing a Total Maximum Daily Load mechanism to reduce inputs of PCBs, with the only major sources listed as "contaminated sediments" and "urban runoff/storm sewers." Corley Decl. Ex. 82, Boehm Dep. Tr. at 329:20-332:18.</li><li>PCBs exist in certain Bay organisms, such as invertebrates, fish and birds, at levels above risk thresholds. Corley Decl. Ex. 12, Jones Rep. at 3.</li><li>Survey results revealed PCB levels in spotted sand bass ranging from 89 ppb to 1,075 ppb—and toxic effects on fish are reported in scientific literature at concentrations as low as 30 ppb. Corley Decl. Ex. 12, Jones Rep. at 3.</li><li>A 2016 bioaccumulation study performed in San Diego Bay determined that accumulation and biomagnification of PCBs by marine organisms posed potential harm to all trophic levels. Corley Decl. Ex. 85, Trapp Rep. at 14.</li><li>Piscivore bird species, including sensitive species of concern nesting in the San Diego Bay National Wildlife Refuge, may be at reproductive risk due to PCB levels in bird eggs above screening levels for adverse effects. Corley Decl. Ex. 12, Jones Rep. at 3.</li></ul> |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | • At PCB remediation sites in the Bay, the SDRWQCB has recognized PCB levels in sediment that exceed Effects Range Low ("ERL"), the concentration (below which environmental toxic effects are scarcely observed or predicted), and/or Effects Range Median ("ERM"), (the concentration above which environmental toxic effects are generally or always observed). Corley Decl. Ex. 8, Woodyard Dep. at 130:2-133:8; Corley Decl. Ex. 70, Tentative IO No. R9-2018-0035 at 4; Corley Decl. Ex. 85, Trapp Rep. at 14.<br><br>• SDRWQCB has repeatedly identified PCB sediment contamination as a potential threat to aquatic life. Corley Decl. Ex. 11, CAO No. R9-2015-0018 at 3; Corley Decl. Ex. 9, CAO No. R9-2017-0021.<br><br>• Fish tissue samples taken by state agencies show that the Bay suffers from some of the highest PCB concentrations in the region. Corley Decl. Ex. 5, SWAMP Report at 47.<br><br>• In fact, the Bay is among the most PCB-contaminated water bodies in the country. Corley Decl. Ex. 85, Trapp Rep. at 14.<br><br>• Because of the well-established human health risks associated with exposure to PCBs, in 2013, California's Office of Environmental Health Hazard Assessment ("OEHHA") determined that PCB contamination levels were so high that people should limit, or avoid altogether, the consumption of certain fish from the Bay. OEHHA amended the FCA in 2018 to implement even more stringent restrictions for children and women of childbearing age. Corley Decl. Ex. 1a-e, Fish Consumption Advisory; Corley Decl. Ex. 13, Jones Rebuttal at 13-14; Corley Decl. Ex. 14, Toll Rebuttal at 2; Corley Decl. Ex. 85, Trapp Rep. at 14; Corley Decl. Ex. 86, Ann S. Jones Declaration. |

ATTACHMENT A TO SDUPD'S SEPARATE STATEMENT IN OPPOSITION TO MONSANTO'S MOTION FOR SUMMARY JUDGMENT (PUBLIC NUISANCE)

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | <ul><li>Consumption advisories are de facto harms under federal regulations because they interfere with the public's free and comfortable use of a resource. Corley Decl. Ex. 13, Jones Rebuttal at 7; 43 C.F.R. § 11.62(f)(1)(iii).</li><li>Data suggests that anglers in the Bay who are aware of the FCA consume less fish, and statewide consumption rates before the FCA were higher than after. Corley Decl. Ex. 13, Jones Rebuttal at 17; Corley Decl. Ex. 14, Toll Rebuttal at 8, Fg. 2-1; Corley Decl. Ex. 86, Ann S. Jones Declartion at ¶11.</li><li>According to Monsanto's expert, somewhere between 65-81% of fish caught from the Bay are precluded from consumption by children or women under age 45. Corley Decl. Ex. 15, Desvousges Dep. at 91:19-92:5.</li><li>Monsanto's expert admits that the most often caught and consumed fish, the Pacific chub mackerel, is subject to a "Do Not Eat" advisory for children and women under 45, which affects a population demographic that represents the majority of the population in and around San Diego. Corley Decl. Ex. 15, Desvousges Dep. at 101:20-24; 102:4-10; Corley Decl. Ex. 16, San Diego Census Data.</li><li>A full 7.5% of consumers who voluntarily responded to the San Diego Fish Consumption Study reported consuming "Do Not Eat" fish. Corley Decl. Ex. 13, Jones Rebuttal at 13-14; Corley Decl. Ex. 76, SCWRRP San Diego Bay Fish Consumption Study (2017).</li><li>Site-specific data for the Bay suggests that certain ethnic minority groups engage in subsistence fishing at a much higher rate than the general population, meaning the risk to those communities is dramatically higher. Corley Decl. Ex. 13, Jones Rebuttal at 17; Corley Decl. Ex. 21,</li></ul> |

| [Monsanto] Undisputed Material Fact[1] | [Monsanto] Supporting Evidence | Disputed/ Undisputed | Port District's Responses, Objections, and Controverting Evidence |
|---|---|---|---|
| | | | Environmental Health Coalition Survey of Fishers; Corley Decl. Ex. 86, Ann S. Jones Declaration at ¶ 20. <br><br> • There is evidence that Monsanto's PCBs pose risks to marine life in the Bay. While PCB impacts to marine life have not been fully quantified, PCBs exist in Bay organisms, such as invertebrates, fish and birds, at levels above risk thresholds. Corley Decl. Ex. 12, Jones Rep. at 3; Corley Decl. Ex. 13, Jones Rebuttal at 3; Ann S. Jones Declaration at ¶¶7-9. |