UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SAN DIEGO UNIFIED PORT
DISTRICT, a public corporation; and
CITY OF SAN DIEGO, a municipal
corporation,

                        Plaintiffs,

v.

MONSANTO COMPANY; SOLUTIA
INC.; and PHARMACIA
CORPORATION,

                        Defendants.

Case No.:  15-cv-578-WQH-AGS

**ORDER**

HAYES, Judge:

The matters before the Court are the Motions for Summary Judgment or, in the Alternative, Partial Summary Judgment Against Plaintiff San Diego Unified Port District filed by Defendants Monsanto Company, Solutia Inc., and Pharmacia Corporation. (ECF Nos. 422-424).

## I.  BACKGROUND

On March 13, 2015, Plaintiffs San Diego Unified Port District (the "Port District") and the City of San Diego (the "City") initiated this action by filing a Complaint. (ECF No.

1). On August 3, 2015, the Port District and the City filed separate First Amended Complaints against Defendants Monsanto Company, Solutia Inc., and Pharmacia Corporation (collectively, "Monsanto"). (ECF Nos. 24, 25). In its First Amended Complaint ("FAC"), the Port District brings claims against Monsanto for public nuisance, equitable indemnity, and purpresture relating to the alleged contamination of San Diego Bay (the "Bay") from polychlorinated biphenyls ("PCBs") manufactured by Monsanto. (ECF No. 25). The Port District alleges that Monsanto, the sole manufacturer of PCBs in the United States from 1935 to 1979, knew PCBs presented a health risk and "were causing widespread contamination of the environment." (*Id.* ¶ 40). The Port District alleges that Monsanto promoted the use and sale of PCB compounds despite this knowledge and "instructed its customers to dispose of PCB containing material in local landfills, knowing that landfills were not suitable for PCB contaminated waste." (*Id.* ¶ 51). The Port District alleges that Monsanto's instructions for improper disposal of PCBs resulted in pollution of the Bay.

On September 28, 2016, the Court issued an Order granting in part and denying in part Monsanto's Motion to Dismiss the Port District's FAC. (ECF No. 81). The Court granted the Motion to Dismiss the Port District's equitable indemnity claim and denied the Motion to Dismiss the Port District's purpresture and public nuisance claims.

The parties engaged in fact and expert discovery. On August 2, 2019, Monsanto filed Motions for Summary Judgment against the Port District on the Port District's request for an abatement remedy (ECF No. 422), the Port District's purpresture claim (ECF No. 423), and the Port District's public nuisance claim (ECF No. 424).

On October 1, 2019, the Port District filed Oppositions to Monsanto's Motions for Summary Judgment. (ECF Nos. 450, 452, 453). The Port District also filed a Motion to Strike. (ECF No. 451).

On October 14, 2019, the Port District filed a Notice of Supplemental Authority in support of its Oppositions to Monsanto's Motions for Summary Judgment. (ECF No. 454).

On October 18, 2019, Monsanto filed Replies in support of its Motions for Summary Judgment (ECF Nos. 457, 459, 460), an Opposition to the Port District's Motion to Strike (ECF No. 461), a Motion to Strike (ECF No. 462), and a Response to the Port District's Notice of Supplemental Authority (ECF No. 463).

On October 21, 2019, Monsanto filed an Amended Reply in support of its Motion for Summary Judgment (Abatement). (ECF No. 465).

On October 25, 2019, the Port District filed an Opposition to Monsanto's Motion to Strike. (ECF No. 466). On October 31, 2019, Monsanto filed a Reply in support of its Motion to Strike. (ECF No. 467).

On December 6, 2019, the Court heard oral argument on Monsanto's Motions for Summary Judgment.

On January 27, 2020, Monsanto filed a Notice of Supplemental Authority in Support of its Motion for Summary Judgment (Abatement). (ECF No. 478). On February 10, 2020, the Port District filed a Response to Monsanto's Notice of Supplemental Authority. (ECF No. 480)

## II.   CONTENTIONS

Monsanto moves for summary judgment in its favor on the Port District's public nuisance claim, purpresture claim, and request for an abatement remedy. Monsanto contends that there is an absence of evidence to support the public nuisance claim. Monsanto contends that the Port District identified three public-use impairments to the Bay: 1) the Campbell Shipyard sediment cap; 2) the Convair Lagoon sediment cap; and 3) the 2013 Office of Environmental Health Hazard Assessment ("OEHHA") Fish Consumption Advisory. Monsanto contends that the Port District failed to identify facts that demonstrate the sediment caps or the Fish Consumption Advisory impair the public's use of the Bay. Monsanto contends that that the Port District may not recover damages on its purpresture claim because abatement is the only available remedy in this representative public nuisance action. Monsanto further contends that there is an absence of evidence to support the purpresture claim. Monsanto contends the Port District's request for an

15-cv-578-WQH-AGS

abatement fund is displaced by the Porter-Cologne Water Quality Control Act (the "Porter-Cologne Act"). Monsanto contends that the request for an abatement fund remedy is not ripe.

The Port District contends that admissible evidence demonstrates that Monsanto instructed users in the improper disposal of PCBs, causing pollution of Bay water and contamination of Bay fish. The Port District contends that this pollution constitutes a public nuisance under California law. The Port District contends that the Convair Lagoon and Campbell Shipyard sediment caps were erected as remedial measures designed to limit exposure to PCBs, and the caps obstruct boating in the Bay. The Port District contends that the Fish Consumption Advisory has led to a decline in fishing and that PCBs in fish tissue pose a threat to human health. The Port District contends it may recover damages on its purpresture claim as a title holder in trust of Bay lands. The Port District further contends that admissible evidence demonstrates that PCBs have polluted the Bay and constitute a purpresture. The Port District contends that the Porter-Cologne Act does not displace the Court's ability to order an abatement remedy. The Port District contends that injury to the public has already occurred, and its claims are ripe for adjudication.

## III.   FACTS

From the 1930s onward, PCBs were released into the environment from Monsanto and its customers. PCBs are synthetic chemical compounds that were produced and used during the twentieth century for "hundreds of industrial and commercial applications." (Environmental Protection Agency ("EPA") Website, http://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls-pcbs#healtheffects, Ex. 17, Declaration of Kenneth O. Corley in Support of Port District's Opposition to Monsanto's Motion for Summary Judgment (Public Nuisance) ("Corley Decl."), ECF No. 450-24 at 2). According to the EPA's 1976 Polychlorinated Biphenyl-Containing Wastes Disposal Procedures ("1976 PCB Disposal Procedures"), PCBs were originally manufactured for "closed uses" as cooling and insulating fluids in heavy-duty electrical equipment, including capacitors and transformers. (Ex. 25, Corley Decl., ECF No. 450-35 at 3). PCBs were also manufactured

for "open uses" in paints, caulks, adhesives, coatings, plasticizers, pesticide extenders, and carbonless copy paper. (*Id.*; Port District's Nuisance Facts, ECF No. 450-1 ¶ 31). The EPA's 1976 PCB Disposal Procedures stated that "[t]he sole producer of PCBs in the United States is the Monsanto Company." (Ex. 25, Corley Decl., ECF No. 450-35 at 3). From 1927 to 1979, Monsanto produced and sold more than 1.4 billion pounds of PCBs, approximately 99% of the PCBs used in the United States. (Port District's Nuisance Facts, ECF No. 450-1 ¶¶ 27-28).

In a July 22, 1971, Monsanto memorandum, "P. G. Benignus" stated that Monsanto's "Askarel Inspection and Maintenance Guide" advised customers to discard the PCB product by "dumping or burying where it will not contaminate a water supply." (Ex. 64, Corley Decl., ECF No. 450-74 at 2). P. G. Benignus stated:

> Since the advent of the PCB pollution problem and as we now have an incinerator, [the discard instructions] [are] no longer adequate.
>
> Please change [the discard instructions] to read, "Due to possible environmental pollution by PCB materials, scrap askarel must not be allowed to contaminate a water supply. The material needs to be destroyed by proper incineration at 2,000°F including facilities to neutralize hydrogen chloride gas. The user may ship the scrap to Monsanto Co., W. G. Krummrich Plant, Sauget, Illinois, Attention Supervisor Dept. A-245. It will be incinerated properly, at a charge of 3 cents a pound."

(*Id.*).

The EPA's 1976 PCB Disposal Procedures stated that "[t]he chemical properties that make PCBs desirable industrial materials"—their stability and nondegradability—"also make them highly persistent in the environment." (Ex. 25, Corley Decl., ECF No. 450-35 at 3). The EPA advised that PCBs cannot be "destroyed by usual waste treatment methods" and should be disposed of by "high temperature incineration" in a specialized incinerator. (*Id.* at 4). The EPA stated that if PCBs cannot be disposed of by proper incineration, they may be disposed of in a "secure chemical waste landfill." (*Id.*). The EPA advised:

> Wastes containing PCBs should not be disposed of with other mixed wastes in a sanitary landfill . . . . Characteristics of transport of PCBs through the soil

are not definitively established. The interaction with other decomposing wastes is not well understood. Some landfills may contain or accept wastes which could cause the release of PCBs.

(*Id.*). The EPA stated that after concern arose in 1970 about the persistence of PCBs in the environment and potential health risks, Monsanto "voluntarily restricted domestic sales of PCBs to use in transformers and capacitators (closed systems)." (*Id.* at 3). In 1979, Congress passed the Toxic Substances Control Act, 15 U.S.C. §§ 2601 *et seq.*, banning the manufacture of PCBs. (*Id.* at 2).

### a. Regional Board Cleanup and Abatement Orders

PCBs are present in sediment, water, and fish in the Bay. On October 17, 1986, the San Diego Regional Water Quality Control Board (the "Regional Board") issued Cleanup and Abatement Order No. 86-92 to Teledyne Ryan Aeronautical for "discharge into the Convair Lagoon portion of San Diego Bay." (Ex. 40, Omnibus Declaration of Robert M. Howard in Support of Defendants' Motions for Summary Judgment ("Howard Decl."), ECF No. 425-45 at 3). The Regional Board determined that Teledyne Ryan Aeronautical "use[d] electrical transformers and capacitors which use fluids containing polychlorinated biphenyls (PCBs)." (*Id.* at 2). The Regional Board stated that "[s]torm runoff from the Teledyne Ryan Aeronautical facility. . . discharges into the San Diego Bay east of Convair Lagoon," causing "elevated levels of PCBs in the San Diego Bay sediments" and concentrations of PCBs in mussel tissue at the "highest ever measured in the history of the State Mussel Watch Program." (*Id.* at 3-4). The Regional Board determined that the PCBs in Convair Lagoon impair beneficial uses and create "a condition of pollution." (*Id.* at 5). Specifically, the Regional Board stated that "the San Diego County Health Department has quarantined the Convair Lagoon portion of San Diego Bay to prevent the collection of shellfish for human consumption . . . result[ing] in the impairment of the shellfish harvesting beneficial use of the [Bay]." (*Id.*). The Regional Board further found:

Discharges of PCBs into San Diego Bay also threaten to impair other beneficial uses of the waters in San Diego Bay. These include Water Contact Recreation, Ocean Commercial and Sport Fishing, Saline Water Habitat, and

> Marine Habitat. The presence of PCBs in the environment at certain concentrations have been found to cause toxic effects in man and animals, particularly if repeated exposures occur.

(*Id.*). The Regional Board considered cleanup and abatement options including dredging and capping. The Regional Board explained that the cleanup was "not based on any finding that all possible effects related to PCB contamination will be eliminated." (Addendum No. 4 to CAO No. 86-92 (Jun. 1, 1992), Ex. 40, Howard Decl., ECF No. 425-45 at 20). However, cleanup would "likely result in a significant reduction in the amount of PCBs available to shellfish and other biota from PCB contaminated sediment." (*Id.* at 21). "The Port was the permitting authority [for remediation] under the California Coastal Act and responsible for conducting an environmental review under CEQA." (Monsanto's Nuisance Facts, ECF No. 424-2 ¶ 77). "At the end of the environmental review process, the Port adopted CEQA findings approving a sand cap covered with eelgrass" at the Convair Lagoon site. (*Id.* ¶ 79).

On May 24, 1995, the Regional Board issued Cleanup and Abatement Order No. 95-21 to Campbell Industries for the Campbell Shipyard site, leased from the Port District. The Regional Board determined that Campbell Industries conducted industrial processes "over San Diego Bay waters or very close to the waterfront." (Ex. 41, Howard Decl., ECF No. 425-46 at 5). The Regional Board stated that "ship hydraulic system and repair and paint application activities" caused PCBs to enter the Bay. (*Id.* at 24). As a "direct result" of Campbell Industries' activities, the Regional Board found elevated sediment concentrations of copper, zinc, lead, tributyltin, high molecular weight polynuclear aromatic hydrocarbons, total petroleum hydrocarbons, and PCBs. (*Id.* at 9, 24). "The Port served as the CEQA lead agency for the remediation at Campbell Shipyard, and it evaluated, designed, funded, approved, permitted, and constructed the Campbell Cap." (Monsanto's Nuisance Facts, ECF No. 424-2 ¶ 63). "In 2004, the Port issued to itself a Coastal Development Permit to construct the Campbell cap." (*Id.* ¶ 69).

7

In 2006, and each following year, the Regional Board has "listed the Bay as 'impaired' for PCBs under Clean Water Act Section 303(d)." (Monsanto's Purpresture Facts, ECF No. 423-2 ¶ 41; Regional Board 2016 Clean Water Act Sections 305(B) and 303(D) Integrated Report, Ex. 6, Corley Decl., ECF No. 450-12 at 39).

On October 30, 2015, the Regional Board issued Cleanup and Abatement Order No. R9-2015-001B to Ryan Aeronautical Company and its successors for PCB wastes discharged from storm water conveyance systems ("SWCS") to the Bay. The Regional Board found that "[s]ome of the highest concentrations of total PCBs found in San Diego Bay sediment have been found adjacent to the 30-inch SWCS outfall." (Ex. 11, Corley Decl., ECF No. 450-17 at 4). The Regional Board stated that the SWCS outfall "is likely one of the sources of the PCBs found in fish tissue in San Diego Bay." (*Id.*). The Regional Board explained that "PCBs can cause cancer and other health effects in humans" and ordered Ryan Aeronautical Company to remediate. (*Id.* at 2).

On April 4, 2017, the Regional Board issued Cleanup and Abatement Order No. R9-2017-0021 to Lockheed Martin Corporation for waste discharged to the East Basin of the Bay. The Regional Board determined that "[a] transformer existed adjacent to the laboratory building that could have leaked fluids containing PCBs." (Ex. 9, Corley Decl., ECF No. 450-15 at 4). The Regional Board stated that "PCBs and mercury were discharged from the former Tow Basin and Railway facilities to the East Basin, contributing to the unhealthy levels of these pollutants in San Diego Bay fish tissue." (*Id.* at 6-7). The Regional Board found:

> The concentrations of pollutants in the sediments of the East Basin of San Diego Bay are at levels that may have an impact on human health and the benthic community, and may have an impact on aquatic-dependent wildlife, thus creating a condition of pollution and nuisance in waters of the State.

(*Id.* at 7).

///

///

### b. Fish Consumption Advisories

According to the EPA, PCBs enter the environment through disposal of PCBs into poorly maintained hazardous waste sites, illegal or improper dumping of PCB wastes, leaks or releases from electrical transformers containing PCBs, disposal of PCBs into landfills not designed to handle hazardous waste, and burning PCB wastes in industrial incinerators. (EPA Website, Ex. 17, Corley Decl., ECF No. 450-24 at 3). Once released into the environment, PCBs bind to soil and sediment and bioaccumulate in fish and wildlife. (*Id.* at 9). The Surface Water Ambient Monitoring Program's ("SWAMP") 2009-2010 Summary Report on Contaminants in Fish from the California Coast, published in 2012, concluded that PCBs in the Bay have "reached concentrations in fish tissue that pose potential health concerns . . . . PCBs may cause cancer, damage the liver, digestive tract, and nerves; and affect development, reproduction, and the immune system." (Ex. 5, ECF No. 450-11 at 12). SWAMP reported in 2012 that PCBs in fish tissue cause "significant risks" to fish-eating birds, in addition to the effects on humans. (*Id.* at 83).

In 2013, OEHAA published a Fish Consumption Advisory for fish from the Bay due to mercury and PCBs. (Ex. 1e, Corley Decl., ECF No. 450-7 at 2). The Fish Consumption Advisory provides:

> Several programs collected fish from San Diego Bay and analyzed them for chemicals of potential concern for human health. The Office of Environmental Health Hazard Assessment (OEHHA) evaluated the results of these studies and found mercury and PCBs in some fish species at levels of concern for fish consumers. OEHHA is providing these guidelines to help people choose which types of fish are safer to eat.

(*Id.*). The Fish Consumption Advisory states that PCBs enter fish through the food they eat and are "passed up the food chain." (*Id.*). "Because [PCBs] do not break down easily, they stay in the environment for a long time." (*Id.*). The Fish Consumption Advisory warns that "PCBs affect many body functions resulting in a variety of health problems, including effects on the nervous system." (*Id.*). The Fish Consumption Advisory warns that "PCBs can cause cancer." (*Id.* at 5).

The Fish Consumption Advisory states that women 45 years of age and under and children between the ages of 1 and 17 should never consume barred sand bass, spotted sand bass, shiner perch, topsmelt, yellowfin croaker, leopard shark, or gray smoothhound shark from the Bay. (*Id.* at 4). Women 45 and younger and children 1 to 17 may consume either two servings per week of diamond turbot, spotted turbot, black perch, pile surfperch, rainbow surfperch, or California lizardfish, or one serving per week of Pacific chub mackerel, round stingray, or shovelnose guitarfish from the Bay. (*Id.*). "Women over 45 years and men can safely eat more fish." (*Id.* at 5). Women over 45 and men should never consume shiner perch or topsmelt from the Bay. (*Id.*). Women over 45 and men may consume either two servings per week of diamond turbot, spotted turbot, black perch, pile surfperch, rainbow surfperch, California lizardfish, round stingray, or shovelnose guitarfish, or one serving per week of spotted sand bass, barred sand bass, yellowfin croaker, pacific chub mackerel, leopard shark, or gray smoothhound shark from the Bay. (*Id.*). "PCBs are in the fat and skin of the fish." (*Id.* at 4-5). People should "[e]at only the skinless fillet" and "[r]emove and throw away the skin before cooking." (*Id.*).

In 2017, the San Diego Water Board concluded that PCBs are "present at levels of concern in fish from the San Diego Bay." (February 2017 Monitoring & Assessment, Ex. 75, Corley Decl., ECF No. 450-85 at 3). In 2018, OEHHA amended the Fish Consumption Advisory "because additional mercury and PCB data became available." (Ex. 1b, Corley Decl., ECF No. 450-4 at 2). The amended Fish Consumption Advisory states that, "[w]hile banned in the 1970s, [PCBs] persist for many years in the environment and are still found in the air and water from spills, leaks, and improper disposal." (*Id.*). The amended Fish Consumption Advisory adds Pacific chub mackerel to the list of Bay fish that women 45 and under and children 1 to 17 should never consume. (Ex. 1a, Corley Decl., ECF No. 450-3 at 2). The amended Fish Consumption Advisory recommends women 45 and under and children 1 to 17 limit consumption of black perch to one serving per week, instead of the two servings per week in the 2013 Fish Consumption Advisory. (*Id.*). The amended Fish Consumption Advisory relaxes the limitation on pile surfperch and rainbow surfperch for

women over 45 and men, stating that they may consume up to seven servings per week. (*Id.*). The amended Fish Consumption Advisory states that "[e]ating fish with higher levels of chemicals like mercury or PCBs may cause health problems in children and adults." (*Id.*). The amended Fish Consumption Advisory states that "PCBs can build up to very high levels in the skin, fat, and some internal organs of fish." (Ex. 1b, Corley Decl., ECF No. 450-4 at 2). According to the 2018 OEHHA Health Advisory and Guidelines for Eating Fish from San Diego Bay, PCBs are a "potential concern for people who eat fish because of their toxicity and their ability to accumulate in fish tissue." (Ex. 1d, Corley Decl., ECF No. 450-6 at 12).

The EPA states that "PCBs are one of the most widely studied environmental contaminants. Many studies in animals and human populations have been performed to assess the potential carcinogenicity of PCBs." (EPA Website, Ex. 17, Corley Decl., ECF No. 450-24 at 8). The EPA states that PCBs "cause a variety of adverse health effects." (*Id.* at 7). The EPA states that "[s]tudies in animals provide conclusive evidence that PCBs cause cancer." (*Id.* at 8). "[T]he data strongly suggest that PCBs are probable human carcinogens." (*Id.*). The EPA states that studies in animals and humans "support evidence for potential [ ] non-carcinogenic effects of PCBs," including serious "effects on the immune system, reproductive system, nervous system, endocrine system and other health effects." (*Id.* at 7). The EPA states that "the types of PCBs likely to be bioaccumulated in fish and bound to sediments are the most carcinogenic PCB mixtures." (*Id.* at 9). The EPA states that "people who ingest PCB-contaminated fish or other animal products and contact PCB-contaminated sediment may be exposed to PCB mixtures that are even more toxic than the PCB mixtures contacted by workers and released into the environment." (*Id.*).

### c. Port District's Jurisdiction Over Bay Lands

Prior to January 1, 2020, the Port District held title in trust to 29% of the water acres in the Bay. The State of California held title to 61% of the water acres in the Bay, and the military held title to the additional 10%. The "State of California and Fish and Wildlife

Service have primary authority over fish kills and fish habitat." (Monsanto's Nuisance Facts, ECF No. 424-2 ¶ 103).

On September 27, 2019, Governor Gavin Newsom signed Senate Bill No. 507 ("S.B. 507"). S.B. 507, which became effective on January 1, 2020, "add[s] Section 5.7 to the San Diego Unified Port District Act." (S.B. 507 Legislative Counsel's Digest, Ex. A, Port District's Supplemental Authority, ECF No. 454-1 at 2). Section 5.7 provides, in relevant part:

> There is hereby granted in trust to the district all the right, title, and interest of the State of California, held by the state by virtue of its sovereignty, in and to all those remaining tidelands and submerged lands not previously granted, whether filled or unfilled, within the San Diego Bay lying northerly of the following described line:
> Beginning at NGS monument Road 2 (PID DC1690), thence S 68°07'54" W 8,621.00 feet to NGS monument North Island NAS Shoran Tower (PID DC1727) . . . .

(*Id.* at 4). The Port District is now the majority title holder of Bay lands.

## IV.   LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). Where the party moving for summary judgment does not bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there

is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542-43 (9th Cir. 1989) ("[O]n an issue where the plaintiff has the burden of proof, the defendant may move for summary judgment by pointing to the absence of facts to support the plaintiff's claim. The defendant is not required to produce evidence showing the absence of a genuine issue of material fact with respect to an issue where the plaintiff has the burden of proof. Nor does Rule 56(c) require that the moving party support its motion with affidavits or other similar materials negating the nonmoving party's claim." (citations omitted)).

If the moving party meets the initial burden, the burden shifts to the opposing party to show that summary judgment is not appropriate. *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 322, 324. The nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient."). The nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotations omitted). The nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 256.

## V. MOTION FOR SUMMARY JUDGMENT – PUBLIC NUISANCE

Monsanto moves for summary judgment on the Port District's public nuisance claim. Monsanto contends that the Port District lacks standing and has failed "to demonstrate through discovery a genuine issue of material fact supporting its claim that a public nuisance from PCBs exists in San Diego Bay." (ECF No. 424 at 2).

The Port District contends that PCBs have polluted the Bay and constitute a public nuisance. The Port District contends that it has standing to pursue this representative public nuisance action.

///

### a. **Public Nuisance in the Bay**

Monsanto contends that the Port District identified

> no more than three alleged public-use impairments from PCBs in San Diego Bay: (1) the sediment cap at Convair Lagoon . . . ; (2) the sediment cap at the former Campbell shipyard . . .; and (3) a 2013 limited fish advisory issued by California's Office of Environmental Health Hazard Assessment ("OEHHA") . . . .

(ECF No. 424-1 at 4-5). Monsanto contends that the sediment caps, as a matter of law, cannot be a public nuisance because the Port District "expressly approved" the caps. (*Id.* at 24). Monsanto asserts that "fish populations and fishing in the Bay are thriving, and the Port cannot show any 'substantial harm' from the 2013 OEHHA fish advisory." (*Id.* at 25). Monsanto asserts that the Fish Consumption Advisory is not a nuisance per se because "no statute 'expressly defines' the Port's alleged harm—the existence of OEHHA's 2013 advisory based on the lawful sale of a useful product ending over 40 years ago—to be a public nuisance." (*Id.* at 28).

The Port District contends that pollution of the water, sediment, and fish in the Bay constitutes a public nuisance caused by Monsanto's promotion of PCBs and instructions for improper disposal. The Port District contends that there is significant evidence that PCBs in the Bay cause health risks to humans, ecological risks to fish and birds, and substantial interference with "the public's free and comfortable use of the Bay." (ECF No. 450 at 21). The Port District asserts that the sediment caps and the Fish Consumption Advisory are "example[s] of the type of harm Monsanto's PCBs cause in the Bay." (*Id.* at 21). The Port District asserts that consumption of fish from the Bay poses a threat to human health. The Port District further asserts that fish consumption advisories are "*de facto* harm" and "lead to a decline in the benefits associated with recreational fishing, as anglers forgo fishing entirely, choose alternate sites, decline consumption of fish caught, and/or enjoy the fishing experience less." (*Id.* at 28).

Under section 3479 of the California Civil Code, a nuisance is

> [a]nything which is injurious to health, including, but not limited to, the illegal

sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway . . . .

"A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." Cal. Civ. Code § 3480. The interference "must be both *substantial* and *unreasonable*." *People ex rel. Gallo v. Acuna*, 14 Cal. 4th 1090, 1105 (1997). A substantial interference is "a 'real and appreciable invasion of the plaintiff's interests,' one that is 'definitely offensive, seriously annoying or intolerable.'" *Id.* (quoting Rest. 2d Torts § 821f, coms. c & d, pp. 105-06). "The unreasonableness of a given interference represents a judgment reached by comparing the social utility of an activity against the gravity of the harm it inflicts . . . ." *Id.* The question is "whether reasonable persons generally, looking at the whole situation impartially and objectively, would consider it unreasonable." *San Diego Gas & Electric Co. v. Superior Court*, 13 Cal. 4th 893, 938 (1996) (quotation omitted).

Civil Code section 3479 sets forth the acts which constitute a nuisance in the present tense. Under its terms, anything that "is" injurious to health, indecent or offensive to the senses, or an obstruction to the free use of property is defined as a nuisance. Despite the use of the present tense, . . . an affected party need not wait until actual injury occurs before bringing an action to enjoin a nuisance.

*Beck Dev. Co. v. S. Pac. Transp. Co.*, 44 Cal. App. 4th 1160, 1213 (1996).[1]

---

[1] The plaintiff in a public nuisance claim is required to prove causation—that "the defendant created or assisted in the creation of the nuisance." *City of Modesto Redev. Agency v. Superior Court*, 119 Cal. App. 4th 28, 38 (2004). Monsanto does not move for summary judgment on the Port District's public nuisance claim based on a lack of evidence to support causation. Accordingly, the Court does not address causation in this Order.

1    "Pollution of water constitutes a public nuisance" under California law. *Newhall*

2    *Land & Farming Co. v. Superior Court*, 19 Cal. App. 4th 334, 341 (1993) (citing *Carter v.*

3    *Chotiner*, 210 Cal. 288, 291 (1930) ("There is no doubt that pollution of water constitutes

4    a nuisance and in a proper case will be enjoined."); *Selma Pressure Treating Co. v. Osmose*

5    *Wood Preserving Co.*, 221 Cal. App. 3d 1601, 1619 (1990)). "In fact, water pollution

6    occurring as a result of treatment or discharge of wastes in violation of Water Code section

7    13000 et seq. is a public nuisance per se." *Id.* (citing Cal. Wat. Code § 13050(m) (defining

8    public nuisance)).

9    In this case, the Regional Board has determined that the Bay is polluted by PCBs

10   under the California Water Code. In 1986, the Regional Board found "elevated levels of

11   PCBs in the San Diego Bay sediments" at Convair Lagoon and "lipid weight levels of

12   PCB's in mussel tissue planted at Convair Lagoon . . . [at] the highest ever measured . . .

13   ." (CAO No. 86-92, Ex. 40, Howard Decl., ECF No. 425-45 at 4). The Regional Board

14   found that the discharge of PCBs into Convair Lagoon from the Teledyne Ryan

15   Aeronautical property impaired shellfish harvesting and threatened the public's health and

16   use of the Bay, "creat[ing] a condition of pollution, as defined by the California Water

17   Code." (*Id.* at 5; *see* Cal. Wat. Code § 13050 ("(1) 'Pollution' means an alteration of the

18   quality of the waters of the state by waste to a degree which unreasonably affects either of

19   the following: (A) The waters for beneficial uses. (B) Facilities which serve these

20   beneficial uses. (2) 'Pollution' may include 'contamination.'"); *see also* Cal. Wat. Code §

21   13050(k) ("'Contamination' means an impairment of the quality of the waters of the state

22   by waste to a degree which creates a hazard to the public health through poisoning or

23   through the spread of disease. 'Contamination' includes any equivalent effect resulting

24   from the disposal of waste, whether or not waters of the state are affected.")). In 1995, the

25   Regional Board determined that "[c]oncentrations of PCBs in bay sediments are above

26   background levels along the Campbell shoreline." (CAO No. 95-21, Ex. 41, Howard Decl.,

27   ECF No. 425-46 at 24). Based on the elevated levels of PCBs and other chemicals, the

28   Regional Board found that "[t]he contaminated bay sediments present at Campbell

Shipyards have caused or threaten to cause a condition of pollution as described in California Water Code Section 13050 . . . [and] may adversely affect San Diego Bay beneficial uses." (*Id.* at 24-25).

In 2015, the Regional Board determined that "[s]ome of the highest concentrations of total PCBs found in San Diego Bay sediment have been found adjacent to the 30-inch SWCS outfall that drains a portion of the former TDY facility." (CAO No. R9-2015-001B Ex. 11, Corley Decl., ECF No. 450-17 at 4). The Regional Board determined that the "PCB-laden sediment discharged from the former TDY facility . . . is likely one of the sources of the PCBs found in fish tissue in San Diego Bay," which exists at "unhealthy levels." (*Id.*). In 2017, the Regional Board determined that "PCBs and mercury were discharged from the former Tow Basin and Railway facilities to the East Basin, contributing to unhealthy levels of these pollutants in San Diego Bay fish tissue." (CAO No. R9-2017-0021, Ex. 9, Corley Decl., ECF No. 450-15 at 6-7). The Regional Board stated:

> The concentrations of pollutants in the sediments of the East Basin of San Diego Bay are at levels that may have an impact on human health and the benthic community, and may have an impact on aquatic-dependent wildlife, thus creating a condition of pollution and nuisance in waters of the State.

(*Id.* at 7). In all cases, the Regional Board ordered the dischargers of the PCBs to study and take remedial measures to reduce the effects of PCBs at certain sites in the Bay, including constructing sediment caps.

Based on the Regional Board's Cleanup and Abatement Orders, the Port District placed sediment caps at Campbell Shipyard and Convair Lagoon to "isolat[e] [ ] pollutants in existing sediments" and protect against "bioturbulation." (*See* Regional Board Order No. R9-2004-0295 (Oct. 13, 2004), Ex. 10, Corley Decl., ECF No. 450-16 at 5). The sediment caps obstruct the Bay at Convair Lagoon and Campbell Shipyard; boats cannot anchor where caps are present, and fishing is not allowed. (*See* Exhibits to Declaration of Paul Brown, Ex. 22, Corley Decl., ECF No. 450-29 at 5-8 (photographs of buoys at cap locations stating, "DO NOT ANCHOR," "NO FISHING ALLOWED," and "DO NOT DISTURB .

. . SUBMERGED OBSTRUCTIONS ARE PRESENT")). Because the Port District expressly authorized construction of the sediment caps, the caps cannot be deemed a nuisance. *See* Cal. Civ. Code § 3482 ("Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance."); *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 888 (9th Cir. 2010) (applying section 3482 to a water quality board permit). However, the nuisance in this case is the alleged pollution of the Bay, not the sediment caps.

The Port District has come forward with evidence that the Bay is polluted or contaminated by PCBs. The Bay is listed as "'impaired' for PCBs under Clean Water Act Section 303(d)." (Monsanto's Purpresture Facts, ECF No. 423-2 ¶ 41; Regional Board 2016 Clean Water Act Sections 305(B) and 303(D) Integrated Report, Ex. 6, Corley Decl., ECF No. 450-12 at 39). SWAMP published a report in 2012 that concluded that the Bay has one of the "most severe PCB contamination" levels on the California coast, and PCBs in the Bay have "reached concentrations in fish tissue that pose potential health concerns . . . ." (Ex. 5, ECF No. 450-11 at 12, 57). In 2013, OEHAA published a Fish Consumption Advisory for fish from the Bay due to mercury and PCBs, finding "mercury and PCBs in some fish species at levels of concern for fish consumers." (Ex. 1e, Corley Decl., ECF No. 450-7 at 2). PCBs in fish tissue also cause "significant risks" to fish-eating birds as they are "passed up the food chain." (SWAMP Report, Ex. 5, ECF No. 450-11 at 83; 2013 OEHHA Fish Consumption Advisory, Ex. 1e, Corley Decl., ECF No. 450-7 at 2). In 2017, the San Diego Water Board concluded that PCBs are "present at levels of concern in fish from the San Diego Bay." (February 2017 Monitoring & Assessment, Ex. 75, Corley Decl., ECF No. 450-85 at 3). In 2018, OEHAA made the fish consumption guidelines even more restrictive for women 45 and under and children. (*See* Ex. 1b, Corley Decl., ECF No. 450-4). The Regional Board stated that "the OEHHA consumption advisory warrants not delisting San Diego Bay for impairment (Category 5) [under Clean Water Act Section 303(d)] due to PCBs in fish tissue . . . ." (Clean Water Act Sections 305(B) and 303(D) Integrated Report, Ex. 6, Corley Decl., ECF No. 450-12 at 39).

The Port District has come forward with evidence that PCBs in the Bay threaten to interfere with the public's health or interfere with the public's right to use the Bay. The EPA has concluded that "[s]tudies in animals provide conclusive evidence that PCBs cause cancer." (EPA Website, Ex. 17, Corley Decl., ECF No. 450-24 at 8). "[T]he data strongly suggest that PCBs are probable human carcinogens." (*Id.*). The EPA states that "[s]tudies of PCB workers found increases in rare liver cancers and malignant melanoma. The presence of cancer in the same target organ (liver) following exposure to PCBs both in animals and humans . . . adds weight to the conclusion that PCBs are probable human carcinogens." (*Id.* at 9). The EPA states:

> The types of PCBs that tend to bioaccumulate in fish and other animals and bind to sediments happen to be the most carcinogenic components of PCB mixtures. As a result, people who ingest PCB-contaminated fish or other animal products and contact PCB-contaminated sediment may be exposed to PCB mixtures that are even more toxic than the PCB mixtures contacted by workers and released into the environment.

(*Id.*). The EPA states that studies in animals and humans "support evidence for potential [ ] non-carcinogenic effects of PCBs," including serious "effects on the immune system, reproductive system, nervous system, endocrine system and other health effects." (*Id.* at 7; *see also* SWAMP Report, Ex. 5, ECF No. 450-11 at 12 ("PCBs may cause cancer, damage the liver, digestive tract, and nerves; and affect development, reproduction, and the immune system"); 2013 OEHHA Fish Consumption Advisory, Ex. 1e, Corley Decl., ECF No. 450-7 at 5 ("PCBs can cause cancer.")). According to the EPA, studies in animals "were not able to identify a level of PCB exposure that did not cause effects on the immune system." (EPA Website, Ex. 17, Corley Decl., ECF No. 450-24 at 11).

OEHHA issued its original Fish Consumption Advisory in 2013 because of the "potential concern for human health" due to mercury and PCBs. (Ex. 1e, Corley Decl., ECF No. 450-7 at 2 ("OEHHA found mercury and PCBs in some fish species [in the Bay] at levels of concern for fish consumers. OEHHA is providing these guidelines to help people choose which types of fish are safer to eat.")). In addition to restricting the number

of servings of Bay fish that consumers should eat per week, the Fish Consumption Advisory, as amended in 2018, identifies eight species of Bay fish that women 45 and under and children should never consume, and two species that women over 45 and men should never consume, due to the presence of PCBs and mercury. For women 45 and under and children, the list of do-not-eat fish includes the Pacific chub mackerel, the "largest or most consumed fish in the San Diego Bay." (Deposition of William Desvousges ("Desvouges Dep."), Ex. 15, Corley Decl., ECF No. 450-21 at 9:20-10:10). According to Monsanto's expert, William Desvousges, between 65% and 81% of the fish caught in the Bay are precluded from consumption by women 45 and under and children.[2] (*Id.* at 7:19-8:5; *see People v. Truckee Lumber Co.*, 116 Cal. 397, 399-400 (1897) (holding that "it is not open to serious question" that polluting the waters of a river, destroying the fish therein, interferes with the public right to "wild game" and constitutes a nuisance)).

The Court finds that the Port District has presented evidence of specific facts that could support the conclusion by a reasonable trier of fact that PCBs have polluted the Bay and caused substantial harm to either human health or the use and enjoyment of the Bay.

///

///

---

[2] Desvousges stated:

> Q. Based off of the analysis you have done, in your opinion would 81% of the fish caught in San Diego Bay be subject to a do-not-eat fish advisory for women under 45 and children?

> MR. MILLER: Objection to the form.

> THE WITNESS: [Desvousges:] Well, this is based on the data for the intercepts in San Diego Bay from RecFIN. It's not based on the overall data because the overall data is 65%. So the 81% is what would be observed from the intercept data. So we have two different – we've provided both of those numbers. So I would say it's either 65 or 81.

(Desvouges Dep., Ex. 15, Corley Decl., ECF No. 450-21 at 7:19-8:5). The fish consumption advisory is the same for women 45 and under and children. (*See* 2013 OEHHA Fish Consumption Advisory, Ex. 44, Howard Decl., ECF No. 425-49 at 4). Monsanto's objection to the form of the question is overruled.

### b. <u>Port District's Standing to Bring Public Nuisance Claim</u>

Monsanto contends that the Port District lacks standing to pursue a public nuisance claim based on the Fish Consumption Advisory because the Port District's jurisdiction is limited to a fraction of the Bay, and the Port District does not own or manage the fish populations.

The Port District contends that it has standing to pursue this representative public nuisance action because the legislature "expressly authorized [the Port District] to bring a public nuisance action to 'protect, preserve, and enhance' the Bay by seeking abatement of a public nuisance." (ECF No. 450 at 30).

Section 731 of the California Code of Civil Procedure provides:

> A civil action may be brought in the name of the people of the State of California to abate a public nuisance, as defined in Section 3480 of the Civil Code, by the district attorney or county counsel of any county in which the nuisance exists, or by the city attorney of any town or city in which the nuisance exists. Each of those officers shall have concurrent right to bring an action for a public nuisance existing within a town or city.

In the Court's September 28, 2016, Order on Monsanto's Motion to Dismiss the Port District's FAC, the Court concluded that "the Port District has standing to bring a representative cause of action under section 731." (ECF No. 81 at 10-11). The Court explained:

> In 1963, through the Port Act, the State of California and the cities of San Diego, Chula Vista, Coronado, National City, and Imperial Beach granted and conveyed "all right, title and interest" in the tidelands and submerged lands around San Diego Bay to the Port District. *See* Harb. & Nav. Code App. 1 §§ 4, 5, 5.5. The Port District was granted the authority over "control, regulation, and management of the harbor of San Diego upon the tidelands and lands lying under the inland navigable waters of San Diego Bay." *Id.* § 4. The Port Act provides the authority to "sue and be sued in all actions and proceedings in all courts and tribunals of competent jurisdiction." *Id.* § 23. The Port District was given the power to "protect, preserve, and enhance,"
>
> (1) The physical access to the bay.

(2) The natural resources of the bay, including plant and animal life.

(3) The quality of water in the bay.

*Id.* § 4.

. . . .

The Legislature granted the Port District "all powers theretofore vested in the county or each such city or exercisable by its officers, which are by the provisions of this act granted to the district or are exercisable by its officers." Harb. & Nav. Code App. 1 § 70. This includes, the power to "protect, preserve, and enhance" the Bay. *Id.* § 4. Before the conveyance of the Bay to the Port District, the State of California and the cities of San Diego, Chula Vista, Coronado, National City, and Imperial Beach had the authority to bring a public nuisance claim to protect the Bay. Because the authority of the State and cities to bring a public nuisance claim was specifically transferred to the Port District, the Court concludes that the Legislature expressed its intention in specific and clear terms to grant the Port District the power to abate a nuisance. *See Lamont*, 93 Cal. Rptr. 2d at 291 ("[W]hen the Legislature has intended to grant the power to abate a nuisance, it has done so specifically and in clear terms."). The Court concludes that the Port District has standing to bring a representative cause of action under section 731.

(*Id.*).

The Court's conclusion has not changed. The Port Act grants the Port District the power to "protect, preserve, and enhance" the "animal life" in the Bay, in addition to the water quality. Cal. Harb. & Nav. Code App. 1 § 4. As of January 1, 2020, the Port District holds the title in trust to a majority of the water acres of the Bay. (S.B. 507 Legislative Counsel's Digest, Ex. A, Port District's Supplemental Authority, ECF No. 454-1 at 2, 4; Monsanto's Nuisance Facts, ECF No. 424-2 ¶ 93; Port Master Plan, Ex. 29 to 30(b)(6) Deposition of David Michael Johns, Ex. 43, Howard Decl., ECF No. 425-48 at 19; *see also* Cal. Harb. & Nav. Code Appx. 1 § 5 (providing that the Port has "power and authority" over the areas of the Bay conveyed to it)). To the extent that the Port District seeks relief related to a portion of the Bay that physically falls outside the portion of the Bay the Port

holds title to in trust, that inquiry is relevant to the abatement remedy. The Court finds that the Port District has standing to bring this representative cause of action under section 731.

Monsanto's Motion for Summary Judgment (Public Nuisance) (ECF No. 424) is denied.

## VI.   MOTION FOR SUMMARY JUDGMENT - PURPRESTURE

Monsanto contends that the Court should grant summary judgment in its favor on the Port District's "representative purpresture claim to the extent [the Port District] seeks 'damages,' which are unavailable as a matter of law." (ECF No. 423-1 at 2). Monsanto contends that the Port District's purpresture claim "is simply a type of representative public nuisance claim." (*Id.* at 5). Monsanto contends that the Port District may not recover damages on its purpresture claim because abatement is the only remedy in a representative public nuisance action. Monsanto further contends that the Port District cannot succeed on the merits of its purpresture claim. Monsanto contends that PCBs do not physically intrude into the Bay, and case law does not support a purpresture claim based on "the presence of dilute chemicals in water bodies." (*Id.* at 23). Monsanto contends that neither the Convair Lagoon nor Campbell Shipyard sediment cap is a purpresture because the Port District and state approved the construction of the caps.

The Port District contends that "PCBs in the San Diego Bay are both a public nuisance and a purpresture." (ECF No. 453 at 10). The Port District contends that it brings its purpresture claim "in its own right as a title holder" in "trust of the tidelands and submerged lands in and along the San Diego Bay." (*Id.* at 11, 13). The Port District contends it can maintain separate claims for purpresture and public nuisance because it brings only the public nuisance claim in its representative capacity. The Port District contends that its "purpresture claim is not simply a representative action for abatement. While Monsanto's pollution of the Bay with PCBs does, indeed, impair the public's right to free use of the Bay and its resources, it undeniably also encumbers and has damaged property [held] by the Port District." (*Id.* at 13-14). The Port District contends that PCBs have contaminated the sediment, water, and fish of the Bay and constitute a purpresture.

The Port District contends that damages are an available remedy for purpresture. The Port District contends that an encroachment need not be visible to be a purpresture. The Port District contends that the sediment caps are necessary efforts to address the PCBs, which obstruct the free use of the Bay and caused the Port District to lose revenue.

"A purpresture exists where one incloses or makes several to himself that which ought to be common to many." *People ex rel. Britton v. Park & O. R. Co.*, 76 Cal. 156, 160 (1888). A purpresture is an unlawful encroachment, intrusion, or obstruction of a public highway, navigable waterway, or other public land. *People v. Gold Run Ditch & Mining Co.*, 66 Cal. 138, 146-47 (1884). A purpresture is often a public nuisance; however, it is possible to have a purpresture that is not a public nuisance. *People by Pixley ex rel. Teschemacher v. Davidson*, 30 Cal. 379, 390 (1866); *see Park & O. R. Co.*, 76 Cal. at 161 (holding that a railroad unlawfully constructed in a public park is a purpresture but "may or may not be a nuisance"). A purpresture is a physical obstruction. *See, e.g.*, *Davidson*, 30 Cal. at 383, 387 (wharf erected in San Francisco Bay was purpresture); *Coburn v. Ames*, 52 Cal. 385, 391, 399 (1877) (road, wharf, and chute on shore of Pacific Ocean beyond the high-water mark was a purpresture); *Park & O. R. Co.*, 76 Cal. at 161 (railroad tracks constructed over Golden Gate Park was a purpresture); *Gold Run Ditch & Mining Co.*, 66 Cal. 138 at 146-47 (discharge of mining debris consisting of boulders, sand, earth, and waste materials in the Sacramento River was a purpresture); *Cty. of Lake v. Smith*, 228 Cal. App. 3d 214, 229 (1991) (dredge and fill encroaching on lake was a purpresture); *Marshall v. Standard Oil Co.*, 17 Cal. App. 2d 19, 30 (1936) (oil derricks and wells on public street was a purpresture). By contrast, physical obstruction is not necessary for a public nuisance. *See* Cal. Civ. Code § 3480; *Gold Run Ditch & Mining Co.*, 66 Cal. at 146 ("An unauthorized invasion of the rights of the public to navigate the water flowing over the soil is a public nuisance; and an unauthorized encroachment upon the soil itself is known in law as a purpresture."). A purpresture is also a public nuisance where it "unlawfully obstructs the free passage or use in the customary manner" of the land by the public. *Park & O. R. Co.*, 76 Cal. at 161; *Marshall*, 17 Cal. App. 2d at 30.

In this case, the Port District has not come forward with evidence that PCBs "inclose[ ] or make[ ] several to [Monsanto] that which is common to many." *Park & O. R. Co.*, 76 Cal. at 160. The EPA website states, "PCBs are a group of man-made organic chemicals consisting of carbon, hydrogen, and chlorine atoms." (Ex. 17, Corley Decl., ECF No. 450-24 at 2). PCBs "range in consistency from an oil to a waxy solid." (*Id.*). Once released into the environment, "the composition of PCB mixtures changes." (*Id.* at 9). PCBs "cycl[e] between air, water, and soil," bioaccumulate in small organisms and fish, and bind to sediments. (*Id.* at 3, 9). The Port District has not presented evidence that PCBs prevent physical access to any water, sediment, or fish in the Bay. *See Coburn*, 52 Cal. at 394 (explaining that "defendants had no authority in law to appropriate [public highways] to *their exclusive use and dominion* to the exclusion of the public" (emphasis added)). To the extent the Port District seeks to prove that the sediment caps at Campbell Shipyard and Convair Lagoon constitute a purpresture, the Port District approved erection of the caps. (*See* Monsanto's Purpresture Facts, ECF No. 423-2 ¶ 53 ("Following a lengthy environmental review process, the Port approved and permitted the sediment caps at Campbell Shipyard and Convair Lagoon.")). The caps are not an "erection [ ] without license . . . upon the property of the sovereign" and do not constitute a purpresture. *Alaska Pac. Fisheries v. United States*, 240 F. 274, 284 (9th Cir. 1917).

Monsanto's Motion for Summary Judgment (Purpresture) (ECF No. 423) is granted.

## VII.   MOTION FOR SUMMARY JUDGMENT – ABATEMENT

Monsanto moves for summary judgment in its favor "regarding any 'abatement fund' the Port seeks, and any effort to seek a declaratory judgment about Defendants' responsibility for unknown future costs." (ECF No. 422-1 at 10). Monsanto contends that the remedy requested is displaced by the Porter-Cologne Act and is not ripe.

The Port District contends that its request for an abatement remedy is not displaced by the Porter-Cologne Act, and its claims are ripe for adjudication.

///

///

### a. Porter-Cologne Act Displacement

Monsanto contends that the Port District's request for an "abatement fund" is displaced by the Porter-Cologne Act. Monsanto contends that the Regional Board has "the exclusive role of determining whether and when dredging and filling operations in the Bay are or are not appropriate, including to abate any alleged nuisance." (*Id.* at 22). Monsanto contends that the Porter-Cologne Act does not allow recovery of an abatement fund for prospective dredging. Monsanto contends the Port District is not entitled to declaratory relief regarding Monsanto's responsibility for future costs because the Regional Board has the exclusive authority to determine the party responsible for remediation.

The Port District contends that it seeks "an equitable order requiring Monsanto to prospectively abate the damage it created . . . indirectly through setting up a fund . . . [or] to abate directly." (ECF No. 452 at 6). The Port District contends that the Porter-Cologne Act does not displace the Port District's authority to seek abatement; rather, it "recognizes and protects the Port District's right to seek abatement." (*Id.* at 18). The Port District contends that it "only seeks declaratory relief in the alternative." (*Id.* at 22). The Port District contends that declaratory relief is an appropriate remedy, and the Port District "will be prepared to present evidence demonstrating the appropriate scope of such relief at trial." (*Id.* at 14-15).

"The general rule is that statutes do not supplant the common law unless it appears that the Legislature intended to cover the entire subject or, in other words, to 'occupy the field.'" *I. E. Assocs. v. Safeco Title Ins. Co.*, 39 Cal. 3d 281, 285 (1985). "[G]eneral and comprehensive legislation, where course of conduct, parties, things affected, limitations and exceptions are minutely described, indicates a legislative intent that the statute should totally supersede and replace common law dealing with the subject matter." *Id.* (quotation omitted). "[T]he common law is not repealed by implication or otherwise, if there is no repugnancy between it and the statute, and it does not appear that the legislature intended to cover the whole subject." *Gray v. Sutherland*, 124 Cal. App. 2d 280, 290 (1954) (quoting 15 C.J.S., Common Law, § 12, p. 620).

"The federal Clean Water Act [ ] (33 U.S.C. § 1251 et seq.) places primary reliance for developing water quality standards on the states." *San Joaquin River Exch. Contractors Water Auth. v. State Water Res. Control Bd.*, 183 Cal. App. 4th 1110, 1115 (2010). California implements the Clean Water Act through the Porter-Cologne Act, California Water Code §§ 13000 *et seq.*, which establishes "a statewide program for the control of the quality of all the waters of the state." Cal. Wat. Code § 13000; *San Joaquin River Exch.*, 183 Cal. App. 4th at 1115. Through the Porter-Cologne Act, the legislature intended "that the state board and each regional board shall be the principal state agencies with the primary responsibility for the coordination and control of water quality." Cal. Wat. Code § 13001.

The Porter-Cologne Act "gives the Board the authority and responsibility to abate nuisances affecting the state's water resources." *Karuk Tribe of N. Cal. v. Cal. Reg'l Water Quality Control Bd.*, 183 Cal. App. 4th 330, 351 (2010) (citing Cal. Wat. Code §§ 13050(h), (m); 13225; 13241; 13263(a); 13340; 13377). The Porter-Cologne Act establishes a regulatory process and certification standards for environmental dredging. *See* Cal. Wat. Code § 13377 ("[T]he state board or the regional boards shall, as required or authorized by the Federal Water Pollution Control Act, as amended, issue waste discharge requirements and dredged or fill material permits which apply and ensure compliance with all applicable provisions of the act . . . together with any more stringent effluent standards or limitations . . . to prevent nuisance."). The Port District must obtain "certification pursuant to Section 401 of the Clean Water Act" from the Regional Board in order to perform dredging in the Bay. Cal. Wat. Code § 13396.

Although the Regional Board's authority is broad, the Porter-Cologne Act provides:

No provision of this division or any ruling of the state board or a regional board is a limitation: . . .

**(b)** On the power of any city or county or city and county to declare, prohibit, and abate nuisances. . . .

**(e)** On the right of any person to maintain at any time any appropriate action

27

for relief against any private nuisance as defined in the Civil Code or for relief against any contamination or pollution.

Cal. Wat. Code § 13002. The term "person" includes "any city, county, district, the state, and the United States . . . ." Cal. Wat. Code § 13050(c). California courts and courts in this circuit have consistently held that "[t]here is nothing in the [Porter-Cologne Act] which expressly or impliedly places in the state board or any regional board the exclusive power to declare that a nuisance exists or to take action to abate a nuisance." *People v. City of Los Angeles*, 160 Cal. App. 2d 494, 502 (1958) (discussing the previous iteration of the Porter-Cologne Act, the "Dickey Act"), *superseded by statute on other grounds*.

> To the contrary the power of any city or county to declare, prohibit or abate nuisances is expressly reserved to them by Water Code, section [13002] . . . . This express reservation of the rights of the plaintiff cities to prosecute the subject action clearly negatives any intent to give the control boards the exclusive right to determine either what does or does not constitute a nuisance or to invoke the equity powers of the courts of this state to abate a public nuisance.

*Id.* at 502-03; *see also People of Cal. v. Kinder Morgan Energy Partners, L.P.*, 569 F. Supp. 2d 1073, 1081-82 (S.D. Cal. 2008) ("[T]he Water Boards' administrative authority, while extensive, does not displace the court's own substantial jurisdiction to declare nuisances and grant damages to injured property owners . . . . The fact that the Regional Board has the power to order a defendant to do something does not deprive a court the power to enjoin the same acts." (citing *City of Los Angeles*, 160 Cal. App. 2d at 502)). The Porter-Cologne Act does not displace this Court's authority to declare a nuisance and take action to abate the nuisance.

Nothing in the Porter-Cologne Act provides that the state or Regional Board is the only authority that may determine the party responsible for remediation. *See* Cal. Wat. Code § 13002(e) ("No provision of this division . . . is a limitation . . . [o]n the right of any person to maintain at any time an appropriate action for relief against any private nuisance . . . or for relief against any contamination or pollution."). The Court may grant declaratory

relief, where appropriate, regardless of whether the Port District requested declaratory relief. *Arley v. United Pac. Ins. Co.*, 379 F.2d 183, 187 (9th Cir. 1967); *see* Fed. R. Civ. P. 54(c) ("Every . . . final judgment . . . should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."). The Porter-Cologne Act does not displace the Court's ability to issue a declaratory judgment.

### b. **Ripeness**

Monsanto contends that the Court lacks jurisdiction because the Port District's "request for an abatement fund is . . . not ripe." (ECF No. 422-1 at 28). Monsanto contends that the Port District's requested remedy will require the Court to speculate that the Regional Board will permit dredging in the Bay. Monsanto contends that the costs of abatement are speculative. Monsanto further contends that the Port District is not entitled to declaratory relief because the requested remedy is unripe and speculative.

The Port District contends that "the injury to the public—PBCs throughout the Bay well above levels that pose a risk to human health and the environment is not some future possibility, the injury exists today." (ECF No. 452 at 23). The Port District contends that its requested abatement remedy is ripe because the Port District does not need Regional Board approval for sampling and studying PCBs in the Bay or for implementing mitigation projects. The Port District contends that its experts' cost estimates are reasonable approximations of the cost of abatement.

The case or controversy clause of Article III of the United States Constitution "limits federal courts' subject matter jurisdiction by requiring, inter alia, that plaintiffs have standing and that claims be 'ripe' for adjudication." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F. 3d 1115, 1121 (9th Cir. 2010) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)). "Standing addresses whether the plaintiff is the proper party to bring the matter to the court for adjudication." *Id.* (citing ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 2.3.1 (5th ed. 2007)). "The related doctrine of ripeness is a means by which federal courts may dispose of matters that are premature for review because the plaintiff's purported

injury is too speculative and may never occur."[3] *Id.* (citing CHEMERINSKY, *supra*, § 2.4.1). In determining whether an action is ripe for judicial review, the court is required to evaluate "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). "The 'central concern [of the ripeness inquiry] is whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Richardson v. City & Cty. of Honolulu*, 124 F.3d 1150, 1160 (9th Cir. 1997) (alteration in original) (quoting 13B CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 3532, at 112 (2d ed. 1984)), *cert. denied*, 1998 U.S. LEXIS 5627 (Oct. 5, 1998) and 1998 U.S. LEXIS 7622 (Nov. 30, 1998).

In this case, the purported injury to the public exists today. Monsanto's asserted role in creating the injury is ready for adjudication. The "abatement alternatives" proposed by the Port District require further study. (Port District's Second Amended Damages and Abatement Disclosures, Ex. 35, Declaration of Micheal W. Dobbs in Support of Port District's Opposition to Monsanto's Motions for Summary Judgment (Abatement & Purpresture) ("Dobbs Decl."), ECF No. 452-63 at 12 ("The group of projects finally proposed by the Port District may differ after a full scoping and analysis is performed."); *see* Expert Report of Paul Fuglevand, Ex. 3, Dobbs Decl., ECF No. 452-5 at 4 ("Any actual remediation would require feasibility studies and design evaluations which may change the assumptions and impact the cost estimates up or down.")). However, a final abatement plan is not necessary before the case proceeds to trial. *See People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51, 133-34 (2017) ("[T]he court's estimate of the amount that would be necessary for [abatement] was just that: an estimate . . . . The abatement fund . . . was a

---

[3] On January 27, 2020, Monsanto submitted a Notice of Supplemental Authority in support of its Motion for Summary Judgment (Abatement), attaching the Court of Appeals for the Ninth Circuit's decision in *Juliana v. United States*, No. 18-36082 (9th Cir. Jan. 17, 2020). (ECF No. 478). In *Juliana*, the court addressed standing and held that the plaintiffs' claimed injuries were not redressable by an Article III court. *See* No. No. 18-36082, slip op. at 21, 32. The court did not address ripeness.

reasonable method of prefunding the remediation . . . [and] an appropriate abatement injunction.").

The Court concludes that the issues in this case are "fit[ ] . . . for judicial decision." *Abbott Labs.*, 387 U.S. at 149. The Port District has proposed funds for investigation to determine the scope of a final abatement remedy, which may or may not include dredging and/or capping. The record demonstrates that the Regional Board has previously approved investigation, dredging, and capping to abate PCBs in the Bay. (*See generally* Regional Board Order No. R9-2004-0294, Ex. 10, Corley Decl., ECF No. 450-16). Requiring a final abatement plan prior to trial would force the Port District to incur costs that it will be unable to recoup in the event it prevails at trial. "'A public entity may not recover in a representative public nuisance action any funds that it has already expended to remediate a public nuisance.'" (*See* Order on Port District's Motion for Leave to File Supplement to FAC, ECF No. 245 at 8 (quoting *ConAgra Grocery Prods.*, 17 Cal. App. 5th at 132)). Under the facts of this case, the doctrine of ripeness does not prevent the Port District from proceeding to trial and attempting to prove that abatement is necessary and feasible and that an abatement fund is a proper remedy.

Monsanto's Motion for Summary Judgment (Abatement) (ECF No. 422) is denied.[4] The Port District is entitled to proceed to a bench trial on its "suit to abate a public nuisance." *See People v. One 1941 Chevrolet Coupe*, 37 Cal. 2d 283, 298 (1951) ("The right of trial by jury did not exist at common law in a suit to abate a public nuisance. Hence it is not a constitutional right now." (quotation and internal citation omitted)).

///

///

_____

[4] The Port District moves to strike the Expert Reports of Jason Conder, Ph.D., Gary H. London, and Richard G. Luthy, Ph.D. (ECF No. 451). Monsanto moves to strike the Declaration of David Gibson. (ECF No. 462). The Court does not rely on the Expert Reports of Jason Conder, Gary H. London, or Richard G. Luthy or the Declaration of David Gibson in ruling on the Motions for Summary Judgment. Accordingly, the Motions to Strike are denied as moot.

## VIII.   CONCLUSION

IT IS HEREBY ORDERED that Monsanto's Motion for Summary Judgment (Public Nuisance) (ECF No. 424) is denied. Monsanto's Motion for Summary Judgment (Purpresture) (ECF No. 423) is granted. Monsanto's Motion for Summary Judgment (Abatement) (ECF No. 422) is denied. The Port District's Motion to Strike (ECF No. 451) is denied as moot. Monsanto's Motion to Strike (ECF No. 462) is denied as moot.

IT IS FURTHER ORDERED that the final pretrial conference is set for October 15, 2020, at 10:00 a.m. in Courtroom 14B before the Honorable William Q. Hayes. The parties shall lodge the proposed pretrial order on or before September 1, 2020.

Dated:  March 26, 2020

Hon. William Q. Hayes
United States District Court

15-cv-578-WQH-AGS