UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO UNIFIED PORT DISTRICT, a public corporation; and CITY OF SAN DIEGO, a municipal corporation, | Case No.:  3:15-cv-00578-WQH-AGS |
| Plaintiffs, | **ORDER** |
| v. | |
| MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION, | |
| Defendants. | |

HAYES, Judge:

The matter before the Court is Defendants' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment against the City of San Diego.  (ECF No. 421).

## I.      PROCEDURAL BACKGROUND

On March 13, 2015, Plaintiffs San Diego Unified Port District ("Port District") and the City of San Diego ("the City") initiated this action by jointly filing a Complaint against

Defendants Monsanto Company, Solutia Inc., and Pharmacia Corporation (collectively, "Monsanto").[1]  (ECF No. 1).

On August 3, 2015, the City filed an Amended Complaint.  (ECF No. 24).  On September 28, 2016, the Court granted Monsanto's Motion to Dismiss the City's Amended Complaint.  (ECF No. 81).

On December 22, 2016, the City filed a Second Amended Complaint ("SAC") against Monsanto.  (ECF No. 93).  The City brings a single cause of action against Monsanto: a continuing public nuisance arising from alleged polychlorinated biphenyl ("PCB") contamination of the San Diego Bay ("the Bay") and the City's municipal stormwater system.[2]  The City alleges that it "has suffered and continues to suffer actual damages and injuries to property requiring abatement and other costs to be determined at trial" as a result of Monsanto's creation of a public nuisance through its production and marketing of PCBs and improper disposal directions related to PCBs.  *Id.* at 46.  The City alleges that Monsanto is liable to the City for the creation of a public nuisance.  The City seeks the following relief: (1) any and all compensatory damages according to proof, (2) punitive damages, (3) litigation costs and attorney's fees, (4) pre-judgment and post-judgment interest, and (5) "any other and further relief as the Court deems just and proper." *Id.*

On May 16, 2017, the parties filed a Joint Discovery Plan.  (ECF No. 115).

On June 2, 2017, the Court filed a Scheduling Order regulating discovery and other pretrial proceedings.  (ECF No. 121).

On September 20, 2017, the Court filed an Amended Scheduling Order pursuant to the request of the parties.  (ECF No. 141).

---

[1] The Port District is currently litigating independent causes of action against Monsanto alleged in a separate First Amended Complaint.

[2] The parties reference the "Municipal Separate Stormwater System," "MS4," "conveyance system," and "stormwater system" interchangeably.  (ECF No. 448 at 13).

On November 22, 2017, this Court denied Monsanto's Motion to Dismiss the City's SAC. (ECF No. 163). The Court concluded that "the City alleges sufficient facts to support a reasonable inference that the City has a property interest in its municipal stormwater system and that the municipal stormwater system has been injuriously affected by the presence of PCBs produced by Monsanto." *Id*. at 12. The Court stated that

> the City alleges that it 'owns, manages, and operates a municipal stormwater and dry weather runoff system, which captures, collects, reuses for beneficial purposes, and/or transports stormwater and dry weather runoff.' (citation omitted). The City alleges, 'Monsanto's PCBs have contaminated and damaged multiple facilities within the City's stormwater and dry weather run off systems.' (citation omitted). The City alleges, 'As a result of Monsanto's PCB presence, the City cannot operate many of its stormwater and dry weather runoff systems as designed because the system now requires upgrades and retrofits to accommodate Monsanto's PCBs.' (citation omitted). The City alleges that multiple facilities in the system have 'been and must be further retrofitted and improved in order to reduce and remove PCBs from stormwater and dry weather runoff.' (citation omitted). The City further alleges that '[a]s a public property owner and former trustee of the Bay, [the City] seeks to recover damages for retrofit injuries to stormwater system property.'

*Id*. at 11-12 (citing to ECF No. 93 at 4, 7-8). The Court concluded that "the City has alleged sufficient facts to state a non-representative public nuisance claim for damages." *Id*. at 15. The Court denied a Motion to Stay or Dismiss the suit under administrative exhaustion principles pending resolution of the City's test claims before the California Commission on State Mandates.

On December 14, 2017, the Court filed a Second Amended Scheduling Order pursuant to the request of the parties. (ECF No. 174).

On February 22, 2018, Monsanto filed the First Amended Answer and Counterclaims. (ECF No. 203). Monsanto denied liability for the alleged contamination of the Bay and injuries claimed by the City. Further, Monsanto alleged that the City is responsible for the contamination of the Bay because "throughout the twentieth century to the present," the City has "discharged, or caused to be discharged, a variety of pollutants

into the Bay, including PCBs." *Id.* at 60.  Monsanto brought the following two causes of actions as counterclaims against the City: (1) unjust enrichment and (2) violations of the Clean Water Act ("CWA") and the City's National Pollutant Discharge Elimination System ("NPDES") permit. *Id.* at 84-92.

On March 21, 2018, the Court filed a Third Amended Scheduling Order pursuant to the request of the parties.  (ECF No. 207).

On September 4, 2018, the Port District filed a Motion to Sever the claims of the Port District from the claims of the City (ECF No. 248), which the City joined on September 10, 2018 (ECF No. 258).  On September 21, 2018, the Court denied the Motion to Sever, concluding that "fundamental fairness and judicial economy weigh against severance."  (ECF No. 268 at 4).

On September 24, 2018, the Court filed a Fourth Amended Scheduling Order that granted in part and denied in part the parties' Motions to Amend the Third Amended Scheduling Order (ECF Nos. 250, 269).  (ECF No. 270).

On January 18, 2019, the City filed a Motion to Sever, or in the Alternative, Amend the Fourth Amended Scheduling Order.  (ECF No. 296).  On March 1, 2019, the Court denied the Motion to Sever, granted in part the Alternative Motion to Amend the Fourth Amended Scheduling Order, and set forth a July 8, 2019 deadline for completion of fact discovery.  (ECF No. 313 at 6).

On March 29, 2019, the Court filed a Fifth Amended Scheduling Order pursuant to the request of the parties.  (ECF No. 327).

On March 29, 2019, the City filed a Motion for Leave to File a Third Amended Complaint.  (ECF No. 328).  On May 20, 2019, the Court denied the City's Motion for Leave to File a Third Amended Complaint.  (ECF No. 366).  The Court found that "the City of San Diego fail[ed] to demonstrate good cause within the meaning of [Federal] Rule [of Civil Procedure] 16." *Id*. at 6.

On August 2, 2019, Monsanto filed a Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment against the City (ECF No. 421).[3]  On October 1, 2019, the City filed a Response in Opposition.  (ECF No. 448).  On October 18, 2019, Monsanto filed a Reply.  (ECF No. 456).  On December 6, 2019, the Court heard oral argument on the Motion for Summary Judgment.  (ECF No. 476).

## II.   FACTS

PCBs are compounds consisting of carbon, hydrogen, and chlorine atoms.  PCBs are largely non-biodegradable.  PCBs are virtually indestructible and require incineration at 2,000 degrees Fahrenheit to be destroyed.  Most PCBs do not readily break down and remain in the environment for long periods of time.

Monsanto was the sole manufacturer of PCBs in the U.S.  PCBs were originally manufactured for use as cooling and insulating fluids in heavy-duty electrical equipment, including capacitors and transformers.  For over 40 years, PCB electrical fluids were required in structures where the risks of fires or explosions were major concerns including high-rise buildings, schools, hospitals, and industrial operations because PCBs are fire resistant.  Over time, PCBs came to be used in other products including hydraulic and heat-transfer fluids, lubricants, surface coating, and carbonless copy paper.

PCBs enter the air, water, and soil through manufacture, use, and disposal; from spills during transport; and from leaks in products containing PCBs.  PCBs can be found in particulate form (free floating) or absorbed onto sediment particles.  PCBs can bind to soil and sediment.  PCBs are water insoluble and fat soluble.  PCBs can travel long distances in the air and via suspended solids in water and can be deposited in areas far from where they were originally released.

---

[3] On August 2, 2019, Monsanto also filed Motions for Summary Judgment or, in the Alternative, Partial Summary Judgment against the Port District.  (ECF Nos. 422-24).  On August 2, 2019, the Port District filed a Motion for Summary Judgment against Monsanto.  (ECF No. 426).

In 1976, the Toxic Substances Control Act ("TSCA") was enacted and included provisions for the total regulation of PCBs. In 1979, the Environmental Protection Agency ("EPA") issued rules under the TSCA prohibiting the future production of PCBs.

The EPA has concluded that PCBs are probable human carcinogens. Since 1989, the Office of Environmental Health Hazard Assessment ("OEHHA") of the California Environmental Protection Agency has listed PCBs as cancer-causing. PCBs accumulate rapidly in most animals and are slow to leave the body. The EPA has concluded that the types of PCBs that tend to bioaccumulate in animals and bind to sediments are the most carcinogenic components of PCB mixtures. The EPA has concluded that people who ingest PCB-contaminated animal products and contact PCB-contaminated sediment may be exposed to PCB mixtures that are more toxic than the PCB mixtures contacted by workers and released into the environment. The EPA has concluded that non-cancerous effects of PCBs include skin and eye effects, liver toxicity, elevations in blood pressure, elevations in serum triglyceride, and elevations in serum cholesterol.

Historic concentrations of PCBs in the Bay are associated with heavy industrial shipbuilding and wartime activities. The Bay is listed as impaired for fish consumption under § 303(d) of the Clean Water Act due to mercury and PCBs found in fish tissue. In 2013, OEHHA published an advisory for fish consumption from the Bay due to mercury and PCBs.

In 1963, the City was divested of any property interest in the Bay. However, the City owns, manages, and operates a municipal stormwater and dry weather runoff system, typically referred to as an MS4. The City's MS4 is constructed of numerous conveyance components, including inlets, outfalls, pipes, drains, catch basins, bioswales, gutters, city streets and other infrastructure and systems. The City's MS4 is designed or used to collect or convey stormwater and dry weather runoff to receiving waters. The City's MS4 is designed to move water out of residential, commercial, and industrial areas as quickly as possible to reduce the risk of flooding. The City's MS4 was not designed with any sediment traps to capture sediment or remove pollutants out of the water. During a period

of rain, sediment will move through the system and can exit into receiving waters. The City owns and operates 253 miles of storm drains which discharge into the Bay. The storm water and sediment discharged through the MS4 contain pollutants, including PCBs.

On April 29, 2005, the the San Diego Regional Water Quality Control Board ("Regional Board") issued a Tentative Cleanup and Abatement Order ("Tentative CAO") for the Shipyard Sediment Site, an area of bottom marine sediment located along the eastern shore of the central Bay. *City of San Diego v. Nat'l Steel & Shipbuilding Co.*, No. 09cv2275 WQH (JLB), 2014 WL 3489282, at *1 (S.D. Cal. July 10, 2014), *order clarified*, No. 09cv2275 WQH (BGS), 2014 WL 4415981 (S.D. Cal. Sept. 5, 2014). The Regional Board designated the City as a discharger "for the contamination at the Site" and "set forth proposed cleanup requirements for the Site." *Id.*

On October 14, 2009, the City initiated a contribution and cost recovery action against other parties named as dischargers in the Regional Board's Tentative CAO. *Id.* at *2. The City asserted claims pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and state law, and sought a determination of liability, cost recovery, and contribution pursuant to CERCLA §§ 107 and 113. *Id.* The defendants named as dischargers filed counterclaims against the City and cross-claims against one another. *Id.*

On March 14, 2012, the Regional Board adopted a final Cleanup and Abatement Order (No. R9-2012-0024) ("final CAO") for the Shipyard Sediment Site. The final CAO stated, in relevant part,

> The San Diego Water Board finds that the City of San Diego caused or permitted wastes to be discharged or to be deposited where they were discharged into San Diego Bay and created, or threatened to create, a condition of pollution or nuisance. … The City of San Diego also owns and operates a municipal separate storm sewer system (MS4) through which it discharges waste commonly found in urban runoff to San Diego Bay subject to the terms and conditions of a National Pollutant Discharge Elimination System (NPDES) Storm Water Permit. The San Diego Water Board finds that the City of San Diego has discharged urban storm water containing waste directly to San Diego Bay at the Shipyard Sediment Site. The waste includes

metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, and zinc), total suspended solids, sediment (due to anthropogenic activities), petroleum products, and synthetic organics (pesticides, herbicides, and PCBs) through its SW4 (located on the BAE Systems leasehold) and SW9 (located on the NAASCO leasehold) MS4 conduit pipes. … The urban storm water containing waste that has discharged from the on-site and off-site MS4 has contributed to the accumulation of pollutants in the marine sediments at the Shipyard Sediment Site to levels, that cause, and threaten to cause, conditions of pollution, contamination, and nuisance by exceeding applicable water quality objectives for toxic pollutants in San Diego Bay. …

(Ex. 115 to Julius Decl., ECF No. 448-26 at 4-5; Ex. 42 to Howard Decl., ECF No. 425-47 at 4-5).  The Regional Board ordered the City and the other dischargers to cleanup and abate, prepare and submit a Remedial Action Plan to the Regional Board for review and approval, submit a final Cleanup and Abatement Completion Report to the Regional Board for review and approval, prepare and submit a Post Remedial Monitoring Plan to the Regional Board for review and approval, and prepare and provide written quarterly progress reports.

In January 2015, the City entered into separate CERCLA settlements with additional dischargers National Steel and Shipbuilding Company ("NASSCO") and BAE Systems San Diego Ship Repair ("BAE Systems") to resolve liability for the investigation and cleanup of the Shipyard Sediment Site's South and North Yards.  NASSCO agreed to bear sole responsibility for performing the work required by the final CAO in the Shipyard Sediment Site's South Yard and the City agreed to pay 24% of past South Trust costs, $1,070,204.02 for past response costs, $301,046.18 for past unpaid state oversight costs related to the South Yard, and 24% of future response costs incurred in the South Yard. On April 21, 2015, this Court granted the joint motion filed by NASSCO and the City for a determination of good faith settlement.  *City of San Diego v. Nat'l Steel & Shipbuilding Corp.*, No. 09CV2275 WQH BGS, 2015 WL 1808527, at *15 (S.D. Cal. Apr. 21, 2015). On May 12, 2015, this Court confirmed the good-faith CERCLA settlement between

NASSCO and the City and provided the City with contribution protection against claims covered by the settlement.

BAE Systems agreed to bear sole responsibility for performing the work required by the final CAO in the Shipyard Sediment Site's North Yard and the City agreed to pay $792,880 for past response costs, $124,649.35 for past unpaid state oversight costs related to the North Yard, and 17% of future response costs incurred in the North Yard. On July 14, 2014, this Court granted the good faith settlement motions filed by BAE Systems and the City. *Nat'l Steel & Shipbuilding Co.*, 2014 WL 3489282, at *31. On November 13, 2015, the Court confirmed the good-faith CERCLA settlement between BAE Systems and the City and barred any claims against the City arising out of facts alleged in the counterclaims and cross-claims. (Ex. 88 to Howard Decl., ECF No. 425-99).

From September 2013 to April 2016, remediation work at the Shipyard Sediment Site's South and North Yards occurred, which involved dredging approximately 142,745 cubic yards of sediment with landfill disposal and placing approximately 42,698 tons of clean cover under piers and sloped areas where dredging was not feasible. Pursuant to the CERCLA settlements with NASSCO and BAE Systems, the City spent $15.4 million for investigation and cleanup of the Shipyard Sediment Site's South and North Yards. The full cost of the $15.4 million for the Shipyard Sediment Site's South and North Yards was reimbursed by insurance. In addition, the City has spent $1,726,598.05 to investigate the Chollas, TAMT, CMSD, and Campbell sites in the Bay. The City has further spent $159,463.97 to cleanup the City's storm drains adjacent to the Shipyard Sediment Site.

As the owner of an MS4, the City is required to obtain and adhere to a permit to discharge stormwater into receiving waters in the San Diego region, including the Bay. The City's permit is issued by the Regional Board, pursuant to § 402 of Clean Water Act.

The City is currently subject to the Regional Board's Permit Order No. R9-2013-0001 ("Stormwater Permit"), as amended in 2015, which establishes the "conditions under which pollutants can be discharged from the storm drain system to local streams, coastal lagoons, and the Ocean." (Ex. 98, ECF Nos. 448-20, 448-21). The City's Stormwater

Permit and Jurisdictional Runoff Management Plan ("Management Plan") require the City to address the presence of any pollutant that could cause or contribute to water quality exceedances. The Stormwater Permit states, in relevant part,

> Pursuant to CWA section 402(p)(3)(B), NPDES permits for storm water discharges from MS4s must include requirements to effectively prohibit non-storm water discharges into MS4s, and require controls to reduce the discharge of pollutants in storm water to the maximum extent practicable (MEP), and to require other provisions as the San Diego Water Board determines are appropriate to control such pollutants. This Order prescribes conditions to assure compliance with the CWA requirements for owners and operators of MS4s to effectively prohibit non-storm water discharges into the MS4s, and require controls to reduce the discharge of pollutants in storm water from the MS4s to the MEP.

(Ex. 98 to Julius Decl., ECF No. 448-20 at 6).

The City has not spent money on inspection or maintenance of the MS4 directly attributable to PCBs. The City does not have a present or future PCB-specific inspection policy for investigating any harm to the MS4 created by PCBs. The MS4 has not been physically damaged or structurally altered by the presence of PCBs in the stormwater. The MS4 has not been corroded, eroded, or structurally weakened by the presence of PCBs and the City is not making claims or seeking damages based on such allegations. Nothing has been done to keep the MS4 up to date, to repair the MS4, or to protect the MS4 regarding the presence of PCBs. The City has not made any repairs to the MS4 required by the presence of PCBs and has not contemplated any future repairs to the MS4 to address the presence of PCBs. The City has not implemented any retrofits to the MS4 related to the presence of PCBs and has no plans to retrofit the MS4 due to PCBs. The City has not implemented any upgrades to the MS4 due to PCBs and has not contemplated any future upgrades to the MS4 due to the presence of PCBs. The City does not have any future maintenance plans for the MS4 to specifically address the presence of PCBs. The presence of PCBs in the MS4 does not prevent the infrastructure from operating as it was designed.

The retrofits the City has made to the MS4 in the Chollas Creek areas and other parts of the City are not a part of this action as they were done prior to 2012.

## III.   STANDARD OF REVIEW

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*  A material fact is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The materiality of a fact is determined by the substantive law governing the claim or defense.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

The party moving for summary judgment "bears the burden of establishing the basis for its motion and identifying evidence that demonstrates the absence of a genuine issue of material fact."  *Davis v. U.S.*, 854 F.3d 594, 598 (9th Cir. 2017) (citing *Celotex*, 477 U.S. at 323); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970).  For "an issue on which the nonmoving party bears the burden of proof," the movant discharges its summary judgment burden by "pointing out . . . an absence of evidence to support the nonmoving party's case"—not by "*negating* the opponent's claim."  *Celotex*, 477 U.S. at 323, 325; *see also Sluimer v. Verity, Inc.*, 606 F.3d 584, 586 (9th Cir. 2010).  The burden shifts to the nonmovant to provide admissible evidence, beyond the pleadings, of specific facts showing a genuine issue for trial.  *See Anderson*, 477 U.S. at 256; *Horphag Res. Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007); *see also Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) ("[A] plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations.").  The nonmovant's evidence is to be believed, and all justifiable inferences are to be drawn in its favor.  *See Anderson*, 477 U.S. at 255.  A nonmovant "defeat[s] summary judgment" if "a reasonable juror drawing all inferences in favor of the respondent could return a

verdict in the respondent's favor." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017).

## IV.   DISCUSSION

Monsanto contends that it is entitled to summary judgment on the grounds that there is no evidence to support the claim of harm to City property and the recovery of damages pursuant to the City's public nuisance claim.   Monsanto asserts that the City has not sustained any physical damage due to the presence of PCBs in the MS4.   Monsanto contends that the City is not entitled to recover  public nuisance damages for investigation and cleanup costs in the Bay.

The City contends that Monsanto is not entitled to summary judgment.   The City contends that the presence of PCBs in the City's MS4 constitutes injury to property interests for which the City may recover damages pursuant to California law.   The City further asserts that it has spent $15.4 million on investigation and cleanup of PCBs in the Shipyard Sediment Site pursuant to CERCLA settlements; $1,726,598.05 to investigate the Chollas, TAMT, CMSD, and Campbell sites in the Bay; and $159,463.97 to cleanup the City's storm drains adjacent to the Shipyard Sediment Site.   The City contends that all three costs were a direct result of Monsanto's actions injuriously affecting the MS4.

Under California law, a nuisance is defined as,

Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway[.]

Cal. Civ. Code § 3479.  A nuisance can be public or private.  *See* Cal. Civ. Code §§ 3479-3481.  "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." Cal. Civ. Code § 3480.

> It is this *community* aspect of the public nuisance ... that distinguishes it from its private cousin, and makes possible its use, by means of the equitable injunction, to protect the quality of organized social life.

*People ex rel. Gallo v. Acuna*, 14 Cal. 4th 1090, 1105 (1997) (emphasis in original).

Public nuisance requires a showing that the interference "be both *substantial* and *unreasonable*." *Id.*

> The Restatement Second formulates the requirement of substantiality as proof of 'significant harm,' defined as a 'real and appreciable invasion of the plaintiff's interests,' one that is 'definitely offensive, seriously annoying or intolerable.' The measure is an objective one: 'If normal persons in that locality would not be substantially annoyed or disturbed by the situation, then the invasion is not a significant one ....' The unreasonableness of a given interference represents a judgment reached by comparing the social utility of an activity against the gravity of the harm it inflicts, taking into account a handful of relevant factors. Here again, the standard is an objective one: '[T]he question is not whether the particular plaintiff found the invasion unreasonable, but "whether reasonable persons generally, looking at the whole situation impartially and objectively, would consider it unreasonable."'

*Id.* (internal citations omitted) (alterations in original).

California Code of Civil Procedure § 731 states,

> An action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by a nuisance, as defined in Section 3479 of the Civil Code, and by the judgment in that action the nuisance may be enjoined or abated as well as damages recovered therefor. …

Cal. Civ. Proc. Code § 731. "Where a public entity can show it has a property interest injuriously affected by the nuisance, then, like any other such property holder, it should be able to pursue the full panoply of tort remedies available to private persons." *Selma Pressure Treating Co. v. Osmose Wood Preserving Co.*, 271 Cal. Rptr. 596, 604 (Ct. App. 1990) (interpreting the term "person" in § 731 to include governmental units).

### a. Harm to the MS4

Monsanto contends that the evidence in the record shows that the City has not sustained any physical damage to City property due to the presence of PCBs in the MS4. Monsanto asserts that the City has not made any retrofits or improvements to the MS4 in response to PCBs and has no plans for making any future retrofits or improvements to the MS4 to address PCBs.  Monsanto asserts that the City has not performed any maintenance to the MS4 as a result of PCBs and has no plans for future maintenance of the MS4 to address PCBs.  Monsanto asserts that the City's Stormwater Permit demonstrates the lack of impact from PCBs on the MS4.  Monsanto asserts that the City's Stormwater Permit does not require the City to respond to or monitor PCBs in the MS4.  Monsanto asserts that the City's Management Plan does not identify PCBs as a priority pollutant.  Monsanto asserts that there is no evidence of a substantial and objectively unreasonable interference to the City's free use of its MS4 due to PCBs.

The City contends that the MS4 is substantially harmed by the presence of PCBs. The City contends that the continual and chronic presence of PCBs in the City's MS4 constitutes property damage for which the City may recover pursuant to California law. The City contends that summary judgment is not proper because the issue of substantiality of harm is a question of fact.  The City further asserts that it has spent $15.4 million on investigation and cleanup of PCBs in the Shipyard Sediment Site pursuant to CERCLA settlements; $1,726,598.05 to investigate the Chollas, TAMT, CMSD, and Campbell sites in the Bay; and $159,463.97 to cleanup the City's storm drains adjacent to the Shipyard Sediment Site.  The City contends that all three costs were a direct result of Monsanto's actions injuriously affecting the MS4.

In this case, the evidence in the record establishes that the City owns and operates a municipal separate storm sewer system (MS4) through which it discharges storm water and sediment into receiving waters, including the Bay.  The evidence in the record establishes that the storm water and sediment discharged through the MS4 contain pollutants, including PCBs.

14

The City Attorney's Office Inspector, provided the following information in a deposition:

> Q.      … Are you aware of any City staff reports presented to the city council regarding any public nuisances that the City claims are caused by PCBs?
> A.      [City Attorney's Office Inspector:] I'm unaware of any.
> Q.      Are you aware of any City staff reports to the city council concerning damage to the [MS4] that the City believes was caused by PCBs?
> A.      I'm unaware of any.
> Q.      Are you aware of any City staff reports to the city council regarding any cost or liabilities that the City contends are caused by PCBs?
> A.      I'm not aware of any.

(Ex. 10 to Howard Decl., ECF No. 425-10 at 31).

The Program Manager for the City of San Diego Storm Water Division, provided the following information in a deposition[4]:

> Q.      The City of San Diego made no written record that it believed PCBs should be a highest or focused priority condition?
> A.      [Program Manager for the City of San Diego Storm Water Division:] Not that I'm aware of.
> …
> Q.      And the City admitted that response and stated that it is not making claims or seeking damages based on allegations that the [MS4] has been corroded, eroded or structurally weakened by the presence of PCBs at this time. Is that correct?
> A.      Correct.
> Q.      And does that remain true? The City is not alleging that its [MS4] has been damaged by the presence of PCBs?
> …
> A.      Yeah -- yes.
> Q.      And the City -- well, let me ask for a number -- ask you to review Request for Admission No. 10. It's similar but discusses physically damaged or structurally altered by the presence of PCBs. It asks the City to admit that the City's [MS4] has not been physically damaged or structurally altered by the presence of PCBs in storm water. Did I get that correctly?
> …
> A.      Yes.

---

[4] The deposition included objections, which have been reviewed by the Court.

Q.      And the City admitted this request for admission; correct?

A.      Yes.

Q.      And it remains the City's position that the City's [MS4] has not been physically damaged or structurally altered by the presence of PCBs in the storm water; correct?

…

A.      Correct.

Q.      And the City is not planning to claim any damages based on physical damage to the [MS4] from PCBs in this case; correct?

A.      Correct.

…

Q.      So what this is asking -- what I was asking in my question is that mere presence of PCBs in the [MS4] doesn't prevent the infrastructure from being operated as it was designed; is that right?

…

A.      It would appear that way.

…

Q.      So there are no significant parts of the [MS4] that have to be retrofitted due to PCBs; is that right?

…

A.      Part of the issue with PCBs is that they bioaccumulate; right? So small amounts -- because they bioaccumulate, they -- when they wash through our -- the MS4 … and they go down to the bay, there's opportunity for critters, other biota, to uptake the increased load of PCB, even in small amounts that come down through.

         So with the increased focus by the water board and the concern -- increased concern for human health from the consumption of fish tissue and other shellfish in the area, as time goes on, there's a concern that even those small amounts of sediments that hold PCBs or if PCBs are dissolved in the water column, that retrofits would then need to be made to prevent them from entering the receiving water to reduce bioaccumulation rates and, hopefully, over time eliminate them of PCBs.

Q.      Is that -- the City hasn't currently made any retrofits; is that right?

A.      The retrofits we've made have been at 43rd and Logan and Memorial Park to infiltrate water, and part of the infiltration of water before you can infiltrate, you have to remove trash and remove sediment so that infiltration can occur; otherwise, you clog up your beds.

Q.      Okay.

A.      And those are the ones in the Chollas Creek areas. There's others at other parts of the city.

Q.     Those facilities that you're talking about, though -- those are not part of this case; right?
A.     No. They're prior to 2012.
…
Q.     Okay. So there's no breakout for PCB-related costs and costs related to other constituents?
…
Q.     Is that correct?
A.     That is correct.

(Ex. 127 to Julius Decl., ECF No. 448-30 at 81, 108; Ex. 8 to Howard Decl., ECF No. 425-8 at 17, 50-53).

The Assistant Deputy Director of Operations and Maintenance for the City of San Diego Storm Water Division, provided the following information in a deposition[5]:

Q.     Have you seen this document before?
A.     [Assistant Deputy Director of Operations and Maintenance for the City of San Diego Storm Water Division:] It's a -- the Watershed Asset Management Plan is a huge binder, and I'm not sure if I've seen Appendix A or not.
Q.     Did you have any involvement in preparing the Watershed Management Asset Plan?
A.     Yes.
Q.     Okay. Which portions of it were you involved in preparing?
A.     I provided input on maintenance frequency and possible replacement of components, specifically pump stations is where I became the most involved with. But I may have been in meetings when component life span was discussed as far as pipes or structures as well.
Q.     How about, when you said you were involved with the -- the maintenance part of it, any specific, you know, maintenance plans that you were --
A.     Maintenance frequency is -- in reality is, you know, how frequently do channels need to be maintained or how -- how often should we clean a pump station, you know, catch -- no -- the actual -- well -- well, the pump station, how frequently we should be performing maintenance, or how frequently we do it, not necessarily how frequently we should.

---

[5] The deposition included objections, which have been reviewed by the Court.

17

Q.     And as part of that maintenance frequency work in connection with Watershed Asset Management Plan, was there any discussion around maintenance related to PCBs?

A.     No, not that I was involved with.

Q.     And how about with respect to – I'm sorry, you said the -- the pumps -- so it was the maintenance frequency, and then what was the other piece of it that you were --

A.     Possibly component replacement.

Q.     Component replacement. So in the component replacement discussions, did any of that have to do with needing to replace something due to PCB contamination?

A.     No.

Q.     And in the component replacement, the discussion, I think you said, was mostly around the pumps?

A.     Correct.

Q.     And perhaps some around the -- the pipes?

A.     Possibly.

…

Q.     … So now I want to talk about, has there been maintenance of the conveyance system, the MS4 system, that had to be done related to PCBs?

A.     When you say "maintenance in the conveyance system," can you clarify?

Q.     Anything. Has there been anything to keep the [MS4] up to date or to do repairs or to, you know, protect it that had to do with the presence of PCBs?

A.     No.

Q.     Have there been repairs to the [MS4] that are specifically required because of the presence of PCBs?

A.     No.

Q.     Have you contemplated future maintenance of the [MS4] that would specifically address any presence of PCBs?

A.     No.

Q.     Are there any future repairs contemplated for the [MS4] to address the presence of PCBs?

A.     No.

Q.     Has the City implemented any retrofits to the [MS4] related to the presence of PCBs?

A.     No.

Q.     Does [the City] have any future plans to retrofit the [MS4] due to damage from PCBs?

A.     No.

. . . .

Q.     Has the City implemented any upgrades to the [MS4] due to the presence of PCBs?

A.     No.

Q.     Are there any upgrades contemplated in the future for the [MS4] due to the presence of PCBs?

…

Q.     To the extent you know.

A.     No.

Q.     So presently you haven't seen any plans within the City that would call for an upgrade to the [MS4] because of PCBs?

A.     No. That is correct.

…

Q.     And are you aware of any CIP project, so capital improvement project, that is directed at addressing PCBs in the conveyance system?

A.     No.

...

Q.     To your knowledge, has the City spent money on inspection or maintenance of the [MS4] that is directly attributable to PCBs?

A.     Not to my knowledge.

Q.     Am I correct the City does not have a PCB specific inspection policy for looking at harm to the [MS4] created by PCBs?

A.     Correct.

…

Q.     And the City at this time doesn't have a plan to implement a PCB specific policy for inspecting [for] harm to the [MS4] caused by PCBs?

A.     Did you say future or current?

Q.     In the future.

A.     Not to my knowledge.

Q.     Doesn't have a present plan.

A.     Not to my knowledge.

(Ex. 9 to Howard Decl., ECF No. 425-9 at 8, 23-25).

Monsanto has identified evidence in the record that demonstrates that the MS4 has not sustained physical damage due to the presence of PCBs.  *See Davis*, 854 F.3d at 598 (citing *Celotex*, 477 U.S. at 323).  The evidence in the record shows that the MS4 "has not been physically damaged or structurally altered by the presence of PCBs in storm water" and that the City is "not planning to claim any damages based on physical damage to the [MS4] from PCBs in this case."  (Ex. 8 to Howard Decl., ECF No. 425-8 at 50-51).  The

evidence in the record shows that the City "is not making claims or seeking damages based on allegations that the [MS4] has been corroded, eroded or structurally weakened by the presence of PCBs …." *Id*. at 50. The evidence in the record shows that the "mere presence of PCBs in the [MS4] doesn't prevent the infrastructure from being operated as it was designed." *Id*. at 52. The evidence in the record shows that the retrofits the City has made to the MS4 "in the Chollas Creek areas" and "other parts of the City" are beyond the scope of this case because they were done "prior to 2012." *Id*.

Monsanto has discharged its burden by "pointing out . . . an absence of evidence," *Celotex*, 477 U.S. at 323, 325, to show harm to the MS4 caused by the presence of PCBs that is "both substantial and unreasonable." *People ex rel. Gallo*, 14 Cal. 4th at 1105; *see Zack's, Inc. v. City of Sausalito* 165 Cal. App. 4th 1163 (2008) (finding that an unlawfully closed or obstructed street was a substantial and unreasonable interference to constitute a public nuisance). The burden shifts to the City to provide admissible evidence, beyond the pleadings, of specific facts showing a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *see e.g.*, *Daniel & Francine Scinto Found. v. City of Orange*, No. SA CV 15-1537-DOC (JCGx), 2016 WL 4150453, at *8 (C.D. Cal. Aug. 3, 2016) (denying the plaintiff's Motion for Summary Judgment because "[e]ven if this evidence were sufficient to show interference with Plaintiff's use and enjoyment of its property (which the Court does not find), Plaintiff has failed to point to evidence in the record (or cite any authority) showing that the interference was substantial and unreasonable"); *Bolbol v. Feld Entm't, Inc.*, No. C 11-5539 PSG, 2013 WL 257133, at *8 (N.D. Cal. Jan. 23, 2013) ("The court doubts that Plaintiffs have provided sufficient evidence to show that Feld's employees' intermittent animal walks amount to 'substantial' and 'unreasonable' interference with sidewalks such as to be labeled a 'nuisance' . . . .");

The evidence in the record shows that the City has not done anything to "to keep the [MS4] up to date," "to do repairs" on the MS4, or to "protect [the MS4] that had to do with the presence of PCBs." (Ex. 9 to Howard Decl., ECF No. 425-9 at 23). The evidence in the record shows that the City has not made any "repairs to the [MS4] that are

specifically required because of the presence of PCBs" and has no "future repairs contemplated for the [MS4] to address the presence of PCBs." *Id*. The evidence in the record shows that the City has not "implemented any retrofits to the [MS4] related to the presence of PCBs" and does not "have any future plans to retrofit the [MS4] due to damage from PCBs." *Id*. The evidence in the record shows that the City has not "implemented any upgrades to the [MS4] due to the presence of PCBs" and has no "upgrades contemplated in the future for the [MS4] due to the presence of PCBs." *Id*. The evidence in the record shows that the City has not "contemplated future maintenance of the [MS4] that would specifically address any presence of PCBs." *Id*. The evidence in the record shows that the components of the MS4 which require replacement (pumps and pipes) do not "have to do with needing to replace something due to PCB contamination." *Id*. at 8. The Court concludes that the City has failed to present specific facts showing "substantial and unreasonable" harm to the MS4 caused by the presence of PCBs. *People ex rel. Gallo*, 14 Cal. 4th at 1105.

### b. Investigation and Clean-Up Costs

Monsanto contends that the City may not recover any public nuisance damages associated with the investigation and cleanup of Bay sites. Monsanto asserts that there is no evidence to support the claim that investigation and cleanup damages are a result of Monsanto's actions injuriously affecting the City's property. Monsanto further asserts that the City's cleanup damages have been fully funded and reimbursed by insurance. Monsanto contends that the City is not permitted to seek double recovery for these reimbursed cleanup costs.

The City contends that all of the investigation and cleanup costs were a direct result of PCB contamination in the MS4 owned and operated by the City. The City contends that the investigation and cleanup costs would not have been necessary absent the PCB contamination caused by Monsanto. The City further contends that the collateral source rule applies to allow recovery from a tortfeasor even when the exact same costs were reimbursed by insurance.

In this case, the evidence in the record shows that the cleanup costs incurred by the City were a result of multiple pollutants identified by the Regional Board. On March 14, 2012, the Regional Board designated the City as a discharger responsible for "caus[ing] or permit[ing] wastes to be discharged or to be deposited where they were discharged into [the] Bay and created, or threatened to create, a condition of pollution or nuisance." (Ex. 115 to Julius Decl., ECF No. 448-26 at 4; Ex. 42 to Howard Decl., ECF No. 425-47 at 4). The Regional Board found that the waste discharged into the Bay by the City's MS4 contained "metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, and zinc), total suspended solids, sediment ..., petroleum products, and synthetic organics (pesticides, herbicides, and PCBs) ...." (Ex. 115 to Julius Decl., ECF No. 448-26 at 4; Ex. 42 to Howard Decl., ECF No. 425-47 at 4). The evidence demonstrates that the Regional Board's designation of the City as a discharger was a result of multiple pollutants.

The City relies upon the expert report of J. Michael Trapp to show that it has spent "$15.4 million for the investigation and cleanup of PCBs at the BAE/NASSCO Shipyard sites as a result of the City's discharge of PCBs from the MS4 and its contribution to the PCB nuisance in the Bay;" "$1,726,598.05 on investigations related to PCBs at various sites in San Diego Bay as a direct result of its discharge of PCBs from the MS4, in order to address the nuisance caused by PCBs;" and "$159,463.97 to clean PCB contaminated sediment out of its storm drains adjacent to the former Campbell Shipyard site." (Pl.'s Separate Statement of Facts ¶ 117, ECF No. 448-1 at 96, 98-99). The expert report states, in relevant part,

> Actions that the City has taken pertaining to the BAE/NASSCO Shipyard cleanups are deemed reasonable and necessary because they were based on regulatory requirements from the [Regional] Water Board and duties of the City as MS4 owner and operator. ... The review of the invoices indicates that the City incurred $1,726,598.05 for the Chollas, TAMT, CMSD, and Campbell site investigations; the costs are deemed necessary and reasonable. ... Actions that the City has taken pertaining to the Chollas, TAMT, CMSD, and Campbell investigations are deemed reasonable and necessary because

they were based on regulatory requirements from the San Diego Water Board and duties of the City as MS4 owner and operator. … Additionally, the review of the invoices indicates the City incurred $159,463.97 specific to cleanups of City's storm water drains to the BAE/NASSCO Shipyard site; the costs are deemed necessary and reasonable. …

(Ex. 8 to Julius Decl., ECF No. 448-4 at 34-35).  However, the regulatory requirements from Regional Board designated the City as a discharger of multiple pollutants including "metals (arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, and zinc), total suspended solids, sediment …, petroleum products, and synthetic organics (pesticides, herbicides, and PCBs) …."  (Ex. 115 to Julius Decl., ECF No. 448-26 at 4; Ex. 42 to Howard Decl., ECF No. 425-47 at 4).  Plaintiff's expert report does not include specific facts to support the conclusion that the investigation and cleanup costs incurred by the City were a direct result of PCB contamination in the City's MS4.  There is no evidence in the record to support the conclusion that the investigation and cleanup costs incurred would have been unnecessary without the presence of PCBs.

The evidence in the record shows that there is "no breakout for PCB-related costs and costs related to other constituents."  (Ex. 127 to Julius Decl., ECF No. 448-30 at 108; Ex. 8 to Howard Decl., ECF No. 425-8 at 53).  The evidence shows that there is no "written record" created by the City reflecting that "PCBs should be a highest or focused priority condition."  (Ex. 127 to Julius Decl., ECF No. 448-30 at 81; Ex. 8 to Howard Decl., ECF No. 425-8 at 17).  The evidence shows that the City has not "spent money on inspection or maintenance of the [MS4] that is directly attributable to PCBs."  (Ex. 9 to Howard Decl., ECF No. 425-9 at 24).  The evidence shows that the City does not "have a PCB specific inspection policy for looking at harm to the [MS4] created by PCBs" and "doesn't have a plan to implement a PCB specific policy for inspecting [for] harm to the [MS4] caused by PCBs" presently or in the future.  *Id.* at 24-25.  The evidence shows that there are no "City staff reports presented to the city council" "regarding any public nuisances that the City claims are caused by PCBs," "damage to the [MS4] that the City believes

23

was caused by PCBs," and "any cost or liabilities that the City contends are caused by PCBs."  (Ex. 10 to Howard Decl., ECF No. 425-10 at 31).

The evidence in the record establishes that investigation and cleanup costs incurred by the City related to multiple pollutants, including PCBs.  The City has failed to come forward with evidence to show that the presence of PCBs in the MS4 directly resulted in the investigation and cleanup costs.  The City has failed to establish a substantial connection between the investigation and cleanup costs incurred and the presence of PCBs in the Bay.

## V.    CONCLUSION

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment against Plaintiff City of San Diego (ECF No. 421) is GRANTED.

Dated:  March 26, 2020

Hon. William Q. Hayes
United States District Court